IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal Case No. 18-00010 |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| JOHN D. WALKER, et al., | ) |
| | ) |
| Defendants. | ) |

TRIAL TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD,
CHIEF JUDGE
MAY 17-18, 2022; 4:47 P.M.
HAGATNA, GUAM

**Testimony of Sergio Lopez**

(Jury Trial Excerpt)

Veronica F. Flores, CSR-RPR
Official Court Reporter
veronica_flores@gud.uscourts.gov

APPEARANCES


Appearing on behalf of plaintiff:


**OFFICE OF THE UNITED STATES ATTORNEY**
**BY: MARIE MILLER, SAUSA,**
**SAMANTHA MILLER, SAUSA,**
**STEPHEN LEON GUERRERO, AUSA**
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam 96910
(671) 472-7332


Appearing on behalf of Defendant Walker:

**MARTIN LAW OFFICE**
**BY: MACK K. MARTIN, ESQ.**
125 Park Avenue, 5th Floor
Oklahoma City, OK 73102
(405) 236-8888


Appearing on behalf of Defendant Hansen:

**MCCONWELL LAW OFFICES**
**BY: EDWARD A. MCCONWELL, SR., ESQ.**
**LAURA MCCONWELL, ESQ.**
5201 Johnson Drive, Suite 300
Mission, KS 66205
(913) 262-0605

**LAW OFFICE OF EDWARD C. HAN**
**BY: EDWARD C. HAN, ESQ.**
238 Archbishop Flores Street
DNA Building, Suite 802
Hagatna, Guam 96910
(671) 477-5055


ALSO PRESENT:

Jon D. Walker, Defendant

Carmen Santos, Clerk

I N D E X

|  | Direct | Cross | Redirect | Recross |
|--|--------|-------|----------|---------|

**GOVERNMENT**
**WITNESS:**

Sergio Lopez       5 SLG     125 EM
                              255 MM

**EXHIBITS:**

|  | Description | Page |
|--|-------------|------|

G-0523   E-mail from Crowe to Walker and Kapp
         Re: Completing the IA renewal forms
         for Cislo and Cislo telling them not to
         worry about the accuracy                      106

G-0818   SEIT/FAA comm re applicable regs             234

G-139-2  Airworthiness Certificate File for
         N9068F (Lopez)                                273


              * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


Court ordered all deposition information be filed
and given to all other parties                        306

Hearing to resume at 10:30 a.m.                       307

```
 1                    May 17, 2022; 4:47 p.m.; Hagatna, Guam

 2                          (Beginning of excerpt.)

 3                                  * * *

 4

 5              THE COURT:  Okay.  Are we ready for your next

 6    witness?  The next break will be dinner break at 5:15, but are

 7    you ready for your next witness to start with him?

 8              MR. LEON GUERRERO:  We are, Your Honor.

 9              THE COURT:  Okay.  Mr. Leon Guerrero, who is

10    this?

11              MR. LEON GUERRERO:  It's Mr. Sergio Lopez.

12              THE COURT:  Sergio Lopez to the stand.

13              THE CLERK:  Sir, please raise your right hand.

14    Do you solemnly swear that the testimony you are about to give

15    in the case before the Court will be the truth, the whole

16    truth and nothing but the truth, so help you God?

17              THE WITNESS:  I do.

18              THE CLERK:  Thank you, sir.  Please be seated.

19    Please state your full name and spell your last name for the

20    record.

21              THE WITNESS:  Sergio Lopez, L-O-P-E-Z.

22              THE COURT:  Let me just ask, do you guys want to

23    take all this down here?  Do we need keep all these exhibits

24    here, or is this witness going to use it?

25              MR. LEON GUERRERO:  He's not, Your Honor.
```

*Direct - Lopez*

```
1              THE COURT:  Yeah, you want to take these out?
2              MR. LEON GUERRERO:  Sure.
3              THE COURT:  Can you just do that, or can we put
4    it down there, do you have room?  Or if you don't have room.
5    Okay.  Never mind.  They don't have room.  You want to put it
6    over there?  You guys have room back there?  Oh, those are
7    admitted.  Okay.  That's fine we'll take care of it later.
8    All right.  So you don't need these exhibits for this witness
9    or any other witness coming back?
10             MR. LEON GUERRERO:  That's correct.  At least for
11   this witness we're not.
12             THE COURT:  All right.  So we'll remove it at the
13   next break.  Okay.  Go ahead.
14             MR. LEON GUERRERO:  Thank you, Your Honor.
15             THE COURT:  Okay.  Go ahead, Mr. Lopez, or I'm
16   sorry, Mr. Leon Guerrero.
17
18                       DIRECT EXAMINATION
19   BY MR. LEON GUERRERO:
20   Q.   Mr. Lopez, can you please tell the members of the
21   jury what is your formal education?
22   A.   I attended college in Miami Dade College and also
23   aviation school in Miami, Florida.
24   Q.   And, sir, what is your current position?
25   A.   I'm presently the manager of the FAA South Florida
```

*Direct - Lopez*

1    Flight Standards District Office, also known as FSDO, but

2    Flight Standards District Office.

3        Q.    And can you please tell members of the jury how long

4    have you been in your position?

5        A.    The present position as a manager, I've been there

6    17 years.

7        Q.    And what are your duties and responsibilities as a

8    manager with the FSDO office?

9        A.    The office covers all southern part of Florida, we're

10   responsible for the oversight and certification and

11   surveillance of air carriers, pilot schools, maintenance,

12   mechanic schools, repair facilities that work on aircraft on

13   the title -- excuse me -- on the CFR Part 145, training

14   centers, pilot training centers.  And all general -- general

15   aviation in that area, as well as we do accident

16   investigations of accidents, aircraft accidents in the

17   southern part of Florida.

18       Q.    And did you receive any additional training in -- as

19   a manager with the FSDO office?

20       A.    As a manager we received significant training in

21   labor relations, in ethics, in management techniques.  Yes, we

22   receive quite a bit of formal training.

23       Q.    And, sir, do you receive any ethics training as a

24   manager with the FSDO office?

25       A.    Absolutely.  We receive it yearly, we receive

1   training.

2          THE COURT:  I'm sorry, so what's FSDO, what does

3   that mean?

4          THE WITNESS:  It's Flight Standard District

5   Office.  So we -- an acronym is FSDO.

6          THE COURT:  Oh, FSDO.

7          THE WITNESS:  F-S-D-O.

8          THE COURT:  FSDO, okay.

9          THE WITNESS:  I said that -- just in case I --

10          THE COURT:  All right.  Thank you.  Flight

11   Standard District Office.

12          THE WITNESS:  District office.

13          THE COURT:  FSDO.

14          THE WITNESS:  FSDO.

15          THE COURT:  Okay.  Thank you.

16   BY MR. LEON GUERRERO: (CONTINUING)

17      Q.   And you indicated, sir, that you received ethics

18   training, do any of your subordinates receive ethics training?

19      A.   All the employees in the office of the FAA receive

20   ethics training, specifically inspectors, yes.

21      Q.   And as the manager, do you require inspectors under

22   you to interact with owner-operators of, I'm sorry, of

23   aviation entities?

24      A.   Yes, on a regular basis inspectors talk to

25   owner-operators.

*Direct - Lopez*

1    Q.   Okay.

2    A.   Deal with owner-operators.

3    Q.   And why you do you require that?

4    A.   Because the owner-operator typically the primary
individuals that are responsible for whatever organization
we're dealing with, whether it's flight school, whether it's
just a general aviation aircraft owner, repair station,
whatever that may be in aviation, they're typically the
responsible party.

10   Q.   And, sir, you just talked about what your current
position is.  Can you please tell members of the jury what was
your first position in the aviation industry?

13   A.   My first position in aviation was with Pan Am World
Airways, the airlines.  I worked there in the Avionics
Department and Maintenance in New York.  I started with them
in New York in J.F. Kennedy Airport.

17   Q.   And can you please tell the members of the jury what
were your duties and responsibilities while working as an
avionics technician?

20   A.   We troubleshot and fixed electronics and aircraft
electrical systems and general aircraft systems from the 727,
the 737, the 747, the 83 Airbus -- 8300 aircraft that Pan Am
operated.

24   Q.   And, sir, did you receive any additional training
while working as an avionics technician?

1    A.   Yes, we received aircraft specific trainings and
2    electronic training as well.

3    Q.   And was there a position that you occupied after
4    working for Pan Am?

5    A.   Yes.  An industry I also worked for Arrow Air, was a
6    cargo operator under Part 121, so a large transport carrier
7    that operated DC8s and 727s.

8    Q.   And what were your duties, I'm sorry, what additional
9    training, if any, did you receive while working for Arrow Air?

10   A.   I also received aircraft specific training in those
11   areas, as well as management training.

12   Q.   After working for Arrow Air, did you have another
13   position in the aviation industry?

14   A.   No, that was my last position before I got on with
15   the FAA.

16   Q.   And your first position with the FAA, where did you
17   work?

18   A.   In 1995, I started with the FAA at the Farmingdale
19   Flight Standards District Office in Long Island, New York.

20   Q.   And what were your duties and responsibilities in
21   that position?

22   A.   I was an inspector, airworthiness inspector, avionic
23   specialty.  I was responsible for certification, ongoing
24   surveillance, investigations, and accident investigations as
25   well.  I was dealing with 91 operators, dealing with air

1  carrier operators, general aviation operators, repair stations

2  that work on aircraft and flight schools and their aircraft as

3  well.

4  　Q.　And, sir, how long did you work in that position?

5  　A.　I was in that position for three years to 1998.

6  　Q.　And did you receive any additional training while

7  working in that position?

8  　A.　Yes.  When we first start as an inspector, we spend

9  about three months in Oklahoma City and in formal training to

10 learn how to be an inspector and then from there, we go on

11 continuous training, different areas and specialties so we're

12 constantly getting trained; yes.

13 　Q.　And, sir, what was your next position within the FAA?

14 　A.　I accepted a position in Miami, FAA Miami

15 International Field Office.

16 　Q.　And what were your duties and responsibilities while

17 working as an avionics inspector in Miami?

18 　A.　Initially, in Miami International Field Office, my

19 position was a principal avionics inspector, airworthiness

20 inspector, and we had responsibility for repair stations, they

21 were certificated in South America, Central America and

22 Caribbean, we were authorized to work on U.S.-registered

23 aircraft.  So we would travel to those countries to do

24 surveillance on those repair stations as well, we did --

25 inspected the aircraft that flew in, foreign aircrafts, that

*Direct - Lopez*

1    flew into the United States, we inspected those, as well and

2    their Part 129 of the Code of Federal Regulations.

3         Q.   Yes, sir, and did you receive any additional training

4    while working in that position?

5         A.   Yes.  We received significant, again, significant

6    training on inspection, especially we're dealing with foreign

7    repair stations.  So we got additional training.

8         Q.   And what was your next position after that within the

9    FAA?

10        A.   I took a management position in Miami International

11   Field Office as a frontline manager or supervisor shortly

12   after being there.

13        Q.   And can you please tell the members of the jury what

14   were your duties and responsibilities as a frontline manager?

15        A.   So it expanded a little when I became a supervisor or

16   frontline manager.  Not only did I have responsibility to

17   oversee all the inspectors that were on my team, which were

18   about 15 inspectors, that traveled to South and Central

19   America and the Caribbean to inspect the U.S.-certificated

20   repair station, but I also was involved with the FAA

21   assessment, International Aviation Safety Assessment Program,

22   which we would travel to foreign country and assess the

23   foreign civil aviation authority to determine if compliance

24   with international standards so the foreign carriers could

25   operate into the U.S.

 1        Q.    And, sir, when you were doing those kind of
 2    assessments, were you doing that under any kind of regulation
 3    or order?
 4        A.    We were doing it in accordance with the FAA
 5    International Aviation Safety Assessment Program.
 6        Q.    Got it.  And, sir, are you familiar with the
 7    International Civil Aviation Organization?
 8        A.    I am.
 9        Q.    And how are you familiar with that?
10        A.    I trained with them for almost a month, I was part of
11    their International Universal Oversight Program, which was
12    kind of the same as the FAA's International Aviation Safety
13    Program.  So as part of ICAO, I was still working for the FAA,
14    but I would go on teams with ICAO, or International Civil
15    Aviation Organization, around the world and assess and do an
16    audit of foreign civil aviation authorities.  So very similar
17    to what the FAA was doing with the International Aviation
18    Safety Assessment Program.
19        Q.    And, sir, can you please tell members of the jury how
20    long did you serve in that capacity?
21        A.    I served from 1998 to 2005, so about seven years.
22        Q.    So you've given the jury an overview of all your
23    aviation experience to include the FAA, can you please tell
24    members of the jury how many years of aviation experience do
25    you have?

     A.   In total, total aviation experience, about 35 years I
would say.

     Q.   And, sir, do you have any FAA certifications?

     A.   I do.  I hold a FAA airframe and powerplant
certificate, it's also known as an A&P, but airframe and
powerplant certificate.

     Q.   And could you please tell members of the jury what
exactly is an airframe and powerplant certificate?

     A.   That's a certificate that an individual requires to
have to work on U.S.-registered aircraft.  If you're going to
be a mechanic on U.S.-registered aircraft, you have to possess
an A&P, and -- holding just an A means you could work on the
airframe and the aircraft or its components, holding a
powerplant certificate means you could work on the powerplant,
the engines of the aircraft, so having A&P means that you
could work on both aspects of the aircraft.

     Q.   And, sir, could you please tell the members of the
jury how exactly did you receive your A&P certificate?

     A.   I received it through experience, the regulations
allow for certificates to be gained through experience,
30 months' experience and then you have to get authorization,
back then I wasn't with the FAA so you go and get
authorization from the FAA to take the test, you take a
knowledge test first, once you take -- once you get the
authorization, you go take a knowledge test, once you pass the

1  knowledge test, then you go take a practical test.

2          So they give you examples on how to fix things and --

3  or ask you how to fix things, then you take it.  So it's a

4  lengthy process to get your certification.

5      Q.   And, sir, how long have you had your A&P

6  certification?

7      A.   Since approximately 1992, so I'd say about 30 years.

8          MR. LEON GUERRERO:  Your Honor, at this time, the

9  government will move Mr. Lopez as an expert in airworthiness,

10  in safe flight operations of aircraft, air agency and airman.

11          THE COURT:  I'm sorry, wait, okay.  So in air --

12  I'm sorry.

13          MR. LEON GUERRERO:  Airworthiness.

14          THE COURT:  And what's the other one?

15          MR. LEON GUERRERO:  Safe flight operations of

16  aircraft, air agency --

17          THE COURT:  Wait, wait, safe flight operations

18  and aircraft, and what's the third one?

19          MR. LEON GUERRERO:  Air agency and airman.

20          THE COURT:  Air agency and airman?

21          MR. LEON GUERRERO:  Correct.

22          THE COURT:  Okay.  Any objections, Counsels?

23          MR. MARTIN:  Your Honor, I would say that this is

24  a question for the credibility of a witness that the jury is

25  to decide and that the Court making such a preliminary finding

1  would be inappropriate at this time.

2           THE COURT:  Well --

3           MR. MARTIN:  There are jury instructions on it,

4  Your Honor.

5           THE COURT:  I'm sorry, well, there will be an

6  instruction -- let me just -- there will be an instruction --

7  okay.  So the first issue is, should the Court -- has the

8  prosecution, through this witness's testimony, established him

9  as an expert in the field of these areas, and the Court can

10  say, ladies and gentlemen, this person is qualified based on

11  his experience, training, knowledge, schooling.  And -- but

12  there will be a jury instruction that it's up to the jury to

13  decide whether they believe everything this witness says, some

14  of it or none of it.  So I will give that instruction.

15           MR. MARTIN:  Okay.  Well, I'd ask the Court to

16  note my objection.

17           THE COURT:  All right.  But your objection is,

18  I'm sorry, that it's up to the jury to decide his credibility,

19  and I agree with, that, and I'm going to give him an

20  instruction to that effect.  All right.  Yes, Mr. McConwell?

21           MR. MCCONWELL:  Yes, Your Honor.  I object to the

22  foundation of Mr. Lopez, as an expert in this matter.  There's

23  been no reference to any field experience, working on

24  maintenance of helicopters , operation of helicopters, either

25  domestically or in international waters or outside the

1    territory of the United States.

2              THE COURT:  Okay.

3              MR. MCCONWELL:  Or the rules and regulations

4    relating to that.  And I don't think he qualifies as an expert

5    to opine on the quality, maintenance, by Hansen or anyone else

6    related to the defendants in this case, at this point.

7              THE COURT:  All right.  So are you saying as it

8    relates to the request by Mr. Leon Guerrero, that this witness

9    should be qualified an expert in airworthiness, he does not

10   have the qualifications for that?

11             MR. MCCONWELL:  In airworthiness of helicopters,

12   inspection of helicopters, determining --

13             THE COURT:  And also --

14             MR. MCCONWELL:  Methods, Part 43 maintenance, he

15   has no experience that he's talked about so far.

16             THE COURT:  All right.  And then, how about the

17   safe flight operation and aircraft?

18             MR. MCCONWELL:  Well --

19             THE COURT:  Is that -- you're saying that any --

20   that the matters that he's testified to do not qualify for

21   this?

22             MR. MCCONWELL:  I do.  He's not talked about the

23   fact that there are civil aircraft flying around that public

24   entities that have no maintenance requirements or --

25             MS. M. MILLER:  Objection, Your Honor.  Relevance

*Direct - Lopez*

1   of a public aircraft --

2                  THE COURT:  Wait.  Hold on, Ms. Miller.  Isn't

3   Mr. Leon Guerrero going to do this?

4                  MS. M. MILLER:  Well, he is, but I thought --

5                  THE COURT:  Wait, no, no, no.  Leon Guerrero, let

6   him do it.

7                  MR. LEON GUERRERO:  I'm just waiting for him to

8   finish.

9                  THE COURT:  You're the prosecutor, do it.  What's

10  your response?

11                 MR. LEON GUERRERO:  So the response is --

12                 THE COURT:  Hold on.  Let me just ask one last

13  question.  On the air agency and airman, I don't understand

14  that, that qualification issue.  I'm not sure about that, so I

15  have a problem with that.  I -- I don't know what that means.

16                 MR. LEON GUERRERO:  He can explain, Your Honor.

17                 THE COURT:  Well, I know, but -- all right.  So

18  as far as his -- any other objections?

19                 MR. MCCONWELL:  Well, he has no experience in the

20  registration or operation of helicopters, is a major issue.

21                 THE COURT:  Is that for the safe flight operation

22  that he's talking about?  It's not clear.

23                 MR. MCCONWELL:  It's unclear to me, I've never

24  even heard of it before, but it's unclear to me what the scope

25  of that is.  It sounded to me like it was international air

*Direct - Lopez*

1    travel of airlines.

2              THE COURT:  Never mind what it seems to you,

3    but -- okay.  I don't understand either.  But, okay.  Anything

4    else?  Any other objection?

5              MR. MCCONWELL:  Well, just objection that he has

6    no international --

7              THE COURT:  Qualification?

8              MR. MCCONWELL:  His experience is international

9    airline from an ICAO standpoint, I think.  That's it.  But he

10   just lacks the qualifications to talk about general aviation,

11   which we're talking about Part 91 is what it's called.

12             THE COURT:  Okay.  Thank you.

13             MR. MCCONWELL:  Thank you.

14             THE COURT:  All right.

15             MR. LEON GUERRERO:  Yes, Your Honor.  So with

16   respect --

17             THE COURT:  On the airworthiness, you're asking

18   --  okay, so airworthiness, okay, he's objecting to

19   airworthiness.  So what have you shown that he -- that this

20   witness is an expert in airworthiness of, is it helicopters or

21   all aircraft?

22             MR. LEON GUERRERO:  Well, Your Honor, with this

23   witness as a manager of the FSDO office in South Florida, he

24   oversees all of the safety inspectors that cover both rotor

25   wing and fixed-wing aircraft in his office.  So --

1          THE COURT:  Okay, so the question is though, does

2     he -- this airworthiness, does that mean that he certifies

3     that something is airworthy?

4          MR. LEON GUERRERO:  Yeah, as far as inspections,

5     maintenance of aircraft, that all goes through his office,

6     he's aware of all those inspections that take place because

7     those are under his purview with the inspectors that conduct

8     them and --

9          THE COURT:  So he testified to that?

10          MR. LEON GUERRERO:  Yes.

11          THE COURT:  Did he testify to that?

12          MR. LEON GUERRERO:  He talked about the safety

13     inspectors that work with him.

14          THE COURT:  All right.  The safe -- okay.  What

15     about safe flight operation and aircraft?

16          MR. LEON GUERRERO:  He's talked about his

17     extensive experience with avionics, being an avionics

18     technician, went into detail on how the aircraft that he was

19     working on, to make sure it was functional, that it was

20     working, operating in a safe manner.  He testified to that.

21          THE COURT:  All right.  And so I don't understand

22     what is an expert in air agency and airman?  What does that

23     mean?  That's not clear to the Court what -- what your -- when

24     you ask for a qualification as an expert in the field, what is

25     he -- where did he testify -- what is air agency and airman

1  mean?

2                MR. LEON GUERRERO:  So he oversees --

3                THE COURT:  Well, did he testify to what air

4  agency and airman meant, that's my question.

5                MR. LEON GUERRERO:  He testified about the

6  different sections that he covers which goes to air agency,

7  the maintenance and then --

8                THE COURT:  He's an expert in air agency.  Let me

9  just ask him.

10                MR. LEON GUERRERO:  Sure.

11                THE COURT:  Okay.  Mr. Lopez, why -- what does it

12  mean to be expert in air agency?

13                THE WITNESS:  Air agency, the FAA defines them as

14  repair stations under Part 145, flight schools under 142 --

15  141, flight training --

16                THE COURT:  What are you citing to, what's 145?

17                THE WITNESS:  That's a code of federal

18  regulation.

19                THE COURT:  Okay, so you're citing to the code of

20  federal.  So the actual code section?

21                THE WITNESS:  Yes, correct.

22                THE COURT:  All right.  So when it says you're

23  an -- they're asking to be an expert in air -- qualify you as

24  expert in air agency, what does air agency mean?

25                THE WITNESS:  So the FAA defines those sections

*Direct - Lopez*

 1  of the regulation that we issue certificate to as air agency.

 2  So if we certify you under 145, the regulation which is a

 3  maintenance facility that works on aircraft, any type of

 4  aircraft, both general aviation aircraft, helicopters, to big

 5  aircrafts, you're certified under 145 of Title 14 Code -- Code

 6  of Federal Regulations, and those under that umbrella is an

 7  air agency --

 8              THE COURT:  Code 145 means air agency

 9  certification?

10              THE WITNESS:  Means repair station, but the under

11  the umbrella of the FAA, the air agency, there are several

12  sections that we cover, 145, 141, 142 and --

13              THE COURT:  Okay, but for purposes of qualifying

14  you as an expert, you're focusing on 145 for air agency?

15              THE WITNESS:  Air agency, also as well as flight

16  schools which is under 141.

17              THE COURT:  Okay.  And what is -- you're an

18  expert in airman, what does that mean?

19              THE WITNESS:  Airman is mechanics under Part 65.

20              THE COURT:  So you're an expert in what, how

21  they --

22              THE WITNESS:  How they get certified, I am one.

23  I mean, so I worked on aircraft.

24              THE COURT:  Okay.  So you're asking -- they're

25  asking, I guess it's just the way it was presented to the

```
1    Court, you're saying that you are qualified to talk to the
2    jury about how somebody -- like a mechanic is certified?
3                    THE WITNESS:  (Nodded head.)
4                    THE COURT:  Under the FAA Code of Federal
5    Regulations.
6                    THE WITNESS:  Correct.
7                    THE COURT:  Okay.  And then air agency is how the
8    aircraft is certified?
9                    THE WITNESS:  Air agency -- a repair station is
10   an entity that could be certified under those rules, under
11   145.
12                   THE COURT:  Okay.
13                   THE WITNESS:  And they could work on aircraft as
14   well.
15                   THE COURT:  So how a repair station can be
16   certified to work on FAA --
17                   THE WITNESS:  Aircraft.
18                   THE COURT:  Aircraft.
19                   THE WITNESS:  Correct.
20                   THE COURT:  Okay.  Got that.  All right.  And
21   then airworthiness of -- is it airworthiness of all aircraft
22   that you're talking -- that you're qualified for?
23                   THE WITNESS:  Correct.
24                   THE COURT:  And so what does airworthiness mean?
25                   THE WITNESS:  The airworthiness is the
```

1    determination on aircraft that is safe for the intended flight

2    and meets certain regulations.

3                    THE COURT:  Okay.  So -- and you've been trained

4    under that?

5                    THE WITNESS:  That's my specialty.  I'm an

6    airworthiness inspector.

7                    THE COURT:  And the Flight Standard District

8    Office handles those issues?

9                    THE WITNESS:  Yes, our inspectors are all --

10   that's all we do.  We're about a 122 individuals and, yes,

11   that's our area of focus.

12                   THE COURT:  All right.  And safe flight

13   operations and aircraft, what is that?

14                   THE WITNESS:  That's under -- there is numerous

15   operation rules in the Code of Federal Regulation for

16   airplanes, one is 91, the general aviation, so that's --

17                   THE COURT:  When you say 91, Code of Federal reg

18   section?

19                   THE WITNESS:  Title 14, Code of Federal

20   Regulation, Part 91.

21                   THE COURT:  So regulation 91?

22                   THE WITNESS:  Correct, Part 91.  It's a huge

23   section, but that covers all the general operations

24   requirements for general aviation aircraft.

25                   THE COURT:  So it covers for operations and the

*Direct - Lopez*

1    aircraft?

2                   THE WITNESS:  For the operation --

3                   THE COURT:  He said safe flight operation and

4    aircraft.

5                   THE WITNESS:  Right.  So the safe operation of

6    aircrafts.

7                   THE COURT:  Of aircraft?

8                   THE WITNESS:  Yeah.

9                   THE COURT:  Not and aircraft?

10                   THE WITNESS:  Of aircraft.

11                   THE COURT:  Okay.  You said and aircraft.  So

12   safe flight operation of an aircraft?

13                   THE WITNESS:  Yeah, under General Aviation rules.

14                   THE COURT:  Okay.  All right.  Counsels?  Still

15   object.

16                   MR. MCCONWELL:  You say your experience is in 145

17   certification?

18                   THE WITNESS:  My experience is -- we cover part

19   91, General Aviation, we cover 145, 135, 141, 147, 133, 137,

20   142.  We cover -- our office and my inspectors and I have

21   covered all those areas and all those certifications of all

22   those aircrafts and operations.

23                   MR. MCCONWELL:  And in this case, you think

24   involves 145, certified repair station?

25                   THE WITNESS:  Excuse me?  I'm sorry.

 1             MR. MCCONWELL:  You think that this case involves

 2   145, certified repair station?

 3             THE WITNESS:  I didn't say that, no, sir.

 4             MR. MCCONWELL:  It doesn't, does it?

 5             MR. LEON GUERRERO:  Objection, Your Honor.  It's

 6   not a question and it's argumentative.

 7             THE COURT:  Overruled.  Go ahead.

 8             MR. MCCONWELL:  Isn't that correct?  You talked

 9   about 145, but this case doesn't involve 145, repair station.

10             THE WITNESS:  It's one of the areas that I know

11   well.  I know, you know 91, 65, all of those regulations.

12             MR. MCCONWELL:  And are you involved in

13   inspection of aircraft that operate in international, in

14   Pacific Ocean or the Atlantic Ocean?

15             THE WITNESS:  I am.

16             MR. MCCONWELL:  And international waters?

17             THE WITNESS:  Yes.

18             MR. MCCONWELL:  You know the rules for that?

19             THE WITNESS:  Yes, sir.

20             MR. MCCONWELL:  Okay.  I still object to his

21   foundation, Your Honor.

22             THE COURT:  All right.  Okay.  The Court --

23   ladies and gentlemen of the jury, before we take our recess,

24   under Federal Rule of Evidence 702, the Court may accept the

25   qualification of an expert by his knowledge, skill, training

*Direct - Lopez*

1    or education, and indicate that based on that, he may testify

2    in the form of an opinion.

3              And so the Court finds that Mr. Sergio Lopez,

4    does have the sufficient qualifications by his knowledge,

5    skill, experience, training and education, and that he may

6    testify in particular for his expert testimony to the area of

7    airworthiness of aircrafts, safe flight operations of

8    aircraft, air agency and airman, is it qualifications?  Is

9    that fair to say?

10             THE WITNESS:  That's fair to say.

11             THE COURT:  All right.  So based on that, the

12   Court can -- the Court will qualify Mr. Lopez as an expert,

13   but I will say that, and I will give an instruction that like

14   all expert witnesses, and even lay witnesses, that you may

15   accept and believe everything he says, part of what he says or

16   none of what he says.  But you know, obviously you're going to

17   listen to him testify under direct examination and

18   cross-examination.  On that note, let's take a lunch recess

19   for an hour -- 45 minutes, I think it's 45 minutes, right?

20   5:15 to 6:00 p.m., have a nice lunch or dinner , I'm sorry,

21   have a nice dinner, it's here for you.  Please rise for the

22   jury.  Keep an open mind.  Mr. Lopez, please be back in

23   45 minutes.

24             (Jury out at 5:14 p.m.)

25             THE COURT:  See you guys in 45 minutes.

```
 1                    (Recess taken at 5:14 p.m.)

 2                    (Back on the record at 6:01 p.m.)

 3          THE COURT:  All Counsels present.  Mr. Lopez is

 4   present.  We ready to call in the jury?  How long will this

 5   witness be, Mr. Leon Guerrero, on direct exam?

 6          MR. LEON GUERRERO:  I'd say anywhere from

 7   45 minutes to an hour.  Give or take.

 8          THE COURT:  Okay.  We'll try to see if we can

 9   finish him then.  You have an hour.  Did you guys have a nice

10   dinner?

11          MS. M. MILLER:  We did.  Your Honor, just one

12   housekeeping item.

13                    THE COURT:  Yeah.

14          MS. M. MILLER:  You've allowed Laura McConwell to

15   continuously make objections in this case even though she is

16   not handling any witnesses, according to Mr. McConwell.  And

17   we respect that obviously, Your Honor, but it seems that you

18   will not have the same --

19          THE COURT:  Let Mr. Leon Guerrero figure out how

20   to do it.  Let him -- you're like a pro.

21          MS. M. MILLER:  Oh sure.

22          THE COURT:  He's like, learning.

23          MS. M. MILLER:  But I think that Mr. McConwell,

24   even if he can't stand up to object, we have no problem --

25                    THE COURT:  You object to them double-teaming you
```

    1    guys?  Really?

    2              MS. M. MILLER:  Well, what I think is, it's an

    3    appearance for the jury.  That's all I'm saying, is that it's

    4    an appearance for the jury with Ms. McConwell, and some of the

    5    objections, Your Honor, again, with all due respect to

    6    Ms. McConwell, we spent like 15, 20 minutes on the NTSB

    7    report, which came right off of the public site.  And that

    8    just wasted so much time --

    9              THE COURT:  Okay.  Putting aside that particular

   10    objection, you're objecting to the double-teaming?

   11              MS. M. MILLER:  Yes.

   12              THE COURT:  Because I won't let you do it with

   13    him?

   14              MS. M. MILLER:  Well, no.  I mean, I think that

   15    if there is going to be a process to allow it, then it should

   16    be both sides, and if it's not, then it shouldn't be either

   17    side.

   18              MR. MCCONWELL:  You had no problem with Samantha

   19    doing it.

   20              THE COURT:  Oh, you don't have a problem with

   21    Samantha?

   22              MR. MCCONWELL:  They had no problem with her

   23    doing the objections for him.

   24              THE COURT:  Oh, you'd rather have Samantha than

   25    Marie?  Is that what you're saying?

        1              MS. M. MILLER:  I'm feeling very rejected and

        2    picked on, Your Honor.

        3              THE COURT:  You are.  I doubt you can feel that

        4    way.  (Laughing.)

        5              I'm sure you're tougher than that.

        6              All right.  Yes, Ms. McConwell, Mr. McConwell, do

        7    you want to respond to that?

        8              MS. MCCONWELL:  Well, we -- you did it before --

        9    the reason we did it before is because Mr. McConwell with his

       10    issue going on with his leg and his knee is not getting up to

       11    be able to make the objections and I can stand up quicker to

       12    get to the microphone.  So I'm sort of like his conduit

       13    mouthpiece.

       14              THE COURT:  Okay.

       15              MS. M. MILLER:  And I think the problem is

       16    Ms. McConwell, you know, she's standing up to make an

       17    objection for her father, but Mr. McConwell --

       18              THE COURT:  I'm go to give him a break.  I'm

       19    going to let him do it.  Let them do it.

       20              MS. M. MILLER:  You're going to let him object?

       21              THE COURT:  You don't want Steve Leon Guerrero to

       22    figure out how to do this?

       23              MS. M. MILLER:  Oh, I absolutely have a hundred

       24    percent confidence in Mr. Leon Guerrero.

       25              THE COURT:  But you weren't even letting him try

*Direct - Lopez*

1    to do it.

2            MS. M. MILLER:  Oh, not at all.  No, no, no, Your

3    Honor, the problem I had -- and just for the record to be

4    clear, Mr. McConwell started testifying again, bringing up the

5    issue --

6            THE COURT:  Okay, that's a different issue.  The

7    issue is do I let them double-team or not.

8            MS. M. MILLER:  Right.  I'm just explaining --

9            THE COURT:  Yeah, I -- so let's not complain

10   about, you could make your objections to how, you know, at a

11   different time, but the question is, am I going to allow them

12   to do it?  I'm going to allow them to do it.

13           First of all, and not that I'm against an age

14   issue, but Mr. McConwell is elderly.  And on Guam, we respect

15   the *manåmko',* and he's a little slower, you know, because --

16   I'm not saying what hasn't already been said by his daughter

17   and himself, and I'm just cutting them a little slack.  Leon

18   Guerrero here is a young chap.  He can figure it out.  And if

19   he can't do it, if he -- if he needs your help, he could turn

20   and say Ms. Marie Miller, can you help me.  And I won't -- I'm

21   pretty sure they're not going to object.  Them --

22           MS. M. MILLER:  No, I'm looking at Laura

23   McConwell --

24           THE COURT:  Although they like Samantha better.

25           MS. M. MILLER:  Apparently so.

        1                THE COURT:  Apparently.  Apparently.  (Laughing.)

        2                MS. MCCONWELL:  Stephen can throw a lifeline.

        3                MS. M. MILLER:  And I am very, very sensitive.

        4                THE COURT:  Stop the sensitivity.  Get tough.

        5    You're a prosecutor, you can handle it.  You go for the

        6    jugular.  You can handle this.

        7                MS. M. MILLER:  You give it, you got to take it,

        8    right?

        9                THE COURT:  Yeah.

       10                MS. M. MILLER:  Yeah.

       11                THE COURT:  When you're a prosecutor, you're up

       12    there, do your job, you flounder, you got to flounder a little

       13    bit.  If, you know, if Leon Guerrero can do it, let him do it.

       14                MS. M. MILLER:  Absolutely.

       15                THE COURT:  But you didn't give him a chance.

       16    You jumped up.

       17                MS. M. MILLER:  Well, again, I'm trying to

       18    protect the record, Your Honor.  And I know, because I --

       19                THE COURT:  There is no record to protect here on

       20    this issue.

       21                MS. M. MILLER:  Well, no, no, no because I've

       22    been in depositions with Mr. McConwell, I know some of the

       23    trigger words, and I'm trying to make sure that the jury isn't

       24    hearing term that, frankly, as Your Honor recognized in your

       25    Order, the whole point is not to confuse the jury by bringing

1   up stuff about international law and --

2           THE COURT:  Let me tell you a lot of things about

3   lawyers, including everybody else, I mean, including myself.

4   Oftentimes, we know far more than everybody else, and yet when

5   we communicate, we act like they know what we're talking

6   about.  Now, Mr. McConwell knows a lot about FAA, and he

7   sounds really smart, I have no idea what he's talking about.

8   Really.  And you too, I mean, you guys, all of us, I'm not

9   talking about just Mr. McConwell, so I think just a warning --

10  are they here?  Are they -- (talking to officer.)

11          Just bring them over here.  So my point is, as

12  you all continue with the rest of this trial, let's get it

13  moving, try to be succinct, brief and try to remember we don't

14  know half the stuff that you know.  I mean, including me.  I

15  mean, I don't -- you know airworthiness?  Okay, sounds like --

16  sounds like it's self-explanatory, but that's not necessarily

17  so.  There's just so much to it.  You know, I'm pretty sure

18  Mr. Lopez here will tell us about that.  But anyway, my point

19  is, you can calm down, I thought we're all getting along.

20  (Laughing.)

21          THE COURT:  I thought we're -- you know, I'm

22  going to cut Mr. McConwell some slack and Ms. McConwell.  I

23  think they -- I think they need each other as a team.

24          MR. MCCONWELL:  I do participate in the

25  objections, Your Honor.

```
 1                    THE WITNESS:  I'm sorry.
 2                    MR. MCCONWELL:  I do participate in the
 3    objections.
 4                    THE COURT:  You participate in the objections,
 5    okay.  Now, if you guys feel like it's uneven, Ms. Miller, if
 6    you feel like you need to come to the aid of your co-Counsel,
 7    Leon Guerrero, or Samantha or whoever else, then, you know,
 8    you could help them.  But sometimes part of being a good trial
 9    lawyer is just doing it yourself.  Please rise for the jury.
10                    (Jury in at 6:08 p.m.)
11                    THE COURT:  We'll go ahead and begin then,
12    Mr. Leon Guerrero, you may go ahead and proceed.
13                    MR. LEON GUERRERO:  Thank you, Your Honor.  Your
14    Honor, at this time I would ask if -- I'm going to utilize the
15    ELMO at this time.
16                    THE COURT:  Sure of course, yeah.
17                    MR. LEON GUERRERO:  And I have provided Counsels
18    -- I do have a demonstrative aid.  As Your Honor has noted,
19    rules and regulations regarding the FAA can be somewhat of
20    a... challenging area, given that there is not too many people
21    that have actually that subject matter expertise on it.  So I
22    have generated --
23                    THE COURT:  I'm pretty sure nobody here has read
24    the federal rules -- aviation regulations, unless they have
25    to.
```

*Direct - Lopez*

1          MR. LEON GUERRERO:  Yes, Your Honor, which is why

2   I created some demonstrative aids.

3          THE COURT:  Okay.

4          MR. LEON GUERRERO:  To aid -- strictly to aid the

5   jury in listening to the testimony of Mr. Lopez.  I have

6   provided those demonstrative aids to the defendants.

7          THE COURT:  Okay.  I don't know what you're

8   talking about.  So you just have to show me what they are.

9          MR. LEON GUERRERO:  Sure.

10          THE COURT:  Do you have any objection to this,

11   Counsels, or have you seen it, do you know what he's talking

12   about?

13          MS. MCCONWELL:  Yes, he did send us an e-mail.

14          THE COURT:  Okay.  So let me just see what --

15   when you say demonstrative aid, what does that mean?  Okay.

16   This is -- okay.  Yeah.

17          MR. LEON GUERRERO:  So I have several of them

18   actually.  And, again, it's really to have Mr. Lopez explain

19   the process of what he testified to, his expertise, mechanics,

20   what's needed for --

21          THE COURT:  Is this going to be submitted after

22   he testifies?

23          MR. LEON GUERRERO:  No, this is -- its not going

24   be admitted as evidence.  It's just to aid the jury while he's

25   testifying.

*Direct - Lopez*

```
 1              THE COURT:  Yes?

 2              MS. MCCONWELL:  Well, I was going to say, if

 3    that's the PowerPoint, I would object to that without having

 4    any foundation.  The -- I thought he was referring to just the

 5    photographs of some of the FAR sections.

 6              THE COURT:  Yeah, I'm sorry.  Okay.  The Court is

 7    not going to allow this as it's submitted, I mean if the

 8    witness testifies to this is one thing.

 9              MR. LEON GUERRERO:  Sure.

10              THE COURT:  But it sounds like you're putting up

11    his testimony while he's testifying, which is not fair because

12    then they may not have an opportunity to object, and it's

13    being shown to the jury.  If you're going to put it in like a

14    summary, whatever is stated here, these little bullet points.

15              MR. LEON GUERRERO:  Yes.

16              THE COURT:  So I've never seen this happen

17    before.  So the Court will not allow this.

18              MR. LEON GUERRERO:  Okay.

19              THE COURT:  But I will, you know, you can speak

20    -- you know, just do regular examination, but yeah, that would

21    just not be allowed.

22              MR. LEON GUERRERO:  That's fine.

23    BY MR. LEON GUERRERO:  (CONTINUING)

24    Q.   So, Mr. Lopez, can you please tell the members of the

25    jury what are the requirements for an aircraft to be
```

1  registered with the Federal Aviation Administration?

2      A.   The requirements to be registered?  The applicant has

3  to -- the owner of the aircraft has to apply with FAA

4  registry.

5      Q.   Okay.  And --

6              MR. MARTIN:  Your Honor, I'm having a little

7  difficulty speaking --

8              THE COURT:  Hearing?

9              MR. MARTIN:  I'm sorry, hearing.  Thank you.

10             THE COURT:  Could you repeat your answer?

11             THE WITNESS:  Yes, the owner of the aircraft

12  would apply with the FAA registry.

13             THE COURT:  Is that okay?  You can hear that,

14  Mr. Martin?

15             MR. MARTIN:  Yes, Your Honor, thank you, thank

16  you.

17             THE COURT:  Okay.

18  BY MR. LEON GUERRERO:  (CONTINUING)

19     Q.   And in complying with the requirements of the

20  registry, is there anything that the owner-operator has to

21  obtain from the registry to be able to operate this aircraft?

22     A.   An aircraft registration.

23     Q.   And in order to get an aircraft registration, is

24  there anything that this owner-operator has to provide or is

25  there a process before that's issued that they have to obtain

*Direct - Lopez*

1    another document prior to that?

2         A.    Obtain another document from the registry?  No, they

3    submit the application to the registry to get the aircraft

4    registered.

5         Q.    Okay.  And after they submit the application to get

6    the aircraft registered, is there something else that an

7    owner-operator needs to be able to operate the aircraft?

8         A.    Yes, an airworthiness certificate.  Once the aircraft

9    is registered, the owner would apply for airworthiness

10   certificate.

11        Q.    And can you please tell members of the jury what's

12   the significance of an airworthiness certificate?

13        A.    The airworthiness certificate establishes the -- that

14   the aircraft meets certification regulations, federal aviation

15   regulations, and that it's safe for the intended flight, and

16   it meets the aircraft type -- approved-type design.

17        Q.    And can you please tell members of the jury when

18   would an airworthiness certificate be issued?

19        A.    When the owner of the aircraft applies for the

20   airworthiness certificate, once he has the registration.

21        Q.    And how long, generally, is an airworthiness

22   certificate good for?

23        A.    Typically, it has no expiration date until, you know,

24   surrender, suspended, cancelled.  There is other criteria, but

25   typically, it has no expiration date.

1    Q.   All right, sir, thank you.

2         MR. LEON GUERRERO:  Your Honor, at this time, I'm

3    going to show the witness what has been admitted into evidence

4    as Government's Exhibit 310.

5         THE COURT:  Okay.  Yup, you may do so.  310.

6         MR. LEON GUERRERO:  Ms. Miller, if you can blow

7    it up, please.  All right.  Thank you.

8    BY MR. LEON GUERRERO: (CONTINUING)

9    Q.   And, sir, can you please tell members of the jury

10   what airworthiness certificate is this issued for, which

11   aircraft?

12   A.   That's issued to aircraft N243D, Delta.

13   Q.   And what's the serial number for that aircraft?

14   A.   691203.

15   Q.   And, sir, if I can have you read, you see where it

16   says authority and basis for issuance?

17   A.   Sure.

18   Q.   Can you please read that to the jury, please?

19   A.   Yes.  "This airworthiness certificate is issued

20   pursuant to 49 U.S.C. 44704, and certifies that as -- of the

21   date of issuance, the aircraft to which issued has been

22   inspected and found to conform to the type certificate,

23   therefore, to be in condition for safe operation and has been

24   shown to meet the requirements of the applicable comprehensive

25   and detailed airworthiness code as provided by Annex 8 to the

1  convention of international civil aviation exception --

2  aviation except as noted herein."

3      Q.   All right.  Thank you, sir.  And you see the

4  reference to type certificate, can you please tell members of

5  the jury what does that mean?

6      A.   Type certificate is a document that establishes the

7  certification requirements for the aircraft, the basis of its

8  certification, what regulations were used and also -- and it's

9  an approved document by the FAA and then it also includes the

10  requirements for continuance airworthiness of that aircraft,

11  so the maintenance requirements and everything it takes to

12  maintain, to keep that aircraft in an airworthiness condition.

13      Q.   And, sir, what's the significance of the language

14  that's referenced in authority and basis for issuance, what's

15  the significance of that?

16      A.   That's -- the significance of it is it established to

17  the owner what the aircraft meets -- that it's safe for intent

18  of flight and it's in a safe condition and it meets the type

19  certificate.

20      Q.   Now, I want to direct your attention to the terms and

21  conditions portion of that exhibit.  And can you please read

22  that for the jury, please?

23      A.   Yes.  "Unless sooner surrendered, suspended, revoked

24  or terminated, termination date is otherwise established by

25  the FAA, this airworthiness certificate is effective as long

*Direct - Lopez*

1    as its maintenance, preventative maintenance and alterations

2    are performed in accordance with Parts 21, 43 and 91 of the

3    Federal Aviation Regulations as appropriate and the aircraft

4    is registered in the United States."

5    Q.   All right, sir.  And you reference Part 21, can you

6    please tell members of the jury what's the significance of

7    Part 21?

8    A.   Those are the rules, the regulations that establishes

9    on the issuance of airworthiness certificates.

10    Q.   How about for Part 43?

11    A.   Part 43 is probably one of the more important ones.

12    Part 43 establishes how the aircraft is going to be

13    maintained, by who it's going to be maintained and what

14    records are going to be used to maintain a U.S.-registered

15    aircraft.

16    Q.   And, sir, is there a regulation that governs the

17    maintenance and inspections of aircraft?

18    A.   Part 43 establishes that.

19    Q.   What is a Part 91 operation?

20    A.   Part 91 covers both the maintenance and inspection

21    and operating rule, the general operating rules for general

22    aviation.  So it encompasses everything for general aviation,

23    and there is additional operating rules like Part 121 that

24    carries -- covers like air carriers like say United Airlines,

25    but this 91 just covers the general rules for general aviation

*Direct - Lopez*

1　and the requirements that all operators, general operators

2　have to comply with when operating aircraft.

3　　　Q.　Thank you, sir.　And can you please tell members of

4　the jury who signed off on this airworthiness certificate?

5　　　A.　Timothy J. Cislo.　He was an FAA inspector in

6　Honolulu FSDO.

7　　　Q.　And what's the date of issuance?

8　　　A.　The date of issuance, it has an R in front of it so

9　it's a reissuance, so September, 26th, 2003.

10　　　Q.　Thank you, sir.　Now, being an expert in this case,

11　sir, have you had an opportunity to listen to the testimony in

12　this case?

13　　　A.　Yes.

14　　　Q.　And based on the testimony that you've heard, what

15　part would Hansen's operations, in the way they utilized their

16　aircraft, what part would they fall under?

17　　　A.　From what I heard, part 91 of the Federal Aviation

18　Regulations.

19　　　Q.　Thank you, sir.　Now, sir, is there any FAA guidance

20　on how an inspector must process an airworthiness certificate?

21　　　A.　Absolutely.

22　　　Q.　And can you please tell members of the jury what are

23　some of the orders that govern the process?

24　　　A.　So FAA has for all inspectors use a FAR Order 8900.1,

25　and then specifically for the issuance of airworthiness

*Direct - Lopez*

certificates, 8130.2. It spells out how an inspector will go
about issuing an airworthiness certificate.

Q.   Thank you, sir. And can you please tell members --
you talked about these different orders that govern the
process, and can you please tell members of the jury what's
the significance of those orders?

A.   Those orders establish the guideline -- the
standardized process an inspector uses. So all the
inspectors, probably about 5,000, close to 5,000 inspectors in
the agency, in the FAA, so it's a document -- document so they
establish the same way and same methods to issue out or do
whatever functions they're doing. So that's the importance of
the order, follow them, so somebody in Honolulu is not doing
something different than somebody in New York or -- so that's
the reason to establish these orders, to have specific
guidelines so the regulatory requirements are met.

          THE COURT: Carmen, why don't you put the camera
on the witness. All right. Go ahead.

BY MR. LEON GUERRERO: (CONTINUING)

Q.   Mr. Lopez, can you tell members of the jury how long
do these inspections of aircraft for the issuance of an
airworthiness certificate, how long do those inspections
generally take?

A.    It's a lengthy process, but generally, I mean it's so
lengthy and so detailed, that generally, offices don't have

the resources to do this.  So they advise the applicants to

use a designated airworthiness representative.  The

individual, designated airworthiness representative, is an FAA

representative.  So the FAA designates these individuals from

industry, they're not employees of the FAA, to do these

certification because it's so complex and so detailed.  So the

inspection -- it's very detailed inspections they have to do.

Q.   Thank you, sir.  And during these inspections, what

are the duties that the inspectors perform?

A.   If the inspectors were to do it, the inspectors

would -- once the application is received, they would review

the application, and then they would plan a trip where they

would go inspect the aircraft, do a visual inspection of the

aircraft.  And then do an inspection of the aircraft records.

And then compare the aircraft records to the aircraft to see

if the aircraft has been modified, altered, if repairs have

been made, then that's documented because every part of

maintenance of an aircraft has to be documented on the

aircraft records.

        So if the individual, you know, when the individual

inspector goes out there, he's validating that all those

elements are done and that the aircraft conforms to the type

certificate that's been issued -- approved by the FAA.

Q.   Thank you, sir.  And if an inspector is satisfied

with the maintenance entries of a particular aircraft, do they

1  immediately issue an airworthiness certificate for that

2  aircraft?

3      A.   Generally, no.  I mean, generally, you know, they'll

4  go -- they have to review certain, you know, airworthiness

5  directives.  They'll go back to the office and prepare the

6  certificates, make sure all the appropriate documentation is

7  done before the certificates are issued.

8      Q.   If an owner purchases an aircraft that already has an

9  airworthiness certificate, is there any requirement that's

10  bestowed on the new owner of the aircraft?

11      A.   If the aircraft has an airworthiness certificate, it

12  remains valid unless the aircraft is -- the registration

13  number's changed, then they would have to get one reissued.

14      Q.   Is an airworthiness certificate still valid if an

15  operator deregisters that aircraft?

16      A.   No.  The regulations require if the aircraft is

17  deregistered, the airworthiness certificate is no longer

18  valid.

19      Q.   And if it's no longer valid, is there anything that

20  the owner-operator has to do with that certificate?

21      A.   They need to surrender it to FAA aircraft records.

22      Q.   How about if an aircraft is destroyed?

23      A.   If the aircraft destroyed, the registration is no

24  longer valid and does -- the airworthiness certificate also

25  needs to be surrendered.

Q.   What happens if an operator is deregistering an aircraft for export, what happens with the airworthiness certificate?

A.   Then once the aircraft is deregistered, then the airworthiness certificate is no longer valid.  So it has to be surrendered.

Q.   Sir, based on your training and experience, would an inspector have a booklet of blank airworthiness certificates that they could issue on the spot?

A.   Generally, absolutely not.

Q.   And why not?

A.   Because it's -- you know, it's a significant document.  Once you issue an airworthiness certificate, it's saying that the aircraft is safe, it's safe for operations, it meets type design.  It's a significant approval process and a lengthy process like I explained.  So you don't want to be carrying it around because it's a long process and a process that brings a lot of responsibility.  So those are typically not, you know, handled in somebody's pocket or, you know, carried around.

Q.   And, sir, would it be appropriate for an aviation safety inspector to leave a blank book of airworthiness certificates with an owner-operator?

A.   Absolutely not.

Q.   And could you please explain why not?

A.   Because, again, like I had said, that, you know, it's an important certificate that's issued, and it has a lot of -- carries a lot of significance.  It's establishing the aircraft is safe for operations.  And it meets type design.  So you don't want to -- again, you don't want to leave it with anybody, and it's a document that's issued by the FAA or one of its designee, FAA authorized designee.  So only them should have that to be able to issue that.

Q.   Sir, in your training and experience, are you able to explain whether older aircraft have more deficiencies noted in a given inspection?

A.   And, generally, yes, when -- these inspections, airworthiness -- or inspections for issuance of an airworthiness certificate, you know, the age of aircraft brings a lot of -- it increases the time that you may spend inspecting records.  You get a brand new aircraft out of production and the process may be simpler, it may take you a day, but if you have an older aircraft that's, you know, been out in environments, you know, saltwater environments, environments where it affects, you know, the aircraft in its operations, you're going to have probably more maintenance recorded, you're going to have to look at more maintenance that -- or alterations that's been done to the aircraft or repairs done to the aircraft that you have to validate.  So absolutely, an older aircraft, it may take a longer process.

1   No different than taking a, to me, a new car to the dealership

2   or taking your -- an older vehicle that you may have to the

3   dealer, to service, it may take a longer time because of, you

4   know, as things get -- age, you know, the repairs are bigger,

5   they're -- so it's significantly more work.

6       Q.   Thank you, sir.  And these inspections that you've

7   been testifying to that these inspectors conduct, can they be

8   -- can they take place remotely?

9       A.   Not -- not for the issuance of airworthiness

10  certificate, absolutely not.

11      Q.   Now, sir, is there any regulation that requires

12  persons that are performing maintenance on U.S.-registered

13  aircraft to be certificated?

14      A.   Yes.

15      Q.   And can you please tell members the jury what are

16  those regulations?

17      A.   Yes, so as we saw in the airworthiness certificate,

18  terms, it refers you to 43 of the Federal Aviation Regulation.

19  43.3 of the federal regulations says that individuals --

20  establishes what the individuals that could work on U.S.-

21  registered aircraft.  With U.S. airworthiness certificates and

22  specifically, mechanics, certificated under Part 65 of the

23  federal regulation, they would refer you to Part 65 of the

24  federal regulations for airframe and powerplant mechanics that

25  could work on U.S.-registered aircraft.

1    Q.   Thank you, sir.  And could you please tell members of

2    the jury what's required for a person to become a

3    U.S.-certificated mechanic?

4    A.   Well, what's required, there is a requirement --

5    first, you have to demonstrate your -- you have to go to the

6    FAA to get authorization to take the test.  To take a written

7    test.  So you have to have, you know, you could do it by based

8    on experience, which requires 30 months for an airframe and

9    powerplant mechanic certificate, FAA mechanic certificate.  Or

10   you can do it through a certificated school that the FAA

11   certificates under FAR 147 of the Federal Aviation Regulation

12   Part 147.

13           So those are the two methods that you could get

14   certificated, but the process is once the individual comes to

15   the FAA with those areas, with those either experienced or

16   school, then he gets signed off on by the inspector, by an FAA

17   inspector.  And then he goes and takes a written test, written

18   knowledge test, for general airframe and powerplant.  Once he

19   passes those areas, he'll go and take what they call a

20   practical test.  So he'll go to an individual that's

21   designated by the FAA, designated maintenance mechanic

22   examiner and that individual will give him some skills, some

23   repairs of, you know, of an airframe or engine work, that he

24   has to do and demonstrate that he has the knowledge and

25   techniques to do those work.  Once all that's done, which is a

*Direct - Lopez*

1    lengthy process, then the individual is issued an FAA airframe

2    and powerplant certificate.

3        Q.    Thank you, sir.  And that's the A and P certificate

4    that you've had since 1992; correct?

5        A.    Correct.

6        Q.    And, sir, is there any federal law that authorizes

7    the issuance of an airman certificate?

8        A.    There is.

9        Q.    And could you please tell members of the jury what

10   that law -- that law is?

11       A.    The FAA 44703 establishes the federal aviation, they

12   issue airman or mechanic certificate or pilot certificates,

13   yes.

14       Q.    Okay.  Thank you, sir.  Now, you just testified that

15   for an individual or for inspections on U.S.-registered

16   aircraft, it has to be done by an individual that's

17   certificated, right?

18       A.    Correct.

19       Q.    With the FAA.  Is there any regulation that governs

20   the performance of maintenance on U.S. aircraft?

21       A.    That governs the maintenance on U.S. aircraft, yes,

22   Part 43 of the Federal Aviation Regulation governs the

23   maintenance.

24       Q.    Okay.  And what does Part 43, what does it require as

25   far as the maintenance and the documentation?

1    A.   Yeah, that rule establishes, again, it establishes

2   numerous things, but it's basically Part 43.1, 43.1 of the

3   federal regulation establishes applicable to U.S. -- aircraft

4   having U.S. airworthiness certificates.  Part 43.3 establishes

5   who could do the maintenance on the aircraft.

6         So it specifically -- there it says, okay, the

7   individuals are going to perform maintenance on

8   U.S.-registered aircraft or holds a U.S. airworthiness

9   certificate must have certificated -- be certificated in

10  accordance with Part 65 of the Federal Aviation Regulations.

11   Q.   Thank you, sir.  And can you please tell members of

12  the jury if an individual does not have an FAA mechanic

13  certificate, are they able to work on U.S. aircraft?

14   A.   Under Part 43, 43.3 again, there is an allowance for

15  individuals that are not certificated to work on

16  U.S.-registered aircraft, as long as they're supervised

17  immediately or personally by a certificated individual.  So

18  the individual that is doing the maintenance has to be

19  supervised by certificated -- FAA-certificated individual.

20   Q.   Okay.  And so this supervision of work cannot -- can

21  it be done remotely?

22   A.   No, that section of the regulation, I believe is 43.3

23  Delta, does not allow.  It has to be -- the individual has to

24  be personally there --

25   Q.   Thank you, sir.

*Direct - Lopez*

1      A.   -- observing.

2      Q.   Thank you.  Now, I want to direct your attention to

3   the documentation part of inspections, and is there any

4   regulations that govern how FAA-certificated mechanics, how

5   they have to record the maintenance that are done on an

6   aircraft?

7      A.   Yes, there is several rules in Part 43, specifically,

8   43.9 addresses the general maintenance -- recording of general

9   maintenance activities, and then 43.11 of the Federal Aviation

10  Regulations establish how you record -- you record

11  inspections.

12     Q.   Okay.  And can you please tell members of the jury

13  what are some of the things that have to be annotated in such

14  a maintenance record?

15     A.   Maintenance record, the work that was performed and

16  the work that was performed in the aircraft and the signature

17  of the mechanic, with his airframe and powerplant or the

18  appropriate, you know, FAA certificate.

19     Q.   Okay.  And so just to confirm, whenever you have an A

20  and P mechanic -- sorry.

21          THE COURT:  Why don't you move it up.

22          MR. LEON GUERRERO:  Sure.

23          THE COURT:  Okay.

24  BY MR. LEON GUERRERO: (CONTINUING)

25     Q.   Whenever you have an A and P mechanic that performs

*Direct - Lopez*

1    maintenance on an aircraft, you indicated that they have to

2    sign off as such on that maintenance record; correct?

3        A.    That's correct.  That's required by the regulations.

4        Q.    Is there any regulations that govern how a

5    owner-operator should document an inspection on their

6    aircraft?

7        A.    It's on 43.11 dot -- it's how you document the

8    inspections of an aircraft.

9        Q.    And could you please tell members of the jury what

10   are some of the items that have to be accounted for in that

11   maintenance record?

12       A.    The same elements of 43.9, you know, the work that

13   was done, the inspection that was done, the signature of the

14   individual doing the work, and his certificate number and the

15   aircraft time.  So because inspections are due after certain

16   amount of time so you also document the times of the aircraft.

17       Q.    And, sir, can you please tell members of the jury why

18   is it important that the work that's performed on the aircraft

19   are correctly documented in a maintenance log?

20       A.    Because that establishes the history of that

21   aircraft, so it's significant because, you know, either

22   repairs were done or alterations or whatever general

23   maintenance done, any time you work on an aircraft, any work,

24   any part you change has to be recorded.  So if for some reason

25   later on some kind of special bulletin comes out, you know, if

1  that part was installed in that aircraft.  So you always have

2  to establish a history of aircraft -- of that aircraft and the

3  maintenance that was done for its continuous ongoing

4  airworthiness condition.

5      Q.   Thank you, sir.  Can you please tell members of the

6  jury what is an FAA Form 337?

7      A.   FAA Form 337, it's a way to record aircraft

8  maintenance, but it's used specifically for recording major

9  repairs and alterations on an aircraft.

10     Q.   And what are some of the information that's requested

11 on the form?

12     A.   The registration number, the serial number, the work

13 that was performed, that it was performed with accordance with

14 an approved process, approved by the FAA.  And it was then

15 it's signed by an mechanic and also numerous individuals can

16 return that aircraft to service after that maintenance, major

17 repair or alteration has been done, and it could be FAA

18 inspector -- inspection authorization or could be a repair

19 station.  So there is numerous ways they could return that

20 aircraft to serve, but it's a higher level of maintenance

21 because now you're doing it -- you're doing a major repair or

22 alteration on an aircraft.

23     Q.   And, sir, after completion of this FAA Form 337, does

24 it need to be submitted anywhere?

25     A.   Yes, it has to be submitted to FAA airman record in

1  Oklahoma City.  I'm sorry, I said airman; aircraft records, I

2  apologize.

3      Q.   Thank you, sir.  Now, I want to direct your attention

4  to what's been conditionally admitted as Government's

5  Exhibit 645 and, Ms. Miller, if we could go to the second

6  page.  Start with the first e-mail.  All right.

7          And, sir, can you please tell members of the jury

8  who's this e-mail from?

9      A.   It's from Timothy Cislo, Timothy J, FAA.

10     Q.   And who is it -- sorry?

11     A.   I'm sorry, it's to Timothy -- it's to Timothy Cislo.

12     Q.   Okay.  And who -- from this e-mail, who is the e-mail

13 from?

14     A.   It shows on the bottom, Rufus.

15     Q.   Okay.  And, sir, can you please read the e-mail to

16 the members of the jury?

17     A.   Yes.  "Hey Tim, I brain farted getting these to you,

18 sorry about that.  Having Walker with us for a month

19 immediately followed by the DOI POI boys onslaught has left me

20 a bit dingier than usual.  What paperwork do you want me --

21 what paperwork do you want me -- err, Turner to have ready?

22 Here are the machines, Hansen Helicopters restricted aerial

23 survey."

24     Q.   And, sir, you have the list of ten aircraft here;

25 correct?

1    A.    Correct.

2    Q.    And, sir, you've been listening to the testimony in

3    this case?

4    A.    Yes.

5    Q.    Have you been listening --

6    A.    Yes.

7    Q.    Okay.  And based on the testimony and the evidence

8    from Agent Prozik, are these the same ten aircraft that

9    Timothy Cislo had signed off on these airworthiness

10   certificates on?

11   A.    Yes.

12   Q.    Okay.  And you explained how an inspection process

13   could be quite lengthy?

14   A.    Yes.

15   Q.    Based on your training and experience, is it possible

16   to do ten airworthiness certificates for ten different

17   aircraft in one day?

18   A.    No, absolutely not.

19   Q.    And can you please explain why?

20   A.    Like I said earlier, the process of issuing an

21   airworthiness certificate, inspecting the aircraft in detail,

22   then comparing it to the aircraft records, it's a very lengthy

23   process.  You also have to look at airworthiness directives,

24   you have to look at all the repairs that may have been done,

25   any of the 337s, the Form 337s we spoke about earlier.  So

```
 1    you're looking at all the aircraft history, make sure that,
 2    you know, the repairs and alterations and maintenance that was
 3    done coincides to the records and you're also validating that
 4    it meets the type certificate, type design of that aircraft,
 5    so it's a lengthy process.  I don't see any way of doing that
 6    in one day that -- sometimes one aircraft inspection may take
 7    you five days.
 8         Q.   Thank you, sir.
 9              And, Ms. Miller, if you can go to the first page on
10    the bottom.  On the bottom of the first page.
11                   THE COURT:  Same exhibit number?
12                   MR. LEON GUERRERO:  Yes, Your Honor.
13    BY MR. LEON GUERRERO: (CONTINUING)
14         Q.   And, sir, can you please tell members of the jury who
15    is the sender of this e-mail?
16         A.   TimothyJCislo@FAA.gov.  It says Timothy Cislo.
17         Q.   And who was the e-mail to?
18         A.   It was to Rufus@hansenhelicopters.com.
19         Q.   Okay.  And, again, based on what you've heard, Rufus
20    is Defendant Crowe who's a defendant in this case; correct?
21         A.   Correct.
22         Q.   And can you please read the e-mail that was sent from
23    Mr. Cislo to Defendant Crowe?
24         A.   Sure.  "All we need is an FAA Form 8130-6 for each
25    one.  When do the current certificates expires?  I'm looking
```

*Direct - Lopez*

1   at May or June to have a sign-fest.  Regards Tim, Timothy J.

2   Cislo, Aviation Safety Inspector, Airworthiness, Honolulu

3   FSDO."

4       Q.   And, sir, again, you've indicated that you are a

5   manager in the southern part of Florida?

6       A.   South Florida Flight Standard --

7       Q.   For the FSDO office?

8            Is there anything here on this e-mail that concerns

9   you?

10      A.   Yes, sir.

11      Q.   And please explain.

12      A.   Yes, the part about "I'm looking at May or June to

13  have a sign-fest"; that's very disturbing as a manager,

14  because this process as I explained, is a very lengthy process

15  and it's not something you take lightly or do just signing

16  something off and issuing.  So it has bad implications.  If I

17  saw this traffic of an inspector, I would probably report it

18  right away to FAA security and probably to the Department of

19  Transportation Office of Inspector General.

20      Q.   All right.  Thank you, sir.  I want to direct your

21  attention now to what's being conditionally admitted as

22  Government's Exhibit 642.  And, sir, have you read this --

23  have you reviewed this exhibit?

24           Oh, I'm sorry.  Give Ms. Miller time to pull it up.

25           MR. LEON GUERRERO:  Carmen, sorry, can we get the

*Direct - Lopez*

1    red line off?  Thank you.

2              THE COURT:  You have about 15 minutes before we

3    recess.

4              MR. LEON GUERRERO:  Yes, Your Honor.

5              THE COURT:  Okay.

6    BY MR. LEON GUERRERO: (CONTINUING)

7        Q.    And if I can get the middle portion blown up.  Okay.

8              And Mr. Lopez, who's this e-mail from?

9        A.    Timothy -- Timothy -- Tim Cislo, and he's using -- it

10   looks like a personal e-mail, cislo002@gmail.com

11       Q.    And what date of e-mail?

12       A.    February 13, 2015.

13       Q.    And who was e-mail to?

14       A.    It was to Rufus Crowe.

15       Q.    And, sir, can you please read this e-mail to the

16   jury?

17       A.    "Rufus, ask and yeah[sic] shall receive.  Can you

18   please check to make sure that all the information is correct

19   on the attached Word documents?  If it is, please print two

20   each of operation limitations.  If things are wrong, please

21   make corrections and then print two each.  I'll also need one

22   logbook entry for each aircraft, it will probably be more

23   believable in the logbook entry are made on stickers that I'll

24   insert in your logbook.  It will kind of be like I brought

25   those stickers.  Issuance of all these is assuming they've all

*Direct - Lopez*

1    had a 100-hour-type inspections within 30 days of February 27,

2    2015.  While we know Turner and the boys are extremely capable

3    chaps, I use chaps since you bade farewell with cheers, very

4    gay, let's just double-check that all the ten aren't returned

5    to service on the same day.  Happy Valentine's Day, Tim. "

6        Q.   And, sir, being a manager with FSDO, is there

7    anything that's reflected here in this e-mail, is there

8    anything that concerns you?

9        A.   Again, this portion it will probably be more

10   believable if the logbook entries are made on stickers that I

11   will insert in your logbooks.

12       Q.   And why is that concerning?

13       A.   Because it's nothing about believable, we have a job

14   to do as FAA inspectors, we have a job to do in the interest

15   of safety for the flying public and the taxpayers and there is

16   nothing about believable.  It's what we do, it's factual.  And

17   we follow the orders and we issue it.  We're not trying to

18   hide something from somebody or fake somebody out.  This is

19   completely inappropriate.

20       Q.   Thank you, sir.  Now, I want to direct your attention

21   to what's been admitted into evidence as Government's Exhibit

22   139-4, to 139-5.

23            MR. LEON GUERRERO:  Ms. Miller, if you can blow

24   up the top part of the letter.

25   BY MR. LEON GUERRERO: (CONTINUING)

*Direct - Lopez*

1     Q.   And, sir, what's the letterhead of on this particular

2   correspondence?

3     A.   It says Whirlwide Helicopters, Inc.

4     Q.   Okay.  And is there also a company that's also

5   indicated on the left side of it?

6     A.   Yes, Hansen Helicopters.

7     Q.   Okay.  And what's the address that's listed for

8   Whirlwide Helicopters?

9     A.   9102 Lini Highway, Port Vila, Vanuatu.

10     Q.   Okay.  And is there also a PO box on there?

11     A.   PO Box 9099, Tamuning, Guam, 96931.

12     Q.   And also to your knowledge -- and you've been on Guam

13   for at least -- for a little bit for this case, do you know

14   671 to be an area code for Guam?

15     A.   Yes.

16     Q.   And who's the e-mail that's reflected on this

17   letterhead?

18     A.   Rufus@hansenhelicopters.com.

19     Q.   Okay.  And, sir --

20          MR. LEON GUERRERO:  I'm sorry, Ms. Miller, if you

21   can blow up the to and from portion.

22   BY MR. LEON GUERRERO: (CONTINUING)

23     Q.   And, sir, who's this correspondence from?

24     A.   It's -- it's to -- it's from Rufus Crowe.

25     Q.   And who is it addressed to?

*Direct - Lopez*

1     A.    Timothy J. Cislo/PMI, Federal Aviation

2   Administration.

3     Q.    And what is this correspondence, what aircraft is it

4   related to?

5     A.    Certificate of airworthiness for aircraft November or

6   N9068F, Foxtrot.

7     Q.    And can you please read the note that's reflected in

8   this letterhead?

9     A.    Yes, "my dog did not eat my C of A" or certificate of

10  airworthiness.

11    Q.    Okay.  And then, Ms. Miller, if I can just have you

12  blow up the content of the letter.

13          And, sir, if you could please read that to the jury?

14    A.    Yes.  "Dear Mr. Cislo, I would like to request a

15  replacement of certificate of airworthiness for one of the

16  Hughes 369 HS November or N9068F, Serial No. SN 210293S.  The

17  document is very faded and the signature is no longer legible.

18  I am including the maintenance logbook entry for the

19  aircraft's current inspection status.  It would be greatly

20  appreciated if you would mail it 'Care of Hansen Helicopters

21  to PO Box 9099, Tamuning, Guam 96931.'  Thank you very much

22  for the assistance.  Sincerely, Rufus Crowe, Chief Pilot."

23          MR. LEON GUERRERO:  Then, Ms. Miller, if I could

24  just have you show the letter itself.

25  BY MR. LEON GUERRERO: (CONTINUING)

*Direct - Lopez*

1    Q.   And, sir, is there anything on this letter that was
2  given to -- or given from Timothy Cislo who you said was an
3  aviation inspector to Defendant Crowe, any concerns on this
4  letter?
5    A.   Yeah, this is a formal application for replacement
6  airworthiness certificate and the note says "my dog did not
7  eat my C of A" and that shows that it was a joke, it -- you
8  know it's -- this is a formal application to the FAA, and it
9  certainly seems inappropriate.
10    Q.   Now, I want to direct your attention to what's been
11  admitted as Government's Exhibit 1253.
12            THE COURT:  Okay, Mr. -- nine more minutes until
13  the next break.
14            MR. LEON GUERRERO:  Yes, Your Honor, thank you.
15  BY MR. LEON GUERRERO: (CONTINUING)
16    Q.   And, sir, have you reviewed what's been admitted into
17  evidence as Government Exhibit 1253?
18    A.   I have, yes.
19    Q.   And, sir, can you please tell --
20            MR. LEON GUERRERO:  And if we could have the top
21  portion blown up, Ms. Miller.  Thank you.
22  BY MR. LEON GUERRERO: (CONTINUING)
23    Q.   So can you tell members of the jury what is the PTRS
24  system?
25    A.   So program tracking and reporting system is what the

 1  FAA uses, the FAA inspectors use to document all the

 2  functions, all the different work activities, inspections,

 3  certifications, whatever function they're doing, and we do a

 4  lot of different functions for a lot of different regulations,

 5  everything is recorded in this program tracking and reporting

 6  system.

 7      Q.   And, sir, for this particular summary chart, was

 8  there parameters that were set for the content of this summary

 9  chart?

10      A.   Sure.  Yes, it appears so.

11      Q.   Okay.  And what was the parameters that were set?

12      A.   So that second line there, it says NPTRS, which is

13  National Program Tracking Reporting System record for

14  inspector code, so the next few numbers is WP, is -- 13 is the

15  designation for the Honolulu office, the Honolulu Flight

16  Standards District Office.  And then TJC is Timothy Cislo's

17  initials.  So that means that the report was pulled for work

18  that Timothy Cislo did as it relates to pertaining to

19  Hansen -- so any of the Hansen companies, apparently.

20           MR. LEON GUERRERO:  And so, Ms. Miller, if you

21  can go to page 3.  And specifically, entry 127.  Okay.

22  BY MR. LEON GUERRERO: (CONTINUING)

23      Q.   And so, sir, those also -- based on these entries

24  that were collected, there was a time frame, correct, that was

25  generated for the summary chart?

 1     A.    I believe so.  I have to go back on the top to see.

 2     Q.    Well, you have the -- would you agree with me that

 3  the end of this entry is Entry No. 127?

 4     A.    Yes.

 5     Q.    And what's the time frame that's referenced here?

 6     A.    That -- that -- those dates there is the date that

 7  the task was initiated, which was July 1st, 2009, and when the

 8  task was completed was August 14th, 2009.

 9     Q.    Okay.  And then if you go to the first page of the

10  exhibit, please.  Okay.  And under Entry No. 1, what's the

11  time frame there?

12     A.    So March 23rd, 2017, and a completion of that task

13  was March 23rd, 2017.

14     Q.    Okay.  And so this, the PTRS, covers a time frame of

15  2009 to 2017; correct?

16     A.    That's correct.

17     Q.    Now, and I'm sorry, if you can blow it just -- make

18  the document regular.

19           Sir, in your review of the summary chart, you

20  testified about the ten aircraft that Mr. Cislo had signed off

21  on the airworthiness certificates?

22     A.    Right; correct.

23     Q.    And do you see those ten aircraft that's reflected in

24  this exhibit?

25     A.    Yes, I see where he documented it.

```
 1              MR. LEON GUERRERO:  Okay.  And so, Ms. Miller, if
 2    I can have you go from Entry No. 14 and just blow up to 23.
 3    BY MR. LEON GUERRERO: (CONTINUING)
 4        Q.   And, sir, you indicated -- and I'm starting here
 5    actually with No. 14 through No. 23, you see that?
 6        A.   Yes, sir.
 7        Q.   And, sir, were those same airworthiness certificates
 8    that Mr. Cislo signed off on?
 9        A.   Yes, sir.
10        Q.   Okay.  And that's reflected in this summary chart;
11    correct?
12        A.   Correct.
13        Q.   And also in this summary chart, you've heard
14    testimony about an accident involving N9068F; do you recall
15    that?
16        A.   Yes.
17        Q.   And that was the aircraft where Rafael Santos, the
18    pilot, had passed away?
19        A.   Yes.
20        Q.   And in your review of the summary chart, did you also
21    see that aircraft on this as well?
22        A.   I did see it on one, I think, I believe, on one
23    listing, yes.
24              MR. LEON GUERRERO:  So if you can go to page 2,
25    Ms. Miller, and specifically, No. 62.
```

*Direct - Lopez*

BY MR. LEON GUERRERO: (CONTINUING)

Q.   And you see N9068F; correct?

A.   Correct.

Q.   And you've also heard testimony about N243D as in Delta?

A.   Yes.

Q.   Okay.  And how that aircraft, based on the evidence, there was different versions of that aircraft, that testimony was presented?

A.   Right.

Q.   And do you see that on this summary chart?

A.   I see both of the aircraft listed, that he did something, he did some function with those aircrafts.

MR. LEON GUERRERO:  Now, sir -- if can you go back to the first page, Ms. Miller.

BY MR. LEON GUERRERO: (CONTINUING)

Q.   In reviewing the summary chart, was there anything else, again, based on the evidence and the testimony that you've heard, is there anything else on this summary chart that caught your attention?

A.   Yes, when -- I think it's line 3, when the renewal of Jon Walker's IA was done.

Q.   Okay.  And what can you tell members of the jury about the renewal of his IA?

A.   That it was -- he -- from my understanding, he lived

*Direct - Lopez*

1  in Missouri, however, for the work was done or the renewal was

2  done by Timothy Cislo out of Honolulu, and he has

3  responsibility for this area, like Guam.  So that means that

4  -- that would mean that Mr. Walker's inspection authorization

5  file that's being renewed here, it was for work or he was

6  based out of here on Guam doing the work with inspection

7  authorization.

8      Q.   Thank you, sir.  I'd like to direct the witness to

9  what has been conditionally admitted as Government's

10 Exhibit 739.

11          MR. LEON GUERRERO:  And, Ms. Miller, if you can

12 just blow up the middle part of Government's Exhibit 739,

13 please.

14 BY MR. LEON GUERRERO: (CONTINUING)

15     Q.   And, sir, who's this e-mail from?

16     A.   Tim Cislo.  From, it looks like a personal e-mail

17 account again, not an FAA account.

18     Q.   And what was the date of the e-mail?

19     A.   May 22nd, 2014.

20     Q.   Okay.  And who was it to?

21     A.   Rufus Crowe.

22     Q.   And can you please read this e-mail to the jury?

23     A.   It says "tough decision, the big old round wheel on

24 the blue one is very -- is way cool, real old school, bitching

25 even.  That yellow one -- yeller one got an A65 with a spare

1    A65 as part of the deal, makes more sense.  I'd have to go

2    with the yeller one."

3                    MR. LEON GUERRERO:  And, Ms. Miller, can you

4    expand the top part of that exhibit.

5    BY MR. LEON GUERRERO: (CONTINUING)

6        Q.   And can you please tell members of the jury who this

7    e-mail is from?

8        A.   It says from Rufus Crowe.

9        Q.   And who is it to?

10       A.   To Jon Walker.

11       Q.   Okay.  And what's the e-mail for Mr. Walker?

12       A.   Jwalker@guam.net.

13       Q.   And what's the subject of this e-mail?

14       A.   Taylorcraft.

15       Q.   And what's the date of the e-mail?

16       A.   Monday, May 26th, 2014.

17       Q.   And can you please read this e-mail to the jury,

18   please?

19       A.   "Hey Jon, he wants the yellow one with the spare

20   engine.  I jewed the seller down to 20K and he jewed me back

21   up to 22K for the container.  He is going to shit when he gets

22   the BOS in the mail.  I'm so excited, it's like Xmas,

23   Christmas.  Poof."

24       Q.   And, sir, as a manager with the FSDO office in south

25   Florida, is there anything on this e-mail that concerns you?

```
1        A.   Yes, it seems like they're giving an airplane to

2   Timothy Cislo.  They're giving him a gift of an aircraft.

3   It's very concerning.

4                MR. LEON GUERRERO:  Your Honor, I think this

5   would be a good spot for -- I have some other matters that I

6   can talk with the witness about, unless you want me to keep

7   going.

8                THE COURT:  Yeah, it's already time.  All right.

9   So that's it.  We're in recess.  All right.  Very well.

10               Ladies and gentlemen, we'll go ahead and recess

11  for now, for the evening.  Please keep an open mind.  Do not

12  form or express any opinion on this case until it's submitted

13  to you.  Do not speak to anyone on any subject connected with

14  the trial.

15               The witness will come back tomorrow.  Let's see,

16  what time do we have?  Mr. Lopez, tomorrow is Wednesday so we

17  start at 12 noon.  Right.  So I know some of -- some of you

18  have to go, or somebody has to goes to a graduation.  All

19  right.  We'll see you guys tomorrow, please rise for the jury.

20               (Jury out at 7:01 p.m.)

21               THE COURT:  All right.  Counsels, all right.  Do

22  we have to do these things tonight then?  On the -- is this --

23  do you want to do that tonight or you want to wait until --

24  this is on the 302s, right?

25               MS. M. MILLER:  Yes, Your Honor.  We have several
```

*Direct - Lopez*

```
 1   things.  We have the co-conspirator statements that were
 2   conditionally admitted.
 3               THE COURT:  Right.
 4               MS. M. MILLER:  We have the Exhibit 1818, which
 5   is the 302, that's the only one the government is seeking to
 6   introduce at this time.  We have received Mr. Martin's
 7   suggested redactions, and we do have a response to those.
 8   Then we have sent to Your Honor and filed today the proposed
 9   jury instructions based on Your Honor's order.  We still have
10   not received from the defendants their deposition designations
11   for Mr. Cann or Mr. Marson.  So that -- those are the four
12   items that I have as outstanding, Your Honor.  And we do have
13   tomorrow I think you scheduled us to be here at 10:45 to have
14   hearings.  So, since it's 7:00 p.m., if you would like us to
15   move -- do it --
16               THE COURT:  We could do it tomorrow.
17               MS. M. MILLER:  Okay.
18               THE COURT:  You want to do it tomorrow?
19               MR. MARTIN:  We said if there is hearings
20   necessary.  On the co-conspirator stuff, Your Honor, that was
21   filed, I haven't had a chance to respond to that.
22               THE COURT:  Okay.
23               MR. MARTIN:  I would like that opportunity.  And
24   I was planning --
25               THE COURT:  This is on the co-conspirator
```

 1    statements.  Okay.

 2              MR. MARTIN:  And there's also a second part of it

 3    on Mr. Cislo's --

 4              THE COURT:  Plea agreement.

 5              MR. MARTIN:  Plea agreement.  I do have some

 6    serious concerns with the government's limiting instruction,

 7    Your Honor, but --

 8              THE COURT:  Okay.  Let's go, so the 302s, what

 9    about the 302s?

10              MR. MARTIN:  I've done my part.  The government

11    has it.  I'm sure they have some objections, Ms. Miller

12    indicated that.  So you're going to have to take --

13              THE COURT:  Did you review his --

14              MS. M. MILLER:  I did, Your Honor, yes.

15              THE COURT:  Do you disagree or agree?

16              MS. M. MILLER:  I disagree, Your Honor.

17              THE COURT:  With everything that he wrote.

18              MS. M. MILLER:  Not with everything, Your Honor.

19              THE COURT:  All right.  So -- all right.  So we

20    can go over that.  We can go over that at hearing.  So on the

21    302s, we'll come back to that.  The co-conspirator statements,

22    Mr. Martin wants to review that again.  Or start to review

23    that.  Cislo plea agreement, Cislo's testifying is he not.

24              MS. M. MILLER:  He is, Your Honor, yes.

25              THE COURT:  So he's going -- is the plea

*Direct - Lopez*

1   agreement just going to come in through him, is it not?

2                   MS. M. MILLER:  Yes.

3                   THE COURT:  All right.  So if there is an

4   objection to having it brought in?

5                   MR. MARTIN:  Well, until he testifies, Your

6   Honor.

7                   THE COURT:  You want to wait until he comes in?

8   You want to wait until he testifies?

9                   MR. MARTIN:  Well, I want to make sure he

10  testifies because otherwise, we've got reversible error under

11  the Supreme Court decision *Hemphill versus United States* by

12  the Supreme Court in January of 2022.

13                  THE COURT:  What's the name of that case?

14                  THE WITNESS:  It's *Hemphill versus New York*,

15  decided January of 2022, by a Court in Washington, D.C.,

16  Something or another.

17                  THE COURT:  All right.  We'll find it.

18                  THE WITNESS:  Nine judges on it, Supreme Court I

19  think --

20                  THE COURT:  So Cislo plea agreement.  I'm sorry.

21  You're wanting the Cislo plea agreement before he testifies to

22  come in?  You want it to come in before that?

23                  MS. M. MILLER:  We're happy to wait until he

24  testifies for it to come in, Your Honor.

25                  THE COURT:  Okay.

1          MS. M. MILLER:  It was conditionally admitted by

2    Your Honor pending his testimony.  He is absolutely going to

3    testify.  So the concerns that Mr. Martin have will be

4    obviated by his testimony.

5          THE COURT:  All right.  So then there is --

6    what's -- and then the jury instruction, is that -- that's

7    something that the Court will consider that the jury

8    instruction conference, for concluding instructions.

9          MS. M. MILLER:  Yes, Your Honor.  And we think

10   that since some evidence has come in -- not evidence, argument

11   of Counsel has come in that could be confusing to the jury, we

12   think that it actually would be very valuable to give that

13   limiting instruction now and at the close of the evidence.

14   Both.

15         THE COURT:  I'm sorry, it's a pretty long

16   limiting instruction, as I see it.

17         MS. M. MILLER:  It is.

18         THE COURT:  And you want the Court to give all of

19   it?

20         MS. M. MILLER:  No, what we'll do, Your Honor, is

21   we'll highlight those things that we think Your Honor should

22   give based on the representations made on to the record by

23   Mr. McConwell, and then the rest could wait until the closing

24   instructions.

25         THE COURT:  Have you had a chance to review the

*Direct - Lopez*

proposed limiting instructions?

MR. MARTIN: I have skimmed it, Your Honor, and I have serious concerns about some areas of it because as we indicated earlier, the government's motion in limine, the door's been open by this witness's testimony, by other testimony and the limiting instruction in certain areas, and I don't have it in front of me -- I don't think applies.

THE COURT: All right. So we could get to that when we need to get to that.

MS. M. MILLER: Yes, Your Honor.

THE COURT: But, all right. So tomorrow then, the jurors will come back at 12 noon. And let's see --

MR. MCCONWELL: Your Honor.

THE COURT: Yes.

MR. MCCONWELL: Your Honor, can I ask for mercy on the time of any hearing we have in the morning. I've got about four hours of conference calls tonight.

THE COURT: We won't be here -- I'm not going to see you until 12 tomorrow.

MS. M. MILLER: Well, ten --

THE COURT: Well, 10 until 12 unless we have a hearing.

MS. M. MILLER: At 10:45.

THE COURT: Is there anything that's -- that is time sensitive that we have to the hearing before tomorrow?

1          MS. M. MILLER:  Well, I think the limiting

2    instruction, Your Honor, is absolutely time sensitive because

3    I --

4          THE COURT:  Let me tell you something on the

5    limiting instruction, I'm going to look at that later.  I want

6    him to review it.  So I'm not going to hear that right now.

7    On the limiting instruction, let me just tell you something,

8    if there is something at the moment that you feel the Court

9    needs do just make sure you -- you know flag it, not tag it,

10   flag it.

11         MS. M. MILLER:  That's what I'll do tonight, send

12   it to opposing Counsel, and then if we could be in before noon

13   so that we could address it with Your Honor because I have a

14   concern that when Mr. McConwell cross-examines Mr. Lopez, he

15   may attempt to go into that area.  And just for the record,

16   Your Honor, there is no waiver of illegality.  (Laughing.)  So

17   this whole idea that the government somehow waived because the

18   Court's order on the -- these issues came out after the

19   government was rebutting Mr. McConwell's opening statement is

20   just not supported by the law.

21         THE COURT:  Okay.  All right.  I don't --

22         MR. MCCONWELL:  I'm going to try to be very

23   careful to not cross over your order.  I do not appreciate

24   these continued accusations and in front of the jury.  And I

25   really ask that we quit doing what we've been doing with

1  regard to comments, antics, all sort of problems, I would

2  normally think wouldn't happen.

3          THE COURT:  Yeah, I think, Counsels, let's

4  remember the operative word of the day, remember how many

5  times I have to say that when beginning of this trial,

6  civility is the operative word.  So I would agree that let's

7  not make comments against each other.  If you have a problem,

8  you know, and clearly don't do it in front of the jury.  And

9  don't do it in front of me, but, I mean -- but if there is an

10  issue, if there is an issue regarding misstatement of evidence

11  just say misstatement of evidence, misstatement of fact.  You

12  know, argumentative, whatever, just stick with the proper

13  objection.

14          MS. M. MILLER:  And just for the record, Your

15  Honor, I'm not being personally attacking, I'm bringing the

16  Court's attention to the fact that Mr. McConwell's opening

17  statement and statement in front of jury and the questions of

18  Mr. Reed, that these pilots could be certified anywhere, are

19  what caused us to file that motion and will cause Your Honor

20  to actually enter that order.  So by reminding the judge and

21  making sure the record is clear, that it was his statements

22  that precipitated this, that is in no way a personal attack

23  and the jury is not here right now.

24          THE COURT:  Okay.  All right.  Remember, first of

25  all, opening statements are not evidence.

```
 1                MS. M. MILLER:  Correct.

 2                THE COURT:  So you don't have to worry about

 3       that.

 4                MR. MCCONWELL:  And I received this about two

 5       minutes before I left my hotel this morning, this limiting

 6       instruction.  I haven't had a chance to even read it.

 7                THE COURT:  Why don't we come back at 11:30 then.

 8                MS. M. MILLER:  Yes, Your Honor.

 9                THE COURT:  Tomorrow we start at 12, I'll see you

10       at 11:30.

11                MS. M. MILLER:  Yes, Your Honor.

12                MR. MCCONWELL:  That'll be fine.

13                THE COURT:  I guess the only thing that's time

14       sensitive -- well, at least according to the prosecutor is the

15       instruction, limiting instruction.

16                MS. M. MILLER:  Correct, Your Honor.

17                THE COURT:  But let's just see if we need to do

18       it.  Whether I agree with it or not is a different story.

19       Okay.  All right.  Anything else?  Anybody else want to get

20       anything else off their chest?

21                MR. MCCONWELL:  I think that's it.

22                MR. MARTIN:  Just want to get along, Judge.

23                THE COURT:  Listen, I feel like I'm in juvenile

24       court.  I feel like I'm a psychiatrist, a counselor sometimes

25       in this courtroom.  Yes.
```

*Direct - Lopez*

```
1              MS. MCCONWELL:  I'm not going to be on the record
2   for my comment.
3              THE COURT:  All right.  I think we need to hear
4   from Mr. Han; no, I'm just teasing.  I'll see all of you guys
5   tomorrow.
6              MS. M. MILLER:  Thank you, Your Honor.
7              (Proceedings concluded at 7:10 p.m.)
8                          * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

*Direct - Lopez*

```
 1                  May 18, 2022; 12:10 p.m.; Hagatna, Guam

 2                                * * *

 3

 4             THE COURT:  You want to call the case, and then

 5   we'll discuss it.  Okay, let's do it.

 6             THE CLERK:  Good morning, Your Honor.  This is

 7   Criminal Case No. 18-00010, *United States of America versus*

 8   *John D. Walker and Hansen Helicopters;* Jury Trial, Day 13.

 9             Counsel, please state your appearances, beginning

10   with the government.

11             MR. LEON GUERRERO:  *Buenas* and *hafa adai*, Your

12   Honor.  Steven Leon Guerrero on behalf of the United States.

13   Also present are Special Assistant U.S. Attorneys, Marie

14   Miller and Samantha Miller.

15             MS. M. MILLER:  *Hafa adai*, Your Honor.

16             MS. S. MILLER:  *Hafa adai*, Your Honor.

17             THE COURT:  *Hafa adai*, everyone.

18             MR. MARTIN:  Good afternoon, Your Honor.  Mack

19   Martin appearing on behalf of Jon Walker, who's also present.

20             THE COURT:  Okay, *hafa adai*, and good afternoon,

21   Mr. Walker, Mr. Martin.

22             MR. MCCONWELL:  Good afternoon, Your Honor.

23   Edward McConwell, Laura McConwell, Edward Han for Hansen

24   Helicopters.

25             THE COURT:  *Hafa adai*, everyone.  All right, you
```

1    may be seated.  First of all, I apologize for being a little

2    late, my lunch didn't come on time so I just needed to make

3    sure I had lunch.  That was beyond my control.  My staff

4    ordered it early and it just didn't come until -- I mean, I

5    didn't even finish my lunch.  It's still there.  I finished

6    half of it, but that's okay, number one.  Number two, I asked

7    the jurors -- and I need to get the schedule.  Can I get the

8    schedule?  I think I left it on my desk.

9            So I asked the jurors if we could switch --

10    remember you guys asked me, instead of going to dinner and

11    then coming back for an hour, so they're -- did you say

12    they're going to do it, they're good with that?

13            So they're good with that.  So today is

14    Wednesday.  We're starting now, the jurors are ready to go,

15    and we have our supper recess at 3:30.  So rather than do a

16    supper recess, we'll go 3:30 to 3:45 for recess, afternoon

17    recess, and 3:45 to -- What did we say?

18            JURY ADMINISTRATOR:  Either 5:15 or 5:30, Your

19    Honor, depending on how long --

20            THE COURT:  5:30.  Yeah, 5:30, that's an hour and

21    45 minutes, so 5:30.  And then we'll recess at 5:30, and then

22    they could just have their dinner afterwards.

23            Okay with everyone?

24            MS. M. MILLER:  Yes, Your Honor.  Thank you.

25            THE COURT:  Okay, thank you.  Thank you, Lani.

*Direct - Lopez*

1 And everything is fine with the jurors.

2 Now, I did review all of the requests. We can

3 get to those later, I don't think they're that urgent right

4 now, number one; and number two, let's go ahead and call in

5 the jury.

6 MS. M. MILLER: Yes, Your Honor.

7 THE COURT: Yes, Mr. Martin?

8 MR. MARTIN: Your Honor, I don't want to get in

9 trouble with the Court, so the government has filed a motion

10 for sanctions and I can't remember if the Court gave us a

11 deadline or if we're going to be able to address it after

12 trial. With all the things that have been filed recently, I

13 haven't had a chance nor has Mr. McConwell to respond to them.

14 THE COURT: I think I said on the issue of

15 sanctions I want to handle that after the trial, so I'm not so

16 worried about -- don't worry about briefing it now, let's just

17 focus on the trial because I'm pretty sure you're trying to

18 focus on getting your testimony in. So we'll work on the

19 briefing of that later.

20 MR. MARTIN: Thank you, Your Honor. I just

21 didn't want to get in trouble for not having it done.

22 THE COURT: You're not in trouble.

23 MS. MCCONWELL: Thanks, Your Honor. We were --

24 THE COURT: Yeah.

25 MS. MCCONWELL: That was my memory, that we were

```
 1   going to make sure --

 2              THE COURT:  Yeah, on any issues with attorney

 3   sanctions, I'll handle it after trial.  I generally do that.

 4   I don't want that to become a distraction for everybody.

 5              Yes?

 6              MR. MCCONWELL:  Your Honor, when I do my

 7   cross-examination, if I come close to an area that may be

 8   sensitive on the motions that are now pending, should we stop

 9   and I'll run it by you before I ask the question, if I think

10   it's close?

11              THE COURT:  Sure.

12              MR. MCCONWELL:  My understanding was I could

13   identify certain sections but I can't argue them or discuss

14   what they mean or any legal aspect, but I could identify the

15   existence of particular sections within the statutes or the

16   regulations.

17              THE COURT:  You know what, just don't overthink

18   it, just -- you know the Court's rulings with regard to some

19   of your arguments and just stay within the parameters of that.

20              MR. MCCONWELL:  I just didn't want somebody to

21   jump up and saying, you violated something.  Because I'm

22   trying not to, and say if I started in that, we can stop real

23   quick but --

24              THE COURT:  Yeah.

25              MR. MCCONWELL:  -- and take it up, if you would
```

*Direct - Lopez*

           like.  But I do intend to identify the different sections that
           are applicable to the situations, and he's already identified
           or discussed some of them in general, so...  I just wanted to
           give you notice on that.

1                      THE COURT:  All right, very well.

2                      MR. MCCONWELL:  Thank you.

3                      MS. M. MILLER:  I just want to make sure because
           I know, Your Honor, we don't want to waste time with the jury,
           but I'm kind of hearing that Mr. McConwell may be planning on
           going into a specific area that Your Honor has already ordered
           the defendants shall not go into.  So I don't think that it's
           reasonable to say to you, Your Honor, "Well, Your Honor, if I
           start going in there, you know, why don't you just stop me."

                       No, I think Counsel has to make sure that he
           understands your order, and if he doesn't, then reread it to
           make sure he does not violate your order.

                       THE COURT:  Okay, well, rather than talk about
           hypothetical, let's just get right to it.  Okay?  Let's just
           do it.  Let's just see what happens.  You guys just follow my
           orders, and the jury is ready to come in.

                       (Jury in at 12:15 p.m.)

                       THE COURT:  Please be seated.  Welcome back,
           ladies and gentlemen.  We're ready to proceed.

                       Mr. Leon Guerrero, you may go.

                       MR. LEON GUERRERO:  Thank you, Your Honor.

*Direct - Lopez*

Ms. Miller, if you can publish what has been
admitted as G-739, please.

THE CLERK:  Sorry, let me just double-check.

THE COURT:  I'm sorry?

THE CLERK:  What exhibit?

MS. MCCONWELL:  What exhibit?

MR. LEON GUERRERO:  739.

THE CLERK:  I'm just double-checking.

THE COURT:  Okay, 739.  Carmen said she's just
double-checking.  Okay.

Notice we have the shields gone?  Looks better,
right?  I felt like I was in a bubble for two years.

MR. LEON GUERRERO:  Thank you, Your Honor.

BY MR. LEON GUERRERO: (CONTINUING)

Q.   So Mr. Lopez, when we last left off last night, you
testified about the information on 739; correct?

A.   Correct.

Q.   And, again, can you please just remind the jurors
what was the concern you had regarding 739?

A.   This is the concern about getting an aircraft for an
inspector, he was choosing one.  They were getting an aircraft
for an inspector.

Q.   Thank you, sir.  Now, again, with you being a manager
of the South Florida FSDO Office, okay, is it appropriate for
a safety inspector to receive anything of value, service or

*Direct - Lopez*

1  compensation for the work they perform?

2      A.   Absolutely not.

3      Q.   And why not?

4      A.   Because our positions as inspectors are positions of

5  public trust.  And that means that we're doing the work for

6  the taxpayers and the flying public, and they trust on us to

7  make sure operations are -- are safe.  And when they fly an

8  aircraft, that the aircrafts are safe.

9          And if there is an inkling or feeling that inspector

10  is taking a bribe or a gift to help out an operator or an

11  applicant or an owner of an aircraft and overlook the safety

12  requirements, that's -- that puts the flying public, the

13  taxpayer in jeopardy.  And so, you know, it's a very important

14  position that we try to uphold and uphold that respect in the

15  aviation community and to the flying public and to the

16  taxpayers.

17      Q.   All right, sir.  And if you were made aware of such

18  information, what would you do?

19      A.   I would immediately report it to the FAA security and

20  to the Office of Inspector General Department of

21  Transportation.

22      Q.   And is that because the FAA doesn't have any law

23  enforcement kind of capabilities?

24      A.   Correct, we don't have criminal investigation

25  authority.

1    Q.   Sir, I want to direct your attention to what has been

2    identified as Government's Exhibit 6.

3                  THE COURT:  Okay, has this been admitted?

4                  MR. LEON GUERRERO:  It has not, Your Honor.

5                  THE COURT:  Okay, so previously been marked and

6    identified?

7                  MR. LEON GUERRERO:  Correct.

8                  THE COURT:  And No. 6, okay.

9    BY MR. LEON GUERRERO: (CONTINUING)

10   Q.   And, sir, being a manager of the FSDO office, you

11   earlier testified that you required your safety inspectors to

12   interact with owner operators of aircraft; correct?

13   A.   Correct.

14   Q.   And when you require this interaction, what's the

15   purpose behind that?

16   A.   It's -- I mean, dealing with aviation safety matters.

17   So typically, the owner operator is the main individual

18   responsible for the operation, and so we're dealing with them

19   in respect to safety issues, regulatory compliance issues and

20   those matters, applications that they may make, inspections

21   that we may have to do and coordinate.  So, yes, the

22   inspector's primary person dealing with is the owner operator.

23   Q.   Okay.  And with this interaction, is there anyone

24   else that the safety inspectors also speak with, if needed,

25   based on the review of the maintenance records?

*Direct - Lopez*

1    A.   Sure.  If they're dealing with maintenance records

2   and a mechanic is working on a U.S.-registered aircraft,

3   they're going to deal with the mechanic as well because

4   they're supposed to be certificated, U.S.

5   certificated-mechanics, so that's in accordance with the

6   Regulations, Part 65.  So we deal with them to make sure that,

7   you know, they're complying with the appropriate requirements

8   of the regulations and -- and -- and verify that, you know,

9   it's in compliance.  So, yes, we deal with them quite a bit.

10    Q.   And is it fair to tell members of the jury that you

11   conduct these interactions, give this information, and you do

12   this to determine whether an aircraft is airworthy or not?

13    A.   Yes.  That's one of the techniques we will use.  You

14   know, discussing issues that we may find in an inspection of a

15   logbook or inspection of an aircraft.  We'll discuss it with

16   the maintenance personnel, with the mechanic to see if, you

17   know, what was appropriately done, what was misrepresented.

18   So yes, absolutely, there's always a discussion with the

19   maintenance personnel.

20    Q.   Okay.  And, sir, in preparing for your testimony

21   today, did you have an opportunity to review what's been

22   identified as Government's Exhibit No. 6?

23    A.   I have, yes.

24         MR. LEON GUERRERO:  And, Your Honor, at this

25   time, I'm going to ask that Mr. Lopez be permitted to provide

testimony.  We're not looking to move the exhibit itself into

evidence, but we're going to ask that he be allowed to provide

testimony based on this mechanic that was employed with

Hansen.  It's not hearsay, as it falls under 801(d)(2) --

THE COURT:  If you're trying to get information

that's contained in this exhibit, which is a 302 FBI report,

then -- then -- it's not been admitted, so that's a different

story.  So if you're trying to ask him a question, just lay

the foundation, and we'll see what the objections are.  But

I'm not going to just give a blanket approval.

MR. LEON GUERRERO:  Okay.  Thank you, Your Honor.

BY MR. LEON GUERRERO:  (CONTINUING)

Q.    So Mr. Lopez, what was the purpose behind reviewing

what's been identified as Government's Exhibit No. 6?

A.    Because it was from a maintenance person -- somebody

performing maintenance on one of the Hansen Helicopters.

Q.    Okay.  And can you please tell members of the jury

who was the individual that agents had spoke to that's

referenced in Government's Exhibit No. 6?

A.    Jeffrey Sarimos.

Q.    And can you please tell members of the jury, did this

individual indicate what his employment was with Hansen?

A.    Yes.  Presently -- from 2014, he was the general

manager.

MR. MARTIN:  Your Honor, I object on the basis of

 1    hearsay.

 2                    THE COURT:  Okay, sustained.

 3                    MR. LEON GUERRERO:  Your Honor, if I may?  It's

 4    not hearsay under 801(d)(2), uppercase D.  This was a

 5    statement given to law enforcement.  This person is an --

 6                    THE COURT:  Okay, wait.  Let me just look at

 7    this.  801...

 8                    MR. LEON GUERRERO:  (d).

 9                    THE COURT:  (d)(2), which one?

10                    MR. LEON GUERRERO:  Uppercase D.

11                    THE COURT:  Okay, 801(d)(2)...  Okay, let me --

12    801(d)(2)(D), okay.  Made by parties --

13                    So this is -- you've already testified Jeffrey

14    Sarimos...  Okay, I already read it, so I know what you're

15    trying to bring it out under.

16                    Yeah, so your point, Mr. Martin?

17                    MR. MARTIN:  This is not a statement by an

18    alleged co-conspirator, Your Honor.  This is a statement --

19    first of all, it's an FBI report and it's excluded under that

20    basis; and second of all, it is a -- not a statement by an

21    alleged co-conspirator, it is a statement by someone that was

22    interviewed by the FBI who is not a co-conspirator.

23                    THE COURT:  Right, so 801(d)(2), capital D.

24                    You see that?

25                    MR. MARTIN:  He said "E", Your Honor.

1          MR. LEON GUERRERO:  No, I said "D", as in dog.

2          THE COURT:  D, as in dog.

3          MS. M. MILLER:  D, as in dog.

4          THE COURT:  Yeah.  Mr. Martin, can you see that?

5          MR. MARTIN:  I see where it is, Your Honor.  And

6  it's still hearsay.  It's offered for the truth of the matter

7  asserted herein.  He's not here to testify, and this statement

8  was not made to him.  He is reading from a report.  He didn't

9  hear these statements being made.  He is reading from a

10 report, and this is a summary of Agent -- if I might have just

11 a second?  This is a summary of Peter Prozac.

12         THE COURT:  Prozik.

13         MR. MARTIN:  I'm sorry, Judge, Prozik.  That's

14 the Oklahoma in me, I apologize.

15         THE COURT:  Uh-huh.  He says that.

16         MR. MARTIN:  Peter Prozik, so he's reading from a

17 report.

18         THE COURT:  All right, the Court will sustain the

19 objection.  You got to lay the foundation for (2)(D), so the

20 Court will sustain the objection on lack of foundation.

21         So just set up the foundation for that.

22         MR. LEON GUERRERO:  Sure.

23 BY MR. LEON GUERRERO:  (CONTINUING)

24    Q.   So Mr. Lopez, based on your review of what's been

25 marked as Government's Exhibit No. 6, what did you find was

*Direct - Lopez*

```
1    the relationship between Mr. Sarimos and Hansen Helicopters?

2        A.   Mr. Sarimos was employed by Hansen Helicopters as a

3    general manager, initially as the mechanic.

4        Q.   And did he indicate how long he worked for Hansen

5    Helicopters?

6                 MR. MARTIN:  Your Honor, this is --

7                 THE COURT:  Sustained.  Objection will be

8    sustained.

9                 MS. MCCONWELL:  And Hansen joins.

10                THE COURT:  Okay, you join the objection.

11   Sustained.

12                You're still pulling out hearsay, so the Court is

13   --

14                MR. LEON GUERRERO:  I'm trying to lay the

15   foundation in this individual --

16                THE COURT:  Yeah, but that's the wrong foundation

17   question, so try to --

18                MR. LEON GUERRERO:  I'll move on, Your Honor.

19                THE COURT:  Okay.

20   BY MR. LEON GUERRERO: (CONTINUING)

21       Q.   So Mr. Lopez, can you please -- I want to direct your

22   attention to what has been conditionally admitted as

23   Government's Exhibit 316.

24                THE COURT:  Is that 3-1-6?

25                MR. LEON GUERRERO:  3-1-6.
```

*Direct - Lopez*

 1              THE COURT:  Okay.

 2    BY MR. LEON GUERRERO: (CONTINUING)

 3         Q.   And, sir, have you had an opportunity to review

 4    Government's Exhibit 316?

 5         A.   Yes.

 6         Q.   All right.  And can you please read the e-mail

 7    correspondence that was given or that was written by Turner to

 8    Randy Rogers?

 9         A.   Yes.

10         Q.   So right in the middle part of that e-mail.

11         A.   "Okay.  I don't think I need to give them any ammo to

12    come back.  Hold the plates.  I'll just let them see the HH

13    only."  Then it says, sent from my iPhone on August 10, 2016,

14    at 3:30 p.m., Turner Kapp, Turner@hansenhelicopters.com.

15              "If you want, just mark them RPC to keep him out of

16    them.  We have RPC4900 through 4915.  These guys have strict

17    orders not to look at anything other than the airframe they

18    are to inspect.  They explained it in detail several times as

19    I refused to show them our shop.  I don't see any need for

20    them to know of our relationship, other than we are just a

21    client."

22         Q.   Okay.  And that last -- the information you just

23    read, that was sent from Turner Kapp; correct?

24         A.   Turner Kapp to Randy Rogers.

25         Q.   All right.  And what's the date of that

1   correspondence?

2       A.   Wednesday, 10 August, 2016.

3       Q.   Okay.

4            MR. LEON GUERRERO:  And Ms. Miller, if you can

5   show the entire e-mail here.

6   MR. LEON GUERRERO: (CONTINUING)

7       Q.   Okay.  And you see -- you see the aircraft that's

8   reflected on this e-mail; correct?

9       A.   Yes.

10      Q.   And based on your training and experience, what's the

11  nationality of those aircraft?

12      A.   Philippines.

13      Q.   And, sir, can you please tell members of the jury, is

14  there anything on this e-mail that caused you concern?

15      A.   Sure.  It looks like they're holding back a plate or

16  data plate that they only want them to inspect certain

17  aircraft, not all the aircraft, so it's concerning.

18      Q.   I want to show you what has been admitted into

19  evidence as Government's Exhibit 317.

20           And, sir, can you please read from the bottom up this

21  e-mail correspondence that's of 317 that's been admitted into

22  evidence?

23      A.   Sure.  Turner:  "Thanks."  And then Randy, "What you

24  think?  I guess I'll bolt the alignment tool on another

25  machine and see if it is consistent?"

*Direct - Lopez*

        And then on top is "Good morning, Turner.  I'm boxing
up paperwork for 369-TG to send to you.  Do you want the data
plate?  Also, a friend of mine called me, he has paperwork,
data plate C of A for this 500-C that burnt.  No accident
report, no insurance report and no report to anyone.  He has
all logs, and it's not on destroyed sheet.  He wants 20k for
it.  Are you interested?

        We're getting Hughes alignment tool this week, we
will let you know what we find.  I remember one time I had a
boom faring that was off to the right, we cut a .010 half moon
shim and put in between boom and boom faring, it brought it
within limits.  Just a thought.  Later, Randy."

     Q.    And, sir, who is this e-mail from?

     A.    It's from Randy Rogers, TCI.Randy@gmail.com.

     Q.    And who was it to?

     A.    Turner Kapp, Turner@hansenhelicopters.com.

     Q.    And what was the date of this e-mail correspondence?

     A.    Monday, 18 July, 2016.

     Q.    And, sir, based on your training and experience, is
there anything that's conveyed in this exhibit that caused you
concern?

     A.    Yes.  They're offering -- he's offering an aircraft
to -- an aircraft that's completely burnt, and it just has a
data plate and the certificate of airworthiness, and it's not
listed on any destroyed sheet, so it's concerning.

1    They're buying just -- it appears they're buying just

2 the paperwork and a data plate for that aircraft and not -- an

3 aircraft that's completely destroyed.

4    Q.   All right.  Thank you, sir.

5         I want to direct your attention to what's been

6 admitted into evidence as Government's Exhibit 672.

7         And, sir, have you -- I'm showing you what has been

8 admitted into evidence as Government's Exhibit 672.  And, sir,

9 who's this -- and we'll read from the middle part up -- who's

10 this e-mail from in the middle portion of this exhibit?

11   A.   It says Jeffrey Sarimos.

12   Q.   And what was the date of the e-mail?

13   A.   December 21, 2015.

14   Q.   Okay.  And I'm sorry, what is the e-mail address for

15 Jeffrey Sarimos?

16   A.   It's JeffMI@hansenhelicopters.com.

17   Q.   Again, who was this e-mail correspondence to?

18   A.   Turner Kapp at Turner@hansenhelicopters.com.

19   Q.   Okay, and what was the subject of this e-mail?

20   A.   HH.

21   Q.   Can you please read to the members of the jury what's

22 the content of this e-mail -- in the middle portion?

23   A.   "Hi Turner, sticker and data plate for N471M you sent

24 me.  I will put this back to N471M.  Please advise.  Thanks,

25 Jeffrey Sarimos."

1    Q.   And what was the name of the company that Jeffrey

2    Sarimos said he was working for?

3    A.   Hansen Helicopters Marshalls, Inc.

4    Q.   Okay, and is this the same Hansen Helicopters

5    Marshalls, Inc. that you had reviewed in Government's Exhibit

6    No. 6?

7    A.   Yes.

8    Q.   Okay, and can you please read the top portion of that

9    -- of this e-mail?

10   A.   Yes, it says, "Okay, I will put it back to N471M.

11   Thanks."

12   Q.   And who sent that e-mail?

13   A.   That was sent by Turner Kapp.

14   Q.   No, who sent the e-mail?

15   A.   Who sent the e-mail?

16   Q.   Yes.

17   A.   It's from Jeffrey --

18   Q.   Okay.

19   A.   -- Sarimos.

20   Q.   You said it was to Turner Kapp?

21   A.   To Turner Kapp, yes.

22   Q.   And what was the subject of that e-mail?

23   A.   HH.

24   Q.   What was the date of that e-mail?

25   A.   December 21, 2015.

1        MR. LEON GUERRERO:  Your Honor, I -- if

2   Ms. Miller can pull up Government's Exhibit No. 6.

3        So for purposes of the objection regarding

4   foundation, Your Honor, with what this witness has testified,

5   that the exhibit, which has been admitted, 672, this is the

6   same individual that law enforcement had spoken to that's an

7   employee of Hansen and, therefore, under Rule 801(d)(2),

8   uppercase D, we submit that the statements should be coming in

9   because they're not hearsay, they're a party admission.

10        THE COURT:  Okay.  Yes?

11        MR. MARTIN:  They're hearsay for this person,

12   Your Honor.  He didn't take the statement.  He's reading a

13   report that was prepared by Mr. Prozik, Agent Prozik of the

14   FBI.  He's not with the FBI.  He's just reading a document,

15   and that's hearsay.

16        MR. LEON GUERRERO:  And I also want to direct

17   your attention, Your Honor --

18        THE COURT:  Okay, wait.  Hold on.

19        Any other objection?

20        MS. MCCONWELL:  Hansen joins.

21        THE COURT:  Joins.  That's your objection because

22   who -- the person who is reporting it is not the person who

23   took it?

24        MR. MARTIN:  The person who is testifying about

25   it, it's double hearsay, Judge, at the very least.  You got to

*Direct - Lopez*

```
1   overcome every one of them.  He is going to read from a
2   statement that somebody else prepared that contains hearsay,
3   and that's not permitted under the rule.
4              THE COURT:  Okay, but under this rule it's
5   non-hearsay.  If it's an admission by a party opponent -- we
6   don't have to overcome any hearsay hurdles if it's
7   non-hearsay.
8              MR. MARTIN:  It's non-hearsay as to Agent Prozik,
9   Your Honor.  As to this person, it is.
10             MR. LEON GUERRERO:  Your Honor, it's still --
11  it's a party admission.  This individual was an employee of
12  Hansen, he gave statements against the interest of the
13  corporation and against the interest of Defendant Walker.
14  It's not hearsay.
15             And also, I'd point Your Honor's attention to
16  Rule 703, basis of expert opinion testimony.
17             THE COURT:  Well, he's not -- is he qualified as
18  an expert?
19             MR. LEON GUERRERO:  Yeah.
20             THE COURT:  He's qualified as an expert, that's
21  true, but I mean, you're telling me that he's presenting this
22  as -- this particular statement as an expert?
23             MR. LEON GUERRERO:  He testified that part of his
24  duties as a manager of South Florida FSDO is to oversee the
25  safety inspectors, and he indicated that part of what he
```

 1   requires his safety inspectors, is to speak with owner

 2   operators of aircraft.  That includes:  Speaking with the

 3   mechanics so they can determine whether or not an aircraft is

 4   airworthy.

 5            This witness is relying on information, which

 6   again is statements from Mr. Sarimos, an employee of Hansen,

 7   to determine whether the aircraft that was asked about was

 8   airworthy.  And given that --

 9            THE COURT:  Have you -- I got it.  I understand.

10   You just have to just point me -- I got it.

11            My question though is -- okay.  What about during

12   the time frame, is the time frame correct?  It says during the

13   relationship and while it existed.

14            MR. LEON GUERRERO:  Yes.

15            THE COURT:  Within the scope of that relationship

16   and while it existed.

17            MR. LEON GUERRERO:  Mr. Sarimos is still working

18   for them to the government's knowledge, so...

19            THE COURT:  Well, it doesn't matter to his

20   knowledge, that's not evidence before the Court.

21            MR. LEON GUERRERO:  He's still an employee.

22            THE COURT:  I know, but has that presented --

23   well, I don't care what you know.  What I care is what's been

24   presented to the Court.  Has that been brought in, that he

25   still works for them?

 1              MR. LEON GUERRERO:  No.

 2              THE COURT:  So then you can't testify to that,

 3      you're testifying to that.

 4              My question is -- so the part about within the

 5      scope of that relationship and while it existed.  So was it

 6      existing at that time?

 7              MR. LEON GUERRERO:  It was.

 8              THE COURT:  Okay, did he say that?

 9              MR. LEON GUERRERO:  Agent Prozik, when he

10      testified, he provided testimony about Mr. Sarimos and that he

11      interviewed him and that he also gave the statements regarding

12      Hansen's operations in that region.  He provided testimony on

13      that.

14              THE COURT:  Yeah, all right.  I'm just talking

15      about the time frame.

16              All right.  Mr. Martin, anything further?  And

17      Ms. McConwell?

18              MR. MARTIN:  Your Honor, he may offer an opinion

19      based on what's contained in there.  He can't testify to

20      what's contained in there because 703 prohibits.  If the facts

21      or data would otherwise be inadmissible, the proponent may

22      only disclose them to the jury if they are -- if they're

23      probative value helping the jury evaluate his opinion and it

24      outweighs the prejudicial effect.

25              This is still a hearsay statement, and I submit

        1    to the Court, he may base an opinion on what's contained there

        2    but he can't testify to it.

        3            THE COURT:  All right.  Anything further,

        4    Ms. McConwell?  You're joining in the objection?

        5            MS. MCCONWELL:  Yes, ma'am.

        6            THE COURT:  So the Court will overrule the

        7    objection and find that 801(d)(2), capital D has been met.

        8    This is non-hearsay.

        9            So go ahead, you may proceed.

       10            MR. LEON GUERRERO:  Thank you, Your Honor.

       11    BY MR. LEON GUERRERO: (CONTINUING)

       12    Q.    Mr. Lopez, in your review of Government's Exhibit No.

       13    6, again, can you please tell members of the jury what was

       14    Mr. Sarimos's position with Hansen?

       15    A.    He initially was a mechanic since 2006, and then in

       16    2014, he became the general manager in Majuro for Hansen

       17    Helicopters.

       18    Q.    And, sir, did he indicate what were some of his

       19    duties while working for Hansen?

       20    A.    Initially -- again, he was a mechanic on boats, on

       21    tuna boats, and then he was a general manager in Majuro

       22    organizing parts and getting parts shipped to different

       23    aircraft.

       24    Q.    Okay.  And based on testimony that you've heard

       25    during this trial, was there anything that you observed in

*Direct - Lopez*

1  this interview with Mr. Sarimos that caused you concern?

2      A.   Several.  Mr. Sarimos made statements that Mr. Kapp

3  had not been in -- had been in Majuro three times, that he had

4  seen a logbook entry by Mr. Kapp when the aircraft was out on

5  a tuna boat and wasn't in Majuro, had departed the month

6  before to a tuna boat.

7          He also made statements that Mr. Kapp had instructed

8  him to change three serial numbers -- I'm sorry, three data

9  plates or -- three data plates on three aircraft of different

10  data plates -- or put the data plates -- I'm sorry -- from one

11  aircraft to other aircraft and changed the registration

12  numbers as well on three different aircraft.

13          He also indicated that he didn't -- they didn't

14  possess mechanic -- U.S. mechanic certificates.  And also,

15  that some of the parts they were using didn't have serviceable

16  tags on 'em.

17      Q.   Now, sir, you indicated that Mr. Sarimos had

18  indicated that Turner Kapp was creating logbook entries that

19  he didn't do.  Can you -- do you recall what aircraft that was

20  for?

21      A.   November 9068F, so N9068F.

22      Q.   Okay.  And as it pertains to that particular

23  aircraft, what did Sarimos say Turner did or did not do?

24      A.   That he made a logbook entry when -- he wasn't -- he

25  didn't know how he made the logbook entry because the aircraft

1  was on a tuna boat and not where Kapp was at.

2  Q.  And did he indicate whether Kapp was present at his

3  location at that time?

4  A.  That -- he indicated he wasn't there during that

5  time.

6  Q.  Thank you.  Now, sir, do you recall hearing testimony

7  from FBI Special Agent Peter Prozik regarding what was alleged

8  to be N243D in Vanguard -- or I'm sorry -- Valdosta, Georgia?

9  A.  Yes.

10  Q.  And he gave testimony about the search warrant that

11  occurred there?

12  A.  Yes.

13  Q.  And do you recall testimony in which he said that the

14  data plate for this N243D was in the drawer of Randy Rogers?

15  A.  Yes.

16  Q.  Okay.  And did you see concern regarding the

17  testimony that he gave regarding that particular situation?

18  A.  Yes.  The data plate was not with the aircraft, it

19  was on somebody's desk and the aircraft was ready to be

20  shipped.

21  Q.  And why is that a problem?

22  A.  Because the data plate is issued by the manufacturer

23  of the aircraft when it's originally built, and it stays with

24  the aircraft.  It identifies that aircraft.  And yeah, there

25  is times where you could take it off and make repairs around

1   the area, if needed, but it always should be maintained with

2   the aircraft because it's how you know what aircraft it is,

3   what appropriate instructions for continuous airworthiness.

4   In other words, how it's maintained in an airworthiness

5   condition.

6        There is, you know, the manufacturer and the FAA

7   issue mandatory bulletins and airworthiness directives to make

8   sure that that aircraft -- if issues come up with that

9   aircraft and they're identified by serial numbers, so the only

10   way you know that you're always going to maintain that

11   aircraft in a safe manner to operate, to keep people safe is

12   the data plate that was initially born with remains on that

13   aircraft, and that is always that aircraft.  It's not to be

14   removed and put it somewhere else or take it to another

15   aircraft.  You'll never know those -- what that aircraft is,

16   what it was, if it's truly safe for operations.

17   Q.   Thank you, sir.  Now, I want to show you what has

18   been identified -- and it hasn't been admitted, Your Honor --

19   what's been identified as Government's Exhibit 523.

20        THE COURT:  Okay, 5-2-3?

21        MR. LEON GUERRERO:  Yes, Your Honor.

22        THE COURT:  Okay.

23        MS. S. MILLER:  I'm sorry, my computer froze for

24   a second.  It's coming back now.

25        MR. LEON GUERRERO:  No problem.

*Direct - Lopez*

```
 1            MS. S. MILLER:  We got it.
 2   BY MR. LEON GUERRERO: (CONTINUING)
 3       Q.   All right, sir -- and I'm showing you what has been
 4   identified as Government's Exhibit 523.
 5            Sir, have you seen this document?
 6       A.   Yes.
 7       Q.   Okay.  And have you had a chance to review the
 8   contents of this document?
 9       A.   Yes.
10            MR. LEON GUERRERO:  Your Honor, I'd move
11   Government's Exhibit 523 into evidence based on the
12   stipulations that defense has -- has had regarding the
13   seizures of digital data.  And also, it should come in as a
14   party admission, co-conspirator statements, and I'd move for
15   its admission.
16            MS. MCCONWELL:  Your Honor, we object to hearsay.
17   Hansen Helicopters does.
18            THE COURT:  Okay.  Mr. -- yes, Mr. Martin?
19            MR. MARTIN:  I join that objection, Your Honor,
20   on behalf of Mr. Walker.
21            MR. LEON GUERRERO:  Yes, Your Honor.  Under
22   Rule 801(d)(2)(E), these are co-conspirator statements.
23            THE COURT:  You don't have to repeat it, just
24   tell me the numbers.
25            MR. LEON GUERRERO:  Co-conspirator statements,
```

*Direct - Lopez*

1   801(d)(2) --

2              THE COURT:  B?

3              MR. LEON GUERRERO:  (d)(2), uppercase E.

4              THE COURT:  B, all right.

5              MR. LEON GUERRERO:  E, as in echo.

6              THE COURT:  E, 801(d)(2)(E)?  Okay.  That's what

7   you're offering it under?

8              MR. LEON GUERRERO:  Yes, Your Honor.

9              THE COURT:  The Court will overrule the objection

10  and admit 5-2-3 into evidence.

11             MR. LEON GUERRERO:  Thank you, Your Honor.

12  (Exhibit 523 admitted)

13  BY MR. LEON GUERRERO: (CONTINUING)

14      Q.   Mr. Lopez, who was this e-mail from?

15      A.   Rufus Crowe at Rufus@americopters.com.

16      Q.   And who is this e-mail to?

17      A.   Jon Walker at jwalker@guam.net.

18      Q.   And what was the date of this e-mail?

19      A.   14 March, 2013.

20      Q.   And what was the attachments on this e-mail?

21      A.   IA renewal documents.

22      Q.   And, sir, can you please read the contents of this

23  e-mail to the members of the jury?

24      A.   Sure.  "Hi, Jon, Tim e-mailed me these IA renewal

25  forms today.  He said don't worry about the accuracy of the

*Direct - Lopez*

1  items submitted, he's not going to check them, but just make

2  sure that the number of items meets the minimum for renewal.

3  He needs them by the end of the month.  He said he'll bring

4  out your IA cards and collect the original documents when he's

5  here in April.  Turner, I don't want to hear any shit from

6  you.  As the Nike ad says, 'Just do it,' Rufus."

7      Q.    And, sir, in reading this particular exhibit, is

8  there any concerns that you have being the manager of the FSDO

9  office?

10     A.    Yes.  As an inspector, I mean, the statements that,

11 "don't worry about the accuracy, the inspector's going to do

12 it."  It's concerning because these documents are important.

13 It's, you know, for renewal of an inspection authorization.

14         An inspection authorization is a little higher level

15 than the airframe and power plant mechanic.  They're able to

16 do additional stuff that an FAA airframe and power plant

17 mechanic can do.

18         So it comes with a lot of knowledge.  I mean, you

19 have to take additional tests which, you know, those tests are

20 important because -- and the knowledge is important because,

21 you know, you learn -- you know that you have to return -- you

22 know, the work is on U.S.-registered aircraft that have to be

23 certificated individuals.  So you know, when you're hiding or

24 you're trying to fill out forms and they're not accurate and

25 you're not meeting the requirements, it's very concerning for

1  this.  It's a significant certificate they hold.

2       Q.   And when you say, sir, "it's additional training,"

3  it's additional training on top of the airframe and power

4  plant certifications that you previously testified, that's --

5  it's a lengthy process as well; correct?

6       A.   Correct.  It's additional authorization.  They have

7  to take additional tests to get that authorization.

8       Q.   And then you also testified earlier that Defendant

9  Walker also had renewed his IA certificate as well; correct?

10      A.   Correct.  We had seen that earlier; yes.

11      Q.   Now, sir, I want to direct your attention to what's

12 been admitted into evidence as Government's Exhibit 1401.

13                THE COURT:  1401?

14                MR. LEON GUERRERO:  1401, Your Honor.

15                THE COURT:  Okay.

16 BY MR. LEON GUERRERO: (CONTINUING)

17      Q.   And, sir, have you had an opportunity to review this

18 document in preparation for your testimony?

19      A.   Yes.

20      Q.   Okay.  And I want to direct your attention to --

21 Well, let me ask you this:  What was -- if you can blow up the

22 first part of this document, Ms. Miller.

23           And who is this information for?

24      A.   This is for Marvin Reed at Hansen Helicopters from

25 the FV American Triumph.

1      Q.   And what aircraft did this apply to?

2      A.   To U.S. Registered Aircraft N500LA.

3      Q.   And what was the date of this information?

4      A.   July 28, 2014.

5      Q.   If I can direct your attention to 1401-4.

6           THE COURT:  I'm sorry, what is this -- has this

7  been admitted?

8           MR. LEON GUERRERO:  It has, Your Honor.

9           THE COURT:  Okay, go ahead.

10  MR. LEON GUERRERO: (CONTINUING)

11      Q.   So, sir, in looking at the photos that are depicted

12  here, is there anything based on your training and experience

13  that causes you a concern?

14      A.   Yes.  As -- you know, as a certificated mechanic, as

15  an inspector, as a manager, it's very concerning.  They're

16  using duct tape to put on the windshield of an aircraft which

17  obstructs -- it obstructs the vision of the pilot.  So it's a

18  very dangerous situation.

19      Q.   Okay.  And if I can direct your attention to 1401-5.

20  Same question, any concerns that you see here?

21      A.   Yes.  It's the duct tape that's put on the windshield

22  and that has obstruct the pilot's vision.

23      Q.   Thank you, sir.

24           Now, I want to direct your attention to what has

25  been, I believe, admitted into evidence as Government's

Exhibit 1538?

          THE COURT:  1538?

          MR. LEON GUERRERO:  Yes, Your Honor.

          THE COURT:  Okay.

          MR. LEON GUERRERO:  Yeah, it's been admitted.

BY MR. LEON GUERRERO: (CONTINUING)

    Q.    And, sir, I'm showing you what's been admitted as
1538; can you please tell members of the jury who sent this
e-mail?

    A.    Turner Kapp.

    Q.    And who is it to?

    A.    Rufus Crowe.

    Q.    And what aircraft was this applicable to?

    A.    U.S.-registered aircraft N9068F.

    Q.    And what was the date of this correspondence?

    A.    September 9, 2015.

    Q.    And could you please read this e-mail to the members
of the jury, please.

    A.    Sure.  "6/11/15, 6973.6, 100-hour will give us
100-hour entry.  It actually needs one more, but I don't think
I can pull a -- I saw it as it came by Guam more than once.
Thoughts?  I'm looking at the 8/11/15 Hobbs report."

    Q.    And just for the members of the jury, just for their
information, this 100-hour entry, what does that mean to you
based on your training and experience?

 1      A.   That's typically the 100-hour inspection required by

 2   the manufacture's program.   It's -- an inspection is required

 3   every hundred hours the aircraft flies and it has to be

 4   documented in maintenance records.

 5      Q.   And could you please tell the members what a Hobbs

 6   report is?

 7      A.   Hobbs report is typically how an aircraft -- a clock

 8   that the aircraft has so it could track the amount of flight

 9   or the flight times.

10              THE COURT:  I'm sorry, what does that mean?  The

11   Hobbs, what does that mean again?

12              THE WITNESS:  It's, like, a clock the aircraft

13   has and it tracks the time.  It's called Hobbs because that's

14   the manufacturer of it.  It tracks the time the aircraft

15   flies.

16              THE COURT:  How long the aircraft is in the air?

17              THE WITNESS:  In the air, yeah.

18              THE COURT:  So how many hours?

19              THE WITNESS:  Yeah, the flight hours.

20              THE COURT:  So when it says "8/11/15," that's

21   just the number of hours?

22              THE WITNESS:  No, that's the date, August 11,

23   2015, that was the report for the Hobbs time.

24              THE COURT:  Oh, I see.  For the time, okay.

25   That's the date of the report?

*Direct - Lopez*

 1                    THE WITNESS:  That's the date of the report for

 2     the Hobbs time.

 3                    THE COURT:  Thank you.

 4                    THE WITNESS:  That's how I interpret it.

 5                    THE COURT:  All right, thank you.

 6     BY MR. LEON GUERRERO: (CONTINUING)

 7        Q.   And is there any concerns you have with this e-mail?

 8        A.   Yes.  It seems like they're trying to just document

 9     hours, inspections on certain hours or hundred-hour

10     inspections that weren't done.  They're trying to document

11     into the records now, they're trying to catch up.

12        Q.   And, sir, I want to direct your attention to what's

13     been admitted into evidence as Government's Exhibit 679.

14                    MS. MCCONWELL:  Your Honor, I don't have that 679

15     has been --

16                    THE COURT:  I'm sorry, can you repeat that?  Can

17     you get the mic close.

18                    MS. MCCONWELL:  I don't have that 679 has been

19     admitted.

20                    MR. LEON GUERRERO:  I have that as being

21     admitted...

22                    THE COURT:  Carmen, can you double-check?

23                    MR. LEON GUERRERO:  May 13, 2022.

24                    THE COURT:  Okay, we'll verify.

25                    THE CLERK:  It's verified.

*Direct - Lopez*

1          THE COURT:  Yeah, it has been admitted?

2          THE CLERK:  Yes, ma'am.

3          THE COURT:  Okay.

4          MS. MCCONWELL:  It has been admitted?

5          THE COURT:  Yeah.  Go ahead.

6   BY MR. LEON GUERRERO: (CONTINUING)

7      Q.   So Mr. Lopez, from the bottom up, I'm going to have

8   you read this e-mail.  So on the bottom part of this exhibit,

9   who is the sender of this e-mail?

10     A.   The sender?  Is from Turner Kapp.

11     Q.   And what e-mail address, please?

12     A.   Turner@hansenhelicopters.com.

13     Q.   And who was this e-mail to?

14     A.   Rufus Crowe.

15     Q.   And what was the date of this e-mail?

16     A.   September 10, 2015.

17     Q.   What was the subject of the e-mail?

18     A.   HH4.

19     Q.   Okay.  And based on your review of the evidence and

20  testimony, is that Hansen Helicopters?

21     A.   Yes.

22     Q.   And can you please read that bottom correspondence,

23  please?

24     A.   It says, "Majuro stamps your passport.  Think there's

25  a possibility it could go that far?  I get caught signing off

*Direct - Lopez*

1   something that there was no way I did, that will go criminal."

2       Q.   And, sir, if I can have you read the middle portion

3   of this exhibit.

4            Who is it from?

5       A.   Rufus Crowe.

6       Q.   And what's the e-mail address?

7       A.   It's Rufus@hansenhelicopters.com.

8       Q.   And who was it to?

9       A.   It was to Turner Kapp.

10      Q.   The same e-mail address?

11      A.   Turner@hansenhelicopters.com.

12      Q.   And what was the date?

13      A.   September 10, 2015.

14      Q.   Okay.  Same subject?

15      A.   Yes, HH4.

16      Q.   And can you please read the e-mail correspondence

17  from Crowe to Defendant Kapp?

18      A.   Yes.  "I thought you put in the logbook that the

19  helicopter was disassembled and shipped to Guam when the boat

20  went to the shipyard?"

21      Q.   And I want to direct your attention to the top

22  portion.  Who sent that -- this e-mail, the information on the

23  top?

24      A.   It's sent from Turner Kapp.

25      Q.   And who is it to?

*Direct - Lopez*

1    A.   Rufus Crowe.

2    Q.   And same subject?

3    A.   Yes.

4    Q.   And date of the e-mail?

5    A.   September 10, 2015.

6    Q.   And please read the content of that e-mail to the

7    members of the jury, please.

8    A.   "Yeah, that's no problem to the 120-15 ATT 6871.0.

9    It's signing stuff after that.  No one knows when it went on

10   the boat.  Actually, was a fare time after 120-15?  It's the

11   signoff's after it was in Guam that I'm concerned about."

12   Q.   Okay.  And this information that's reflected on this

13   particular exhibit, was this information consistent to what

14   you reviewed on Mr. Sarimos's statements to law enforcement?

15   A.   Yes.

16           MR. LEON GUERRERO:  Now, Your Honor, I'm going to

17   have -- and I'm going to ask the witness to step from the

18   stand and come here to the ELMO.  I'm going to direct him

19   Government's Exhibit 1520-1 to 1520-4, which has already been

20   admitted into evidence.  I'm going have him explain the

21   contents of that exhibit to the members of the jury.

22           THE COURT:  Okay.  What is 1520-1, which one is

23   it?

24           MR. LEON GUERRERO:  It is --

25           THE COURT:  Just show it to me.  It's already

*Direct - Lopez*

```
 1    been admitted?

 2               MR. LEON GUERRERO:  Yes.

 3               THE COURT:  Just show it to me.  You want him to

 4    come down to the ELMO?

 5               MR. LEON GUERRERO:  To the ELMO.  Because for the

 6    next line of questioning, I want him to be able to explain --

 7    it's going to be easier for him to explain the contents of

 8    what's here to the jury if he's able to point it out here on

 9    the ELMO.

10               THE COURT:  Okay.

11    BY MR. LEON GUERRERO: (CONTINUING)

12         Q.   So Mr. Lopez?

13               THE COURT:  You may do so, come on down.

14               MR. LEON GUERRERO:  Please come down.

15    BY MR. LEON GUERRERO: (CONTINUING)

16         Q.   And, sir, what I'm going to have you do is explain,

17    based on your review, what was concerning on Government's

18    Exhibit 1520, based on the e-mail correspondence that you've

19    testified to and based off the information reviewed regarding

20    Sarimos.

21         A.   So the aircraft was --

22               COURT REPORTER:  Can you speak into the

23    microphone.

24               THE WITNESS:  Better?

25    BY MR. LEON GUERRERO: (CONTINUING))
```

*Direct - Lopez*

```
 1       Q.   And sir, just real quickly, you see a reference to
 2   serial number?
 3       A.   Yes, 2-1-0-2-9-3-S.
 4       Q.   Okay.  And based on the evidence and testimony that's
 5   been presented, does that belong to 9068 Foxtrot?
 6       A.   Yes.
 7       Q.   And can you please explain to members of the jury
 8   what caused you concern on this exhibit?
 9       A.   Yes, so on January 8, 2014 --
10            MS. M. MILLER:  Hold on, Your Honor.  It's not on
11   the juror's --
12            THE COURT:  We'll get it fixed.  Is everybody --
13   you guys have it?
14            THE JURY:  Yeah.
15            THE COURT:  You got it now?  Does the jury have
16   it now?
17            THE JURY:  Yes.
18            THE COURT:  Everybody?  Does anybody not have it?
19            Okay, we're good.  Go ahead.  Go ahead.
20            THE WITNESS:  So on January 8, 2014, the aircraft
21   total time, 6,394 hours' inspection was completed.  So this
22   inspection was completed by Phillip T. Kapp, Turner Kapp, and
23   he signed it with airframe and power plant certificate, FAA
24   certificate number and his inspection authorization of the
25   inspection.
```

*Direct - Lopez*

1    And then -- so he even spells out here when the next

2 inspection will be due, which would be 6,494.4 hours, that's a

3 hundred hours after the inspection, which is what the

4 manufacture's manual requires.

5    Well, the next entry in the logbook in this -- I'm

6 sorry, in this record logbook for Hansen is August 12, 2014,

7 and aircraft total time is 6,871.  So almost 500 hours --

8 500 hours past between 6,394 to 6,070 -- 6,871.  So there is

9 no documented 100-hour inspection.  There should have been

10 about four different 100-hour inspections documented for that,

11 minimum.  And also, the manual requires additional inspection,

12 like 300-hour inspections.

13    In addition, which is really significant as well, is

14 FAR 43.9 that we went over yesterday establishes that any

15 maintenance on aircrafts has to be documented.  So this

16 aircraft is flying 500 hours, almost 500 hours, and there is

17 no maintenance recorded.  And aircrafts break -- I mean,

18 there's always problems.  That's why we have mechanics.  There

19 is always issues with aircraft, whether it's a light bulb or a

20 fuel pump or a windshield that needs to be repaired.  There is

21 always maintenance being done on these aircrafts to maintain

22 them in an airworthy condition, and there's absolutely no

23 documented maintenance by any mechanic -- U.S.-certificated

24 mechanic in this log page.  So 500 hours went by and there is

25 no documented record of this -- any kind of maintenance or any

1    kind of inspection, and that's very, very concerning and

2    troubling.

3                    THE COURT:  I'm sorry, get onto the mic there,

4    Mr. Leon Guerrero.

5    BY MR. LEON GUERRERO: (CONTINUING)

6        Q.   Can you turn to the next page, please.  And can you

7    please -- based off of what you've reviewed and the evidence

8    you've heard, could you please tell members the jury what's

9    concerning on the second page of this exhibit?

10       A.   Yes.  It looks like the entry that Mr. Sarimos was

11   referring to, the aircraft that Mr. Kapp was -- or the

12   aircraft was on a tuna boat and he made the logbook.  He made

13   an entry like he had installed -- reinstalled the main rotor

14   blades and floats per MD, and also conducted on checks and

15   test flown satisfactory.  So he also tested the aircraft when

16   the aircraft was on a tuna boat and he wasn't there.

17       Q.   You can return to the witness stand, please.

18            And, Mr. Lopez, just in closing, there is some

19   reference you indicated the importance of having signatures

20   from an IA certificated mechanic; correct?

21       A.   I'm sorry?

22       Q.   An IA certificate, somebody with an IA certificated,

23   there is a lot of meaning value that comes with that?

24       A.   Yeah.  When an individual has an IA, an A&P -- you

25   have to have an FAA airframe and power plant certificate, an

*Direct - Lopez*

1   A&P certificate, before you get the IA, so you have to have

2   experience, three years minimum experience with an A&P to

3   obtain the IA inspection authorization, which is a

4   higher-level certificate and it allows you to do additional

5   stuff.

6       Q.   Okay.  And so the fact that you've indicated all of

7   these issues that you pointed out with this maintenance

8   record, does that cause you concern given that --

9               MS. MCCONWELL:  Your Honor, I object to leading.

10              THE COURT:  Okay, sustained.

11              MR. LEON GUERRERO:  Okay.  So I'll rephrase the

12  question.

13  BY MR. LEON GUERRERO: (CONTINUING)

14      Q.   Who's the individual that you've seen in review of

15  this logbook that signed off on this work?

16      A.   Phillip T. Kapp.

17      Q.   Okay.

18      A.   Turner Kapp.

19      Q.   And based on your training and experience, does it

20  concern you that Defendant Kapp with this IA was signing off

21  on these maintenance entries with the issues that you just

22  testified to?

23      A.   Yes.  It's concerning, yeah.  I mean, it's very

24  concerning, especially when -- if you're doing a logbook entry

25  when you're not where the aircraft is at, where the

*Direct - Lopez*

1   maintenance being done with the aircraft -- the record should

2   always be the records when -- you always should enter conduct

3   maintenance and document it where you're at.

4        Q.   Thank you, Mr. Lopez.

5             MR. LEON GUERRERO:  Your Honor, if I could have

6   one moment?

7             THE COURT:  You may.

8             MR. LEON GUERRERO:  Your Honor, I have no further

9   questions for the witness.

10            THE COURT:  All right.  Any cross-examination,

11  Counsels?  Mr. McConwell, you're going to cross-examine the

12  witness?

13            MR. MCCONWELL:  Yes, Your Honor.  Could I have a

14  couple minutes to --

15            THE COURT:  You may.

16            MR. MCCONWELL:  -- get my stuff, maybe five

17  minutes to do that?

18            THE COURT:  Five?

19            MR. MCCONWELL:  Five minutes or ten minutes would

20  be even better.

21            THE COURT:  What do you need to do?

22            MR. MCCONWELL:  If I could get about ten minutes

23  to get my materials organized and get them over there, that'd

24  would be helpful.

25            THE COURT:  Okay.  Ladies and gentlemen, let's

*Direct - Lopez*

 1   just take a ten-minute recess and so Mr. McConwell can get his

 2   paperwork ready.

 3              All right?  Keep an open mind, we'll see you in

 4   ten minutes.

 5              (Jury out at 1:08 p.m.)

 6              THE COURT:  Okay, ten minutes.  Mr. McConwell,

 7   how long do you think you'll be, just so we can get a little

 8   idea what's going on here.

 9              MR. MCCONWELL:  I would think it would be a

10   rather lengthy examination, Your Honor.

11              THE COURT:  Lengthy?  How long -- what's lengthy?

12              MR. MCCONWELL:  Maybe an hour and a half.

13              THE COURT:  Hour and a half?  Okay.

14              And, Mr. Martin, I'm just trying to figure out,

15   should they have their next witness on deck?

16              MR. MARTIN:  Your Honor?

17              THE COURT:  Yeah?

18              MR. MARTIN:  I may or may not cross-examine,

19   depending upon Mr. McConwell's.

20              THE COURT:  Okay.

21              MR. MARTIN:  I did not anticipate a lengthy one,

22   but...

23              THE COURT:  All right.  I would just have your

24   next witness on call, on deck.

25              MR. LEON GUERRERO:  Will do, Your Honor.

*Direct - Lopez*

```
 1                    THE COURT:  All right.  See you all in ten
 2    minutes.
 3                    MR. LEON GUERRERO:  Thank you.
 4                    (Recess taken at 1:09 p.m.)
 5                    (Back on the record at 1:27 p.m.)
 6                    THE COURT:  We're back on the record.  All
 7    Counsels present and witness present.  You may proceed.
 8                    Oh, let me get the jurors in.  Sorry.
 9                    MR. MCCONWELL:  I could give them a summary of
10    what we did if they're not here.
11                    THE COURT:  I'm sorry?
12                    MR. MCCONWELL:  I said I could give them a
13    summary of what we did if they're not here.  I'm just kidding.
14                    THE COURT:  I just finished my lunch, so that was
15    good news for me.  Did you guys eat lunch?
16                    THE CLERK:  We don't have the time, Your Honor.
17                    THE COURT:  How come?  You guys in court today?
18                    THE CLERK:  We were with Judge Manglona.
19                    THE COURT:  Oh, you were heading Manglona's case?
20    Well we can talk about it later.
21                    THE CLERK:  Yes, Your Honor.
22                    THE COURT:  There's some cake in my chamber.
23                    MR. MARTIN:  Judge, will we be doing this supper
24    on the rest of days, too, or just for today?
25                    THE COURT:  No, let's do it on the rest of the
```

*Direct - Lopez*

1  days.  We could do that.

2          MR. MARTIN:  We'll just skip supper and just take

3  a short recess?

4          THE COURT:  You guys can skip supper, yeah.  I

5  mean, we could have it later, that's what I'm saying.  Delayed

6  supper.

7          MR. MARTIN:  The jury, so they get to go home a

8  little bit earlier?

9          THE COURT:  Well, I'm still going to give them

10  their supper.

11          MR. MARTIN:  Oh, okay.

12          THE COURT:  They'll just eat it at the end of the

13  day as opposed to -- we won't -- we don't want to break up the

14  evidence.

15          MR. MARTIN:  I understand.

16          THE COURT:  Yeah.

17          (Jury in at 1:29 a.m.)

18          THE COURT:  Welcome back, ladies and gentlemen of

19  the jury.

20          And you may proceed with the cross-examination,

21  Mr. McConwell.

22          MR. MCCONWELL:  Thank you, Your Honor.  Can you

23  hear me okay?

24          THE COURT:  (Nodded head.)

25

*Direct - Lopez*

```
 1                    CROSS-EXAMINATION

 2   BY MR. MCCONWELL:

 3       Q.    Mr. Lopez, how long have you been with the Federal

 4   Aviation Administration?

 5       A.    27 years.

 6       Q.    And how long have you been with the Flight Standards?

 7       A.    I've been with the Flight Standards over 27 years.

 8       Q.    Would you tell the jury what the Flight Standards

 9   Division is within the meaning of the FAA?

10       A.    The Flight Standards Division, we're the ones that

11   are assigned to do certification, ongoing surveillance of

12   aircrafts, mechanics, air -- pilots, flight schools, repair

13   facilities, airlines or air carriers.  We do the

14   certification, the ongoing surveillance, the ongoing

15   surveillance of general aviation operations.  So we're the

16   safety oversight of the FAA.

17       Q.    And where does the FAA get its authority to provide

18   the safety oversight?

19       A.    Under law.

20       Q.    What law, sir?

21       A.    U.S.C. 49.

22       Q.    And is that commonly known as the Federal Aviation

23   Act of 1958 Amended?

24       A.    No.

25       Q.    Pardon?
```

*Cross - Lopez*

1    A.   No, it's not.

2    Q.   You don't know whether it is or not?

3    A.   No, I didn't say that.  I said, no, it's not known

4  that way.

5    Q.   Okay.  So Chapter 49 of United States Code, it's what

6  gives the authority to the FAA to operate?

7    A.   Correct.

8    Q.   And what is the mission of the FAA?

9    A.   The mission, safety and -- safety of the national air

10  space.

11    Q.   And the --

12    A.   Efficiency and safety of the national air space.

13    Q.   And the national air space is described as how?

14    A.   The national air space?  It is --

15    Q.   Geographic parameters of that --

16    A.   I'm not sure, sir.

17    Q.   Pardon?

18    A.   I'm not sure.

19    Q.   Well, of the United States of America; correct?

20    A.   National air space of the United States of America,

21  yes.

22    Q.   And its territories, United States territories?

23    A.   Correct.

24    Q.   And that's it; correct?

25         MR. LEON GUERRERO:  Objection, relevance.

*Cross - Lopez*

 1                    THE COURT:  I'm sorry?  What was it, what's the

 2     objection?

 3                    MR. LEON GUERRERO:  Objection to relevance on the

 4     air space of the FAA's applicability and the regulations.  So

 5     objection, relevance.

 6                    THE COURT:  Mr. McConwell?

 7                    MR. MCCONWELL:  The parameters of the authority

 8     of the United States FAA is relevant to this case, Your Honor.

 9                    THE COURT:  Okay, overruled.  Go ahead.

10     BY MR. MCCONWELL: (CONTINUING)

11         Q.   Do you have authority to regulate or handle -- have

12     responsibility for safety within United States and its

13     territories; correct?

14         A.   Yes, and then some.

15         Q.   Well, the Statute 49 provides no other authority;

16     does it, sir?

17         A.   You have to show me -- it provides authority for

18     U.S.- registered aircraft and U.S.-certificated aircraft no

19     matter where it operates.

20         Q.   And 49 U.S. Code defines what civil aircraft of the

21     United States are; correct?

22         A.   Yes.

23         Q.   And that civil aircraft of the United States are

24     those registered on the FAA Registry in Oklahoma City?

25         A.   Correct.

1     Q.   And you have discussed with us how one registers an

2 aircraft; correct?

3     A.   The application process, not the details of it.

4     Q.   What are the qualifications of a person or the

5 eligibility of a person to register an aircraft on the United

6 States Registry?

7     A.   I'm not familiar with that.  That's not my expertise

8 -- my area of expertise.

9     Q.   You're not familiar with -- are you familiar with

10 whether there is a regulation or not?

11    A.   I am.

12    Q.   And that's under what chapter, sir, of the Federal

13 Aviation Regulations?

14    A.   Title 14, Part 47.

15    Q.   You're familiar with Part 47?

16    A.   A little.  I'm not the expert in that area.

17    Q.   Do you have a memory -- you read it -- you were

18 trained on it when you were trained as an ASI; correct?

19    A.   Not so much, that's a different area.  We look at it,

20 but we're not trained on it.

21    Q.   So have you referenced Chapter 47 in your preparation

22 for your testimony here?

23         MR. LEON GUERRERO:  Objection.  Outside the

24 scope, Your Honor.  I didn't go into information about

25 Title 47.

*Cross - Lopez*

          1          MR. MCCONWELL:  He talked about registration

          2   processes at the beginning of his testimony, Your Honor.

          3          MR. LEON GUERRERO:  But we didn't talk about

          4   Title 47, so --

          5          THE COURT:  Does Title 47 deal with registration

          6   process?

          7          MR. MCCONWELL:  That is the registration.

          8          THE COURT:  Sorry.  Does Title 47 deal with the

          9   registration process?

         10          THE WITNESS:  Yes, it's -- Part 47 is the

         11   registration...

         12          THE COURT:  Objection overruled.  Go ahead.

         13   BY MR. MCCONWELL: (CONTINUING)

         14      Q.   It sets forth the eligibility to register an aircraft

         15   under U.S. Registry; correct?

         16      A.   Correct.

         17      Q.   You have referred to that section at some point in

         18   your career; correct?

         19      A.   But you asked me about how you process registration,

         20   I don't do that.  I don't have that expertise.

         21      Q.   I'm talking about eligibility, sir.

         22      A.   Okay.

         23      Q.   And what does one have to be to be eligible to

         24   register an aircraft on the United States Registry?

         25      A.   Again, that's a specialty of the registration

*Cross - Lopez*

1    department, not my --

2        Q.   But you have referred to that and you're referring to

3    registration requirements?

4        A.   All I said was that an applicant makes application

5    for registration.

6        Q.   And you, at some point, referred to that section of

7    47; haven't you, sir?

8        A.   I did not, no.

9        Q.   Do you have any current memory of what's in

10   Chapter 47, particularly 47.3, with regard to registration?

11       A.   I would have to see it.

12       Q.   Okay.  It would help you to refresh your

13   recollection; correct?

14            MR. LEON GUERRERO:  Objection, Your Honor.  He

15   didn't even testify to anything about Title 47, so outside the

16   scope of direct.

17            THE COURT:  No, I'm sorry, overruled.  I've

18   already overruled that objection.

19            What was the last question?

20            MR. MCCONWELL:  If it would help him to refresh

21   his recollection to refer to Chapter 47 in his testimony.

22            MR. LEON GUERRERO:  Relevance, Your Honor.

23            THE COURT:  I've already, Mr. -- Okay, what is

24   the relevance of this particular line of questioning?

25            MR. MCCONWELL:  The description of who's eligible

1  to register an aircraft on the United States Registry, and

2  that is an issue in this case.

3         THE COURT:  All right, overruled.  Go ahead.

4  BY MR. MCCONWELL: (CONTINUING)

5     Q.   I have put before you several books.

6         THE COURT:  Books?

7         MR. MCCONWELL:  I have put before the witness a

8  -- what's called a FAR manual.

9         THE COURT:  Okay.

10        MR. MCCONWELL:  And I'll ask you to pull it out

11  and --

12        MR. LEON GUERRERO:  And I'm going to object.

13        THE WITNESS:  Could you show me where it's at,

14  sir?

15        MR. LEON GUERRERO:  I'm going to object because I

16  haven't reviewed the books.

17        THE COURT:  You want to look at the books?  Go

18  look at it.  Go look at it.

19        MR. LEON GUERRERO:  Well, Counsel could bring it

20  --

21        THE COURT:  Why don't you guys meet halfway.  Go

22  on.  He can't walk that far, he's not that fast.

23        MR. MCCONWELL:  I'm impaired.

24        THE COURT:  He's impaired.  He at least admits

25  it.  Let's try to help each other out.

```
 1                    (Counsel reviewed book.)

 2                THE COURT:  Enough time?

 3                MR. LEON GUERRERO:  Yes, Your Honor.

 4                THE COURT:  Okay.  All right.  Okay, we'll wait

 5      for Mr. McConwell.

 6      BY MR. MCCONWELL: (CONTINUING)

 7           Q.   Do you recognize that as the -- what's referred to in

 8      the industry as the FAR/AIM?

 9           A.   I use the Code of Federal Regulations issued by the

10      FAA.

11           Q.   Would you refer please to 47?

12                MR. LEON GUERRERO:  And I'm going to object, Your

13      Honor.

14                THE COURT:  I'm sorry, hold on.  What's the

15      objection?

16                MR. LEON GUERRERO:  The objection is it hasn't

17      been marked as an exhibit, and it wasn't provided to the

18      government.  Number two, they haven't offered it to be a

19      demonstrative aid.  And number three, the relevance.

20                THE COURT:  Overruled.  Go ahead.

21      BY MR. MCCONWELL: (CONTINUING)

22           Q.   Turn to Chapter 47 for us, please.

23           A.   Okay.  Okay.

24           Q.   Particularly, 47.3.

25           A.   Okay.
```

*Cross - Lopez*

1    Q.   Do you see there a reference to eligibility

2  requirements to obtain a U.S. Registry -- or file an aircraft

3  and register it with the United States Registry?

4    A.   The title of 47.3 says registration required.

5    Q.   Okay.  It gives the requirements for registration or

6  the eligibility for registration; correct?

7    A.   I don't know that, I haven't read through it.

8    Q.   Well, will you take a moment and read it, please.

9    A.   Do you want me to read it out loud?

10            THE COURT:  Do you want him to read it out loud?

11  BY MR. MCCONWELL: (CONTINUING)

12    Q.   I would like you to read it out loud, yes.  Chapter

13  47.3?

14    A.   "An aircraft may be registered under 49 U.S.C. 44103

15  only when the aircraft is not registered under the laws of a

16  foreign country and is owned by the citizen of the United

17  States, owned by an individual citizen of foreign country

18  lawfully admitted to permanent residence in the United States,

19  owned by a corporation not a citizen of the United States when

20  the corporation is organized and doing business under the laws

21  of the United States or the states within the United States,

22  and the aircraft is based and primarily used in the United

23  States, or an aircraft of the United States government or the

24  state of the District of Columbia, a territory or possession

25  of the United States or political subdivision of a state

1   territory or possession.  No person may operate an aircraft

2   that is eligible for registration under 49 U.S.C. 44101

3   through 44104, unless the aircraft has been registered by its

4   owner, is carrying aboard a temporary authorization required

5   by 4721, is an aircraft of the Armed Forces of the United

6   States governmental units of those named in Paragraph A of

7   this section and Puerto Rico."

8               MR. LEON GUERRERO:  Your Honor, I'm going to

9   object.  Basis is Your Honor's Order, ECF 1535.  Also, as to

10  relevance, and I'd ask that Your Honor move to strike the

11  testimony from the witness.

12              THE COURT:  Okay.  Mr. McConwell?

13              MR. MCCONWELL:  Your Honor?

14              THE COURT:  On the Court's Order, 1535.  You want

15  to look at that just to refresh your memory?

16              MR. MCCONWELL:  My memory is that --

17              THE COURT:  You don't have to tell me what your

18  memory is, but what's your --

19              MR. MCCONWELL:  We were entitled to identify the

20  section, that was -- it's limited to that.  That's all I'm

21  asking.

22              THE COURT:  Okay.  He's talking about the

23  relevance of this particular section.  And what is the

24  relevance of this section?  Of course he knows the sections,

25  he says he knows these sections as an expert, but what is the

*Cross - Lopez*

 1  relevance of this section to this case?

 2              MR. MCCONWELL:  The relevance of this section,

 3  Your Honor, is that the Vanuatu Corporation is at issue --

 4              MR. LEON GUERRERO:  Objection.

 5              MR. MCCONWELL:  -- and this case are not -- they

 6  are foreign corporations.

 7              THE COURT:  All right, hold on.

 8              MR. LEON GUERRERO:  I move to strike Counsel's

 9  comments, Your Honor.  Again, it's in correspondence with Your

10  Honor's Order, 1535.

11              THE COURT:  All right, let me pull 1535.

12              MR. MCCONWELL:  My point is he's testified to

13  registration and he's now identified the registration

14  requirements.  It is totally relevant to the testimony of this

15  case.  Vanuatu Corporation --

16              THE COURT:  Okay, and whose testimony is it

17  relevant to?

18              MR. MCCONWELL:  Pardon?

19              THE COURT:  Whose testimony is it relevant to?

20  Prior testimony?  Which prior testimony is it relevant to, if

21  it's relevant testimony?

22              MR. MCCONWELL:  It's relevant to prior testimony.

23              THE COURT:  Okay, whose prior testimony?

24              MR. MCCONWELL:  I'm sorry?

25              THE COURT:  Whose prior testimony is it relevant

*Cross - Lopez*

1    to?

2              MR. MCCONWELL:  I can't tell you exactly who, but

3    several people have identified the documents that have

4    identified these Vanuatu corporations.

5              THE COURT:  Okay, hold on.  Let me just look at

6    1535.  I'm only going to hear from Mr. Leon Guerrero.

7              MS. M. MILLER:  No, I'm just standing up, Your

8    Honor.

9              THE COURT:  Oh, okay.  Everybody is standing up.

10   Which section are you looking at, Mr. Leon Guerrero?  What

11   page on Line 1535?

12             MR. LEON GUERRERO:  I'm looking at the

13   conclusion, Your Honor, on the last page.

14             THE COURT:  Okay, just 13.  Okay.

15             MR. LEON GUERRERO:  And --

16             THE COURT:  Just, what line?  Just tell me the

17   page and line.  You don't have to read it.  Just page and

18   line, that's all.

19             MR. LEON GUERRERO:  Page 12, Line 21 to 24.

20             THE COURT:  Okay, wait.  Hold on, hold on.  Tell

21   me what it is, please?  Page what?  First of all, ECF what?

22             MR. LEON GUERRERO:  ECF 1535.

23             THE COURT:  Ms. McConwell, you might give that to

24   your co-Counsel.  ECF 1535, page?  Line?

25             MR. LEON GUERRERO:  Page 12, Lines 21 through 24.

*Cross - Lopez*

```
 1                    THE COURT:  Okay.  That's what your objection's
 2   based on?
 3                    MR. LEON GUERRERO:  Also, Your Honor, Page 13,
 4   Lines 1 through 23.
 5                    THE COURT:  Page 12, Lines 21 through 24 and
 6   Page 13, Lines 1 through 23.  Let me go to Page 12.  Okay, so
 7   let's go to Page 12, Lines 21 through 24.
 8                    MR. LEON GUERRERO:  Then we also filed our
 9   limiting instruction, Your Honor.
10                    MS. MCCONWELL:  Which we haven't had the
11   opportunity --
12                    MR. LEON GUERRERO:  1548 is the amended limiting
13   instruction.
14                    THE COURT:  But I haven't ruled on that; is that
15   correct?
16                    MR. LEON GUERRERO:  That's correct.
17                    THE COURT:  So I'm not going to talk about that
18   if I haven't looked at it.  We haven't ruled on it.
19                    (Pause.)
20                    THE COURT:  Hold on.  Let me talk to my intern
21   for a second.
22                    All right.  So let's pass on that.  Because if I
23   haven't talked about it, we haven't decided, it's not fair to
24   -- let's go to Page 12, Line 21 through 24.
25                    So Mr. McConwell, did you read the Court's -- my
```

1  Court's decision Page 12, Lines 21 through 24?

2          MR. MCCONWELL:  I did, Your Honor.  I saw that,

3  and I think if you refer over to the next page, 13 -- Lines 13

4  through 16.

5          THE COURT:  Okay.

6          MR. MCCONWELL:  Plus the fact --

7          THE COURT:  Okay, let me just read it.  Hold on.

8  I can only think slowly, hold on.  13 through 16.  Okay, so

9  that's your response.

10          MR. MCCONWELL:  Yes.

11          THE COURT:  Okay.  And then plus the fact what,

12  what else is your response?

13          MR. MCCONWELL:  They've opened up the topic by

14  the direct examination of this witness, Your Honor, about

15  registration and how registration takes place, and I believe

16  that would include the requirements of registration.

17          THE COURT:  All right.  So let me hear from

18  Mr. Leon Guerrero on his response.

19          MR. LEON GUERRERO:  Yes.

20          THE COURT:  First of all, on the response of --

21  as contained in the Court's Order.

22          MR. LEON GUERRERO:  Yeah, as contained in the

23  Court's Order, Your Honor has ordered not any --

24          THE COURT:  I know what I ordered, but to the

25  extent that it is relevant on the last part, that part.  What

1  about that?

2      MR. LEON GUERRERO:  This goes to that void ab

3  initio argument, Your Honor, that Your Honor has already ruled

4  it's not relevant for purposes of charges in this case.

5      As far as the registration, on direct

6  examination, I did not go into any specific detail regarding

7  registration of aircraft.  That was outside the scope of that.

8      So the fact that we have a witness that's

9  testifying about what he does in performance of his duties,

10  doesn't open the door for anything and everything for this --

11  for Counsel to try to dive into specific parts of this case

12  when that wasn't opened.

13      And, again, I didn't ask any questions regarding

14  specific registrations for any of the particular aircraft of

15  this witness.  So, therefore, it's not relevant.  It's outside

16  the scope of cross -- or direct, and I'd ask that the

17  testimony that he provided be stricken.

18      THE COURT:  How did he open it?  By referring to

19  the section?

20      MR. MCCONWELL:  No, talking about the

21  registration of aircraft under the United States Registry and

22  the process, and we think he has opened up the issue -- the

23  whole issue of eligibility.  And I've not argued anything at

24  all, I'm just pointing out what the statutes say.  And they

25  can -- their evidence is -- I don't want to -- I can explain

1  it.

2              THE COURT:  No, I got it.  I understand what

3  you're saying.  You're just saying he opened the door.

4              Anything else, Counsel?

5              MR. LEON GUERRERO:  Again, we didn't open the

6  door to any --

7              THE COURT:  I already heard that.  He says you

8  opened the door, you said you didn't.  Any other arguments,

9  Counsels?

10             MR. LEON GUERRERO:  And it is a legal issue that

11 Counsel shouldn't be giving to this particular witness.

12             THE COURT:  I'm sorry, it's a legal -- okay, the

13 Court will -- I don't understand that response, but if there's

14 nothing further, Counsels, the Court will overrule the

15 objection to the extent of his knowledge about registration.

16 That's it.  He's an expert, so the Court will allow that

17 generally, just because they talked about registration.

18             MR. MCCONWELL:  Thank you, Your Honor.

19             THE COURT:  Okay.  You may proceed.

20             MR. MCCONWELL:  I have one other section I wanted

21 him to read, and that's 47.43 which, again, is just the

22 statutory language.  I won't comment on it, whatever, but what

23 the language is, that he should be aware of as an ASI and an

24 officer manager --

25             THE COURT:  Why don't you just ask the question.

1    Just ask the question, then let's see whether it's relevant.

2    Go ahead.

3    BY MR. MCCONWELL: (CONTINUING)

4        Q.    Take a look, please, at Chapter 47.43.

5        A.    Okay.

6        Q.    Would you read that section, please?

7        A.    Sure.  "47.43, invalid registration.  The

8    registration of an aircraft is invalid if at the time it is

9    made, the aircraft is registered in a foreign country --

10                MR. LEON GUERRERO:  Objection, Your Honor.

11   Again, that's going to the heart of Your Honor's Order, 1535.

12                THE COURT:  What section, which part of my order?

13                MR. LEON GUERRERO:  The whole order,

14   specifically, Your Honor --

15                THE COURT:  Well, I don't think the whole order,

16   but which part --

17                MR. LEON GUERRERO:  Page 13, Lines 11 through 13.

18                THE COURT:  Same -- okay, this is the same

19   argument.  Mr. McConwell, go ahead.

20                MR. MCCONWELL:  My same response.  They've opened

21   it up and I'm just asking the existence of sections of the

22   regulations that they rely on, his office relies on, and his

23   people that work for him rely on, and his knowledge of it.

24                MS. M. MILLER:  Your Honor, may I be heard,

25   please?  May I be heard, please?  It's critical.

*Cross - Lopez*

```
 1                    THE COURT:  You don't think Mr. Leon Guerrero has

 2       indicated enough?

 3                    MS. M. MILLER:  No.

 4                    THE COURT:  Okay, hold on.  Hold on, Counsel.

 5       Let me look at something.  Hold on.

 6                    (Pause.)

 7                    THE COURT:  All right.  Anything further,

 8       Mr. McConwell?

 9                    MR. MCCONWELL:  No, Your Honor.

10                    THE COURT:  The Court -- I don't need to hear

11       from Ms. Marie Miller.  The Court is looking at its own order.

12       I think the citation was wrong from the prosecutor.  So

13       Page 12 -- hold on a second.  Let me look at this.  Hold on,

14       let me go back to this.  Let me make sure I got this right

15       section here.

16                    (Pause.)

17                    MR. MCCONWELL:  I do have one other item on this,

18       Your Honor.

19                    THE COURT:  Okay.  The Court is going to look at

20       Page 12, Lines 13 through 20 with regard to any matter within

21       the jurisdiction of the executive branch.  So the Court will

22       sustain the objection on that ground.

23                    Yes, Mr. -- go ahead, Mr. McConwell.

24                    MR. MCCONWELL:  The evidence is relevant to an

25       issue of whether or not 306 even applies on the basis of
```

*Cross - Lopez*

```
 1   eligibility.  As I say, they've opened up to the door to it,

 2   and that's why we're pursuing that.

 3                  THE COURT:  What is 306 again?

 4                  MR. MCCONWELL:  It requires --

 5                  THE COURT:  No, what is it?

 6                  MR. MCCONWELL:  -- 49 U.S.C. 40, 306 --

 7                  THE COURT:  Okay, the statute.  49 U.S. Code,

 8   Section 306.

 9                  MR. MCCONWELL:  Yeah, that statute requires --

10                  THE COURT:  Okay.  So you're asking -- so you

11   want to focus on the statute now, not the FAR, not the Federal

12   Aviation Regulation but the statute, so the Court will allow

13   you to talk about the statute.

14                  MR. MCCONWELL:  Okay.

15                  THE COURT:  But as far as anything else with this

16   particular Federal Aviation Rule, the Court will sustain the

17   objection.  Go ahead.  You may proceed.

18                  MR. MCCONWELL:  As to my question, my current

19   question, Your Honor?

20                  THE COURT:  Yeah.  So go on to your next

21   question.

22                  MR. MCCONWELL:  Okay, I'm going to go back to

23   something else.

24                  THE COURT:  Okay.

25    BY MR. MCCONWELL: (CONTINUING)
```

```
 1       Q.   Can you tell me with regard to the Flight Standards

 2   group, who was the head of the maintenance section in the

 3   Flight Standards group in 2005 when you became a frontline

 4   manager?

 5       A.   Who was the head of the maintenance section?  I'm not

 6   sure of that question, what does that mean?  FAS 300?

 7       Q.   Yes.

 8       A.   They're not the head of the maintenance section,

 9   they're the policy office.

10       Q.   Do you know who Dave Cann is?

11       A.   Yes, I've heard --

12       Q.   What did you understand his position to be with the

13   Flight Standards?

14       A.   He retired sometime ago.  He was division manager for

15   the maintenance policy branch.

16       Q.   He was the division manager of the maintenance policy

17   for the FAA; correct?

18       A.   Maintenance policy branch, yes.

19       Q.   Okay.

20       A.   At one point.  I don't know how long ago he retired,

21   but it's been a while.

22       Q.   Now, you're aware that Chapter 49 gives the authority

23   to the United States, to the FAA; correct?

24       A.   Correct.

25       Q.   Now, does it also give the authority to promulgate
```

1    regulations to implement the Act?

2        A.    Yes.

3        Q.    Now, the statute and the regulations, that's law;

4    correct?

5        A.    The statute is law, yes.

6        Q.    And the regulations are law, also?

7        A.    They're regulations applied by the laws.

8        Q.    And then we have another category called FAA Orders?

9        A.    Yes, correct.

10        Q.    Would you tell us what FAA Orders are?

11        A.    Orders are the methods on how to get compliance, how

12    to meet the requirements of the regulations.  So they're

13    typically issued for different variance on specific topics on

14    how to meet those requirements of the regulations.

15        Q.    They're not law, though; correct?

16        A.    They're not law.

17        Q.    They're just directions to the internal employees of

18    the Federal Aviation Administration?

19        A.    Yes.

20        Q.    And would you agree that it's common that from FSDO,

21    Flight Standard's District Office to Flight Standards District

22    Office that regulations are interpreted differently?

23        A.    No, I don't think so.

24        Q.    Never happened?

25        A.    It will happen, but it's not a frequent thing, no.

*Cross - Lopez*

```
 1        Q.   And then you also have another category called
 2   advisory circulars; correct?
 3        A.   Correct.
 4        Q.   And that, again, is not law?
 5        A.   Correct.
 6        Q.   Just a suggestion by the FAA?
 7        A.   That's correct.
 8        Q.   And one of them is, for example, 43.13, advisory
 9   circular 43.13, which I laid up there with the FAR book?
10             MR. LEON GUERRERO:  Objection, Your Honor.
11   Beyond the scope.
12             THE COURT:  Let me just hear the question first,
13   hold on.  What's the question?
14             MR. MCCONWELL:  One example of an advisory
15   circular is advisory circular 43.13.
16             THE COURT:  All right.  And what's the objection?
17             MR. LEON GUERRERO:  Relevance.  We didn't go into
18   any advisory circulars during his direct examination.
19             THE COURT:  So objection as to outside the scope
20   of direct?
21             MR. LEON GUERRERO:  And relevance.
22             THE COURT:  I'm sorry?
23             MR. LEON GUERRERO:  And relevance.
24             THE COURT:  Okay, two objections.
25             MR. MCCONWELL:  It goes to the maintenance aspect
```

*Cross - Lopez*

1   that he did testify about the maintenance surveillance, and

2   it's relevant to, they say, to this case, and that's why I'm

3   just pointing out an item that they have available for FAA

4   suggestions to the public.

5               THE COURT:  All right.  Overruled, then, based on

6   that.  Go ahead.

7               THE WITNESS:  What was the question, I'm sorry?

8   BY MR. MCCONWELL: (CONTINUING)

9       Q.   Can you pull out the advisory circular that's

10  underneath the log records?

11      A.   Yes.

12      Q.   So when a mechanic works on an aircraft, he has

13  maintenance manuals provided by the factory --

14      A.   Yes.

15      Q.   -- manufacturer.  He has structure repair manuals

16  provided by the factory?

17      A.   Yes.

18      Q.   And if it's not in the book, the mechanics can refer

19  to an advisory circular, 43.13, prepared by the FAA as

20  additional suggestions for meeting the airworthiness

21  requirements?

22      A.   Correct, if there is no instructions in the manuals

23  on how to.

24      Q.   Pardon me?

25      A.   If there's no instruction in the manual.

*Cross - Lopez*

1      Q.    Why don't you hold that up for just a minute for me.

2    Okay.  And all that information now, the AIM and the advisory

3    circulars are all online for mechanics; correct?

4      A.    Yes.

5      Q.    You testified about Part 145 repair stations, but do

6    you know whether or not Hansen Helicopters was ever a Part 145

7    repair station?

8      A.    I'm sorry, I didn't testify to 145.

9      Q.    You mentioned 145 as one of the areas of your

10   coverage.

11     A.    Yeah, that's my expertise, but I didn't testify to

12   anything to 145.

13     Q.    You identified as that one -- that's one mechanism

14   for repair and return to service of aircraft.

15     A.    I didn't speak about that, I just said that -- that's

16   in my acknowledged expertise.

17     Q.    Now, to process a regulation or to amend a

18   regulation, would you agree that that has to go through a

19   process with the Administrative Procedures Act to amend the

20   regulation?

21     A.    Yes, there is a section in the regulations that

22   covers that.

23     Q.    And that the FAA cannot regulate by policy; correct?

24     A.    Correct.

25     Q.    Can you define "airworthiness" for me?

A.   It's defined in several sections, but it's basically
that the aircraft meets a type design and -- type design and
it's safe for the operation and it complies -- it continues to
comply with Part 21.43 and 91, and that's spelled out in the
section of the airworthiness certificates that I read out.

Q.   So 21 is a certification section of the Federal
Aviation Regulations?

A.   For airworthiness certificate, yes.

Q.   And 43 is the maintenance section; correct?

A.   Correct.

Q.   Now, a FSDO inspector cannot return an aircraft to
service; can they, sir?

A.   Correct.

Q.   That it has to be done by a certificated airframe and
powerplant mechanic or an IA, if that's required for return to
service?

A.   That's correct, sir.

Q.   And I think you testified that the FSDOs do not have
staffing enough to provide issuance of certificates in some
instances that require what's called conformity inspections --

MR. LEON GUERRERO:  Objection, Your Honor.
Misstating the evidence.

THE COURT:  I'm sorry, but I haven't heard the
question.  So hold on a second, Mr. --

MR. MCCONWELL:  I haven't finished.

```
 1                THE COURT:  Start the question again.  What's the
 2   question?
 3   BY MR. MCCONWELL: (CONTINUING)
 4       Q.   Can you tell us what a conformity inspection is, sir?
 5       A.   I'm sorry, on what terms?
 6       Q.   Conformity inspection.
 7       A.   But, again, there is numerous methods for conforming
 8   inspections, numerous requirements.  Which numerous
 9   requirement are you speaking about?
10       Q.   Can you tell me what it is?
11       A.   Depending on what you're talking about.  Is it for a
12   production certificate, is it for a type certificate, is it
13   for airworthiness certificate, is it for -- I mean,
14   there's variables for performing inspection.  Is it for an
15   FDC?  So I need -- if you want me to, you know, detail, I need
16   to know specifically what...
17       Q.   Well, they're required frequently when an aircraft is
18   --
19                MR. LEON GUERRERO:  Objection.  Counsel is
20   testifying.
21                THE COURT:  Right.  Okay, yeah.  Just -- the
22   Court will -- just ask the question.
23                MR. MCCONWELL:  I was going to give him some
24   options, but I'll let him describe the different circumstances
25   under which a conformity inspection is required.
```

*Cross - Lopez*

                THE WITNESS:  Different circumstances for adding

an aircraft to an air operator certificate?

BY MR. MCCONWELL: (CONTINUING)

    Q.   Let's limit this by keeping it to general aviation,

Part 91.

    A.   Okay.  So, I'm not sure I understand your question.

I apologize.

    Q.   For 91 aircraft.

    A.   Okay.

    Q.   What different types of conformity inspections are

there, sir?

    A.   For the aircraft operator and the Part 91?

    Q.   We're talking about the aircraft.

    A.   Okay, but I still don't understand your question.

    Q.   If the aircraft is going to be used under Part 91 --

which is the general aviation section; correct -- what type of

conformity inspections are there?

    A.   The only time conformity inspection is required when

there is an issuance of some kind of approval, so I'm not --

there's nowhere under 91 that established a conformity

inspection.

    Q.   Well, I think you testified that -- well, tell us

what an airworthiness certificate is.

    A.   An airworthiness certificate is issued to an aircraft

when the aircraft -- when the applicant applies for an

*Cross - Lopez*

1  airworthiness certificate to operate an aircraft.  When the

2  aircraft meets its type design, it's safe for operation and

3  complies with Part 21.43 and 91.

4      Q.   Well, isn't an airworthiness certificate issued at

5  the time of manufacturer of an aircraft and it's a permanent

6  certificate?

7      A.   It's not permanent, it's only issued when the

8  aircraft is registered.  Once an aircraft is U.S.-registered,

9  you need an airworthiness certificate to operate it.

10     Q.   And that requires a conformity inspection?

11     A.   It requires -- 8130-2 requires an inspection of the

12 aircraft.

13     Q.   Are aircraft -- each individual type aircraft

14 certified at the time of the original manufacturer?

15     A.   Not all aircraft.  I mean, the manufacturer has to

16 apply for a type certificate.

17     Q.   So the manufacturer applies for it, it's issued, then

18 is that a permanent certificate or does it have to be -- have

19 a new one issued at the time the first owner buys it?

20     A.   The type certificate?

21     Q.   Yes, sir.

22     A.   That you --

23     Q.   Airworthiness certificate.

24     A.   Oh, airworthiness certificate.  Airworthiness

25 certificate; when the applicant applies, you get one.  And

1    again, it says it on the certificate.  It's -- you know, until

2    surrendered or revoked by the FAA or it doesn't meet the type

3    design in Part 21.43 and 91.

4        Q.   Does an airworthiness certificate have to be reissued

5    at the time an aircraft is sold to a third party?

6        A.   If it's sold to a U.S.-registered aircraft, if it

7    maintained U.S.-registered aircraft; is that what you're

8    asking?

9        Q.   If it's sold to a U.S. citizen.

10       A.   If it's sold to a -- if it's a U.S.-registered

11   aircraft, it maintains to be U.S.-registered aircraft, and

12   then the airworthiness certificate is still valid.

13       Q.   Okay.  So the airworthiness certificate is valid,

14   then, right?

15       A.   Yes, unless the registration number changes.

16       Q.   And the registration number, by the way, that's the

17   N-number on an aircraft; correct?

18       A.   That is correct, sir.

19       Q.   And that can be changed any time the owner wants to

20   change it by seeking availability and getting approval from

21   the FAA; correct?

22       A.   They apply to an office in Oklahoma City in the

23   registration office, not our office.

24       Q.   So the fact that a particular N-number is on a

25   particular aircraft with a particular serial number, does not

*Cross - Lopez*

1    mean it couldn't be changed out multiple times if the process

2    was followed?

3                    MR. LEON GUERRERO:  Objection, speculation.

4                    THE COURT:  Overruled.  Overruled.  Go ahead.

5                    THE WITNESS:  The registration?  Yeah, it could

6    change ownership, a registered --

7    BY MR. MCCONWELL:  (CONTINUING)

8        Q.    The N-number can be changed; correct?

9        A.    If the owner requests, yes.

10       Q.    So it doesn't necessarily have to stay with a

11   particular data plate; does it, sir?

12       A.    The registration, no, absolutely not.

13       Q.    How many different types of airworthiness

14   certificates are there, by the way?

15       A.    There is multiple airworthiness certificates.

16       Q.    Why don't you identify them for me, sir.

17       A.    There is airworthiness certificate, there is a

18   special airworthiness certificate with different categories.

19   So Part 21 spells out the different types of airworthiness

20   certificates.  There's experimental, there is also -- under

21   specialty, there's also ferry permits that are issued.  So

22   there is multiple ones.

23       Q.    Experimental airworthiness certificate doesn't

24   require any inspection by the FAA; does it, sir?

25       A.    The process typically is done by the FAA MIO Office,

1    manufacturing office, so we don't get into a lot of detail

2    with that.  So I don't know the inspections they do.

3        Q.    You don't know whether or not it's required for an

4    experimental certificate?

5        A.    We don't get into that detail because they're

6    typically handled by the manufacturing office of the FAA, so

7    we don't get into that detail.

8        Q.    How about a situation where a replacement certificate

9    is provided or needed?

10       A.    What -- I'm sorry, I don't understand the question.

11       Q.    You referenced, I think, in one of the exhibits, the

12   "R" that's on the airworthiness certificate.

13       A.    Yeah.

14       Q.    That has a distinct meaning; doesn't it, sir?

15       A.    Generally, that -- generally, that means that on the

16   airworthiness certificate, on the "R" in front of the date

17   means that the date that's there was the original date it was

18   issued, and then the "R" is just saying it was replaced -- it

19   could have been replaced on another date.

20       Q.    So what that require -- the requirement is, is the

21   person that needs the replacement certificate would send in a

22   request to the Flight Standard District Office; correct?

23       A.    A valid request, yes.

24       Q.    And, typically, the Flight Standard District Office

25   inspector there would reissue the airworthiness certificate,

 1    if the application was correct?

 2         A.    Well, it's not as simple as that.  It's -- you know,

 3    there has to be a reason.  If it's just deteriorated or the

 4    registration number changed, it needs to be reissued, the

 5    inspector's still going to look at logbooks to make sure it's

 6    current, because that's the opportunity to do it, and then

 7    reissue the certificate.

 8         Q.    Are you testifying that an inspectors never send the

 9    replacement certificate out without going out and looking at

10    the aircraft, sir?

11         A.    Generally, inspector will at least -- the applicant

12    will bring in the logbooks to look at them.

13         Q.    Well, you're saying generally, but you can't tell us

14    that that is a requirement of the regulation at all?

15         A.    That is not a requirement.  But generally, yes,

16    you're correct.  But generally, the inspector will want to see

17    the logbooks and the entries to make sure that they're issuing

18    to the correct aircraft.

19         Q.    How about a renewed airworthiness certificate, does

20    that require a conformity inspection, sir, or merely a pass-by

21    look at the aircraft?

22         A.    I'm not familiar with that term, could you explain

23    what the "renewal" means?

24         Q.    Were you familiar with special airworthiness

25    certificates?

 1     A.   Yes.

 2     Q.   How about aerial survey or airworthiness

 3 certificates?

 4     A.   A category of a special airworthiness certificate?

 5     Q.   Yes, sir.

 6     A.   Yes.  It's a category, it's not a certificate.

 7     Q.   It's what?

 8     A.   It's a category, it's not a certificate.  It's a

 9 category in the special airworthiness certificate.

10     Q.   But it's a special airworthiness certificate in a

11 particular category; correct?

12     A.   Correct.

13     Q.   And those are also permanent certificates until it's

14 sold or the numbers are changed or something?

15     A.   Yes, that's correct.  Typically, yes.

16     Q.   And they don't need to be renewed every year or every

17 two years --

18     A.   No.

19     Q.   -- or five years?

20     A.   No, there is occasion, I think, and there's some

21 experimental that may have expiration, but typically no.  No.

22     Q.   Well, now you flipped over to special aerial survey,

23 and they don't require an inspection every time they're

24 renewed -- or they don't need to be renewed; correct?

25     A.   Yeah, if they don't put an expiration date, it isn't

1    required.

2        Q.   So if someone at the Flight Standards District Office

3    required a renewed certificate every two or three years,

4    there's no regulatory basis for that requirement; correct?

5            MR. LEON GUERRERO:  Objection, Your Honor.

6    Speculation.

7            THE COURT:  Let me hear the last question.  Hold

8    on a second.

9            What was the last question, Veronica?

10            (Whereupon, the reporter read back requested

11    portion.)

12            THE COURT:  Can you answer that?

13            THE WITNESS:  I think so.

14            THE COURT:  Okay.  Overruled, then.  Go ahead.

15            THE WITNESS:  Generally, there is no general --

16    to answer that question, it's difficult because there is

17    multiple special airworthiness certificate, multiple

18    categories.  So there is some -- there may be some reason why

19    an inspector would put an expiry because there may be some

20    requirement depending on the type of operation and category.

21    BY MR. MCCONWELL: (CONTINUING)

22        Q.   Well, I'm asking -- it doesn't make a difference what

23    the inspector wants, it's whether there is a regulatory

24    requirement.  That was my question.

25        A.   But there is no regulatory -- but there is guidance

1   on certain categories and it may require -- and the situation

2   may require it because all applicants -- there's applicants

3   that have different variants on what they're doing, so it may

4   be -- an inspector may have to do that because either

5   coordination with engineering, FAA engineering, or the policy

6   office and headquarters.  So typically, they won't do that

7   unless it's some specific reason for it.  But there is -- to

8   answer it yes or no, it's not correct.

9       Q.   Now, you've testified about special airworthiness

10  certificates that were issued by Mr. Cislo, particularly in

11  February of 2015; correct?

12      A.   Correct.

13      Q.   And you testified that that required -- you couldn't

14  do that in a day; correct?

15      A.   Correct.

16      Q.   But if you didn't have to have any conformity

17  inspections, you could do that in a day; couldn't you, sir?

18      A.   Not -- no.  And -- and if they were an expired

19  certificate, they will have to have gone through the same

20  certification process, so no.

21      Q.   Was there any regulatory basis for saying they were a

22  required certificated, sir, because they had been issued for

23  at least 15 years?

24      A.   But -- yeah, they -- if they were expired and the

25  applicant applied in the process to issue a new one, they had

1    to do an inspection.

2        Q.   Well, if he applied and didn't have to apply, why

3    would an inspector even go out to inspect the aircraft?

4            MR. LEON GUERRERO:  Objection.  Speculation,

5    asking why somebody would do something.  Speculation.

6            THE COURT:  Can you answer that?

7            MR. MCCONWELL:  He's an expert.

8            THE WITNESS:  I can answer as a manager.

9            THE COURT:  Okay.

10           THE WITNESS:  If --

11           THE COURT:  The Court will overrule the

12   objection.  Go ahead.

13           THE WITNESS:  If an applicant submitted a renewal

14   of ten certificates, ten certificates to an office, first of

15   all, I would certainly send an inspector to look at what's --

16   what the issue is and get into the details, not just write out

17   certificates and mail them out.  That would be absolutely

18   contrary to any regulation or any guidance under any order.

19   BY MR. MCCONWELL:  (CONTINUING)

20       Q.   But that would be a discretionary --

21       A.   That's not discretionary, I'm sorry.

22       Q.   Now, if conformity inspections weren't required to

23   issue these certificates in February of 2015, they could

24   easily be performed in a day, then; correct?

25       A.   If they were just typing out something, they may be

1    able to do it in a day.  But, again, like I said, at the

2    minimum, you're going to look at a record.  There's no way

3    they could do that in one day.

4        Q.   How many times have you reviewed records for

5    re-issuance of special aerial survey airworthiness

6    certificate?

7        A.   Well, my office is probably the largest office in the

8    country.  We have over a hundred inspectors.  We deal with

9    every aspect of general aviation.  We see these kind of things

10   on a regular basis.  And no inspector of mine will -- would go

11   out and just sign off certificates, and when you get ten

12   applications without -- without doing any kind of audit or

13   assessment or any kind of determination, so just to say ten

14   came in, sign them off and ship them out, we would never do

15   that.

16       Q.   Do you know anything about the operation or policies

17   of the Honolulu FSDO in this regard?

18       A.   I do not, sir.

19       Q.   Can you explain why the Honolulu FSDO, at least on

20   one occasion, has issued multiple airworthiness -- special

21   airworthiness aerial survey certificates on one day?

22              MR. LEON GUERRERO:  Objection, Your Honor.

23   Relevance.

24              MR. MCCONWELL:  On this aircraft?

25              THE COURT:  It actually calls for speculation, so

1   the Court will sustain the objection on speculation.

2   BY MR. MCCONWELL: (CONTINUING)

3       Q.   Or you're just saying it's impossible?

4       A.   I'm saying it's contrary to orders, it's contrary to

5   doing your job correctly.  And, you know, if one of the

6   inspectors was doing that, I would be concerned that he may be

7   taking bribes.

8       Q.   With regard to that, there is no evidence that this

9   alleged bribe in May of 2014, was in any way related to the

10  February, 2015 issuance of -- re-issuance of special

11  airworthiness certificates aerial survey; is there, sir?

12                  MR. LEON GUERRERO:  Objection.  Misstating the

13  evidence with the e-mails and the testimony that's been

14  provided.  There is a connection with --

15                  THE COURT:  I'm sorry, misstating -- can I hear

16  the question again, Veronica?

17                  (Whereupon, the reporter read back requested

18  portion.)

19                  THE COURT:  Okay, overruled.  Go ahead.

20                  THE WITNESS:  I'm sorry, could you ask it again?

21                  THE COURT:  Let her repeat it.  Sometimes lawyers

22  forget what they just asked.  We'll have Veronica repeat it.

23                  (Whereupon the reporter read back requested

24  portion.)

25                  THE WITNESS:  Any inspector that takes a bribe is

*Cross - Lopez*

1  on -- is doing something on behalf of somebody other than the

2  flying public and the taxpayers.

3  　　　　　　MR. MCCONWELL:  I move that that be stricken as

4  nonresponsive, Your Honor.

5  　　　　　　THE COURT:  Overruled.  Overruled.

6  BY MR. MCCONWELL: (CONTINUING)

7  　　Q.　But you're not aware of any evidence that those

8  certificates, the reissued certificates, related at all to the

9  alleged bribe in 2014 in May; have you, sir, you're not aware

10  of any evidence?

11  　　A.　Other than he was taking a bribe and he was doing

12  work that -- that should have been done, doing stuff for the

13  operator that should've been done.

14  　　Q.　That's your understanding; correct?

15  　　A.　Yes.

16  　　　　　　MR. LEON GUERRERO:  Objection, argumentative.

17  　　　　　　MR. MCCONWELL:  It was a non-responsive answer,

18  Your Honor.

19  　　　　　　THE COURT:  Overruled.  Is that your

20  understanding?

21  　　　　　　THE WITNESS:  That he was -- that he was doing

22  work for the operator on behalf of the operator, not on behalf

23  of the flying public and the taxpayer, yes.

24  BY MR. MCCONWELL: (CONTINUING)

25  　　Q.　Well, can an inspector be paid a commission for the

*Cross - Lopez*

1    sale of an aircraft if it had nothing to do with his work as

2    an aviation inspector?

3         A.   I'm not sure I understand the question, sir.

4         Q.   Can an inspector be paid a bonus for sale of an

5    aircraft or assistance in sale of an aircraft if it had no

6    relationship to any work that the inspector did for the

7    person?

8         A.   There is not enough details there.  I'm not an

9    ethical counselor for the FAA, but there is not enough

10   information there for me to make any judgment on.

11        Q.   How about:  Is there any prohibition of an inspector

12   accepting a gift of any kind or donation to an aviation

13   museum?

14        A.   The inspector should not take anything from any --

15   anybody because of their jobs.

16        Q.   Even though he may not have been benefitted at all?

17        A.   Doesn't matter, it's just the appearance.

18        Q.   Bad judgment, right?

19        A.   It's appearance.  Not bad judgment, it's criminal.

20        Q.   And do you tie the alleged bribe in 2014 to any other

21   work that Mr. Cislo did for the helicopters at issue?

22        A.   Absolutely.  As a manager, every work that that

23   individual did is a question.

24        Q.   It's in question, but you have no evidence that it

25   related to anything else; correct?

*Cross - Lopez*

1    A.   That individual's work taking -- accepting bribes is

2    criminal and it's not in the interest of the flying public,

3    it's not in the interest of the taxpayers, and it's the

4    interest of the individual paying the bribe.  So you could

5    rest assure he was probably doing everything he can to help

6    him out.

7    Q.   That's your inference; correct?

8    A.   Yes.  As a manager in my expertise, yes, sir.

9    Q.   What is the mission of the Federal Aviation

10   Administration in the Pacific waters, international waters?

11           MR. LEON GUERRERO:  Objection, Your Honor.

12   Pursuant to the Court's Order, 1535, I believe Counsel is

13   going into that area that he was advised not to go down and

14   it's not relevant.

15           THE COURT:  Overruled on that question.  Go

16   ahead.

17           THE WITNESS:  I'm sorry, could -- could you ask

18   it again?

19           THE COURT:  You know, I think it was already

20   asked and answered.

21           MR. MCCONWELL:  Not this particular one, Your

22   Honor.  As it relates to international waters in the Pacific

23   Ocean.  The mission of the FAA in Count 5.

24           THE COURT:  All right.

25           THE WITNESS:  If the aircraft is U.S.-registered

*Cross - Lopez*

1   or the U.S. airman involved, we have responsibility.

2   BY MR. MCCONWELL: (CONTINUING)

3       Q.   If it's a civil aircraft of the United States, you

4   have responsibility; is that your answer?

5       A.   U.S. -- yes.

6               MR. LEON GUERRERO:  Objection, Your Honor.

7   Relevance.  Per your order --

8               THE COURT:  Overruled, overruled.

9               MR. LEON GUERRERO:  -- Lines 9 through 10, he's

10  going down questions that are in that order.

11              THE COURT:  Overruled.  You can ask that

12  question.

13              MR. MCCONWELL:  Could you read it back?

14              THE COURT:  You said it related to the Count 5;

15  is that what you said?

16              MR. MCCONWELL:  No, I said that --

17              THE COURT:  No, earlier though you did.

18              MR. MCCONWELL:  -- that was the response to the

19  relevance.

20              THE COURT:  No, earlier you did say it was

21  related to Count 5.

22              MR. MCCONWELL:  I did, yes.

23              THE COURT:  All right, go ahead.  Veronica.

24              (Whereupon, the reporter read back requested

25  portion.)

*Cross - Lopez*

```
 1              THE WITNESS:  If it's a U.S.-registered aircraft,

 2   yes.

 3   BY MR. MCCONWELL: (CONTINUING)

 4        Q.   How does a company that operates helicopters on tuna

 5   boats in the middle of the Pacific Ocean -- let me withdraw

 6   that.

 7             Are you aware that the helicopters at issue were all

 8   operated only in international waters in the Pacific Ocean

 9   from tuna boats?

10        A.   And they were U.S.-registered, yes.

11        Q.   And that's your basis for saying that you have

12   responsibility or authority over 'em?

13        A.   Absolutely.

14        Q.   How does the maintenance facility maintain those

15   helicopters if they can't find U.S. mechanics?

16        A.   They have to -- they have to comply with the

17   regulations.

18        Q.   Or that there's no way --

19        A.   Or apply for an exemption, but they have to comply

20   with the regulations.

21        Q.   So there would have been an exemption process

22   allowing Hansen Helicopters or the Vanuatu corporations --

23        A.   I never seen one issued.  I mean, the U.S.

24   regulations are clear on who maintains a U.S.-registered

25   aircraft with a U.S. airworthiness certificate, and I've never
```

1    seen exemption issued for something like that.

2        Q.   Have you seen a regulation that requires or that

3    mandates that non-U.S. registered aircraft have to be

4    maintained by U.S.-certified mechanics -- certificated

5    mechanics or pilots?

6        A.   Non-U.S.?

7        Q.   Yes.

8        A.   The time I've seen it is when it's applicable to air

9    carriers, they're using -- under a lease, they're using

10   foreign-registered aircraft, and then they have to be

11   maintained in accordance with U.S.-certificated individuals.

12       Q.   But this is a non-air carrier situation; correct?

13       A.   Correct.  It's a 91 operation.

14       Q.   Well, how does the FAA maintain safety for these

15   helicopters that are operating in the Pacific Ocean?

16       A.   They should -- I mean, one of the things -- we're a

17   risk-based organization, there's just not enough inspectors in

18   the country to do the amount of aviation work, so we do our

19   surveillance, especially on 91 operations, not air carrier.

20   Air carrier is completely different.

21            But on general aviation, we do it on a risk basis,

22   right?  So if they're reporting accidents and incidents --

23   which in this case, they were not -- if they're reporting it,

24   we're -- it gives the inspector concerns in an office, that

25   there is a lot of incidents, accidents being reported by this

*Cross - Lopez*

1    company, we need to send, you know, teams or dedicate more

2    resources to see what's going on.  So it's a two-way street,

3    so it's risk-based, and depending on the information being

4    provided on the surveillance activities that are being done.

5    And if Inspector Cislo was taking bribes and wasn't

6    documenting inspections, wasn't looking at what was going on

7    and just, you know, looking the other way, then no additional

8    inspections will be required because everything is perfect.

9    But if he was doing his job correctly as an inspector, there

10   may have been a lot more inspections out there.

11        Q.   Well, if he was doing his job, in your vernacular,

12   would he have been able -- would he have allowed the

13   continuation of maintenance the way it had been performed by

14   the companies?

15        A.   If he would have been doing his job correctly and not

16   taking the bribes he was taking, he may have found out that

17   the company was using uncertificated mechanics to work on

18   aircrafts, U.S.-registered aircraft.

19        Q.   Would have had to apply for an exemption, perhaps?

20        A.   Typically -- I mean, exemption is a method when you

21   can't comply with the regulations, but it's a big legal

22   process and, I mean, it's an option of an applicant, but it

23   has to be done.

24        Q.   How does a supervising inspection authorize --

25   mechanic supervise mechanics that are out on boats?  Can they

1 do it remotely?

2    A.   Absolutely not.  The regulation is clear about that.

3    Q.   Could you have an exemption about that?

4    A.   No.  I mean, that would be -- again, the applicant

5 would have to apply for that and get it from FAA headquarters

6 legals that issues exemptions.  We have no authority in the

7 field office level to issue any kind of exemptions.

8    Q.   But if they weren't FAA-registered helicopters, the

9 FAA wouldn't have any authority over that?

10    A.   Again, I was talking about U.S.-registered aircraft

11 and the U.S. airworthiness certificates.

12    Q.   Another option would have been to have gone back and

13 set up another repair station; correct?

14    A.   That's up to the applicant.

15    Q.   Pardon me?

16    A.   That would be up to the applicant.

17    Q.   Well, if Mr. Cislo was trying to help him set up a

18 repair station, would you refer to 145 repair station, he then

19 could -- if the operation manual provided it -- remotely

20 surveil the mechanics?

21         MR. LEON GUERRERO:  Objection, Your Honor.

22 Counsel's testifying as to first objection.  Second --

23         THE COURT:  Hold on.  I don't understand the

24 question, so let me just -- I don't know if he made a

25 question.  What's the question?  Hold on before I hear the

1    objection.  What's the question?

2              MR. MCCONWELL:  Let me rephrase it, if I could,

3    Your Honor?

4              THE COURT:  Okay, yeah.

5              MR. MCCONWELL:  I'm sorry, let's just go back to

6    the question.

7              THE COURT:  Okay.  I don't know if there was a

8    question formatted.  I think you were still trying to develop

9    it, but go ahead.  You can have Veronica review it.

10             Go ahead, Veronica.

11             (Whereupon, the reporter read back requested

12   portion.)

13             THE COURT:  Okay, all right.  Okay, now I see the

14   question there.  All right.

15             And what's the objection?

16             MR. LEON GUERRERO:  Objection, speculation, the

17   relevance, and there is no information about Mr. Cislo trying

18   to open up a maintenance station out in the Pacific.  So on

19   those bases, I ask that the objection be sustained.

20             THE COURT:  The Court will sustain the objection

21   on speculation.

22   BY MR. MCCONWELL: (CONTINUING)

23      Q.   What options were there for providing or allowing

24   mechanics -- supervising mechanics to surveil work on the tuna

25   boats that you see that were available?

1     A.    Not sure.  Options, in what form?

2     Q.    How you maintain them, how do you supervise your

3  mechanics?

4     A.    If they're certificated mechanics, or...

5     Q.    Well, you don't have to be a certificated mechanic to

6  work under the supervision of a supervising inspection

7  authorized mechanic; do you, sir?

8     A.    If the FAA mechanic is supervising, he has to be

9  there personally observing.

10     Q.    Okay.  But in a repair station setting, that can be

11  waived by the operations manual; couldn't it, sir?

12     A.    Typically, a person that returns to service an

13  aircraft after maintenance on a repair station still requires

14  a repair certificate under Part 65.

15     Q.    How much did the FAA allocate toward time and money

16  toward the assurance of safe operations in the Pacific for

17  aircraft of this type?

18     A.    I could assure you --

19           MR. LEON GUERRERO:  Objection, relevance.

20           THE COURT:  Relevance?

21           MR. MCCONWELL:  They're saying we interfered with

22  their performance of their duty, and that would include the

23  Pacific, since these are the only place these helicopters

24  operated.  And I would ask him what resources did they set up

25  to help surveil that situation, or were they doing anything to

*Cross - Lopez*

1    protect or help these aircraft?

2              THE COURT:  All right, overruled.  Go ahead.

3              THE WITNESS:  If the inspector -- if the office

4    truly knew the situation, the risk that was going on and it

5    was being conveyed to them by Timothy Cislo, the inspector

6    that was taking the bribe, if he really would have conveyed

7    it, they probably would have -- I'm speculating here -- but I

8    assume they would dedicate a lot of resources.

9    BY MR. MCCONWELL: (CONTINUING)

10       Q.   Now, as an office manager, FSDO manager and a

11   frontline manager, if you had foreign corporations operating

12   U.S.-registered aircraft in your territories, you would have

13   certainly known it; wouldn't you, sir?

14       A.   If -- yes, I would -- we would know that the types of

15   operations within our geographic boundary, yes.

16       Q.   If you knew it was a foreign corporation, you'd have

17   some conclusion about what that meant; correct?

18       A.   My conclusion will be that the aircraft is

19   U.S.-registered, that's what I'm looking at.

20       Q.   And you wouldn't care whether they were

21   foreign-registered or not?

22       A.   I don't get involved with that.  My office don't get

23   involved with the ownerships and registration.

24       Q.   Your office does get involved with the enforcement;

25   don't they, sir?

 1          A.    We do get involved with law enforcement, yes, sir.

 2          Q.    And one of the enforcement would be violations of the

 3     Federal Aviation Regulations, which could include

 4     registration?

 5          A.    We typically -- the registration, we typically send

 6     it to FAA security because they have specialized people for

 7     that.

 8          Q.    And if you notice that there was this situation going

 9     on, you would have sent it right away to FAA security?

10          A.    If there was -- if some inspector came up to it, they

11     would notify management and notify FAA security.  But the

12     thing is that the FAA inspector would have to know and if, you

13     know, Cislo was taking these bribes, he may have not been

14     passing that information on to them.

15          Q.    Now, you operate under what is called 8900.1; is that

16     correct?

17          A.    That's correct, sir.

18          Q.    And would you tell the jury what that is and the

19     volume of information that would be contained in the thousand

20     of pages?

21          A.    It's a huge document and it covers all the different

22     functions and -- that an inspector may do.  So it's a

23     document, a guidance document on how the inspector does the

24     functions and multiple and, like you said, it's a huge

25     document.

```
 1       Q.   And all aviation inspectors, safety inspectors are
 2   required to follow the requirements of 8900.1?
 3       A.   Yes, sir.
 4       Q.   And tell us what the policy of the FAA toward dealing
 5   with issues with operators was in 2015 through -- even
 6   current?
 7       A.   I'm not sure I understand that question.
 8       Q.   Were you aware in 2015 that there was a policy
 9   developed by the Federal Aviation Administration to work with
10   operators rather than try to be punitive on them but try to
11   work situations out?
12       A.   Oh, the compliance philosophy?
13       Q.   Yes.
14       A.   Yes, I'm aware of that.
15       Q.   And that compliance philosophy was running full steam
16   in 2015?
17       A.   But, again, that philosophy is not applicable to
18   criminal activity.
19       Q.   Well, that remains to be seen, whether there was
20   criminal activity or not?
21            MR. LEON GUERRERO:  Objection, Your Honor.
22   Commenting on the evidence.  I'd ask that --
23            THE COURT:  Objection will be sustained.  That
24   will be stricken from the record.
25            MR. MCCONWELL:  I'm sorry.
```

```
 1              THE COURT:  The jurors, please, disregard that.
 2   Question.  Next question?
 3   BY MR. MCCONWELL: (CONTINUING)
 4       Q.   Well, if you have an operator, you don't know whether
 5   there's alleged criminal activity or not --
 6              MR. LEON GUERRERO:  Objection, Your Honor.
 7              THE COURT:  I'm sorry?
 8              MR. MCCONWELL:  Can I finish the question?
 9              THE COURT:  Yeah, let me hear the question.
10   Yeah, go ahead.
11   BY MR. MCCONWELL: (CONTINUING)
12       Q.   If you have an operator that you have no information
13   about or suspicion or anything with criminal activity, the
14   philosophy should be followed; correct?
15              MR. LEON GUERRERO:  Objection, Your Honor.
16   Again, speculation, relevance.
17              THE COURT:  Overruled, overruled.  Go ahead.
18              THE WITNESS:  So immediately, this was referred
19   to the Department of Transportation, Office of Inspector
20   General.  Just the mere fact that it was referred, means there
21   is suspicion of criminal activity.  So the compliance action
22   no longer applies.
23   BY MR. MCCONWELL: (CONTINUING)
24       Q.   Well, it was assigned to aviation inspectors before
25   it was some -- at least six or eight months before it was
```

*Cross - Lopez*

```
 1   referred to the Department of Transportation IG; wasn't it,
 2   sir?
 3        A.   I'm not sure the dates.  You would have to show me
 4   that.  But the fact that we're here, the FAA thought it was
 5   criminal at one point, so compliance action wouldn't even be
 6   considered.
 7        Q.   But I'm talking about up to the point there be a
 8   referral, wasn't the FAA supposed to be trying to help this
 9   operator to figure out whether there really was a problem or
10   any inappropriate activity?
11        A.   The basis of that, even if -- we're already in
12   criminal, but the basis of that, is the operator is trying to
13   fix things that are being presented, that if they're asked to
14   present aircraft to inspection, they present 'em.  If they're
15   not being compliant, that requirement doesn't apply.
16        Q.   Now, the first indication of any possible situation
17   occurred after 2015; correct?
18        A.   I'm not sure of that, sir.
19        Q.   You don't know when this alleged suspicion started?
20        A.   I don't have the specific details on that, sorry.
21        Q.   Did you have any complaints from the Honolulu FSDO,
22   the supervising FSDO of the Hansen operation or the Vanuatu
23   corporations?
24        A.   I wasn't involved in that part, so I don't know.
25        Q.   You're not aware -- you've reviewed the file and
```

```
 1    you've attended a lot of different hearings --

 2        A.    Right.

 3        Q.    -- and all, right?

 4        A.    Right, but I don't know the details of the Honolulu

 5    FSDO.

 6        Q.    But you don't know that they ever raised any concern

 7    until there was a complaint by Gary Robinson --

 8                MR. LEON GUERRERO:  Objection, Your Honor.

 9    Testifying; Counsel is testifying.

10                THE COURT:  I'm sorry, let me hear the question.

11    So what -- what's the question?

12                MR. MCCONWELL:  He's not aware of any allegation

13    or complaint until there was a communication from a Gary

14    Robertson, an Australian citizen, about Tropic Helicopters.

15                MR. LEON GUERRERO:  Counsel's testifying.  Move

16    to strike --

17                MR. MCCONWELL:  It was -- we could have evidence

18    of it in documents and they've got witnesses --

19                THE COURT:  Wait, wait.  Hold on.  I can't hear

20    both of you at the same time.  I'm sorry.

21                Has there already been evidence presented about

22    this witness -- I mean, this person, number one; and if it

23    not, are you intending to bring in a witness regarding this?

24                MR. MCCONWELL:  There will be.  It'll be

25    witnesses brought in by the prosecution.  If they don't call
```

*Cross - Lopez*

1    'em, we will, because we identify them as witnesses for us if

2    we needed to.

3             THE COURT:  Okay.  Counsel?  Mr. Leon Guerrero?

4             MR. LEON GUERRERO:  Until then, Your Honor, it's

5    an inappropriate question.  Counsel's testifying as to facts

6    not in evidence, so it's none of this information that was

7    provided during direct examination of this witness.

8             THE COURT:  He said he's going to bring it in and

9    he has good faith basis to believe it's going to come in.

10            MR. LEON GUERRERO:  But until then, I'd ask that

11   question not be allowed because it's facts not in evidence and

12   it's also outside the scope of direct examination, and it's

13   not relevant.

14            THE COURT:  Relevance?

15            MR. MCCONWELL:  I think it is relevant to -- he's

16   saying how the FAA ought to proceed with regard to the

17   operators, and it's relevant when the issues first started and

18   how they started and the background of how this whole process

19   in this case started and the background of it.

20            THE COURT:  Okay.  The Court already, though, has

21   granted a motion regarding -- relating to the quality of FAA

22   oversight over the Civil Aviation Registry.  I've already made

23   a ruling on that.

24            MR. MCCONWELL:  And that's -- that's not talking

25   about that at all.

1              THE COURT:  That's not talking about this at all?

2    It has nothing to do with compliance philosophy?

3              MR. MCCONWELL:  No.  We're talking about FSDO

4    compliance philosophy, the FAA compliance philosophy and how

5    this thing started and what --

6              THE COURT:  Okay.  The objection will be

7    sustained, though, to the extent that the Court has already

8    made a ruling regarding FAA oversight that I just indicated.

9    So the objection will be sustained on that ground.

10              MR. MCCONWELL:  Okay.

11   BY MR. MCCONWELL: (CONTINUING)

12       Q.   Is there any regulation that precludes the repair of

13   a helicopter by replacing every part?

14       A.   Is there regulation that replaces every part?

15       Q.   In the helicopter?

16       A.   I've not heard of that.

17       Q.   Pardon me?

18       A.   I have not heard of that.

19       Q.   Okay.

20       A.   It's no longer the aircraft, to replace every part.

21       Q.   Well, the FAA doesn't like maintenance people

22   replacing aircraft that have been damaged or allegedly

23   destroyed; do they, sir?

24              MR. LEON GUERRERO:  Objection, Your Honor.

25   Argumentative.  Counsel asked "the FAA doesn't like," and it's

*Cross - Lopez*

1   just --

2               THE COURT:  Probably speculative.  The objection

3   will be sustained on speculation.

4   BY MR. MCCONWELL: (CONTINUING)

5       Q.   Would you know whether or not the FAA has a dislike

6   for mechanics replacing or rebuilding or repairing aircraft

7   that had been allegedly destroyed?

8               MR. LEON GUERRERO:  Same objection, Your Honor.

9               THE COURT:  Overruled, overruled.  Do you know?

10              THE WITNESS:  Of this like, I'm not sure I

11  understand.  But we don't -- it's not -- we have regulations

12  that we have to follow.  It's not a personal thing, it's not

13  like or dislike, it's just we follow regulations and guidance.

14  BY MR. MCCONWELL: (CONTINUING)

15      Q.   Okay.  And the regulations do not prohibit the repair

16  and rebuilding of a helicopter by replacing every part; do

17  they, sir?

18      A.   And they don't allow it either.

19      Q.   But they don't prohibit it?

20      A.   And they don't allow it.

21              MR. LEON GUERRERO:  Objection.  Asked and

22  answered.

23              THE COURT:  Overruled.  Okay.  Overruled.  Go

24  ahead.

25              MR. MCCONWELL:  I think he answered it.

*Cross - Lopez*

          THE COURT:  Okay.  You said one thing, he said

another thing.

BY MR. MCCONWELL: (CONTINUING)

    Q.   The return to service in how you go about repairing a

helicopter, for example -- and we'll talk about these 500s and

369s involved in this case -- that's up to the discretion of

the mechanic, the certificated mechanics, that are doing the

work; correct?

    A.   Yes, they have to follow the appropriate manual that

attempted that.

    Q.   Well, if you dismantle a 369 helicopter, any

helicopter and spread its parts all through this room, the

individual parts and pieces lose their identity to the

helicopter; correct?

    A.   Well, there is something -- the primary structure has

to have the data plate so it doesn't lose its identity, and

all the parts -- the major parts have ID plates on it as well.

    Q.   I probably should go back a moment and say, prior to

a FAA Order or National Policy in 2018, long after these

circumstances in this case came up, there was no requirement

or suggestion that mechanics had to provide a structure piece

of a helicopter with the data plate in order to repair it;

correct?

    A.   Not that I recall, no.

    Q.   Does the FSDO office, your FSDO office or any of the

*Cross - Lopez*

other FSDO offices, do they assist the National Transportation

Safety Board in investigations of aircraft accidents?

    A.    We do.

    Q.    And frequently, if it's out to sea or someplace in a

remote location, the NTSB would delegate that responsibility

to your FSDO; correct?

    A.    Yes.

    Q.    Now, you mentioned 8900.1, but I want to go back to

that for a moment, and part of the requirement of 8900.1 is

that the FSDO inspectors must record everything they do,

basically, on a PTRS system --

    A.    That's correct.

    Q.    -- correct?

    A.    Correct.  Generally, the function they do is spelled

out in the --

    Q.    And that's part of the official records of the FSDO

and the FAA; correct?

    A.    Correct.

    Q.    And they're maintained on a permanent basis?

    A.    Yes.

    Q.    And you've already gone through one.  You had a PTRS

sample of Mr. Cislo that, I think, you referred to in direct

examination; correct?

    A.    It was a report of his PTRS records.

    Q.    But you had a chart with every entry that he made --

1   A.   That is correct.

2   Q.   -- and work he did?

3   A.   Correct.

4   Q.   So he wasn't hiding what he was doing when he was

5   doing work for foreign corporation; was he, sir?

6          MR. LEON GUERRERO:  Objection, speculation.

7          THE COURT:  All right.  Sustained.

8   BY MR. MCCONWELL: (CONTINUING)

9   Q.   Now, this case was assigned to a group called SEIT;

10  correct?

11  A.   I believe so, yes.

12  Q.   What are they?

13  A.   Special Emphasis Investigation Team.

14  Q.   What is their mission?

15  A.   It's spelled out in FAA Order -- Flight Standards

16  Order 1100.1.

17  Q.   Would you please tell us what their mission is?

18  A.   I would have to read it, sir.

19  Q.   You don't have 1100.1?

20  A.   I don't have it with me, no, sir.

21  Q.   And how long has it been spelled out in that order?

22  A.   It's been a while, but I would have to look at it,

23  but it's been there for a while.

24  Q.   Is the SEIT group required to fill out PTRS reports,

25  just like other inspectors?

1    A.   They're inspectors like my inspectors, my FSDO.

2 They're required to follow the FAA 8900.

3    Q.   And that's to treat operators fairly and try to work

4 out problems; correct?

5    A.   I'm not sure I understand the question, sir.

6    Q.   As to treat operators fairly and try to work out

7 problems rather than create issues?

8    A.   It doesn't say --

9         MR. LEON GUERRERO:  I'm going to object, Your

10 Honor.  Objection as to outside the scope.  There was no

11 testimony that was given regarding the SEIT -- the SEIT team,

12 so outside the scope and relevance.

13         THE COURT:  Mr. McConwell, on those objections?

14         MR. MCCONWELL:  Well, I think it is within the

15 scope of the direct examination, sir -- ma'am, Your Honor.

16         THE COURT:  You talked about the SEIT, though.

17 Was that -- he said it was not within the scope of the direct

18 exam.

19         MR. MCCONWELL:  Well, they are safe -- aircraft

20 safety inspectors.  I think that brings them within.

21         MR. LEON GUERRERO:  Your Honor, there was no

22 testimony that was given, no evidence given about the SEIT.

23 So how can Counsel ask questions about it on cross?  It's

24 outside the scope the direct.  It's not relevant.

25         THE COURT:  Mr. McConwell?

*Cross - Lopez*

1          MR. MCCONWELL:  I still think reference to ASI's

2   and them being ASI's, it opens it up --

3          THE COURT:  ASI's, meaning?

4          MR. MCCONWELL:  Aviation Safety Inspectors, which

5   they are.

6          THE COURT:  Are they ASIs?

7          THE WITNESS:  The individuals, SEIT?  Yeah,

8   they're aviation safety inspectors.

9          THE COURT:  All right, overruled.

10         THE WITNESS:  It's a group of them.

11         THE COURT:  Okay.  Overruled, then.  Go ahead.

12  Did you understand the question?  You forgot the question?

13         Veronica.

14         (Whereupon, the reporter read back requested

15  portion.)

16         THE WITNESS:  As with respect to the SEIT?

17  BY MR. MCCONWELL: (CONTINUING)

18     Q.   Yes, sir.

19     A.   I don't -- I don't work for SEIT.  I'm in the FSDO,

20  there's a team of inspectors.  I'm not the proper one to ask

21  that question to.

22     Q.   Okay.  Can you tell us what a 44709 letter is?

23     A.   It's a re-examination letter.

24     Q.   That's a form letter that's sent out when you want to

25  re-examine an aircraft?

*Cross - Lopez*

1      A.   An aircraft, an airman, a certificate holder, yes.

2      Q.   In this instance, an aircraft; correct?

3      A.   Yes, correct.

4      Q.   And you, I believe, were shown a 44709 letter dated

5 May 1, 2015; correct?

6      A.   I wasn't.

7      Q.   You didn't see that?  I thought we got you, we had

8 one of those.  Anyway, did you see -- have you seen the 44709

9 letter that was sent out in this case?

10     A.   No, sir.

11     Q.   Or any of them?

12     A.   No, sir.

13     Q.   So you're not -- you have not looked at any of those?

14     A.   No, sir.

15     Q.   Now, is it a prerequisite of the issuance of a 44709

16 letter that you have to establish that you have authority over

17 the aircraft involved?

18          MR. LEON GUERRERO:  Objection, Your Honor.  This

19 goes to Your Honor's Order 1535, jurisdiction over the

20 aircraft.  He's going into those lines of questioning.

21          THE COURT:  What's the -- what's the purpose of

22 this line of questioning?  Hold on.

23          MR. MCCONWELL:  My response to -- he's allegedly

24 -- they've represented he's looked at everything on the

25 discovery log which would include these documents, but...

*Cross - Lopez*

```
1                    THE COURT:  Okay.  Are you --
2                    MR. MCCONWELL:  I need to have the question back,
3        if I could, Your Honor?
4                    THE COURT:  Okay.  Veronica.
5                    (Whereupon, the reporter read back requested
6        portion.)
7                    THE COURT:  Okay.  So what's -- why -- relevance
8        of this questioning, Mr. McConwell?
9                    MR. MCCONWELL:  It's relevant to the status of
10       the aircraft and the status of the investigation, Your Honor.
11                   THE COURT:  The status of the aircraft... and the
12       status -- okay, okay.  I'll overrule at this time.  Go ahead
13       and proceed -- I'm not sure where you're going with this.  Go
14       ahead.
15                   Do you understand?
16                   THE WITNESS:  Yeah.  I mean, we would only issue
17       a letter like that, a 709 letter, for U.S.-registered
18       aircraft.
19       BY MR. MCCONWELL: (CONTINUING)
20          Q.   You wouldn't issue it for non -- aircraft that was
21       not a U.S.-registered aircraft?
22                   MR. LEON GUERRERO:  Objection, Your Honor.  It's
23       not relevant, and it's violating your order --
24                   THE COURT:  Objection overruled.  Go ahead.
25                   THE WITNESS:  We would -- a 44709 examination
```

*Cross - Lopez*

```
1    letter, we would issue for certificated entities of the FAA.
2    BY MR. MCCONWELL:  (CONTINUING)
3         Q.   Pardon me?
4         A.   Certificated entities of the FAA, mechanics or
5    aircraft, airworthiness certificates, the re-examination of a
6    U.S.-registered aircraft.
7         Q.   But you wouldn't do it for non-registered --
8    non-U.S-registered aircraft?
9              MR. LEON GUERRERO:  Asked and answered, Your
10   Honor.
11             THE COURT:  Overruled.  He hasn't been able to
12   answer the question.
13             And your answer?
14             THE WITNESS:  We would only issue it for
15   U.S.-registered aircraft.
16   BY MR. MCCONWELL:  (CONTINUING)
17        Q.   And why is that?
18        A.   Because that's -- we regulate U.S.-registered
19   aircraft.
20        Q.   That operate in United States --
21             MR. LEON GUERRERO:  Objection, Your Honor.
22   Violating your order --
23             THE COURT:  Overruled, overruled.  Go ahead.
24             THE WITNESS:  That operate anywhere.
25   BY MR. MCCONWELL:  (CONTINUING)
```

*Cross - Lopez*

 1       Q.   What authority do you have for operations outside the
 2   United States or U.S.-registered aircraft?
 3       A.   The regulation apply to U.S.-registered aircraft,
 4   U.S. airworthiness certificate.  It's our responsibility under
 5   regulation to oversee them.
 6       Q.   But it's not the responsibility under 49 U.S.C.,
 7   commonly known as the Federal Aviation Act, and I'll refer to
 8   44101 to 103 and 44709?
 9               MS. M. MILLER:  Your Honor, may I --
10               THE COURT:  I'm sorry, no, just a minute.  I
11   don't understand the question.  Could you repeat -- what is
12   the question?
13               MR. MCCONWELL:  Could we re-read it back.
14               THE COURT:  You guys interrupt in the middle of
15   the question.  I can't ever figure out what the analysis is
16   going to be.
17               MR. MCCONWELL:  And I start looking at things and
18   I can't remember all of it.  I just want to be sure.
19               THE COURT:  Everybody has a tendency to interrupt
20   in the middle of the question.  I can't figure this out.
21               Go ahead.
22               (Whereupon, the reporter read back requested
23   portion.)
24               THE COURT:  Repeat the first part.  But it's not
25   the responsibility; is that what you said?

```
 1                    (Whereupon, the reporter read back requested
 2       portion.)
 3                    THE COURT:  Mr. McConwell, I don't think that's a
 4       full question.
 5                    MR. MCCONWELL:  I think you're right.  I got
 6       interrupted.  Let me move on to something else.
 7                    THE COURT:  So that question is --
 8                    MR. MCCONWELL:  I'll withdraw.
 9                    THE COURT:  That part of the question is
10       withdrawn and you're going to start again.  Go ahead.
11       BY MR. MCCONWELL: (CONTINUING)
12           Q.   Now, with regard to issuance of airworthiness
13       certificates, do you have to require -- or are you required to
14       take a look at the registration of the aircraft and the
15       validity of it before you issue an airworthiness certificate?
16           A.   No, sir.
17           Q.   There is no requirement at all about that?
18           A.   We look at the certificate that, you know, it's been
19       issued but we don't go into the details of it.
20           Q.   But there is no regulatory requirement on that, sir?
21           A.   Our issuance of an airworthy certificate and guidance
22       is 8900 and 8130.2, it's --
23                    COURT REPORTER:  I'm sorry, can you speak slower
24       and repeat that, please.
25                    MR. MCCONWELL:  I'd like --
```

*Cross - Lopez*

```
 1                    THE COURT:  Wait, hold on, hold on.  Go ahead.

 2                    THE WITNESS:  Our guidance for issuance for

 3       airworthiness certificate, it's in FAA Order 8900.1 and the

 4       8130.2.

 5                    THE COURT:  Okay.  Yes, Mr. McConwell, go ahead.

 6                    MR. MCCONWELL:  Yes, I'd like to have Government

 7       Exhibit 818 pulled up, please.

 8                    THE COURT:  818.  Has that been admitted?

 9                    MR. MCCONWELL:  No, not yet.

10                    THE COURT:  Not yet admitted, okay.  So we show

11       that to the witness only and Counsel.  We have 20 minutes

12       before the next break, Mr. McConwell.

13                    MR. MCCONWELL:  Thank you, Your Honor.

14                    THE COURT:  How much longer do you have with this

15       witness?

16                    MR. MCCONWELL:  I'm not too much longer.  I would

17       like to keep it less than a half hour, but I can even do

18       better than that if we do take a break.

19                    THE COURT:  Okay, just checking.  818.

20       BY MR. MCCONWELL: (CONTINUING)

21          Q.   Are you familiar with FAA Order 8130.2(g), Change 1,

22       Chapter 2, Section 1, Paragraph 204?

23          A.   I'm familiar with the order, yes, sir.

24          Q.   And are you familiar with the effect of that order

25       that a prerequisite or the issuance of an airworthiness
```

*Cross - Lopez*

 1   certificate is what the inspectors must do?

 2        A.   Right, that's what I testified to earlier.

 3        Q.   Pardon?

 4        A.   I had testified to that earlier.

 5        Q.   Okay.

 6             MR. MCCONWELL:  And I'll offer this exhibit, Your

 7   Honor.

 8             THE COURT:  All right.  Counsel?

 9             MR. LEON GUERRERO:  Objection, Your Honor.

10   Number one, hearsay.  Number two, violation of your order,

11   1535.  And if we can be heard outside the presence of the

12   jury, admission of this would violate that order.

13             THE COURT:  On airworthiness?

14             MR. LEON GUERRERO:  Yes.  The exhibit and any

15   line of questioning regarding it, it goes to the jurisdiction

16   of the aircraft, the validity of the registration of the

17   aircraft, all in violation of your order, so we object to it.

18             THE COURT:  Well, you just recite to the order,

19   Mr. Leon Guerrero.  You don't have to give an argument

20   regarding the order.

21             The Court will hold off on this question and

22   we'll talk about this during the break.  You want to -- just

23   hold this in abeyance.

24             Do you have another question to proceed forward,

25   Mr. McConwell?

```
 1              MR. MCCONWELL:  Yes, I do.  I offer -- I would
 2    like to have the 121 -- Defendant's Exhibit 121.  I need the
 3    copies.
 4              THE COURT:  Okay.  So 1-2-1 has not been admitted
 5    as well?
 6              MR. MCCONWELL:  Not yet, Your Honor.
 7              THE COURT:  So we'll come back to 8-1-8. 1-2-1;
 8    does that have go on the ELMO or are we going to be able to do
 9    that digitally?
10              MR. MCCONWELL:  That would be ELMO on that,
11    sorry.  I could give him copy of it.
12              MS. MCCONWELL:  May I approach the witness?
13              THE COURT:  You may.  So Ms. McConwell will pass
14    it over to the witness.  And this is Exhibit 1-2-1?
15              MS. MCCONWELL:  D-121.
16              THE COURT:  Okay.  D-121.  Defendant's
17    Exhibit 121.  Let me look at this.
18    BY MR. MCCONWELL: (CONTINUING)
19        Q.   Do you recognize that as an official form of the PTRS
20    system, sir?
21        A.   Yes, it looks like the national program tracking and
22    reporting system.
23        Q.   And that's the type of information that's maintained
24    in the permanent record of the Federal Aviation
25    Administration; correct?
```

*Cross - Lopez*

 1      A.   Yes.

 2      Q.   And this relates to 9081 Aircraft; correct?

 3      A.   It relates to N9068F.

 4      Q.   And you testified about that earlier; correct?

 5      A.   About that aircraft?

 6      Q.   Yes.

 7      A.   Yes, sir.

 8      Q.   And this relates to the FSDO -- Honolulu FSDO's

 9  investigation for the NTSB -- or with the NTSB of that

10  accident; correct?

11      A.   I can't tell that by this report because it doesn't

12  have the office designator on it.

13      Q.   If you take a look at the second page, you'll see

14  that the FSDO representative and the NTSB representative are

15  referenced on the second page.

16      A.   I see it at the bottom of the second page.  But

17  that's not the same name as the inspector on the top, so I

18  really don't know if that inspector is from Honolulu.

19      Q.   But it says HNL --

20              MR. LEON GUERRERO:  Objection, Your Honor.

21  Counsel is testifying as to the document and it hasn't been

22  admitted into evidence.

23              THE COURT:  All right, the objection will be

24  sustained.

25  BY MR. MCCONWELL:  (CONTINUING)

*Cross - Lopez*

     1      Q.   Does the document identify Honolulu FSDO ASI?

     2      A.   In the comments section, but not in the document

     3   itself as to who entered it or who did it.

     4           MR. MCCONWELL:  I'll offer Exhibit 121, Your

     5   Honor.

     6           MR. LEON GUERRERO:  Objection, hearsay.

     7           THE COURT:  Okay, the Court will sustain the

     8   objection on the Court's prior order, ECF...  What was it?  Is

     9   that the one that I have, ECF?

    10           MR. MCCONWELL:  Your Honor, this has nothing to

    11   do with that argument at all, that issue.

    12           THE COURT:  The -- this is the Court's prior

    13   order of ECF -- what is the ECF's number, Emily?  1535,

    14   Page 13, Line 11 through 12 regarding helicopters not being

    15   subject to FAA or NTSB regulatory jurisdiction, so the Court

    16   will over -- will sustain the objection on that ground.

    17           MR. MCCONWELL:  Your Honor, this document does

    18   not apply to that issue at all.  This is just the report of

    19   the accident.

    20           THE COURT:  Okay.  I know what it is, you don't

    21   have to tell me what it is because then you're just discussing

    22   it.  You're -- and it hasn't been admitted yet, but we'll come

    23   back to this as well.

    24           MR. MCCONWELL:  Can I ask him a question about

    25   whether this applies to anything other than the accident

```
 1   investigation?

 2              THE COURT:  Okay, you may do that.

 3   BY MR. MCCONWELL: (CONTINUING)

 4      Q.   Mr. Lopez, this document, this PTRS document, the

 5   factual summary of the accident and the information, that was

 6   accumulated about the accident and recorded in the PTRS

 7   system; correct?

 8      A.   I don't know if it's an accident investigation report

 9   because there is no office record locater that establishes the

10   office.  There is no function or designation of what activity

11   was taking place here, it's just a bunch of comments, but I

12   can't tell exactly what activity was being done because it's

13   not identified.

14      Q.   Well, you do see in the accident -- the report

15   directory relates to the accident; correct, of that aircraft?

16      A.   There is comments, yes, in the bottom of the comment

17   section.

18      Q.   And you see a reference on the document of an NTSB

19   representative and a FSDO representative?

20              MR. LEON GUERRERO:  Objection, Your Honor.

21   Counsel's inquiring about the --

22              THE COURT:  I think the objection -- it's already

23   been asked and answered anyway.  That was already asked and

24   answered.

25              MR. MCCONWELL:  Okay.
```

```
 1                THE COURT:  We'll come back -- if you're going to
 2    try to move for admission, we'll come back to that at the
 3    break.
 4                MR. MCCONWELL:  Thank you, Your Honor.
 5                THE COURT:  And that's as to 8-1-8 and D-1-2-1.
 6                MR. MCCONWELL:  The next document is Exhibit 87.
 7                THE COURT:  Okay.  Not yet admitted into
 8    evidence, Mr. McConwell?
 9                MR. MCCONWELL:  That's correct.
10                THE COURT:  Okay, very well.  D-87?
11                MR. MCCONWELL:  Yes.
12                THE COURT:  Okay, go ahead.
13                MR. LEON GUERRERO:  Your Honor, I don't have a
14    copy of D-87.
15                MR. MCCONWELL:  It's on our exhibit list and it's
16    been there for months.
17                THE COURT:  Okay.
18                MR. LEON GUERRERO:  I move to strike Counsel's
19    comment.
20                THE COURT:  Well, you guys say the same thing,
21    so... everybody has it for months and years and so forth.
22                MR. MCCONWELL:  We defer to that after the break,
23    then, and make sure they can take a look at it and re-verify
24    they have it.
25                THE COURT:  Very well, that's a good idea.
```

Case 1:18-cr-00010    Document 1980    Filed 07/05/23    Page 198 of 308

D-818, D-121, 87.  Okay.

MS. S. MILLER:  I thought it was 86.

THE COURT:  He said 87.

MS. S. MILLER:  87, sorry.  D-87.

THE COURT:  Yeah.

MR. MCCONWELL:  Your Honor, if we could go ahead take our break, I'll try to get through my notes and see if -- I don't have much left except these exhibits.

THE COURT:  We'll take a break a little early, then.  Okay, we'll do that.

Ladies and gentlemen, keep an open mind.  Do not form or express any opinion on the case until it's submitted to you.  Do not speak to anyone on any subject connected with the trial.  We'll see you in a few minutes.  Have a nice break.

(Jury out at 3:01 p.m.)

(Recess taken at 3:01 p.m.)

(Back on the record at 3:21 p.m.)

THE COURT:  We're back on the record.  Let's go ahead and call in the jury.

How much time do you have, Mr. McConwell?

MR. MCCONWELL:  Probably 20 minutes or so.

THE COURT:  About 20 minutes.  And then, Mr. Martin, are you going to cross this witness?

MR. MARTIN:  Your Honor, I may, but it will not

*Cross - Lopez*

1  be very long.

2            THE COURT:  Okay.

3            MR. MCCONWELL:  Do we want to talk about these

4  exhibits before we go back with the jury?

5            THE COURT:  Did you already give it to them?

6            MR. LEON GUERRERO:  Yeah, I've seen them, Your

7  Honor.

8            THE COURT:  So let's start with 8-1-8.  Let's

9  pull 8-1-8 up.  Do you want to show that to us?

10           Is that on ELMO or is that on digital?

11           MR. MCCONWELL:  It's digital.

12           THE COURT:  Okay, digital.  Let's go for 8-1-8.

13  And then we'll just -- I'm sorry, Emily, can you just tell

14  them hold off on the jurors.

15           8-1-8?

16           MS. MCCONWELL:  I'll bring it up, Your Honor.

17           THE COURT:  Okay, 8-1-8.

18           MS. M. MILLER:  Yes, Your Honor --

19           THE COURT:  Hold on.  I want to look at 8-1-8.

20  Let's pull up 8-1-8.  So there is three exhibits, 8-1-8, D-121

21  and D-87.  So let's go to 8-1-8, first.

22           Do you have it up yet?

23           MS. MCCONWELL:  I'm plugged in.

24           THE COURT:  There we go.  So what are you

25  offering this for, Mr. McConwell?

1          MR. MCCONWELL:  Just a record of the process of

2     issuing airworthiness certificates.

3          THE COURT:  Airworthiness certificate?

4          MR. MCCONWELL:  Yes, ma'am.

5          THE COURT:  All right.  And -- okay, yes,

6     Ms. Marie Miller?  You don't want Mr. Leon Guerrero to argue

7     this?

8          MS. M. MILLER:  No, Your Honor.  This is what I'm

9     concerned about, and it affects all the witnesses in this case

10    and, frankly, the facts of the case, generally.

11         Your Honor has entered an order.  Your Honor

12    entered an order that is spot on because you recognized that

13    what the defense was trying to do was actually bastardize the

14    application of U.S. law in this case.  And you even found in

15    your order that --

16         THE COURT:  You don't have to tell me what the

17    order is.  I know what the order is.  My question is --

18         MS. M. MILLER:  This is exactly what he's doing

19    here.  Read the first sentence.  In accordance with FAA Order,

20    blah-blah-blah U.S. registration is a prerequisite for the

21    issuance of an airworthiness certificate.  The FAA must ensure

22    --

23         THE COURT:  Okay, I've got it.  I see.

24         MS. M. MILLER:  So where he's going next with

25    this next is, well, if it shouldn't have been issued because

*Cross - Lopez*

1    of the Vanuatu -- you know, whatever the argument is -- then

2    he's going right into the very area that Your Honor said he

3    shouldn't go into it because it's a legal issue.  It's going

4    to confuse the jury.  You're going to give them jury

5    instructions that are going to say one thing and they will

6    have heard this wrong thing said over and over and over again

7    by Mr. McConwell, and so we can't rely on that order to

8    actually give us, you know, the right parameters for this

9    case.

10                THE COURT:  Mr. McConwell, what are you trying to

11   bring this under?  What's the offer of proof for this exhibit?

12                MR. MCCONWELL:  I'm just -- he started talking

13   about registrations, he's talked about issuance of

14   airworthiness certificates, and I'm just bringing it -- and

15   I'm not arguing it, I'm just offering the evidence of what's

16   there.  And this is -- these are information that's passed

17   through them, part of their investigating file.  He's reviewed

18   everything, and I'm assuming his office would follow the same

19   thing.  In fact, I think he already said he did.

20                THE COURT:  All right, so --

21                MS. M. MILLER:  This witness said repeatedly, "I

22   am not a registration person."  And you don't open the door to

23   applying the law improperly, Your Honor.

24                THE COURT:  Now, Mr. -- Here's the deal, Ms. --

25   okay, let's do this:  His argument is one thing, and to

1   present evidence -- this witness did talk about airworthiness.

2   He was asked a question "what does airworthiness mean."

3                   MS. M. MILLER:  Yes, yes.

4                   THE COURT:  In his expert opinion, he said what

5   airworthiness means.

6                   MS. M. MILLER:  Yes, which Your Honor said was

7   relevant in your order.  Your Honor split the baby very

8   carefully.

9                   THE COURT:  Right, okay.

10                  MS. M. MILLER:  It is relevant to talk about what

11  should have been done --

12                  THE COURT:  All right.  The Court is going to

13  allow this exhibit to be brought in.  The argument -- it's one

14  thing to allow the witness to talk about and to say, hey, this

15  is what airworthiness means, this is what's required.  That's

16  it.  But to go against the order is another thing, to argue it

17  is another thing.

18                  MS. M. MILLER:  This is also hearsay, Your Honor.

19                  THE COURT:  Well, okay.  So on the hearsay

20  objection?

21                  MR. MCCONWELL:  Well, it's not hearsay to the

22  government, number one.  But as part of their administrative

23  business record's file, he's already identified -- it's in the

24  files produced by the government in one of --

25                  THE COURT:  Did you guys stipulate to the --

*Cross - Lopez*

1          MR. MCCONWELL:  No, I may be overly agreeing to

2   things based upon what I assume is a reciprocity deal on

3   business records, and they've introduced stuff they call

4   business records out of the files at random that weren't part

5   of our stipulation.

6          THE COURT:  Okay.  Putting that aside, what you

7   did and what you didn't do and what you thought you did and

8   what you -- you think you got screwed or whatever -- however,

9   that's one thing.  But my question is:  Did you all agree on

10  this particular exhibit?

11         MS. M. MILLER:  No.

12         THE COURT:  You did not agree on any type of --

13         MS. M. MILLER:  No.

14         THE COURT:  -- stipulation as to the chain of

15  custody?

16         MS. M. MILLER:  No.

17         THE COURT:  Not chain of custody, business

18  records?

19         MS. M. MILLER:  No.  As a matter of fact --

20         THE COURT:  Not business records, the custodial

21  records.

22         MS. M. MILLER:  This isn't a custodian of records

23  issue.  This is not that.  Look at the very top of this

24  e-mail.  "OIG assistance with N243D criminal case."  This was

25  the exact thing that Mr. McConwell was objecting to in the

1  government's case when he thought I was actually going into

2  documents that were prepared for this litigation.  That's what

3  this is.  The only reason why he now has no problem with it

4  being hearsay is because he wants to open the door into the

5  whole void ab initio issue, and I know it isn't readily

6  apparent, Your Honor, but that's exactly where he's going.

7          THE COURT:  No, but it is readily apparent

8  because it -- for one thing, to bring up what constitutes

9  airworthiness and a certificate is one thing.  To argue it

10  before the jury as banned by the Court is another thing.

11          MS. M. MILLER:  Yes.

12          THE COURT:  So you got to have confidence that

13  when the defendant tries to make that argument, if and when,

14  then we'll deal with that issue.  But as for this particular

15  issue of airworthiness, the context in which this expert, who

16  is -- by the way, I think this expert witness is helping the

17  prosecution more than you're allowing him to.

18          MS. M. MILLER:  Oh no, a hundred percent.  I

19  agree.

20          THE COURT:  You're trying to --

21          MS. M. MILLER:  No, no.

22          THE COURT:  No, no, no.  I'm observing this and I

23  think -- I'm just telling you that's my observation, but he

24  knows a lot, he's saying a lot.  And anyways, I got your

25  argument.

1          MS. M. MILLER:  Yes.

2          THE COURT:  Yes, Mr. Martin.

3          MR. MARTIN:  I was just going to say, Your Honor,

4   the government has provided to us his report.  He has reviewed

5   every document in this case.  And this is one of those

6   documents, so I submit you can go into his underlying basis.

7          THE COURT:  I don't know if he said he -- I don't

8   know.

9          MR. MARTIN:  I've got the report that says it,

10  Judge.  ECF 468, "All information provided to the defendants

11  reflected in the discovery log this gentleman has reviewed."

12          THE COURT:  But I think he testified that he had

13  not reviewed necessarily this particular e-mail.

14          MR. MARTIN:  I'm talking about the government's

15  filing.  Are they telling me the report they gave me on this

16  witness is inaccurate?  That everything that I based my

17  cross-examination on is not right?  I intend to go into it

18  about all of that.

19          THE COURT:  All right, okay.  Let me just say

20  this:  On this exhibit, I'm going to allow it for the limited

21  purpose of just his definition and his response about

22  airworthiness.  I'm just going to allow that.

23          To allow it pursuant to what's going on with how

24  he's testifying is one thing.  To focus on his arguments that

25  potential closing arguments by Defense Counsel is another

 1    thing.  So the Court will allow 8-1-8.

 2                D-1-2-1, let's look at that.  D-1-2-1 before we

 3    call in the jurors.

 4                MS. MCCONWELL:  And I don't have the electronic,

 5    that's the paper one.

 6                THE COURT:  Right.  So you want to go to the ELMO

 7    and put it on, please.  And what is the purpose of D-1-2-1?

 8    It's a PTRS, so that's a preliminary -- what -- what you do

 9    you call it?

10                THE WITNESS:  Program tracking and reporting

11    system.

12                THE COURT:  Preliminary tracking and --

13                THE WITNESS:  Program tracking and reporting

14    system.

15                THE COURT:  Program tracking and --

16                THE WITNESS:  Reporting.

17                THE COURT:  Reporting.  I know we've talked about

18    this.  It was brought up the other day.  Program tracking and

19    reporting system.

20                What is your offer of proof, Mr. -- proffer here,

21    Mr. McConwell, on this exhibit?

22                MR. MCCONWELL:  My proffer is --

23                THE COURT:  D-1-2-1.

24                MR. MCCONWELL:  The government has extensively

25    gone into the investigation of the accident involving 9068

*Cross - Lopez*

1   Foxtrot.  This particular document -- this particular document

2   expands that information in detail.  It's in the Federal

3   Aviation Regulations and in the NTSB file because this

4   document was prepared by this inspector with -- in conjunction

5   with the NTSB.  His name is reflected on here and there's

6   additional information that's relevant to the accident, and

7   that's why it should be allowed, Your Honor.

8             MR. LEON GUERRERO:  Your Honor, if I may?  The

9   confusion -- sorry.  The confusion with this particular

10  exhibit is the name of the individual that entered this PTRS

11  or the inspector here, Paul Thorn.  He's not with the Honolulu

12  FSDO office, he's with the FSDO office in LA.  So that's a

13  confusing point.  Same thing with the phone number, inspector

14  phone number.  That's an LA number.  And then also the

15  inspector office --

16            THE COURT:  Okay, that just goes to the

17  credibility of the exhibit.  But do you object to this coming

18  in?

19            MR. LEON GUERRERO:  We do, because everything in

20  the PTRS is hearsay statements, Your Honor.  So -- there is

21  just multiple hearsay statements in this exhibit.

22            THE COURT:  All right.  Mr. McConwell, hearsay?

23  How do you overcome this?

24            MR. MCCONWELL:  It's official record of

25  investigation.  For example, the factual report from the NTSB

```
1   comes in and where they gathered hearsay, and that's their
2   evaluation of what happened.  That's nothing more than just
3   part of the report that's relevant to the issues.  Things
4   they've raised.
5              THE COURT:  I'm sorry, the NTSB final report on
6   this 9068 Foxtrot has been admitted; correct?
7              MR. MCCONWELL:  Yes.
8              MS. M. MILLER:  The final.
9              THE COURT:  That's right.  So my question is:
10  Does this PTRS, D-1-2-1, Defendant's Exhibit D-121, is that
11  part of the NTSB final report that has been admitted?
12             MR. MCCONWELL:  It's part of the investigation
13  that led to the final report and we don't -- that final
14  report, whether it was the FAA or whether it was the NTSB, but
15  it's relevant information to that report that they relied upon
16  in putting in the final report together, but it's information
17  that's additional that should be allowed in this instance and
18  issues they raised, Your Honor.
19             THE COURT:  I'm sorry.  This is part of the --
20  this is a Department of Transportation report, right?  This is
21  a DOT report?
22             MR. MCCONWELL:  The Department of Transportation
23  did not come out physically and investigate this accident,
24  from my understanding on this one.
25             THE COURT:  Okay.  I'm sorry, but is this a
```

1    Department of Transportation report?

2            MS. M. MILLER:  It is a DOT FAA report, Your

3    Honor.  It is not an NTSB report.  And if you recall, Your

4    Honor, when I tried to move in the final NTSB report, Defense

5    Counsel tried to get this PTRS in and Your Honor said "no,"

6    because they admitted that this was not part of the NTSB

7    report, this is not part of the NTSB record.

8            Further, Your Honor --

9            THE COURT:  Okay.  So we already discussed this

10   yesterday, this is the same report?

11           MS. M. MILLER:  This is the same report that Your

12   Honor denied their motion to require it to be brought in at

13   the same time that the NTSB report was in.  This is replete

14   with hearsay.  It's an internal document, it evidences hearsay

15   throughout --

16           THE COURT:  Okay, I got that.  But my only

17   question was -- and I'm just trying to remember -- did we --

18   out of completeness, I thought that the Court had made a

19   ruling --

20           MS. M. MILLER:  You did.

21           THE COURT:  -- regarding --

22           MS. MCCONWELL:  Your Honor --

23           THE COURT:  Excuse me.  Regarding the PTRS in

24   conjunction with the final NTSB report.

25           MS. M. MILLER:  There were three pieces that

1  Ms. McConwell tried to get in.  We wanted to get in the final

2  report, she said --

3             THE COURT:  The Court granted that.

4             MS. M. MILLER:  And you granted that.  She then

5  said, "I want two more pieces to come in with it."

6             THE COURT:  Right, I recall that.

7             MS. M. MILLER:  One, was the preliminary NTSB

8  report.  And over objection, Your Honor allowed that in.  And

9  then the second piece was this PTRS report.  But Your Honor,

10 when you reviewed it, you said, "no, this cannot come in."

11            And you asked Defense Counsel very pointedly,

12 "are you saying that this is part of the NTSB report?"  And

13 they said, "no, we are not."  Because they can't say that

14 because it's not.

15            THE COURT:  All right.

16            MS. MCCONWELL:  Your Honor, this isn't part of an

17 official business record of the Federal Aviation

18 Administration which Mr. -- this particular witness has

19 already testified about the -- let's see -- Summary Exhibit

20 1252, which is a summary of Mr. Cislo's activity which was

21 pulled under the PTRS system, which this witness is completely

22 familiar with and has already identified what that is.

23            With regard to yesterday in the final report from

24 the NTSB, yes, we asked for two exhibits to be included.

25 Ms. Miller objected to the one, but she agreed with the

 1    preliminary report, so we withdraw the PTRS and we determined

 2    we would, basically, come back and fight another day on that

 3    particular item.  So when you --

 4            THE COURT:  Today is the other day?  Today is the

 5    next day?

 6            MS. MCCONWELL:  Today is a new day.  And so --

 7            THE COURT:  Okay, let's see if -- there is not

 8    going to be a new decision, but let's go.

 9            MS. MCCONWELL:  -- when her Exhibit 1991 was

10    admitted, it contained the seven pages of the final report

11    along with another, I believe, three pages from the

12    preliminary report, and so that was what was admitted by you

13    yesterday.

14            THE COURT:  Okay.  So let me ask you, though:  Is

15    this program tracking and reporting system, D-121, part of or

16    incorporated by reference within the final report that was

17    admitted yesterday?

18            MS. MCCONWELL:  No, because --

19            MS. M. MILLER:  No.

20            THE COURT:  I'm sorry, the answer is no?

21            MS. M. MILLER:  No.

22            MR. MCCONWELL:  Let me answer this, if I could,

23    Your Honor?

24            MS. M. MILLER:  She just said no.

25            MR. MCCONWELL:  We did not realize --

```
 1                THE COURT:  I'm letting you both now speak so I'm
 2   not going to do this.  Pretty soon I'm going to say one
 3   person, and that's it.
 4                MR. MCCONWELL:  I agree.
 5                THE COURT:  You agree?
 6                MR. MCCONWELL:  What we did not realize yesterday
 7   is that this author was identified in the matter with the NTSB
 8   investigator and that the FAA is the one that really did the
 9   investigation and helped prepare the report --
10                THE COURT:  All I care -- look, you guys know so
11   much more than I do.  You're far more --
12                MR. MCCONWELL:  Sorry.
13                THE COURT:  No, let me just say:  You live and
14   breathe FAA.
15                MR. MCCONWELL:  Fifty years of it will do that to
16   you.
17                THE COURT:  Okay.  Yeah, you're a lot smarter
18   than me.  My question -- all I care about, as the judge here
19   in this case, is this PTRS part of the final report that I
20   allowed yesterday, and the answer is no?
21                MS. M. MILLER:  No.
22                THE COURT:  So what's the relevance of this PTRS?
23   It's not part of the final report that was allowed, because
24   you guys were trying to tie it together.
25                MS. MCCONWELL:  Well, that was with Mr. -- it was
```

*Cross - Lopez*

 1   with a completely different witness, that was not with this

 2   witness.  This witness has provided --

 3                 THE COURT:  Putting that aside, but what's the

 4   relevance of this?

 5                 MS. MCCONWELL:  I'm going to turn it back to

 6   Mr. McConwell.  I just wanted to make sure that our discussion

 7   yesterday with regard to the admission of 2991 was accurately

 8   reflected.

 9                 MR. MCCONWELL:  The relevance is, it provides

10   more detail of the accident itself.  And I believe, if you

11   went back and got the whole file, you'd find it in the report.

12   I can't say that, but I do know that the Honolulu FSDO or the

13   LA FSDO or region were the ones that were investigating this

14   accident.  This is the record of those people, they're both

15   identified in this document.  He did --

16                 THE COURT:  I'm sorry.  So it provides more

17   detail to the final report?

18                 MR. MCCONWELL:  Yes, it --

19                 THE COURT:  It does.  I'm sorry, even though it

20   wasn't relied on the final report?

21                 MR. MCCONWELL:  We don't know that.  We suspect

22   it was.

23                 THE COURT:  She said it was not.

24                 MR. MCCONWELL:  Okay.  We don't know that for

25   sure.

 1                    THE COURT:  Wait, wait, wait.  Either it was or

 2     it wasn't?

 3                    MR. MCCONWELL:  We don't know.  We weren't there

 4     when they wrote -- it does refer.

 5                    MS. M. MILLER:  It's all hearsay.

 6                    THE COURT:  Okay.

 7                    MR. MCCONWELL:  And you wanted us to come back

 8     and give better foundation.  But what we're talking about,

 9     this witness --

10                    THE COURT:  I'm just trying to figure out the

11     relevance of this report.  All right, anything else?  I can't

12     have confusion amongst lawyers here.

13                    MS. M. MILLER:  I don't think there is any

14     confusion.  You have heard Defense Counsel admit, "no, this

15     was not part of that report."

16                    THE COURT:  All right, the Court -- okay,

17     Mr. McConwell -- all right, so -- okay, so it may add more but

18     I'm not sure if this is the right witness, so the Court will

19     sustain the objection, number one.  I know that it was somehow

20     trying to be tied to the final report that was issued

21     yesterday.  It's clear that it's not tied to it, so therefore,

22     the Court is not going to allow this report in at this time.

23                    MR. MCCONWELL:  With this witness?

24                    THE COURT:  Well, yeah.  If you figure it out

25     another way, I don't care but just --

```
 1                    MR. MCCONWELL:  Work on it.

 2                    THE COURT:  So that's out.  So I'm not going to

 3     allow the D-121.  Let's go to D-87.

 4                    MR. MCCONWELL:  Okay, 87.

 5                    THE COURT:  Let me look at it, please.  Is that a

 6     digital one?

 7                    MS. MCCONWELL:  Yes, ma'am.

 8                    MR. MCCONWELL:  It should be, yes.

 9                    THE COURT:  Let's get it on to the digital --

10     here we go, this is D-87.  What is the purpose of this special

11     airworthiness aerial survey?  Go ahead.

12                    MR. MCCONWELL:  This is a chart that summarizes

13     the special airworthiness certificates, restricted

14     certificates that were issued to these aircraft involved in

15     this case.  The same ones that Mr. Cislo issued in both 2012

16     and 2015.  There were three other -- or four other inspectors,

17     Richard Nelson, Edward Valdes, Stanley Chuck, and Curtis

18     Whaley, actually -- he was frontline manager, I think --

19     issued certificates for these aircraft, the special

20     airworthiness certificates restricted aerial surveys.

21                    THE COURT:  So are these -- are all of these

22     particular aircrafts part of the indictment?

23                    MR. MCCONWELL:  Yes, there's the ten that

24     involved Cislo.  The ten in Cislo.  These are the same.  The

25     first one was issued --
```

```
 1                    THE COURT:  You don't have to tell me about --
 2       all I care about is:  Are these part of the indictment?
 3                    MR. MCCONWELL:  Yes.
 4                    THE COURT:  Okay.  That's number one.  Number
 5       two, now, why are you going to try -- are you guys objecting
 6       to this defense?
 7                    MS. S. MILLER:  Yes, Your Honor.  This is
 8       actually going back to the summary chart issue, which I know
 9       you don't want to hear about, but --
10                    THE COURT:  No, it's not.
11                    MS. S. MILLER:  -- this is one of Defendants'
12       summary charts that they never provided underlying information
13       for.
14                    THE COURT:  No, it's not that I don't want to
15       hear about it, no.  It's if they do not provide the -- The
16       problem is that I recall is that they don't want -- "they,"
17       meaning Defense Counsel -- didn't want to characterize it as a
18       summary chart when, in fact, it appears --
19                    MR. MCCONWELL:  That's something different.
20       That's a different issue.
21                    THE COURT:  That's a different -- so this is not
22       a summary chart?
23                    MR. MCCONWELL:  This is a summary chart taken out
24       of Federal Aviation records that we have a Blue Ribbon copy
25       of --
```

*Cross - Lopez*

```
 1                    THE COURT:  I got it.

 2                    MR. MCCONWELL:  -- and you made us kind of agree

 3      to their charts with that background, and we're doing the same

 4      thing.

 5                    THE COURT:  But here's the deal:  So this is a

 6      summary chart, you admit this is a summary chart.  The

 7      question was, have the underlying pieces of evidence, the

 8      documents substantiating the summary chart been provided to

 9      the prosecution?

10                    MR. MCCONWELL:  They provided it to us.

11                    THE COURT:  Well, if it's -- is it -- is this

12      your summary chart or their summary chart?

13                    MS. M. MILLER:  His.

14                    MR. MCCONWELL:  No.  They provide the Blue Ribbon

15      copies of the airway file, the registration file, the suspense

16      file on each aircraft, including these ten, and that's where

17      this information --

18                    THE COURT:  But listen to the question.  The

19      question is very simple.  This is your summary chart, this is

20      defense summary chart; correct?

21                    MR. MCCONWELL:  Right.

22                    THE COURT:  All right.  My question is -- and I

23      think I know the answer to this -- have the Defense Counsel,

24      i.e. you, provided to the prosecution the documents underlying

25      justification of the summary evidence here?
```

 1              MR. MCCONWELL:  They provided it to us.

 2              THE COURT:  Okay, so they provided it to you,

 3      then did you provide it back to them?

 4              MR. MCCONWELL:  Well, effectively.

 5              MS. M. MILLER:  No.

 6              THE COURT:  You did?

 7              MS. M. MILLER:  No.

 8              MR. MCCONWELL:  It's in my computer system.

 9      They've done it -- actually, they provided -- well, this one

10      they provided to us.

11              THE COURT:  Okay.  You had it in your possession

12      from them, but my question is:  Did you give it to them to

13      say, "Hey, this is..."  who wants to answer it?

14              MR. MCCONWELL:  Can I explain what a Blue Ribbon

15      copy is.

16              THE COURT:  No, I don't care what a Blue Ribbon

17      copy is.  Mr. McConwell, you know why I don't care?  All I

18      care about -- this is the only question I have, because

19      summary charts are very, very special for jurors.  It's very

20      simple for jurors to look at a summary chart.  If there are 50

21      exhibits that justify and substantiate this summary, the

22      jurors do not want to go through those 50 exhibits --

23              MR. MCCONWELL:  I understand.

24              THE COURT:  -- or 500 exhibits, whatever it might

25      be.  So my question is:  Is this part of what was litigated

*Cross - Lopez*

1   where I said if the prosecution -- if any party, but in

2   particular if the Defense Counsel did not provide the exhibits

3   underlying the summary chart to the -- to prosecution, defense

4   didn't do it, then I would not allow the summary chart in.

5   That's the only question I have.

6          And Ms. Samantha?

7          MS. S. MILLER:  I hate to be a broken record,

8   Your Honor, but yes, just telling us that you gave us this

9   information is not sufficient.  They either have to provide us

10  with a Bates range or re-provide the materials back to us so

11  we can fact-check it, and they did not.

12         THE COURT:  Okay.  I agree with her.

13         MR. MCCONWELL:  May I explain what it is, Your

14  Honor?

15         THE COURT:  I think it's too late to say what it

16  is now.  All I care about is, did you provide it?

17         MR. MCCONWELL:  We took their stuff that they

18  provided us and went through and picked out all these airway

19  certificates issued.  They're all in the records, they're in

20  the airworthiness file.

21         THE COURT:  Okay, you know what?  Everything you

22  said may be true, but the question is, did you say to them,

23  okay, you gave us 30 terabytes -- whatever you call that --

24  250 files of discovery, and by the way, of that discovery,

25  there is 50 exhibits that justify the summary chart, and these

*Cross - Lopez*

1  are the 50?  That was the only question I have.  And if the

2  answer is no, I did not resend it to them, whatever -- however

3  you want to say it, then I have banned this to come in.

4           MR. MCCONWELL:  Okay.  They did not provide us

5  that detail to us when we agreed to the eight -- or seven or

6  eight charts that she wanted us to agree to on the same type

7  of information out of the FAA official files and the Blue

8  Ribbon copies that they provided to us.

9           THE COURT:  I thought they did.  I thought they

10 did.

11          MS. M. MILLER:  We did and we can prove it.

12          THE COURT:  There was no objection that they had

13 -- that wasn't an objection made by you all.

14          MS. M. MILLER:  Correct, correct.

15          MR. MCCONWELL:  They gave us the dump just -- we

16 had the same thing.  We had to go through every aircraft and

17 double-check within the records ourselves, and it's the same

18 information.  And for them to indicate it's not as something

19 they gave us is amazing.

20          THE COURT:  Okay.  Amazing, amazing.

21          MR. MCCONWELL:  It really is amazing, especially

22 under the circumstances of how we developed a good faith for

23 how she's supposed to do these summary charts.  We did agree

24 to seven or so of 'em.  I gave you the exact --

25          THE COURT:  Okay, let's not have revisited

*Cross - Lopez*

history here with everybody.  I already know the answer to the

question now.  So based on what has just been admitted -- and

Ms. McConwell, if you want to add something to it, let me know

-- but based on the fact what I've just stated, the Court will

not allow this in.

MR. MCCONWELL:  Okay.  If we then give them a

thumb drive with the same stuff they gave us, is that

sufficient -- or some other witness at some point?

THE COURT:  You mean, like, you want to give it

to them --

MS. M. MILLER:  No.

THE COURT:  Just a minute.  Calm down.  He's just

asking me.

MS. M. MILLER:  We're getting witnesses ready to

move forward, Your Honor.  This has been just ridiculous with

these people.

MR. MCCONWELL:  I agree.

MS. M. MILLER:  This has been --

THE COURT:  Okay, all right.  I already made my

ruling.

MS. M. MILLER:  Now we're going doing that, now

we're going to be prepping --

THE COURT:  I think he was just asking to see if

you all had a change of heart.  The answer is "no."

MR. MCCONWELL:  Okay.  Now --

*Cross - Lopez*

1              MS. M. MILLER:  Not at all.

2              MR. MCCONWELL:  Now, we have another witness and

3     we go bring the Blue Ribbon copy in, and I don't know how many

4     thousand of pages are in it --

5              MS. M. MILLER:  Do it.

6              MR. MCCONWELL:  -- and go through them line by

7     line and show where each of these guys reissued a certificate

8     of airworthiness for these airplanes, these ten airplanes.  We

9     tried to do it in a summary easy chart for the --

10             THE COURT:  Okay, but remember this, Counsels,

11    it's very simple, the Federal Rules of Evidence, they saw the

12    wisdom of the summary chart process; you guys didn't follow

13    it, therefore, because you didn't follow it, the Court is not

14    going to allow it.  That's it.  Very simple.  Easy.

15             MR. MCCONWELL:  But we will offer the raw data,

16    then.

17             THE COURT:  Well, go ahead.  If you want to spend

18    a thousand years talking to the jury about every exhibit, good

19    luck.  We'll see about that.

20             Yeah?

21             MS. MCCONWELL:  Well, Your Honor, based on the

22    Court's ruling, then --

23             THE COURT:  And I've already made this ruling.

24    It's not just today.  I made this ruling already a few weeks

25    ago.

```
 1                MS. S. MILLER:  March 8th, Your Honor.

 2                THE COURT:  March 8th.  Okay, so that was...

 3    April, May -- okay, that's two months ago.

 4                MS. M. MILLER:  More than two months ago.

 5                MS. MCCONWELL:  Any exhibit -- we're going to

 6    object to any exhibit that wasn't on the witness -- or the --

 7                THE COURT:  You guys can do whatever you want.

 8    Object to however way you want to do it, it doesn't the matter

 9    to me.  I mean, you don't have to tell me what you're going to

10    do, let's just do it.

11                So the Court has made its ruling on this and the

12    Court will not allow this in based on violation of the Federal

13    Rule and the procedures that you're supposed to follow on

14    summary charts.

15                Remember this, remember this:  Summary charts --

16    if you don't remember this -- if you don't remember this -- in

17    the wisdom of the people that put together the Federal Rules

18    of Evidence, summary charts are to aid the jury and make it so

19    much simpler, and that's why it's just important that you

20    follow the procedure, everybody does it.  So the Court will

21    just allow it based on lack of failure to follow procedure.

22                All right.  So all we have to do is focus on

23    8-1-8.  I'll let that in just for purposes of -- he's a smart

24    witness, he knows about airworthiness.  That's all.  Now,

25    arguing it otherwise in violation of my Court Order is a
```

1   no-no.

2                Okay, anything else?

3                MR. MCCONWELL:  I'm going to have an exhibit that

4   -- 751-265-269.

5                THE COURT:  Is this one that has not been

6   admitted?  Let's talk about it now.

7                MR. MCCONWELL:  I need to get a foundation for

8   it.

9                THE COURT:  Okay, let's go.  751, what is it?

10                MR. MCCONWELL:  751, 265 through 269.

11                THE COURT:  All right.  Prosecution, are you

12   going to object to this?

13                MS. S. MILLER:  We're still pulling it up, just

14   one second, please, Your Honor.

15                THE COURT:  Okay.  Yeah, let's look at it.

16                MS. MCCONWELL:  266?

17                THE COURT:  751-265 to 269, according to

18   Mr. McConwell.

19                (Discussion with clerk.)

20                MR. MCCONWELL:  Again, this will be offered

21   without argument.  Oh, I need to put it on the ELMO?

22                (Discussion with clerk.)

23                MR. MCCONWELL:  We will have --

24                MS. MCCONWELL:  No, it's a government exhibit.

25                THE COURT:  Oh, government exhibit, okay.  So --

*Cross - Lopez*

```
 1                    MS. S. MILLER:  But they're the ones offering it.

 2                    MS. MCCONWELL:  7-5-1 dash 2-6-5.

 3                    THE COURT:  So you guys aren't sharing?  You're

 4       not going to help each other out, okay.

 5                    MS. S. MILLER:  Unfortunately, no.

 6                    THE COURT:  Unfortunately, yeah.

 7                    MS. M. MILLER:  Your Honor, yes, we object to

 8       hearsay.

 9                    THE COURT:  Okay, so does anybody have the

10       exhibit?  If I can't see it, I can't --

11                    MS. MCCONWELL:  Do I need to --

12                    THE COURT:  Can you get it up, Ms. McConwell?

13                    MS. MCCONWELL:  Yeah, it's up.

14                    THE COURT:  There we go.  Okay, this is

15       justification for Hansen Helicopters 44709 reinspection.

16                    Who wrote this?  Who wrote --

17                    MR. MCCONWELL:  I believe Mr. Dymock.

18                    THE COURT:  Okay, who's Dymock again?

19                    MR. MCCONWELL:  Dymock, he's one of the SEIT

20       team.  He was the lead investigator in this case.

21                    THE COURT:  All right.  And the prosecution is

22       going to object to this?

23                    MS. M. MILLER:  It's hearsay, Your Honor.  The

24       whole thing is hearsay.

25                    THE COURT:  All right.  So it's a hearsay
```

*Cross - Lopez*

1  objection.  And you're trying to get it in through him?

2                MR. MCCONWELL:  Yes.  He can establish what this

3  document represents and how it's maintained in the ordinary

4  course of business and enforcement actions, and I believe --

5                THE COURT:  He's the records custodian on this

6  exhibit?

7                MR. MCCONWELL:  Not on this exhibit, but this

8  type of exhibit.  The way these -- the requirement of these

9  exhibits, how they're prepared and how they're maintained in

10  the regular course of business by the Federal Aviation

11  Administration.

12                THE COURT:  But if you're trying to get this in

13  through an expert -- here, you're trying to get it in as a

14  business record exception, I would assume that you are trying

15  to establish that he would know all the elements under the

16  business records exception?

17                MR. MCCONWELL:  Yes.

18                THE COURT:  As the custodian of record, he would

19  be somebody that -- right?

20                MR. MCCONWELL:  I believe he would, yes.

21                THE COURT:  Are you the custodian of record?

22                THE WITNESS:  No, ma'am.

23                THE COURT:  You know nothing?

24                THE WITNESS:  No.

25                THE COURT:  He knows nothing.  He knows nothing

*Cross - Lopez*

1  about this Mr. -- he's already said it.

2          MR. MCCONWELL:  I would ask that Mr. Dymock be

3  brought in to testify --

4          THE COURT:  You can bring Mr. Dymock in.

5          MR. MCCONWELL:  Okay.

6          MS. M. MILLER:  No, he cannot because he didn't

7  comply with the Touhy requirements, which, Your Honor, I

8  brought to their attention more than two years ago.  Here we

9  are again in trial, not even at the eve of trial.

10          THE COURT:  All right.  So --

11          MR. MCCONWELL:  I have brought it to their

12  attention.  I brought it to their attention --

13          THE COURT:  We'll argue that another day, if at

14  all, if necessary.  The bottom line is:  He's not qualified --

15  this expert witness is not qualified to be the business

16  records custodian, so this is -- this is out.

17          Is there any other exhibits?  Let's talk about it

18  now because I --

19          MR. MCCONWELL:  I have one more exhibit.  It's

20  actually a statute that I want to talk to him about.

21          THE COURT:  What is that?

22          MR. MCCONWELL:  It's 49 U.S.C. 44102.

23          THE COURT:  Okay, and what is the purpose of this

24  -- what is the proffer on that --

25          MR. MCCONWELL:  The proffer on this is this is

1   the statutory requirement for registration of helicopters, and

2   I just want to make sure we have a record of that because it's

3   from the statute, not the regulations, which I believe are

4   different --

5               THE COURT:  Do you have any objection to that,

6   Counsel?

7               MR. LEON GUERRERO:  Yes, Your Honor.  He

8   testified as an expert in the maintenance certificates and the

9   airworthiness of aircraft, not on registration.

10              THE COURT:  Mr. McConwell, on that objection?

11  Before we get the jury in.

12              MR. MCCONWELL:  Well, I thought he said he was

13  familiar with 49.

14              THE COURT:  He did say he was.

15              MR. MCCONWELL:  This is right out of 49.  It

16  happens to almost -- or at least questions involved in the FAA

17  Act.

18              THE COURT:  I'm sorry, so you're saying that he

19  -- because he's familiar with 49 -- What is the section?

20              MR. MCCONWELL:  This is 49 44102.

21              THE COURT:  Okay.  You just want to know if he's

22  familiar with it, that's all?

23              MR. MCCONWELL:  I want to identify this section

24  and talk about this section, just identify what it is and let

25  him read it, and then we're done --

 1                    THE COURT:  And what does it relate to?

 2                    MR. MCCONWELL:  It relates to the qualification

 3    and eligibility for registration of aircraft on the Civil

 4    Aviation Registry.

 5                    THE COURT:  Are you familiar with that?

 6                    THE WITNESS:  No, ma'am.

 7                    THE COURT:  He's not familiar with that.  He said

 8    he's not familiar with that.  He doesn't know that.

 9                    MR. MCCONWELL:  Can I show it to him and ask if

10    he remembers that he has something like in his training about

11    what -- the authority over which he operates?

12                    THE COURT:  So you're trying to get -- you're

13    questioning his credibility as an expert?  I guess you can do

14    that.

15                    MR. MCCONWELL:  I certainly am if he doesn't

16    understand this.

17                    MS. S. MILLER:  Your Honor, your order in 1535

18    says -- and I quote -- "the validity of FAA registrations is

19    not relevant."

20                    So first of all, he's not an expert in

21    registration.  And second of all, your order says this

22    information is not relevant.  So talking to him about

23    statutory provisions, it's just a waste of everyone's time and

24    a violation of your order.

25                    THE COURT:  Wow, now I've got three of you guys

```
 1    triple-teaming here, and all I said was -- I'm going to limit
 2    this because -- yes, Mr. McConwell.
 3              MR. MCCONWELL:  The motions we're dealing with,
 4    the regulations of 47.3 and the 47.43, that's where their
 5    complaint was, that they -- they had no complaint, and I
 6    believe it's applicable to the criminal claims under what the
 7    statutory basis --
 8              THE COURT:  All you want to know is does he know
 9    the statute regarding -- the federal statute regarding
10    registration?  That's what you're asking?
11              MR. MCCONWELL:  We can do that.
12              THE COURT:  No, I'm asking.  I don't know.  What
13    do you want to do?
14              MR. MCCONWELL:  I'll ask the Court to take
15    judicial notice of 44102, 49 U.S.C. 44102.
16              THE COURT:  Well, that's different.  You're
17    trying to get this in -- are you trying to get this in with
18    this witness?
19              MR. MCCONWELL:  I'd like to show this to the
20    witness --
21              THE COURT:  And the question is:  Do you know
22    what this statute's about?  That's the question?
23              MR. MCCONWELL:  He said he knows what 49 is
24    about.
25              THE COURT:  Okay, and that's all you want to
```

*Cross - Lopez*

```
 1   know?
 2              MR. MCCONWELL:  I want him to identify this one.
 3   I asked the Court to take judicial notice of this statute, 49
 4   U.S.C. 44102, and I may ask him a question about it or have
 5   him read it for us.
 6              THE COURT:  No, you're not going to have him read
 7   it.  I don't think you need to have him read it,
 8   Mr. McConwell.
 9              MR. MCCONWELL:  Okay, well, I want to admit it
10   into evidence, then.
11              THE COURT:  What do you know about 49?
12              THE WITNESS:  The law I know, I mean.  But I
13   don't know that law about registration.  I'm not an expert.
14              THE COURT:  He's not an expert on registration,
15   and it's irrelevant.  It's against the Court's prior order.
16   So what's -- so why are we going to do this, Mr. McConwell?
17              MR. MCCONWELL:  We've offered it, Your Honor.
18   And so the Court will refuse to take judicial notice of it?
19              THE COURT:  You know, taking judicial notice of
20   it, I'll talk -- we can talk about that later at a later time
21   on judicial notice.
22              MR. MCCONWELL:  I can go on.
23              THE COURT:  But to go -- yeah, I'm just not clear
24   what you want to do with this.
25              All right, so you're not -- any other exhibits?
```

           1              MR. MCCONWELL:  That's it.

           2              THE COURT:  All right.  Let's call in the jury.

           3              MR. LEON GUERRERO:  Your Honor, are we able to

           4    take down that exhibit?  It's still on the TV monitor.

           5              MS. M. MILLER:  It's on jurors...

           6              THE COURT:  Yeah, let's take it down.

           7              (Pause.)

           8              THE COURT:  Come back to me on the judicial

           9    notice later, Mr. McConwell, if you still want that.

          10              (Jury in at 3:57 p.m.)

          11              THE COURT:  Please be seated.  Thank you, ladies

          12    and gentlemen.  Sorry for that long delay.  We were working

          13    with the lawyers on certain exhibits, whether they were going

          14    to be brought in or not.

          15              Mr. McConwell, you may proceed.

          16              MR. MCCONWELL:  Thank you, Your Honor.  Can we

          17    put the exhibit back up that we had, that we were talking

          18    about?

          19              THE COURT:  I'm sorry, which exhibit is that?

          20              MS. MCCONWELL:  818.

          21              THE COURT:  Okay, yeah.  And the Court will --

          22              MR. MCCONWELL:  818, Your Honor.

          23              THE COURT:  And based on the Court's ruling,

          24    it'll be for limited purpose of his knowledge, that's it, in

          25    terms of testing his credibility.  But, go ahead.

```
 1              MR. MCCONWELL:  And that document has been

 2    admitted, Your Honor; is that correct?

 3              THE COURT:  No, it has not.  I don't think so.  I

 4    think you're trying to move it for admission and it's been

 5    objected to.  The Court -- you're moving to admit it now?

 6              MR. MCCONWELL:  Yes, I do move its admission.

 7              THE COURT:  All right, the Court will admit it

 8    over objection, and you may proceed.

 9    (Exhibit 818 admitted)

10    BY MR. MCCONWELL:  (CONTINUING)

11       Q.   Okay.  Mr. Lopez, take a look at that document, if

12    you would, please.  And can you identify any of the people on

13    the "from, to," and copy lines?

14       A.   The from is Gerber[sic], Adam, FAA.

15       Q.   Is he a member of the SEIT team?

16       A.   I'm not sure.

17       Q.   Okay.  The next one?

18       A.   Dymock Douglas, FAA.

19       Q.   Is he a member of the SEIT team?

20       A.   Yes, sir.

21       Q.   He was actually the lead investigator on this case;

22    correct, for SEIT?

23       A.   I do not know that for sure, sir.

24       Q.   He was one of the investigators, though?

25              MR. LEON GUERRERO:  Objection, asked and
```

1    answered.

2                    THE COURT:  Sustained.

3    BY MR. MCCONWELL: (CONTINUING)

4        Q.   He was one of the investigators?

5                    MR. LEON GUERRERO:  Objection, asked and

6    answered.

7                    THE COURT:  Sustained.  I think he already

8    answered that.  I think he answered that.

9                    MR. MCCONWELL:  I thought he said "no."  I asked

10   about if he was in charge, the leader of it.  And then I asked

11   him if he was one of the team members.  He said "no" to the

12   leadership, and then my second question was he was a member of

13   the team.

14                   THE COURT:  All right.  Overruled, then.

15                   Do you know?

16                   THE WITNESS:  I believe so.

17   BY MR. MCCONWELL: (CONTINUING)

18       Q.   And Mr. Bowler, who's he?

19       A.   Mike Bowler, FAA.

20       Q.   And he was also a member of the SEIT team, sir?

21       A.   I believe so, yes.

22       Q.   And was he the manager of the SEIT team or assistant

23   manager?

24       A.   I believe so; yes, sir.

25       Q.   All right.  Now, would you read the message here on

*Cross - Lopez*

1  this document, please?

2      A.   Sure.  "Doug, in accordance with FAA Order 8130.2(g),

3  Change 1, Change 2, Section 1, Paragraph 204, U.S.

4  registration is a prerequisite for issuance of an

5  airworthiness certificate.  The FAA must ensure that an

6  aircraft presented for airworthiness certification is probably

7  registered pursuant to 49 U.S.C. 44709(d) and 14 CFR 21.173.

8  Thanks."

9      Q.   And the reference to "44709," that's a U.S. statute;

10  is that correct?

11      A.   Yes, that's a 49 --

12      Q.   The other reference is -- one was FAA Order; correct?

13      A.   The 8130.2 --

14      Q.   That's not law; correct?

15      A.   I'm sorry?

16      Q.   That's not law that you follow?

17      A.   No, that's an order.

18      Q.   And then the CFR reference, that's regulatory --

19  Federal Aviation Regulations; correct?

20      A.   Correct, that reference.

21      Q.   In this instance, 21 is part of the certification --

22      A.   Requirements.

23      Q.   Let's go to Page 2, please.

24           And would you please read for me Paragraph 204?

25      A.   "Aircraft registration.  The procedure for aircraft

*Cross - Lopez*

registration and issuance of registration numbers are
contained in Part 47 Aircraft Registration.  The registration
of an aircraft is not a function of airworthiness
certification.  However, the U.S. registration is a
prerequisite of for issuance of an airworthiness certificate.

        The FAA must ensure that an aircraft presented for an
airworthiness certification is properly registered, 49 U.S.C.
44704(d) and 14 CFR 21.173.  A certificate of aircraft
registration Aeronautical Center Form 8050.3 or 8050-6, query
from an official FAA Registry database or e-mail telephone
confirmation from Flight Standards Service, Aircraft
Registration Branch are acceptable verified registration.

        The pink copy of Aeronautical Center Form 8050-1
Aircraft Registration Application cannot be used to verify
registration.  If the certificate of aircraft registration
does not have an expiration date or if the registration is
expired, the aircraft is not eligible for an airworthiness
certificate."

    Q.   In reference to the pink copy, we had a pink copy
shown to you, I believe; didn't we, sir?

    A.   Yes, sir.  Yes, sir.

    Q.   Or maybe it was Mr. Prozik?

    A.   Not yet to me, but I've seen it in the testimony.

    Q.   Well, tell the jury what the pink copy means?

    A.   It's a temporary registration where the applicant

1  first gets and sends it to Oklahoma City.

2      Q.   And you can operate the aircraft for how long on that

3  pink copy?

4      A.   I forgot the amount of days, but you can only operate

5  it within the United States.

6      Q.   Within the United States for a period of time?

7      A.   Yes.

8      Q.   And that was to give the registry time to get the

9  official registration card?

10     A.   Yes.

11     Q.   Okay.

12          MR. MCCONWELL:  If we could go now to -- I lost

13  my place.  1520-1 through 4.  It's Government's Exhibit.  I

14  move to admit that document, if it hasn't been admitted, Your

15  Honor.

16          THE COURT:  I'm sorry, is that a different

17  document, 1520?

18          MR. MCCONWELL:  The one I just read, I think you

19  admitted it, so it's been a while.

20          THE COURT:  It's already been admitted.

21          MR. MCCONWELL:  Could we have that next document,

22  please?

23          THE COURT:  Okay.  And what number is that again,

24  Mr. McConwell?

25          MR. MCCONWELL:  1520-1 through 4, Your Honor.

*Cross - Lopez*

          1                    THE COURT:  That has not been admitted?

          2                    MR. MCCONWELL:  No, that has not -- well, yes, it

          3      has.  The government admitted it, I believe.

          4                    THE COURT:  Okay.  Government, did you move for

          5      admission of this, and I'll double-check with Carmen?

          6                    Mr. Leon Guerrero or...

          7                    MR. MCCONWELL:  I think it's the log record for

          8      9068 Foxtrot that they went through.

          9                    MS. MCCONWELL:  Yes, ma'am.

         10                    THE COURT:  It's been admitted?  All right.

         11                    MR. LEON GUERRERO:  Yes, Your Honor.

         12                    THE COURT:  Okay, yes.  So you want to publish

         13      it, Mr. McConwell?

         14                    MR. MCCONWELL:  Yes, please.

         15                    THE COURT:  All right.

         16      BY MR. MCCONWELL: (CONTINUING)

         17           Q.   Now, do you see the log entry here on this document,

         18      the rather long one?

         19           A.   Yes, sir.

         20           Q.   And Mr. Kapp was a certificated A&P mechanic and with

         21      inspection authorization; correct?

         22           A.   Yes, sir.

         23           Q.   And as that -- that brings a presumption of accuracy

         24      to logbook entries; doesn't it, when you have it signed off by

         25      a certificated mechanic?

                                      *Cross - Lopez*

1      A.   I don't know about that presumption of -- I'm not

2   sure I understand the question.

3      Q.   If you look at the log record, you see it's signed

4   off on by a mechanic --

5            MS. MCCONWELL:  It's not published to jury.

6            THE COURT:  You can't see it, Jurors?  Okay, is

7   it now published?  You can see it now, okay.  We've got it.

8   Thank you, Ms. McConwell.

9            Go ahead.

10  BY MR. MCCONWELL: (CONTINUING)

11     Q.   So you're not saying that this work was not performed

12  by Hansen or someone else; are you?

13     A.   All it's saying is it's documented, Phillip Kapp

14  signed off, that work was being performed.  Whether he

15  performed it or not, I'm not sure.

16     Q.   By the certificate signed by Mr. Kapp, it's presumed,

17  in ordinary circles, by the maintenance by Part 43 and 439 and

18  43.11, your vernacular, that that is a -- work was performed

19  and the aircraft was returned to service on that date?

20           MR. LEON GUERRERO:  Objection, speculation.

21           THE COURT:  Wait.  Do you know that?

22           THE WITNESS:  It's a presumption, it's

23  speculation.

24           THE COURT:  It's a presumption?

25           THE WITNESS:  Yeah, it's a speculation because we

*Cross - Lopez*

1  don't know if that individual is there to sign it off.  If he

2  signs it off --

3              THE COURT:  But his question is, is there a

4  presumption?  Is there a presumption in your circle?  That's

5  what he said.

6              THE WITNESS:  If the individual signs off for

7  that work, so yes, that's what it represents.  Now, have we

8  validated that, can we validate that?  No, not based on that.

9              THE COURT:  So there's a presumption of circles

10 but that doesn't mean that --

11             THE WITNESS:  It's complete or accurate.

12             THE COURT:  -- and accurate?

13             THE WITNESS:  Accurate.

14             THE COURT:  All right.

15 BY MR. MCCONWELL:  (CONTINUING)

16    Q.   And then -- by the way, did you realize that --

17             THE COURT:  Okay.  Mr. -- wait.  Sorry, Mr. Leon

18 Guerrero, you're still standing.

19             MR. LEON GUERRERO:  No --

20             THE COURT:  You want that answer stricken?

21             MR. LEON GUERRERO:  Yes, I want it stricken,

22 because it's based on speculation.  The witness just testified

23 that.

24             THE COURT:  You want that answer stricken?

25             MR. LEON GUERRERO:  Yes.

*Cross - Lopez*

```
 1                    THE COURT:  Okay.  Well...
 2                    MR. MCCONWELL:  He's testified, I believe, that
 3       it's presumption in aviation circles that these are --
 4                    THE COURT:  I know what he testified to.
 5                    MR. MCCONWELL:  So I think that's the answer, is
 6       this is the way --
 7                    THE COURT:  Okay, wait.  So -- let me just say,
 8       the Court will -- will allow this evidence in.  Okay.  He's --
 9       he's already testified to it.  He knows it.  He agrees with
10       you, but he has a caveat, so...
11                    Go ahead, you may proceed.
12       BY MR. MCCONWELL:  (CONTINUING)
13          Q.   Well, the whole aviation system is built on mechanics
14       return items to service, and certified mechanic; correct?
15          A.   Well, it's built that way, but if it was perfect, we
16       wouldn't be here.  If everybody was doing everything
17       correctly, they wouldn't need aviation safety inspectors.
18          Q.   So you jumped to some conclusion about this single
19       page; correct?
20          A.   I didn't -- I just read what it said.
21          Q.   Okay.  You said there's things missing; correct?
22          A.   Correct.
23          Q.   Now, you know that the Federal Aviation 43.9 and 11
24       require documentation of work performed?
25          A.   Yes.
```

*Cross - Lopez*

```
1        Q.   And you know that it was done in this instance;
2   correct?
3        A.   I don't know that the work was done, it was
4   documented.
5        Q.   Okay.  And do you know whether or not this aircraft
6   had been disassembled to perform maintenance on the fuselages
7   or not for corrosion?
8        A.   I don't know that.
9             MR. MCCONWELL:  Okay.  Let's scroll down, please,
10  Laura.  Go on down further.  Okay.
11            THE COURT:  You want go to Page 2?
12            MR. MCCONWELL:  I want to go to Page 2.
13            THE COURT:  Okay.
14  BY MR. MCCONWELL: (CONTINUING)
15       Q.   Now, on Page 2, there seems to be a complaint here --
16  first of all, log records don't need to be kept with the log
17  -- by the aircraft; do they, sir?
18       A.   They should be.
19       Q.   What rule is it that requires that?
20       A.   Well, the records are being entered by the person
21  performing the maintenance, so they should have some records.
22  The historical records, maybe not.  But the records that the
23  inspector -- the mechanic is supposed to enter in accordance
24  with 43.9 and 43.12 should be with the aircraft.
25       Q.   But you don't -- really?  Is that the rule?
```

*Cross - Lopez*

         1        A.   That's what -- if -- how else would he sign that off

         2   if the records are not there?

         3        Q.   That's your presumption that all the records with the

         4   aircraft should be with the aircraft?

         5        A.   The aircraft for the work that's being performed

         6   should be with the aircraft.

         7        Q.   How about the other records?

         8        A.   What other records?

         9        Q.   The maintenance records that are maintained pursuant

        10   to 91.419 -- 417?

        11        A.   Historical records don't need to be maintained right

        12   with the aircraft, but the records that -- for the work that's

        13   being performed needs to be maintained.

        14        Q.   Did you say that the historical records of 91.417,

        15   which is the requirement of maintaining records, have to be

        16   maintained with the aircraft?

        17        A.   I'm saying that the records, the entries for work

        18   that's being performed needs to be with the aircraft, where

        19   it's being performed at.

        20        Q.   I've given you a document next to you, a big book

        21   there.  Do you see that white book next to you, sir?

        22        A.   Yes.

        23        Q.   If you read the number off on it to help me, I would

        24   appreciate it.  There is an exhibit number.

        25        A.   This one here, sir?

*Cross - Lopez*

1    Q.   Yes.

2    A.   2957-B.

3    Q.   Okay.  That has been identified as the -- some of the

4    logbook records or records of the aircraft of 243 Delta.  Now,

5    that's a lot more records than a single page that you looked

6    at concerning this particular aircraft 9068 Foxtrot; correct?

7    A.   Yes, it's more record -- I haven't looked at it.

8    Q.   So there are other records available concerning this

9    aircraft and inspection performed that you didn't look at;

10   correct?

11   A.   For this aircraft?

12   Q.   Yes.

13   A.   I was talking in reference to that page.

14   Q.   Okay.  So you just got the little snippet of what

15   happened without any historical information?

16   A.   Yes, I was just showing what happened to that page.

17   Q.   Now, let's take a look down here at the bottom end of

18   this.

19        Would you read for me the April 2, 2015 entry?

20   A.   April 2, 2015.  Sure.  "Reinstalled MR blades and

21   floats per MD and -- and...uh...April instructions"?  I'm not

22   sure.  "Ops check and test flown satisfactory Hobbs and 3.6."

23   Q.   Okay.  And then read the record above it, if you

24   would, on March the 8th, 2015.

25   A.   "Removed MR blades and floats for shipping."

     1     Q.   And floats for shipping?  Did you look at records

     2   that established that aircraft had been disassembled and

     3   shipped to Majuro?

     4     A.   No.  All I saw was that Kapp was not, at the time, to

     5   do those -- at the location to do the logbook entries.

     6     Q.   But if Kapp was in Guam on March 8, 2015, and

     7   prepared this aircraft for shipment and removed the rotor

     8   blades and the floats --

     9           MR. LEON GUERRERO:  Objection.  Counsel is

    10   testifying, Your Honor, and there is no -- he's misstating the

    11   facts.

    12           MR. MCCONWELL:  I'll withdraw the question, Your

    13   Honor.

    14           THE COURT:  Okay, withdrawn.  Next question.

    15   BY MR. MCCONWELL: (CONTINUING)

    16     Q.   From this record, can you determine that the main

    17   rotor blades and floats were removed for shipping, the

    18   3.2 hours?

    19     A.   It says that removed main rotor blades and floats for

    20   shipping.

    21     Q.   Okay.  And you got a Hobbs meter, 3.2?

    22     A.   Yes.

    23     Q.   And then you have an entry of 4/2/2019, that the main

    24   rotor blades were reinstalled and the floats per the MD

    25   manuals; correct?

*Cross - Lopez*

1     A.   I see that, yes.

2     Q.   Now, that's the one that Mr. Kapp may or may not have

3     been in Majuro; correct?

4     A.   Correct.

5     Q.   But you have no evidences that he wasn't there to

6     remove these items; do you, sir?

7     A.   I was going with the statement that said that he

8     wasn't with that aircraft, that aircraft was on a tuna boat.

9     Q.   But you don't know that for sure; do you?  You don't

10    have documents of where that aircraft was --

11                MR. LEON GUERRERO:  Objection, argumentative.

12                THE COURT:  Overruled.

13                THE WITNESS:  I was just going by the statements

14    I read.

15    BY MR. MCCONWELL: (CONTINUING)

16    Q.   Somebody said that to you, you think, right?

17    A.   The statements that I read.

18    Q.   Okay.  And then Mr. Kapp signed -- his entry, his

19    logbook entry was that the rotor blades were put back on and

20    the floats were put back on.  That's what that says; correct?

21    A.   That's what it says.

22    Q.   Now, that obviously happened because the aircraft was

23    flown after that; correct?

24                MR. LEON GUERRERO:  Objection.  Speculation,

25    relevance.

*Cross - Lopez*

1          THE COURT:  What was the last question, Veronica?

2          (Whereupon, the reporter read back requested

3    portion.)

4          THE COURT:  All right, sustained.

5          MR. MCCONWELL:  Pardon?

6          THE COURT:  Sustained.  Sustained.

7    BY MR. MCCONWELL:  (CONTINUING)

8      Q.   Did you have information that the aircraft was flown

9    after the rotor blades were reinstalled and the floats were

10   reinstalled, sir?

11     A.   I don't know if they were or they were not because

12   Mr. Kapp did this entry.  And from what I read, he wasn't in

13   the location to do it, so I don't know who did that or if it

14   was even done.

15     Q.   So you have no information, after reviewing all the

16   files, that the aircraft -- as to whether or not the aircrafts

17   were flown after this logbook entry, that the main rotor

18   blades were installed -- reinstalled, and the floats were

19   reinstalled?  No information at all?

20     A.   What I have is that Mr. Sarimos stipulated that

21   Mr. Kapp was not there, so the sign-off will be fraudulent, if

22   that's the case.

23     Q.   Well, but the sign-off is true because the aircraft

24   flew; correct?

25          MR. LEON GUERRERO:  Objection, Your Honor.

*Cross - Lopez*

1    Calling for a legal conclusion.

2              THE COURT:  I'm sorry, what's the objection?

3              MR. LEON GUERRERO:  Calling for a legal

4    conclusion.  It's also misstating the evidence.

5              THE COURT:  Okay, the Court will --

6              MR. LEON GUERRERO:  Speculation.

7              THE COURT:  -- sustain the objection on

8    speculation.  Go ahead, next question.

9    BY MR. MCCONWELL:  (CONTINUING)

10       Q.   So you have no information, all these things you've

11   reviewed?

12             MR. LEON GUERRERO:  Asked and answered.

13             THE COURT:  Overruled, go ahead.

14   BY MR. MCCONWELL:  (CONTINUING)

15       Q.   No information at all?

16       A.   I have the information that Mr. Sarimos said that

17   Mr. Kapp wasn't in location when this aircraft was out on a

18   tuna boat, so the logbook entry would be fraudulent because he

19   did it.  He said he did it, and he wasn't there.

20       Q.   You know that the aircraft crashed on September

21   the 2nd, 2015, which is several months after the rotor blades

22   were reinstalled, in fact, and the floats were reinstalled;

23   don't you, sir?

24       A.   I'm just going by what this statement says, I don't

25   know that part of the event.

1      Q.   So you ignore the facts of reality of the aircraft's

2  history, then?

3                MR. LEON GUERRERO:  Objection, argumentative.

4                THE COURT:  Yeah, sustained.

5  BY MR. MCCONWELL: (CONTINUING)

6      Q.   How do you ignore the fact that the airplane got to

7  wherever, 200 miles from Pago Pago where it crashed?

8                MR. LEON GUERRERO:  Form of the question and

9  speculation and argumentative.

10                THE COURT:  Overruled.  Go ahead.

11                THE WITNESS:  Can you repeat?

12  BY MR. MCCONWELL: (CONTINUING)

13      Q.   Pardon?

14      A.   Can you repeat the question?

15      Q.   How do you reconcile your statement that you have no

16  information that the aircraft flew after September -- or April

17  the 2nd, 2019, when it -- or it was '15, actually -- and when

18  you knew that it crashed several months later in Pago Pago?

19      A.   Again, I'm going by the statement Mr. Kapp did, that

20  he wasn't at location to do that work that he said he did.

21      Q.   So you're saying it's false regardless of whether or

22  not it's true?

23      A.   I'm just saying that his statement -- him signing off

24  when he wasn't there on a logbook on something he did, it

25  sounds like falsification.

*Cross - Lopez*

1      Q.    But the statement is correct or true that the rotor

2 blades were reinstalled, right?

3                MR. LEON GUERRERO:  Asked and answered, Your

4 Honor.

5                MR. MCCONWELL:  I'll go on, Your Honor.

6                THE COURT:  All right.  You're withdrawing the

7 question.  Next question.

8 BY MR. MCCONWELL: (CONTINUING)

9      Q.    Now, you testified that you received ethics training

10 when you started working?

11     A.    We receive it yearly.

12     Q.    Pardon?

13     A.    Yearly, annually we receive it.

14     Q.    And that's contained in 8900.1, the operative FA

15 Order that controls what your group does?

16     A.    There is -- they're there and then the order 3750 and

17 then Title 5 of 2635.

18     Q.    And that 8900.1, the entirety apply to the SEIT team?

19     A.    FAA Order applies -- the 8900 applies to all the

20 inspectors.

21     Q.    So they all have to act ethically, according to the

22 order; correct?

23     A.    Yes, sir.

24     Q.    How do you reconcile or -- so it does require the

25 SEIT inspectors to act ethically or have ethical conduct when

*Cross - Lopez*

```
1    they're performing their duties with regard to inspection for

2    safety or operators or otherwise?

3         A.   Yes, sir.

4              MR. MCCONWELL:  I have no further questions, Your

5    Honor.

6              THE COURT:  Thank you, Mr. McConwell.

7              Mr. Martin, any questions?

8              MR. MCCONWELL:  Oh, I'm sorry.  Can I have one

9    more?

10             THE COURT:  Yes, go ahead.

11   BY MR. MCCONWELL: (CONTINUING)

12        Q.   Would you agree with me, sir -- sorry, we'll get you

13   out of here.

14             Would you agree with me, sir, that one of the best

15   evidences of airworthiness and safety is the number of hours

16   that an aircraft operates -- or a group of aircraft operate

17   without significant accidents caused by maintenance or

18   otherwise?

19        A.   I'm -- not necessarily, but it depends if it's being

20   reported correctly, if there is, you know, incidents and

21   accidents and issues that are being reported.  So it's a gamut

22   of things.

23        Q.   Well, there's been some evidence -- and you heard it

24   -- that these aircraft operated by the contracts alone

25   40 hours -- or 700 hours a year, I'm sorry, and they had about
```

*Cross - Lopez*

 1  35 to 40 aircraft operating for this whole 20-year period.  If

 2  you take that by 20, that comes up to around 560,800 hours of

 3  operation based on the 40 aircraft.

 4          Isn't that pretty good evidence of these aircraft

 5  were properly maintained, sir?

 6      A.   No, not necessarily, because we don't know what

 7  happened in-between.  We don't know if all the hours are

 8  documented, we don't know if, you know, it was the actual

 9  aircraft, we don't know if the maintenance and issues that are

10  constantly having been recorded.  So that alone is not an

11  indicator.

12      Q.   Another indicator would be to go look at how to

13  compare this helicopter -- helicopters compared to other

14  helicopter accidents; correct?

15      A.   It may be one element.

16      Q.   And this helicopter, these helicopters had very, very

17  few accidents, virtually none concerning maintenance items;

18  correct?

19      A.   Let me just say --

20              MR. LEON GUERRERO:  Objection.  Counsel is

21  testifying, Your Honor.

22              MR. MCCONWELL:  I'll withdraw that question.

23              THE COURT:  Okay, withdrawn.

24  BY MR. MCCONWELL:  (CONTINUING)

25      Q.   So you think -- you have to review the actual

*Cross - Lopez*

history, the hours flown, the more the merrier are better
without accidents.  That's a good indicator; isn't it?

A.   It's not the indicator.  I mean, that alone is not an
indicator.  We don't -- on our risk, we look at, if we see an
operator operating a lot of hours and doesn't have an issue,
doesn't mean we don't look at them.  I mean, that's one --
maybe one of the indicators, but it's not the indicator.

Q.   So if a Honolulu FSDO had no problems that they
complained here or were come here to talk about of the
operation of Mr. Walker's helicopters for the years 2000 to
2011, that's a good indicator that he was operating a safe
airworthy system; isn't it?

A.   No, sir.  Because -- I mean, you have Timothy Cislo
inspector that was not doing his job effectively.

Q.   Except for Mr. Cislo, up to the time he started?

A.   That's a big issue.

Q.   Okay.  How about 2000 to 2008, that's a good
indicator there was nothing wrong with the operation for an
unsafe standpoint?

A.   I don't know the history back then and what was going
on, sir.  I know that in respect to Cislo, what he was doing
was completely contrary to anything we do.

Q.   So your opinions are primarily based on Mr. Cislo's
alleged impropriety?

A.   My opinion and expertise on these areas, when you

```
 1   have an individual taking bribes, they're not doing the

 2   effective work for the flying public and for the taxpayers,

 3   and that hinders aviation safety.

 4        Q.   And who is the flying public in international waters

 5   off of tuna boats?

 6              MR. LEON GUERRERO:  Objection, Your Honor, per

 7   your order.

 8              THE COURT:  Overruled, overruled.

 9              THE WITNESS:  The spotter will be one for sure.

10   BY MR. MCCONWELL: (CONTINUING)

11        Q.   Pardon?

12        A.   The spotter will be one.

13        Q.   Okay.  Anybody else?

14        A.   The pilot.

15              MR. MCCONWELL:  I have no further questions, Your

16   Honor.

17              THE COURT:  All right.  Mr. Martin, you have any

18   questions?

19              MR. MARTIN:  Yes, Your Honor.

20

21                     CROSS-EXAMINATION

22   BY MR. MARTIN:

23        Q.   Mr. Lopez, have you been watching this trial from the

24   beginning, sir?

25        A.   Yes, pretty much.
```

*Cross - Lopez*

 1     Q.   Okay.  Have you been sitting back here?

 2     A.   On occasion.

 3     Q.   And when you're not back here, were you watching it

 4   on Zoom or something?

 5     A.   Yes, on occasion.  Yes, sir.

 6     Q.   So you've seen pretty much everything?

 7     A.   Pretty much.  Some areas I missed, but yes, pretty

 8   much.

 9     Q.   And as it's reflected in your report, you have

10   reviewed everything in this case; isn't that true, sir?

11     A.   I have looked -- I mean, we reviewed -- I don't

12   memorize all those documents, sir.

13     Q.   No.  My question was:  You have looked at everything

14   in this case; isn't that true, sir?

15     A.   What I believe to be.

16     Q.   Well, let me ask you:  The government provided me

17   your report, and in the report, it indicates that Mr. Lopez

18   reviewed defendant's admissions in motions, attachments,

19   letters from their attorneys, e-mails amongst the defendants

20   and others, letters between defendants and others, Excel

21   spreadsheets, as well as other records created by the

22   defendants.

23          Did you review that, sir?

24     A.   Yes, sir.

25     Q.   Mr. Lopez analyzed a number of demonstrative aids,

*Cross - Lopez*

1   including a chart of defendant's corporate entities, a chart

2   demonstrating the relationship between Walker and the

3   companies, aircraft helicopter and tuna boats.

4        Did you review that, sir?

5   A.   Yes, sir.

6   Q.   A number of summary charts created from documents in

7   this case previously marked to the defendants were reviewed,

8   including the summary of the mechanics and their

9   certifications, pilots and their certifications, aircraft

10  histories, aircraft helicopter accidents, and purchases by

11  Hansen of parts.

12  A.   Yes, sir.

13  Q.   You reviewed all that.  Interviews of pilots and

14  mechanics who worked for Hansen were read, interviews from

15  witnesses to defendant's actions, statements were also read,

16  business records from FAA pertaining to defendant's

17  communications and other business with the FAA were reviewed,

18  business records of the NTSB related to defendant's aircraft

19  helicopter were reviewed.

20       Did you review all of that?

21  A.   Yes, sir.

22  Q.   All investigative records regarding the subject

23  aircraft helicopters were reviewed, including SEIT information

24  and FAA administrative proceedings against Defendant's

25  aircraft helicopters.

     1              Did you review all that, sir?

     2        A.    I've reviewed them.

     3        Q.    Type certificates for defendant's aircraft.

     4              Did you read that?

     5        A.    Yes.

     6        Q.    All reference to CFRs and orders.

     7        A.    Okay.

     8        Q.    Did you review that?

     9        A.    Yes, yes.

    10        Q.    Cislo's plea agreement; did you review that?

    11        A.    I did, yes, sir.

    12        Q.    Cislo's interview; did you review that?

    13        A.    I did.

    14        Q.    All information provided to defendants reflected in

    15   the discovery log; did you review that?

    16        A.    Yes, sir.

    17        Q.    So these are just the government's exhibits; you see

    18   this?

    19        A.    Yeah.

    20        Q.    You have reviewed every page here?

    21        A.    I've looked through the documents and through the

    22   spreadsheets and all that, I just -- I didn't memorize all of

    23   them.

    24        Q.    I didn't ask you that.

    25              Have you looked at every page that is on this table?

*Cross - Lopez*

```
 1        A.    I can't say unless we pull out every page and look at
 2   it.
 3        Q.    Well, you don't remember everything you looked at.  I
 4   mean, do you know how many pages you probably looked at, sir?
 5        A.    I lot.
 6        Q.    How long did that take you, sir?
 7        A.    I've been working this for about two years.
 8        Q.    Well, how long does it take you to review a page?
 9        A.    I don't know, sir, depending what it has in it.
10        Q.    Do you think you could look at everything in this
11   case, sir, 26 terabytes of data in two years?
12        A.    I've looked at what's -- what I seen.  I don't know
13   the number of terabytes.  I don't know any of that, I'm sorry.
14        Q.    Well, if I represent to you, sir, that it would be a
15   stack of paper from here to the international space station,
16   did you look at that much data, sir?
17              MR. LEON GUERRERO:  Objection.  Counsel is
18   testifying.
19              THE WITNESS:  That's speculation.
20              THE COURT:  Overruled.
21              THE WITNESS:  Speculation.  I'm sorry, I --
22   BY MR. MARTIN: (CONTINUING)
23        Q.    Let me re-ask the question so you can understand it.
24              If I represented to you that, if the pages were
25   stacked on top of each other, they would reach from here to
```

*Cross - Lopez*

1    the International Space Station, 255 miles in space, are you

2    telling this jury you have looked at every one of those pages?

3         A.   But you told me it's only these here.

4         Q.   I asked you if you looked at those.  I'm not through

5    yet, sir.  I've got a lot of questions.  So let's go back to

6    the question I asked.

7              If I represented to you that the 26 terabytes of

8    information was from here to the International Space Station,

9    almost, about 255 miles, are you telling the ladies and

10   gentlemen of the jury you looked at all of that?

11        A.   I don't think that's the correct information.  I

12   don't know where you got that from, but I would like to see

13   that, where it says that.

14        Q.   Did you not understand my question?  Let me ask it

15   again.

16        A.   But I'm answering something that I don't know it's

17   accurate.  I don't know that 26 terabytes goes to the moon

18   or...

19        Q.   Well, I said International Space Station.

20        A.   International Space Station, I'm sorry.  I don't know

21   that.

22        Q.   Did you look at a mile of paper stacked on top --

23        A.   I don't know what a mile of paper looks like.

24        Q.   Well, a mile is 5,280 feet, okay?  Is that right,

25   5,280 feet is a mile?

```
 1        A.    I think so.

 2        Q.    Right.  I mean...

 3        A.    5,600.

 4        Q.    5,280; you agree with that?

 5        A.    Okay.

 6        Q.    No, I mean, if I'm wrong, I'm wrong.  I'll own it.

 7        A.    The number of feet?

 8        Q.    Yes.

 9        A.    I'm not sure, I think.  I thought it was 5,600 or

10   something, but go ahead.

11        Q.    Okay, we'll use 5,600.

12              Are you telling the ladies and gentlemen of the jury

13   you looked at 5,600 feet of documents stacked on top of each

14   other?

15        A.    I'm not telling them that, because I don't know that

16   26 terabytes is 5,000 feet of --

17        Q.    No, it's a lot more than that.  It's about 255 miles,

18   sir.  I've checked it out.

19        A.    I wouldn't know.

20        Q.    So would it be fair to say that you really don't know

21   everything you've looked at; is that an accurate statement,

22   sir?

23        A.    I've -- I've -- I know everything I testified to,

24   sir.

25        Q.    No, no, I didn't ask you about what you testified to
```

 1    because I haven't even asked you questions about what you

 2    testified to yet.  I'm asking you questions about what you

 3    looked at in preparation to come in here.

 4        A.   I didn't memorize it.

 5        Q.   Okay, all right.  Well, let me move a little further,

 6    then.

 7             You heard the testimony of Mr. Reed; did you not,

 8    sir?  When he testified that Mr. Walker moved to Missouri in,

 9    approximately, 2011.

10        A.   Yes.

11        Q.   And he wasn't involved in the day-to-day operations

12    of the operation; correct?

13        A.   Yes, I heard that.

14        Q.   Okay.  And you also -- I think, the government's

15    already introduced, I believe, what's been marked and

16    introduced as Government's Exhibit 6.  You also said you

17    reviewed an interview of Mr. Sarimos; do you recall that, sir?

18        A.   Sarimos?

19        Q.   Sarimos, thank you.

20        A.   Yes, sir.

21        Q.   Do you remember that one?

22        A.   Yes, sir.

23        Q.   If we could go to Government's Exhibit G-0 --

24    Government's Exhibit 6, I'm sorry.

25             MR. LEON GUERRERO:  Your Honor, I'm more than

1   happy to have that admitted.  I think over the objection of

2   the defense, he was only able to testify as to the content,

3   but I'm more than happy to admit Government --

4               MR. MARTIN:  I thought it was admitted.  If I am

5   wrong, I apologize.

6               THE COURT:  Let me check.  Carmen, is Exhibit 6

7   admitted?

8               THE CLERK:  Yes, ma'am.

9               MR. MARTIN:  It was admitted over objection.  It

10  doesn't mean I can't use it, I don't know.

11              MR. LEON GUERRERO:  I'll take the objection back.

12  Withdrawn.

13              THE COURT:  Okay.

14  BY MR. MARTIN: (CONTINUING)

15      Q.  Can we look at G-6, or Government's Exhibit 6.  And

16  in particular, let's go to Page 3.  And if we go down... let's

17  see here.  Let's just stop right there.  I'm going to show you

18  -- and I want you to follow what I've got here.

19              Do you see what I circled in red, sir?

20      A.  Yes, sir.

21      Q.  Okay.  And you're very familiar with this; aren't

22  you, sir?

23      A.  You want me to read it?

24      Q.  No, I'm asking if you're familiar with it?

25      A.  I remember it now, yes, sir.

*Cross - Lopez*

         Q.   Okay.  Follow along with me.  "Sarimos does not

interact with Crowe frequently."

              Do you see that, sir?

         A.   Yes, sir.

         Q.   Is that correct?

         A.   It says that there, yes, sir.

         Q.   Okay.  "Sarimos communicates with Marvin Reed

concerning the delivery of helicopters to and from the vessels

in Majuro."  Correct?

         A.   It says that, yes, sir.

         Q.   "Sarimos had no interaction with Walker, Sarimos has

never observed Walker in Majuro."

              Is that accurate, sir?

         A.   Yes, sir, it says that there.

         Q.   And that would be consistent with what Marvin Reed

testified to, that he kind of stepped away from the active

involvement in the business; wouldn't you agree, sir?

         A.   I don't know about that.  I just know what Sarimos's

statement is.

         Q.   And I apologize for mispronouncing his name.

              Sarimos, and you relied on what he said, right?

         A.   Yes.

         Q.   Okay.  Carmen, could I remove my red marking there?

              Now, if we go back up to "for example."  Let's go to

exhibit -- Government's Exhibit 316.  It's been introduced.

*Cross - Lopez*

```
 1              THE COURT:  And admitted?

 2              MR. MARTIN:  Yes.  I'm sorry, Your Honor.

 3   Introduce and admitted.

 4              THE COURT:  All right, 316.

 5   BY MR. MARTIN: (CONTINUING)

 6       Q.   Do you see those names at the top, sir?  Randy

 7   Rogers, Turner Kapp.

 8       A.   Yes, sir.

 9       Q.   Okay.  And do you see anywhere in there where

10   Mr. Walker, my client, is referenced in that that e-mail, sir?

11   Did he receive a copy of it?

12       A.   No, sir.

13       Q.   Okay.  And can you point out for the ladies and

14   gentlemen of the jury Randy Rogers?

15       A.   Where, here?

16       Q.   Yeah.

17       A.   No, sir.

18       Q.   You don't -- he's not in the courtroom; is he, sir?

19       A.   No, sir.

20       Q.   How about Turner Kapp, can you point him out?

21       A.   He's not here either, sir.

22       Q.   Okay.  My client's here, but he's not in this exhibit

23   anywhere; is he, sir?

24       A.   Correct.

25       Q.   And as a matter of fact, there are multiple exhibits
```

*Cross - Lopez*

in this case that have been introduced that you've testified about that have no reference to Jon Walker, whatsoever; do they, sir?

A.   I believe there's some -- correct.  You're correct.

Q.   Thank you.  Now, sir, Mr. Walker had a special type of certification; did he not, sir?  It's called an IA or AI?

A.   Inspection authorization.

Q.   IA, then.  And that has to be renewed every few years; correct, sir?

A.   Correct.

Q.   How often?

A.   Every two years in March, the odd years.  So it would be 2001, 2023, every two years.

Q.   And to renew that, you have to certify that you have obtained appropriate training; correct, sir?

A.   Training or return to service aircraft annual inspections.

Q.   So he could either take a course online or return to service an aircraft; correct?

A.   Yes, there's a requirement for courses and there is a requirement for --

Q.   And once that's done and it's submitted to the FAA, it's renewed; correct?

A.   That's correct.

Q.   And Mr. Cislo had nothing to do with whether or not

*Cross - Lopez*

1   he met those requirements; did he, sir?

2       A.   Mr. Cislo issued the authorization on several

3   occasions, reissued the authorization several occasions.

4       Q.   And you have no evidence to indicate that he didn't

5   either return an aircraft to service or he didn't obtain the

6   appropriate training online or wherever?

7       A.   Yeah, exactly what the application says, his renewal

8   application.

9       Q.   Now, are you an IA, sir?

10      A.   No, sir.

11      Q.   Is that -- you're an A&P?

12      A.   A&P, yes, sir.

13      Q.   Is that -- because I'm not an aircraft guy and I

14  apologize -- is that higher, lower, what's --

15      A.   It's an additional authorization to do, like, annual

16  inspections and a return to service after a major repair and

17  alteration of an aircraft.

18      Q.   And is that what you can do, sir, with your

19  certification?

20      A.   With my A&P?  With my airframe and power plant?

21      Q.   Right.

22      A.   I could just -- I do all the maintenance, I could do

23  all the maintenance on the aircraft.

24      Q.   Can you return it to service?

25      A.   Yes, but as long as it's not for major repair and

        authorization.

             Q.    I'm sorry?

             A.    As long as it's not major repair and authorization or
        an annual inspection.

             Q.    But Mr. Walker can do that, right?

             A.    He has the authorization, yes, sir.

             Q.    Okay.  And basically, Mr. Walker can -- he can work
        on aircraft anywhere in the world, right?

             A.    With his -- any U.S.-registered aircraft.

             Q.    Right.

             A.    That is correct.

             Q.    Okay.  And he can get that IA authorization in
        Missouri, he can get it in Guam, he can get it wherever he has
        to be when he completes the training or returns an aircraft to
        service, right?

             A.    So generally, what it is is the IA renews his
        application, because each office keeps a file of their IAs or
        inspection authorization.  So they renew it based on the work
        where he's primarily doing work at, and that will say in his
        renewal application, that he's doing work in Guam.  So that's
        where his primary work is being done, and it will be in the
        application.  So the Honolulu office would do it because they
        had responsibility for this area over here.

             Q.    So he had to represent in the documents that it was
        done it Guam because that's his called -- his basis of

 1    operations, sir?

 2         A.   It doesn't say -- I think it reads something to the

 3    effect where he mainly does his work or something to that

 4    effect.

 5         Q.   Could you repeat?  I'm sorry.

 6         A.   I think the statement on it, on the application says

 7    where he does his work or something to that effect.  It

 8    doesn't say principle base operation or anything like that,

 9    but it --

10         Q.   And we heard testimony that he came to Guam

11    occasionally; did he not, sir, for Mr. Reed?

12         A.   Yes, sir.

13         Q.   So there is nothing wrong with that?

14         A.   No.

15         Q.   Now, we've talked about, if we could, Exhibit 139.

16    That's the exhibit where you were concerned about.

17              Could we pull that up, please.

18              THE COURT:  That has been admitted?

19              MR. MARTIN:  I believe 139, Pages 4 and 5 have,

20    Your Honor.  And let's verify that I'm correct on that, but I

21    believe it's Pages 4 and 5.

22              THE COURT:  Check on that, hold on.

23              THE CLERK:  Verified, Your Honor.

24              THE COURT:  Yup, okay.  It's confirmed.  That's

25    correct, Mr. Martin.  You're right.

*Cross - Lopez*

1          I got about 16 minutes before we recess.

2    BY MR. MARTIN: (CONTINUING)

3        Q.    Do you see Exhibit 139, Page 4, sir?

4        A.    Yes, sir.

5        Q.    And that was the letter from Rufus Crowe.

6              Do you see it, sir?

7        A.    Yes, sir.

8        Q.    And is he in the courtroom?

9        A.    No, sir.

10       Q.    Okay.  And Mr. Crowe, what you didn't like from what

11   I understand is, this language here about "my dog did not eat

12   my C of A."  You didn't think that was professional and you

13   thought that was inappropriate; correct?

14       A.    Yes, sir.

15       Q.    And other than that, he's just requesting for a

16   replacement certificate, right?

17       A.    Yes.

18       Q.    Okay.  And of course he says in there "the document

19   is very faded, the signature no longer legible."

20             Do you see that, sir?

21       A.    Yes, sir.

22       Q.    I'm going to ask you -- this is not admitted to look

23   at that same exhibit, but instead of 139-4, let's go to 139-2,

24   and that's not for the jury yet, Your Honor.

25             THE COURT:  I'm sorry?  139-2.

1          MS. MCCONWELL:  I didn't want to move to that

2   page until we weren't published yet.

3          THE COURT:  Okay.

4   BY MR. MARTIN: (CONTINUING)

5      Q.   And do you see what's been identified as Government's

6   Exhibit 139-2, sir?

7      A.   Yes.

8      Q.   And does that reflect -- is that part of the document

9   -- or part of the -- what's referred to in the letter of 139,

10  Pages 4 and 5, sir?

11     A.   I'm not sure.

12     Q.   Well, you've looked at every page and every piece of

13  exhibit in this case; is that one of those you don't remember,

14  sir?

15     A.   I'm not sure if that's the one dealing with the

16  letter, I apologize.

17     Q.   Okay.  Do you see -- let's do this just to help.

18  Look at the N-number on it.

19     A.   Yeah.

20     Q.   Okay.  Now, if we could go back to 139-4.

21          And do you see on 139-4, what's reflected as the

22  N-number on that, sir?

23     A.   Yes, sir.

24     Q.   And does that refresh your recollection as to whether

25  or not that document relates to that letter, sir?

*Cross - Lopez*

1       A.   It's --

2                MR. LEON GUERRERO:  Your Honor, I'm going to

3   object as to speculation.  This is a 44-page document, and

4   there is actually a gap between what was introduced and the

5   document that Counsel is trying to show the witness.  So

6   unless he can lay a foundation that what he's trying to show

7   this witness with this letter coincides with one another, I'd

8   object to lack of foundation.

9                MR. MARTIN:  Your Honor, this is a government

10  exhibit that they provided to us relating to this document

11  here.  The document I am trying to introduce is directly

12  related to this letter, as is evidenced by its two pages

13  before found in this file folder.

14               MR. LEON GUERRERO:  If you look at what Counsel

15  is trying to show the witness, that's on Page --

16               THE COURT:  Okay.  This is 139 dash -- What was

17  this?

18               MR. MARTIN:  2.

19               THE COURT:  This is 2.

20               MS. S. MILLER:  No, this is 4.

21               THE COURT:  Oh, this is 4.  139-4, okay.  So what

22  was your question, though, with regard to this?

23               MR. MARTIN:  I'm asking if that relates to this

24  letter, Your Honor.

25               THE COURT:  So does this 139-4 relate to 139-2?

*Cross - Lopez*

1          MR. MARTIN:  Correct.

2          THE COURT:  Can we go to 2, 139-2.  Go back to 4.

3          All right, overruled.  Go ahead.

4   BY MR. MARTIN: (CONTINUING)

5     Q.   So Mr. Lopez, I'm going to show you what's now been

6   introduced as Exhibit 139-2 and ask you to look at that again,

7   sir.  And can it be -- Does the jury see that?

8          THE COURT:  I don't think it's been admitted yet.

9          MR. MARTIN:  I just moved for its admission.  I

10  thought you admitted it, Your Honor.

11         THE COURT:  Did I?  Okay, I'll admit it.

12         MR. MARTIN:  I asked that it be published.

13         THE COURT:  No objection to 139-2?

14         MR. LEON GUERRERO:  We do stand by the objection

15  we said previously.

16         THE COURT:  Okay, overruled.  Go ahead.

17  (Exhibit 139-2 admitted)

18         THE COURT:  So you want it published?

19         MR. MARTIN:  Yes, Your Honor, I ask to publish.

20         THE COURT:  Okay, published.  Go ahead.

21  BY MR. MARTIN: (CONTINUING)

22    Q.   Is that a standard airworthiness certificate, sir?

23    A.   Yes, sir.

24    Q.   And is it faded, sir?

25    A.   I can't tell by it.  It's a copy, so I can't tell

*Cross - Lopez*

1    what it really looks like.

2        Q.   Okay.  Was that -- can you read, not what's typed,

3    but can you read the signature on the certificate, sir?

4        A.   On this copy?  On the copy, no.

5        Q.   Okay.  But this is what -- this was 139-2.  Now, if

6    we can go back to 139-4.  Go up just a little bit, please.

7    There we go.  That's fine.

8             "The document is very faded, and the signature no

9    longer legible."

10            Do you see it, sir?

11       A.   I do see it.

12       Q.   That statement in there is consistent with what we

13   saw in 139-2; wouldn't you agree, sir?

14       A.   For that copy, I don't know about the original

15   certificate.

16       Q.   Well, they can't mail the original back in; can they,

17   sir, because it has to stay with the aircraft, right?

18       A.   Well, that's the whole thing.  I mean, there

19   shouldn't be two certificates.  If you bring -- if you're

20   going to turn one in -- if you're going to replace it, you

21   turn it in so you get the other one.

22       Q.   The airworthiness certificate has to stay with the

23   aircraft; right, sir?

24       A.   Well, it's -- you're going to get it replaced, it has

25   to be brought in.

1    Q.   So when you mail it in --

2    A.   That's why it should be mailed.

3    Q.   And do we know if that is a copy that the FAA made

4  because it was mailed in, or do we know whether or not that is

5  a copy that was made and sent in?

6    A.   You were showing me a copy.  I'm just responding to

7  the copy.

8    Q.   And you know this was a government exhibit, sir?

9    A.   Yes.

10    Q.   Okay.  And this was something that was provided to me

11  from the government, right?

12    A.   Right.

13    Q.   Now, let me ask you, sir -- I'm going to ask you to

14  look at, sir, Government's Exhibit G-1401.

15             THE COURT:  Not admitted yet?  Has that --

16             MR. MARTIN:  It's been admitted.  I'm sorry, Your

17  Honor, and I apologize.

18             THE COURT:  You want to publish, then, G-1401?

19             MR. MARTIN:  Yes, Your Honor.

20             MR. LEON GUERRERO:  Your Honor, can I confirm

21  because I don't have that admitted on our list.  141?

22             MR. MARTIN:  No, 1401.

23             MR. LEON GUERRERO:  I'm sorry, withdrawn.

24             MR. MARTIN:  I apologize.

25             MR. LEON GUERRERO:  Withdrawn.

```
 1              THE COURT:  Withdrawn.  They're withdrawing their
 2   objection.  Go ahead.  We got 10 minutes, Counsel.
 3   BY MR. MARTIN: (CONTINUING)
 4       Q.   That Oklahoma drawl, Your Honor, I'm trying to speed
 5   it up.
 6            If we could go further down.  I'm going -- go to the
 7   photographs, I'm sorry.  On down.  That's good.
 8            You see that photograph, sir?
 9       A.   Yes, sir.  Yes, sir.
10       Q.   And somebody's actually written on there HR Center
11   Windshield with epoxy and duct tape.
12            Do you know who did that, sir?
13       A.   No, sir.
14       Q.   Now, you indicated that this was dangerous, right?
15       A.   It looks absolutely dangerous, yes, sir.
16       Q.   Okay.  That aircraft is not operating; is it, sir?
17       A.   No.
18       Q.   And so as long as it's not operating and sitting on a
19   boat, it's not a crime, right?
20       A.   It's not a violation to the regulation -- to -- it
21   had to operate on airworthy aircraft, so right.
22       Q.   As a matter of fact, it's not a crime -- even if you
23   operate it with duct tape, it's not a criminal offense?
24       A.   No, it would be a regulatory offense.
25       Q.   Okay.  But it's not violating the regulations right
```

*Cross - Lopez*

 1   now because it's sitting there and is parked; correct?

 2        A.   That's a valid statement.

 3        Q.   And as a matter of fact, the e-mail communication

 4   talked about the fact that they couldn't change it because the

 5   weather was too bad and so it's just sitting there and they

 6   took a picture of it, right?

 7        A.   Well, the violation is whoever did that repair, the

 8   mechanic, it's not in accordance with any document, so...

 9        Q.   Well, if it's raining and the weather's bad and they

10   want to protect the helicopter, they've got to do something

11   until they can get it fixed; don't they, sir?

12        A.   That's not a proper repair.

13        Q.   I'm not saying it's a proper repair.  If you can't

14   repair it because the weather is too bad and the weather won't

15   permit you to repair it and you want to protect the

16   helicopter, you might tape that up for the protection of the

17   helicopter until you can repair it?

18        A.   I find that to be incorrect.  I mean, that's just not

19   a proper repair.

20        Q.   I'm not saying it's not a proper repair.  Did you not

21   understand my question, sir?

22        A.   I did, but that's speculation.  I'm just saying it's

23   not a proper repair.

24        Q.   Okay.  Well, I'm not asking you about the repair.

25   Let's say you want to protect the safety and integrity of the

*Cross - Lopez*

 1   helicopter from weather damage.

 2       A.   Yeah.

 3       Q.   Can you put tape over it until you can do a proper

 4   repair?

 5       A.   I'm not sure if that will do that.

 6       Q.   You don't think tape will keep water or storm or

 7   anything out of it?

 8       A.   I don't know any manual that says it would, so I'm

 9   not familiar with that.

10            MR. MARTIN:  If we can go down to the

11   communication a moment.

12            THE COURT:  Which exhibit is this you're looking

13   at?

14            MR. MARTIN:  Just stop and go back up.  This is

15   Exhibit 1 -- I'm sorry, Your Honor.  I think it's 1401.

16            MS. MCCONWELL:  It's 1401.

17            MR. MARTIN:  If we can go up just a little bit.

18   Little further.  Okay, stop just a second.  Go down just a

19   little further, please -- or no, yeah, come back down.

20   BY MR. MARTIN: (CONTINUING)

21       Q.   You see what I've underlined, sir?

22       A.   Yes.  You want me to read it?

23       Q.   No.  I asked you if you saw it?

24       A.   Yes, sir.

25       Q.   "We did a temporary-fixed solution, but it works good

*Cross - Lopez*

1    and safe in flight.  We couldn't change it here in fishing

2    ground, the weather is not good."

3            Do you see that, sir?

4       A.   Yes, sir.

5       Q.   The weather wasn't allowing them to do that.

6            You understand that, sir?

7       A.   Yes, but that's not complying with the regulations.

8       Q.   I understand.  I didn't ask you if it was complying

9    with the regulations.  Thank you.

10            Now, let me ask you another question, sir.  If we

11   could, let's go to Exhibit 1520.  And that's admitted, Your

12   Honor.

13            Do you see 1520, sir?

14      A.   Yes, sir.

15      Q.   And before I go into this, there is nothing

16   inappropriate about using more than one logbook; is there,

17   sir, to record events relating to an aircraft?

18      A.   The aircraft should have a logbook.  I don't know

19   what that statement means, sir.

20      Q.   There's nothing inappropriate about having

21   maintenance records in one book and maintenance records in

22   another book or in a separate location; is there, sir?

23      A.   Well, the current records has to be together.  I

24   mean, you could have historical records placed somewhere else,

25   but there should only be one set of records for an aircraft.

*Cross - Lopez*

1      Q.   Well, they can be in different locations, right?

2      A.   Historical ones could be stored somewhere.

3      Q.   Okay.  And you -- I believe you indicated -- if we

4   could go up just a little bit.  I want to look at -- I believe

5   you indicated that this entry concerns you because there was,

6   approximately, a 400-hour gap, and I think what you called the

7   hundred-hour review --

8      A.   Inspections.

9      Q.   -- inspections.  And that's explained away; is it

10   not, sir, in the next entry?

11      A.   I don't believe so, sir, as an expert.

12      Q.   Well, let me ask you:  Does it not say -- if we can

13   go to the top, the first entry was -- I just want to get to

14   the date.

15           The first entry was January 8, 2014?

16      A.   Yeah.

17      Q.   If we could come back down and look at what I had

18   circled there.  That's good.

19           August 12, 2014, you see the hours on there, 6871?

20      A.   Yes, sir.

21      Q.   Aircraft removed from container.  That means that

22   aircraft was in some type of a container; right, sir?

23      A.   Right.

24      Q.   And is that normal and proper for aircraft when

25   they're being taken to be worked on to be put in a container

*Cross - Lopez*

1    and shipped somewhere?

2         A.   I'm not an expert in shipping aircraft, so I

3    apologize I can't answer that.

4         Q.   Well, you know that it's happened; isn't that true?

5         A.   I've seen that, yes, sir.

6         Q.   Okay.  Records from 1814 to this date not located.

7         A.   I see that.

8         Q.   This logbook page copy found in AC -- I'm assuming

9    that's abbreviation for aircraft.

10        A.   Right.

11        Q.   So this logbook page copy found in aircraft file.

12             Do you see that, sir?

13        A.   Yes, sir.

14        Q.   Hobbs time reset AFTT is 6871.0.

15             Do you see that, sir?

16        A.   Yes, sir.

17        Q.   Okay.  So that reflects that this is not even a

18   logbook, this is a record that was found in the aircraft file;

19   is that accurate, sir?

20        A.   It's saying maintenance record, yes, sir.

21        Q.   Okay.  And it explains, at least the appearance of a

22   gap there; doesn't it, sir?

23        A.   Well, I mean, generally, yes.  But the fact that that

24   other record is there and they're making the entry, what

25   happened to all those other entries in-between, so that's a

 1   concern.

 2        Q.   I understand that, sir.  But I'm asking you:  That is

 3   an explanation that tells why it was not written in the other

 4   ones, right?

 5        A.   It's not a valid explanation.

 6        Q.   It's not a valid explanation.  And tell me of the 255

 7   miles of data that you reviewed, what document says that's not

 8   a valid explanation?

 9        A.   I'm just saying from my expertise.  I would question

10   that as an inspector.

11        Q.   Okay.  Well, let me ask you is this:  Have you ever

12   lost anything, sir?

13        A.   Have I ever lost anything?

14        Q.   Yes.

15        A.   Yeah, I lost things.

16        Q.   And when you lose 'em, you have to either get another

17   one or start over or just forget about it, right?

18        A.   Yes.

19        Q.   Now, other than you not liking this, there is not one

20   record in the 200 or the 26 terabytes of data that says either

21   that wasn't lost or that it's located somewhere else or it

22   could be found; is there, sir?

23        A.   There is no record of any inspections that were done.

24        Q.   And that explains it, right?

25        A.   Not to me, no.

```
 1        Q.   Okay.  Well, let me ask you, sir:

 2                  THE COURT:  How much longer with this witness,

 3   Mr. --

 4                  MR. MARTIN:  I'm almost through, Your Honor.

 5                  THE COURT:  Okay.

 6                  MR. MARTIN:  And I apologize.

 7                  THE COURT:  That's okay.  We'll try and finish,

 8   then.

 9   BY MR. MARTIN: (CONTINUING)

10        Q.   You'll agree with me, sir, that you've read the

11   indictment, right?

12        A.   Yes, sir.

13        Q.   And you know everything that's in this indictment,

14   right?

15        A.   I don't have it memorized.  I apologize.

16        Q.   But you've read it?

17        A.   I read it.

18        Q.   And you understand that the FAA is the person that

19   determines whether or not an aircraft is eligible for

20   registration; don't you?

21        A.   The FAA does, yes, sir.

22        Q.   Not Mr. Walker, not Hansen or anyone else?

23        A.   I don't know the registration process, so I can't

24   speak of that, so... it's not -- you know, it's not a valid

25   statement.  I'm not a registration expert, so I apologize.
```

*Cross - Lopez*

1    Q.   Well, you've seen the indictment, right?

2    A.   I have seen the indictment.

3         MR. MARTIN:   May I approach the witness, Your

4    Honor?

5         THE COURT:   You may.

6    BY MR. MARTIN: (CONTINUING)

7    Q.   And I apologize if I've written on this.  But does

8    that look like the indictment, sir?

9    A.   Yes.

10   Q.   Okay.  If I might, I'm going to turn the page to

11   Page 3, Line 2.  I have highlighted something there in red.

12        Do you see that, sir?

13   A.   Page 3, Line 2?

14   Q.   Right.

15   A.   Okay.

16   Q.   Can you read for me what the indictment says that I

17   highlighted in red?

18   A.   "The FAA then says whether the eligibility

19   requirements are met."

20   Q.   Do you agree with that statement, sir?

21   A.   I'm not an expert, I apologize, in registration, so I

22   don't have a valid answer for that.

23        MR. MARTIN:   May I have one second, Your Honor?

24   BY MR. MARTIN: (CONTINUING)

25   Q.   Let me ask you, sir:  Do you know who Randy Rogers

*Cross - Lopez*

1    is, sir?

2        A.    I don't know him.  I've heard the terms of...

3        Q.    You --

4        A.    I'm sorry, I don't know him.  I mean, I've heard his

5    name used and I saw the e-mails.

6        Q.    Okay.  Did you read a statement he gave, sir?

7        A.    Which one, sir?

8        Q.    The statement that he gave to agents of the -- I

9    believe, the Federal Bureau of Investigation in the 26

10   terabytes of data?

11               MS. M. MILLER:  Um, Your Honor, I will ask for a

12   sidebar, please.

13               MR. MARTIN:  He could say yes or no, Your Honor.

14               THE COURT:  Did you read his statement?  The

15   question is:  Did you read his statement, that's all it is.

16               MS. M. MILLER:  Okay.

17               THE COURT:  Okay.  Go ahead.  Can you answer the

18   question?

19               THE WITNESS:  I believe I did, sir.

20   BY MR. MARTIN: (CONTINUING)

21       Q.    Okay.

22               MS. M. MILLER:  Yes.  If you're going to go into

23   the statement, absolutely.

24               MR. MARTIN:  I'm going to ask him one question,

25   Your Honor.

*Cross - Lopez*

```
 1                THE COURT:  What's the question?
 2   BY MR. MARTIN: (CONTINUING)
 3      Q.   The question is:  Are you familiar with the fact that
 4   --
 5                MS. M. MILLER:  Objection.  If he's --
 6                THE COURT:  Without getting into the statement.
 7                MR. MARTIN:  Well, that's my question, Your
 8   Honor.
 9                MS. M. MILLER:  Then we're going to have to talk
10   outside the presence of the jury.
11                THE COURT:  Ladies and gentlemen, we'll go ahead
12   and take a -- Let me just ask:  Is this the last question for
13   this juror -- I'm sorry, this witness and then --
14                MS. M. MILLER:  There's still redirect.
15                THE COURT:  That's what I'm going to ask you:
16   And how long is the redirect?
17                MR. LEON GUERRERO:  I'd say no more than 5,
18   10 minutes.
19                THE COURT:  Ladies and gentlemen, let's go ahead
20   and take your dinner recess.  Please keep an open mind.  Do
21   not form or express any opinion of this case until it's
22   submitted to you.  Do not speak to anyone connected with this
23   trial.  Have a nice dinner.  See you tomorrow.  Thank you.
24   Please rise for the jury.
25                (Jury out at 5:03 p.m.)
```

*Cross - Lopez*

                    THE COURT:  We're outside the presence of the
jury.  What's the question that you want to ask the witness,
Mr. Martin?

                    MR. MARTIN:  Your Honor, I believe -- and I don't
have the transcript right in front of me, but I believe the
question is:  Are you familiar with the fact that Mr. Rogers,
when interviewed by the agents of the Federal Bureau of
Investigation -- and I think it's them -- asked him about
Mr. Walker.  He advised that Mr. Walker would not buy a
helicopter from him unless it had an airworthiness
certificate.

                    THE COURT:  Okay.  So -- this is Rogers saying
this?

                    MR. MARTIN:  No, Mr. Rogers.  He's a co-defendant
in this case.

                    THE COURT:  Right, I know.  So...

                    MR. MARTIN:  And I'll try to find the exact
language in this real quick, Your Honor.  I actually
highlighted it.

                    THE COURT:  Rogers said in a transcript somewhere
that -- that Mr. Walker, your client, would not buy a -- what,
an aircraft?

                    MR. MARTIN:  An aircraft from him unless it had
an airworthiness statement[sic] and if I can have just a
second, Your Honor.  I'll try to find that exact language.

 1                    THE COURT:  All right.  I mean, I think we got

 2     it.  I got the gist.

 3                    MR. MARTIN:  And that's the --

 4                    THE COURT:  I got the gist.  You're representing

 5     that some -- all right, so there is an objection to that?

 6                    MS. M. MILLER:  Yes, Your Honor.  What I'm

 7     concerned about is, if you recall, you entered an order

 8     severing Mr. Rogers because of the statements that were

 9     contained in the very document that Mr. Martin is now

10     referencing.

11                    So we're talking about reversible error.  If we

12     get into that document, because he was severed on the basis

13     that he made incriminating statements about Mr. Walker when he

14     was interviewed, and that since he represented he refused to

15     testify because of his own Fifth Amendment right against

16     self-incrimination, he was subsequently severed.

17                    So what I'm concerned about is going into any

18     portion of the very statement that Counsel, for the defense,

19     used to justify the severance of Mr. Rogers from the case.

20                    THE COURT:  Go ahead.

21                    MR. MARTIN:  As I recall, Your Honor, Mr. Reed

22     was severed for that reason.  I thought -- and I may be

23     mistaken, so I'll say this with that caveat, I thought

24     Mr. Rogers was severed because of medical issues.

25                    MS. M. MILLER:  No, they were -- No.  It was --

*Cross - Lopez*

both of them were severed at the same time, Your Honor, and in
the same order.

MR. MARTIN:  I have found the language if you
want to hear it, Your Honor, that I -- the question.

THE COURT:  Okay, go ahead.

MR. MARTIN:  The question is:  Isn't it true that
Mr. Rogers said in the interview, quote, I know everyone -- I
know everyone I go to buy, Jon Walker, I have to notify him
because he is the one that has to send the big bucks, and
everyone I go to buy, he asked me, "does it have a standard
airworthiness certificate?  And if I say no, he says, well, I
don't want it."

THE COURT:  All right.  So they both have been
severed, right?  Anyway, they both have been severed from this
trial -- from this particular case, and so you are -- What are
you trying to -- what's the purpose of bringing this in?

MR. MARTIN:  Well, Your Honor, the government's
--

THE COURT:  This is clearly --

MR. MARTIN:  The government's alleged that my
client is involved in a conspiracy to defraud the FAA by
having unairworthy aircraft, and this rebuts that very
inference.  And I think I'm entitled to present a defense to
that point.

THE COURT:  All right.

          MS. M. MILLER:  Your Honor, the problem is he's
using a statement from a document that Counsel for the
defendants used to justify the severance of Mr. Rogers because
of the inculpatory statements that Rogers made against Jon
Walker, as well as Hansen Helicopters.

          So how do we parse that so that they get in the
inculpatory but the government can't do anything with it,
because if we get into the excul- -- I mean, they get in the
exculpatory but we can't, then, get in the rest of the
statement which is inculpatory because we would be violating
this Court's Order, which said that we couldn't bring this
particular statement in because it would be a violation, if
proffered.

          MR. MARTIN:  All right.

          THE COURT:  Go ahead.

          MR. MARTIN:  Your Honor, I've outlined the basis
for wanting to introduce this statement.  I think that it
directly rebuts the inference that the government has alleged
in their indictment.  I think I'm entitled to do it.  And like
I said, I don't recall the basis for the severance of Rogers.
I do recall the basis for the severance of Reed, and I think
I'm entitled to present a defense in this case and this is
part of it.

          THE COURT:  All right.  I'll hold that under
advisement.  Let me think about it.  What else?  That's your

```
 1    last question?

 2                 MR. MARTIN:  Well, I was -- towards the end I've

 3    got to look at some notes, Your Honor, but I'm right there,

 4    yes.

 5                 THE COURT:  All right.  It's possible you could

 6    have some other questions tomorrow, is what you're saying?

 7                 MR. MARTIN:  Right.

 8                 THE COURT:  And Mr. Leon Guerrero, you're saying

 9    you're going to redirect for about 5, 10 minutes, did you say?

10                 MR. LEON GUERRERO:  Well, that's also depending

11    on any extra questions that Mr. Martin is planning on asking.

12    I don't know how lengthy it's going to be, but if he stopped

13    now, 5, 10 minutes.

14                 THE COURT:  Okay.  Anything else, Counsel?

15                 MR. MARTIN:  No, Your Honor.

16                 THE COURT:  All right.  So if he's going to be

17    done in 15, 20 minutes tomorrow morning or tomorrow when we

18    start, who is the next witness up?

19                 MR. LEON GUERRERO:  Mr. Roger Shepard, Your

20    Honor.

21                 THE COURT:  Okay.  And who is he now?

22                 MR. LEON GUERRERO:  He's from the civil aviation

23    of New Zealand.  He's a New Zealand official.

24                 THE COURT:  He's already here?

25                 MR. LEON GUERRERO:  Yes.  Yes, Your Honor.
```

*Cross - Lopez*

```
1            THE COURT:  And you guys are ready for him?  You
2     guys have already exchanged the proffer of exhibits and so
3     forth?
4            MS. M. MILLER:  Yup.
5            MR. LEON GUERRERO:  Yes, Your Honor.
6            MS. MCCONWELL:  They provided me a list of
7     exhibits they were going to use for him, I think, last week.
8     I don't know if any of the new exhibits are something that
9     they're intending to use with him.
10           THE COURT:  Any supplementals that you're going
11    to bring in?
12           MR. LEON GUERRERO:  No, Your Honor.
13           THE COURT:  Okay.  So you're relying on what you
14    submitted last week?
15           MR. LEON GUERRERO:  Yes, Your Honor.
16           THE COURT:  Okay, very well.  Yes, Ms. Samantha
17    Miller?
18           MS. S. MILLER:  Your Honor, I would just ask that
19    we come in about 30 minutes early tomorrow so we can cover the
20    issues that we didn't have a chance to today?
21           THE COURT:  Which issues are?
22           MS. S. MILLER:  On our list we still have the
23    co-conspirator exhibits that were conditionally admitted.  We
24    would seek ruling that they be fully admitted.  And we need to
25    discuss our objections to Mr. Martin's redactions on Exhibit
```

*Cross - Lopez*

1    G-1818.  We need to discuss the limiting instruction that we

2    requested with respect to Your Honor's 1525 Order, and then we

3    need to discuss, unfortunately, deposition designations

4    because we still only have one of the three and we intend to

5    present that testimony next week.

6              THE COURT:  All right.  Counsels?

7              MS. MCCONWELL:  Yeah, I have the Mr. Marson.

8    Mr. Han and I are going to get that scanned because I missed

9    their staff being able to do that, so we'll either get that

10   e-mailed to them tonight or first thing tomorrow morning.  It

11   is now ready to go, and then I'll get Mr. Cann.  They already

12   have Mr. Marinho.

13             THE COURT:  All right.  So tomorrow -- if you're

14   looking at the calendar tomorrow, why don't you guys -- okay,

15   10:30.  I'll look and see which ones are really -- let's look

16   and see which ones are really time sensitive.  You're saying

17   all of them are time sensitive?  Because I don't want to spend

18   -- I want us to start on time with the jurors.  What is really

19   time sensitive for tomorrow?

20             MS. S. MILLER:  I think -- I mean, I think

21   certainly the limiting instruction we would request that be

22   given to the jury sooner rather than later.  I think the other

23   time-sensitive issue is the deposition designations, because

24   we need to figure out how we're going to present this

25   testimony next week.

*Cross - Lopez*

```
 1              THE COURT:  Right.  So the problem is she said
 2    she's going to give it you -- she still has to give you some
 3    of the deposition.
 4              MS. S. MILLER:  Two-thirds of them, Your Honor.
 5    And you know you told us to have these -- they have them to us
 6    by the 12th, then they said two days ago they'd provide it to
 7    us yesterday, we still don't have them.  And she's still only
 8    saying that she's going to give us one more of the three, and
 9    we're intending to present these three depositions next week.
10              MS. MCCONWELL:  Well, I was just told two
11    depositions, and so I have Marson that I'll give them and I
12    have gone through and I have identified the trial exhibits and
13    all of our objections.  This was -- the Marson deposition was
14    one of the ones where, pursuant to the rules of the taking of
15    the deposition, that objections were not made during that time
16    so I needed to go through copiously, plus that, and I've
17    matched up all of the things.
18              I also -- because I don't know how to do the blue
19    marking, I had to do the old school thing.  We will be
20    scanning it and e-mailing so that they'll have it.  Mr. Han
21    and I have already discussed that since we missed his staff.
22              They have Mr. Marinho -- or whatever his name is
23    -- and then I will get Cann to them, but it will probably be
24    this weekend.  Because I was told on looking at their list --
25    or the Cann deposition was at the end of what they wanted to
```

1   use, so we'd -- and Ms. Miller and I did discuss at one of our

2   breaks whether -- and I needed to discuss with Counsel --

3   whether we intend to let them just do the Cann portion that

4   they want during their testimony and then we do the Cann

5   portion we want during the defense case.  I just need to --

6   since we brought that up at our break, I just want to confirm

7   that.  So anyway...

8           THE COURT:  All right.  So on the -- is the Cann

9   deposition going to be brought in next week, or is that toward

10  the end of trial?

11          MS. S. MILLER:  Our intention was to present our

12  portion of that testimony certainly next week.  What we were

13  trying to work out -- the unfortunate thing here is it's a

14  continuing moving target.  We're told we're going to get it by

15  certain dates, then it keeps moving forward and forward and

16  forward, so we're going to be next week and we're not going to

17  have this information.

18          What we discussed is whether they intend on

19  putting -- originally, Mr. Cann was a defense expert.  We also

20  noticed him as a witness for us, so we were going to present

21  his testimony in our case in chief.  What we're wondering is

22  whether -- we wanted to, potentially, do it all in one fellow

23  swoop for the jury purposes, but it sounds like they may not

24  be ready.

25          MS. MCCONWELL:  Your Honor, they're not -- I

```
 1    mean, it's sort of academic because they're not going to put
 2    our portion with theirs, they're going to do their own video.
 3    We're probably going to have to do it old school and have a
 4    witness on the stand and read the testimony for our portion,
 5    so yeah, I'm going to get her --
 6                THE COURT:  I'm sorry, Cann is coming here?
 7                MS. S. MILLER:  No, he's Rule 15 deposition.
 8                THE COURT:  Just his deposition.
 9                MS. S. MILLER:  The problem with it is we've had
10    our videos cut for months and months and months, and then they
11    have not done the same, so I think they're planning on just
12    reading it into the record.
13                THE COURT:  I thought you guys were trying to
14    resolve this issue with the depositions and getting the
15    objections?
16                MS. MCCONWELL:  Well, yeah.  So I've given them
17    Marinho, I've given them my -- and they have the objections
18    that are in the deposition.  I've given them my additional
19    ones.  They gave me what they wanted to designate, but they
20    weren't -- they don't give me any of their objections.
21    Ms. Miller said she doesn't want to give me until she knows
22    what I've designated.  I've got it designated.  I've got all
23    of my objections written in this.  Mr. Han and I are going to
24    go and scan it so I can give it to them and it'll either be to
25    them either tonight or tomorrow morning.  So --
```

*Cross - Lopez*

```
 1              THE COURT:  Okay.  Are you guys past the

 2   deadline, though?

 3              MS. S. MILLER:  We can't provide objections

 4   without knowing what they're designating; what are we

 5   objecting to?

 6              THE COURT:  You guys are past the deadline,

 7   right, Defense?

 8              MS. S. MILLER:  It was May 12th.

 9              MS. MCCONWELL:  I am, but we discussed -- we had

10   discussed this on last week when I was at the deadline that I

11   said I'm not going to be at the deadline.  I'm working on

12   getting this done because I have to do this old school, and I

13   will get them marked and to them.  And I have that so I will

14   get that to them tonight.

15              MS. S. MILLER:  Your Honor --

16              THE COURT:  Okay, okay, just wait.  I already got

17   it.  I understand it.  Marinho is coming in tonight, you've

18   already given them the other one.  Now, the Cann deposition,

19   they need that --

20              MS. MCCONWELL:  Right.

21              THE COURT:  -- because they want to present the

22   Cann deposition when?

23              MS. S. MILLER:  Next week, Your Honor, probably

24   Monday, Tuesday, Wednesday for these three witnesses.

25              THE COURT:  Okay, so Cann --
```

*Cross - Lopez*

          1            MS. S. MILLER:  Subject to change, depending on
          2    how long the cross goes, but...
          3            MS. MCCONWELL:  I've been told that after
          4    Mr. Lopez, it's Mr. Shepard, and then it's going to be
          5    Mr. Marty, and then it's going be Mr. Bustos, and then it's
          6    going to be Ms. Hedrick, and then it was going to be
          7    Mr. Klang, and then it was going to be the depositions, so...
          8            THE COURT:  All right, so that's the order that
          9    you have?
         10            MS. S. MILLER:  Right, and we have two --
         11    three days because we have Thursday, Friday, Saturday.  So I
         12    don't think Mr. Klang is going to testify in that order
         13    anymore because we have these international witnesses here and
         14    ready to go.  So we're going to have them go first and then we
         15    were intending to do those three depositions early next week.
         16            THE COURT:  All right.
         17            MR. MARTIN:  Do we have an order of how they're
         18    going to call their witnesses?  It keeps changing, Judge.  I
         19    don't mind them changing it, but I want to know.
         20            MS. M. MILLER:  We've given it to them, Your
         21    Honor.  We've already told them it is going to be --
         22            THE COURT:  Okay.  Long story short, is the list
         23    they have right now --
         24            MS. M. MILLER:  Yes.
         25            THE COURT:  -- as we speak, is that the list --

*Cross - Lopez*

1    is that order in which you're calling witnesses?

2              MS. M. MILLER:  Yes.  As a matter of fact, we

3    even said to Counsel in an e-mail that if they objected to

4    Mr. Marty testifying after -- of Mr. Shepard, then let us know

5    and we will move Ms. Hedrick up because she's the registration

6    person.  We've gotten no response to them for that -- from

7    that.  And so we have been communicating, we have been

8    cooperating.  We've met every one of the Court's deadlines

9    that you've given us, and we're just asking for reciprocal

10   response in terms of meeting the deadlines.  Because what's

11   happening is, we're not able to present our evidence in the

12   order in which we want to because of the wait and the wait and

13   wait.

14             THE COURT:  All right.  The Court, as I recall,

15   you're to meet and confer on Marinho and submit a joint

16   transcript to the Court; is that right?

17             MS. M. MILLER:  That's ready to go.

18             THE COURT:  That's ready to go?

19             MS. M. MILLER:  That's ready to go.

20             THE COURT:  All right, good.

21             MS. MCCONWELL:  Well, I think the reason it's

22   ready to go is because I'd been asking when we're going to

23   meet and discuss it.  As Ms. Miller just told me today,

24   they're going to stand on all of theirs.  They have no

25   objections, and so --

```
1              MS. S. MILLER:  That's what they requested to do,

2    too, so we're conceding.  We wouldn't have done that otherwise

3    but for the --

4              MS. MCCONWELL:  I had additional objections that

5    were in the -- that were in the -- that are in the margin, so

6    that one has been ready to go.

7              THE COURT:  Okay.  So just make sure -- just

8    submit it.  All right.  So just submit it.  If you're done,

9    submit it.

10             MS. MCCONWELL:  The government has that.

11             THE COURT:  All right, so just submit it, if it's

12   ready.

13             MS. S. MILLER:  We'll file it, Your Honor.

14             THE COURT:  All right, that's fine.  But on the

15   Cann one, you guys are overdue so just get it done and -- I

16   mean, if you fail to get it done, then we're going to have

17   issues.

18             MS. MCCONWELL:  Well, they do have our

19   designations.  I have to go through and highlight those on the

20   thing, and I've been working on it, but that's part of the --

21   having the 50-plus new exhibits coming in, in the evening plus

22   the additional demonstrative evidence, plus the additional

23   motions has -- you know, I'm trying to prioritize what I have

24   to get to the Court.

25             And for Mr. Cann -- or Cann, I had that after
```

 1   Mr. Lopez was going to be Shepard, Marty, Bustos, and then

 2   Hedrick, and then they were going to pick up again at Klang,

 3   and then there was going to Marson, Marinho, Cislo, Ficarelli,

 4   so I didn't think that Cann's deposition was going to come in

 5   for a while.  So now that they've told me they're moving it

 6   up, I will move it up on the priority.

 7           THE COURT:  The only thing is the Court gave a

 8   deadline, so you guys got to stick with the deadline.  I

 9   expect it from all parties.

10           MS. MCCONWELL:  Yes, ma'am.

11           MS. S. MILLER:  Your Honor, if I may just ask?

12   We would move for the Court to update its prior order, which

13   is ECF 1509, to require them to provide all of their

14   designations by end of day this Friday.  We've been -- it was

15   due on the 12th, it's now the 18th.  They have known since we

16   were here in March that we were going to have to do deposition

17   designations.  They've known all along we were going to call

18   these witness.  I don't understand what the issue is here.

19           MS. MCCONWELL:  They've had our deposition

20   designations.  I just haven't gotten it colored in on the

21   deposition.

22           MS. S. MILLER:  That's not true, Your Honor.  We

23   have one of three, one of three.

24           MS. MCCONWELL:  No, we e-mailed that to them six

25   months ago.

*Cross - Lopez*

```
 1                  THE COURT:  Just get -- here's the deal.
 2                  MR. MARTIN:  They didn't like the way that they
 3       were sent to them, Judge.  They were sent to them over a month
 4       ago.
 5                  MS. S. MILLER:  They sent line -- they sent us a
 6       list of their lines and expected us to do their work for them
 7       by highlighting it for Your Honor and identifying objections.
 8                  MS. M. MILLER:  And then we filed a motion to
 9       compel, which you granted and said this is the way I want it
10       so that I can read the transcript.  I can see the
11       government's, what they want in, in highlights, I could see
12       what you want in in highlights, I can see the objections.  You
13       put in your order exactly how you wanted it.  We gave it to
14       them that day that you entered that order, and we've been
15       waiting ever since.
16                  THE COURT:  Okay.  So that seems like we should
17       have had this taken care of, everyone.
18                  MS. MCCONWELL:  Well --
19                  THE COURT:  It seems like a simple process.
20                  MS. MCCONWELL:  -- Marinho can be brought in --
21                  THE COURT:  All right.  So just file Marinho
22       today.  All right?  Marinho will be filed today.  Cann --
23                  MS. MCCONWELL:  I'll get Marson to them as soon
24       as we get it scanned in.  So they'll either have it tonight or
25       first thing tomorrow morning, so they'll have that.
```

*Cross - Lopez*

1                    THE COURT:  So we'll say that -- let me just

2      order that that should be before we begin court tomorrow.

3                    MS. MCCONWELL:  Okay.

4                    THE COURT:  So tomorrow we begin court hearings

5      at 11.

6                    MS. MCCONWELL:  Then I will get Cann, Dave Cann.

7      If I could -- yeah, then I'll need their objections on Marson,

8      which they have --

9                    THE COURT:  So what are you requesting, then?

10                   MS. MCCONWELL:  I want an extra -- I don't want

11     to have to do -- we were in court until 7, I still have to get

12     the deposition of Dave Cann scanned, Mr. Han will help me do

13     that, but I would prefer if you're going to order -- that it

14     wouldn't be Friday night, it would be Saturday.

15                   THE COURT:  So you'll have it ready by Saturday;

16     what time?

17                   MS. MCCONWELL:  At end -- hopefully, end of

18     business.

19                   THE COURT:  Okay.  So that's Saturday.  Let's

20     look at Saturday.  That's 5:00 p.m.

21                   MS. MCCONWELL:  I'll have to have it done Friday

22     night because I'm in trial all day.

23                   MS. S. MILLER:  Your Honor, we're in trial all

24     day, too, and we have a team that's helping us in D.C., who

25     don't work on Saturdays and Sundays.  The reason I'm asking

*Cross - Lopez*

1  for -- to get it --

2          THE COURT:  They don't work on Saturdays and

3  Sundays?

4          MS. S. MILLER:  We're asking to have it by Friday

5  end of day.

6          THE COURT:  Tell them to work on Saturdays and

7  Sundays.

8          MS. S. MILLER:  It's so that they can work it on

9  their Friday in D.C.  That's why we're asking for Friday end

10 of day this week so that our team can help us in D.C., while

11 we're in trial.

12          THE COURT:  Even -- but they will work on

13 Saturdays and Sundays, their Saturdays and Sundays, if needed?

14          MS. S. MILLER:  Your Honor, you know how the

15 government is?  Sometimes you have to get authorized leave

16 time.

17          MS. M. MILLER:  Anyway, that's not the point.

18 The point is we --

19          THE COURT:  No, I know how the government is, but

20 you're telling me that you --

21          MS. S. MILLER:  It's well overdue and we think

22 asking for two more days is not unreasonable, and Friday is a

23 great deadline.

24          THE COURT:  Well, I don't necessarily disagree

25 with you.  I just -- I guess I was just surprised when you

*Cross - Lopez*

said that your stateside people don't like to -- or may not

work on Saturday and Sunday.  I'm not sympathetic to that.

Okay.  Because we're all working on Saturday, we're here.

So -- long story short, Ms. McConwell on the Cann

deposition -- I think everything else is taken care of.

Marinho is going to be filed today or tomorrow.  Let's do it

today, and then tomorrow -- I mean, I'm sorry.  So you said

you could get Cann in by tomorrow night, then?

MS. MCCONWELL:  No, I --

THE COURT:  You said effectively --

MS. MCCONWELL:  -- said I have --

THE COURT:  -- Friday.

MS. MCCONWELL:  I have Marson that I'm going to

give to them, and I had asked for Saturday for Cann.  But

effectively, I'll be finished with it Friday night, but I

still -- we still have to -- I still have to scan it and all

of that to be able to e-mail it to the government.  We're

asking for Saturday.

THE COURT:  So what day are you asking for?

MS. MCCONWELL:  Saturday.

THE COURT:  Saturday.  By what time?

MS. MCCONWELL:  Close of business.

THE COURT:  Which is, close of business means

5:00 p.m. to you all?

MS. MCCONWELL:  Yeah, 5:00 p.m.

*Cross - Lopez*

```
1              THE COURT:  All right.  We're going to be
2   finished at 5:00 p.m. on Saturday.  Let me get Saturday's
3   calendar.
4              All right.  I'll order it by Saturday, but I have
5   issued deadlines.  I have issued procedures that makes it
6   easier for me to absorb all of this, so I expect Counsels to
7   follow that.
8              MS. MCCONWELL:  Yes, ma'am.
9              THE COURT:  All right, anything else?  So
10  5:00 p.m., all deposition information must be filed with the
11  Court and given to all the other parties.
12             Anything else?  Any other housekeeping matters?
13             MS. M. MILLER:  We still have 1818, Mr. Martin's
14  suggested redactions.  When would you like to hear that, Your
15  Honor?
16             THE COURT:  Suggested redactions on the 302?
17             MS. M. MILLER:  Yes.
18             THE COURT:  Okay, so what is time sensitive in
19  all these issues?  I only want to hear what's priority.
20             MS. M. MILLER:  So the only thing that's a
21  priority, I think, in terms of time sensitivity besides the
22  depositions is the --
23             THE COURT:  Well, they're taking care of that.
24             MS. M. MILLER:  -- limiting instruction.  That's
25  it.
```

*Cross - Lopez*

```
1                    THE COURT:  Have you looked at the limiting
2    instruction, Counsels?
3                    MS. MCCONWELL:  We haven't seen the new ones.  We
4    did look at --
5                    THE COURT:  There was a new one?
6                    MS. MCCONWELL:  There was new one filed at --
7                    MS. M. MILLER:  Filed first thing this morning,
8    Your Honor.
9                    THE COURT:  All right, so you haven't looked at
10   it.  Why don't you all look at it and we can discuss it.  I'll
11   determine whether it's time sensitive.  So I will send out --
12   why don't we meet.  We'll meet tomorrow.  Tomorrow we begin at
13   11:00 a.m., so let's meet at 10:30.
14                   MR. MARTIN:  Very well.
15                   THE COURT:  10:30 a.m.  Anything else?
16                   MR. MARTIN:  No, Your Honor.
17                   THE COURT:  All right.  Thank you, Counsels.
18                   MS. S. MILLER:  Thank you, Your Honor.
19                   THE COURT:  See you tomorrow.
20                   (Proceedings concluded at 5:25 p.m.)
21                        (End of excerpt.)
22                            *  *  *
23
24
25
```

*Cross - Lopez*

CERTIFICATE OF OFFICIAL REPORTER


CITY OF HAGATNA       )
                      )  ss.
TERRITORY OF GUAM     )


      I, Veronica F. Flores, Official Court Reporter for the District Court of Guam, do hereby certify the foregoing pages, 1 to 307, to be a true and correct transcript of the proceedings held in the above-entitled matter to the best of my ability.

      Dated this 5th day of July 2023.


                         /s/Veronica F. Flores
                         Veronica F. Flores