IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Court of Appeals No. 25-3808 |
| ) | |
| Plaintiff, ) | Criminal Case No. 18-00010 |
| ) | |
| vs. ) | |
| ) | |
| JOHN D. WALKER aka JON WALKER, ) | |
| and HANSEN HELICOPTERS, INC., ) | |
| ) | |
| Defendants. ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD
CHIEF JUDGE
JUNE 9, 2025; 8:17 A.M.
HAGATNA, GUAM

**Sentencing Hearing**

**(Excerpt)**

Veronica F. Flores, RMR
Official Court Reporter

APPEARANCES

Appearing on behalf of plaintiff:

**OFFICE OF THE UNITED STATES ATTORNEY**
**BY: MARIE MILLER, SAUSA,**
**STEPHEN LEON GUERRERO, AUSA**
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam 96910
(671) 472-7332

Appearing on behalf of Defendant Walker:

**LAW OFFICE OF STEVEN R. WELK**
**BY: STEVEN R. WELK, ESQ.**
4675 MacArthur Court
Suite 1250
Newport Beach, CA 92660
(949) 732-3724

**LAW OFFICE OF VANESSA L. WILLIAMS**
**BY: VANESSA L. WILLIAMS, ESQ.**
GCIC Building, Suite 500H
414 West Soledad Avenue
Hagatna, Guam 96910
(671) 477-1389

Appearing on behalf of Defendant Hansen:

**LAW OFFICE OF EDWARD C. HAN**
**BY: EDWARD C. HAN, ESQ.**
238 Archbishop Flores Street
DNA Building, Suite 802
Hagatna, Guam 96910
(671) 477-5055

<u>ALSO PRESENT</u>:

John D. Walker, Defendant

Virginia Kilgore, CRD

Anna Perez, CRD

Karen Quitlong, Law clerk

Janet Yamashita, Probation

Kirstin Ault, Esq. (via video)

Richard Ficarelli, Agent

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| GOVERNMENT WITNESS: |  |  |  |  |
| Luis Reyna | 9 | 114 |  |  |

Veronica F. Flores, RMR
Official Court Reporter

```
 1                    June 9, 2025; 8:17 a.m.; Hagatna, Guam

 2                              * * *

 3

 4              THE CLERK:  All rise.  The District Court of Guam

 5    is now in session.  The Honorable Frances Tydingco-Gatewood

 6    presiding.

 7              THE COURT:  All right.  Please be seated.  Good

 8    morning everyone.  We'll call the case, please.  I'm sorry,

 9    hold on.  We're getting your client.  He's coming out.  We'll

10    wait.  He's on his way in.

11                         (Defendant entered.)

12              THE COURT:  Okay, good morning, Mr. Walker.

13              THE DEFENDANT:  Morning.

14              THE COURT:  Ready to proceed?  Okay, we'll call

15    the case.

16              THE CLERK:  Criminal Case 18-00010, *the United

17    States of America versus John D. Walker and Hansen

18    Helicopters*; Continued sentencing.

19              Counsel, please state your appearances beginning

20    with the government.

21              MR. LEON GUERRERO:  Good morning, Your Honor,

22    Stephen Leon Guerrero, Marie Miller and Richard Ficarelli on

23    behalf of the United States.

24              MS. MILLER:  *Hafa adai*, Your Honor, good morning.

25              THE COURT:  *Hafa adai*, Ms. Miller, Agent
```

```
 1    Ficarelli and Mr. Leon Guerrero.  Yes.

 2                  MR. WELK:  Good morning, Your Honor, Steve Welk

 3    for Defendant, John Walker, who is present in Court and I'm

 4    also joined by co-Counsel Vanessa Williams.

 5                  THE COURT:  Okay, good morning, Mr. Welk,

 6    Mr. Walker.

 7                  THE DEFENDANT:  Morning.

 8                  THE COURT:  Ms. Williams and Mr. Han.  Okay, we

 9    ready to proceed now?

10                  MR. HAN:  Morning, Your Honor.

11                  MS. MILLER:  Yes, Your Honor.

12                  THE COURT:  All right.  Yes, Ms. Miller, you may

13    proceed.

14                  MS. MILLER:  Thank you, Your Honor.

15                  THE COURT:  Okay.

16                  MS. MILLER:  Your Honor, before I call my next

17    witness, I just want to level set a bit so perhaps we could

18    move this along more quickly than what we did on Friday.

19    Mr. Welk said several times the federal rules of evidence are

20    applied loosely during the sentencing hearing, except that's

21    not correct.  The federal rules of evidence do not apply at

22    all during sentencing hearing.

23                  THE COURT:  Hold on.  Hold on.

24                  MS. MILLER:  Yes.

25                  THE COURT:  Ms. Williams?
```

1          MS. WILLIAMS:  I'm sorry, Your Honor, may

2     approach the bench to grab two hearing assisting devices.

3          THE COURT:  Oh, yes, go ahead, yes.  You may.

4     Hold on a second.  We'll just verify that it works.  Yeah,

5     sometimes it's hard to hear in this courtroom because of the,

6     you know, the high ceilings.

7          THE CLERK:  Test, test, test, test.

8          THE COURT:  Okay, good.  All right.  Okay.  All

9     right.  Let's make sure.  Mr. Walker, can you hear okay?

10          THE DEFENDANT:  I can.

11          THE COURT:  All right.  At any time you cannot,

12     please either let your Counsels know or your Counsel know or

13     just raise your hand to the Court.  Okay?

14          THE DEFENDANT:  I will.

15          THE COURT:  All right.  Very well, you may

16     proceed, Ms. Miller.

17          MS. MILLER:  Yes, Your Honor.  So, hearsay is

18     generally admissible in sentencing hearings and one of the

19     issues that Mr. Welk argued was that there could be a

20     constitutional issue if hearsay was accepted at the sentencing

21     hearing but neither the confrontation clause nor the federal

22     rules of evidence support any such argument.

23          So, I just want to make sure that we don't impose

24     a higher burden than is necessary during the sentencing

25     hearing and obviously, Your Honor, you know why.  You are the

decision maker during this sentencing hearing.  You are not a
jury, you're not a lay person.  You know what is and is not
reliable.  You make the determination about whether any
evidence presented has an indicia of reliability that you
would like to rely on in issuing its sentence or not.

So, I think that if we ensure that we follow 18
U.S.C. 3661 which puts no limitation on what you could
consider, and if we ensure that we do not impose a higher
burden than is necessary, we can get through this more
quickly, so that's just what I wanted to put on the record
before we started and now the government would like to call
its expert money laundering expert Luis Reyna.

THE COURT:  Okay.  Mr. Reyna.  Oh, yes, Mr. Welk.

MR. WELK:  If I could respond briefly?

THE COURT:  You may, you may, come on -- come on
up.  Yeah.  I'll let him come up and just settle himself then
you could respond briefly.  Go ahead.

MR. WELK:  Just really quickly, Your Honor.  The
government when filed its notices regarding the expert
witnesses in this case relied upon the federal rule of
evidence that applies to expert witnesses, so the idea that
the federal rules of evidence do not apply at all, is -- is
not accurate.

Secondly, to the extent that the government is
arguing that the Constitution also does not apply to this

1  proceeding, that is also clearly arranged and I -- I believe

2  that this Court understands what the rules are regarding

3  sentencing, so and I trust that the Court will apply those

4  rules.

5           THE COURT:  I will.

6           MR. WELK:  Appropriately.  Thank you.

7           THE COURT:  Yeah, I do.  Okay, you may proceed.

8  Can you please stand, sir, and be sworn in by the clerk.

9           THE CLERK:  Please raise your right hand.

10              *(Luis Reyna was sworn by clerk.)*

11           THE CLERK:  Please be seated.  For the record,

12  state your full name and spell your last name.

13           THE WITNESS:  Luis Reyna, R-e-y-n-a.

14           THE COURT:  Okay, yes, Ms. Miller.

15           MS. MILLER:  Yes, Your Honor, thank you.

16

17                    DIRECT EXAMINATION

18

19  BY MS. MILLER:

20     Q.   Mr. Reyna, could you please describe for the Court

21  your educational background?

22     A.   Yes.  I have a Bachelors in Business Administration

23  with a concentration in accounting from the University of

24  Texas at San Antonio.  I also have a Masters in Business

25  Administration from Webster University as well.

```
 1                THE COURT:  From which university is that?

 2                THE WITNESS:  Webster University.

 3                THE COURT:  Webster.  I'm sorry, where is that

 4     located?

 5                THE WITNESS:  In Saint Louis, Missouri.

 6                THE COURT:  Oh, okay.

 7     BY MS. MILLER: (CONTINUING)

 8          Q.    Were you in the military, Mr. Reyna?

 9          A.    Yes, I was.

10          Q.    Could you tell the Court what branch?

11          A.    Yes, I served in the Army Reserves and I also

12     deployed to Bosnia in support of Operation to Enforce.

13          Q.    And after the military, could you tell the Court what

14     your work experience has been?

15          A.    Yes.  I was an accountant for Cessna Aircraft

16     Company, I was there for a little over six years.  And then I

17     also -- am currently employed as a Special Agent with the

18     Internal Revenue Service Criminal Investigation.  I'm based in

19     Houston, Texas, that's my field office but I'm specifically

20     assigned to the San Antonio Texas post of duty.

21          Q.    And how long have you been an IRS Criminal

22     Investigations Agent?

23          A.    Over 20 years.

24          Q.    Okay.  Do you have any certifications?

25          A.    Yes, I do.
```

1      Q.   Could you explain to the Court what your

2   certification is in?

3      A.   Yes.  I'm a certified Anti-Money Laundering

4   Specialist.  And this certification is provided through the

5   association of certified anti-money laundering specialist.

6   And they are responsible for standardizing the anti-money

7   laundering profession with the certification and based on your

8   education, training and experience, you're able to sit for the

9   exam, the CAMS exam and then once you pass the exam, you're

10  certified.  You just need to maintain so many continuing

11  education credits per year through your cycle.

12     Q.   How many money laundering cases have you

13  investigated?

14     A.   Over a hundred.

15     Q.   And how many times have you testified in Court?

16     A.   At least 30 times.

17     Q.   Have -- have you ever been rejected as an expert

18  witness?

19     A.   No.

20          MS. MILLER:  Your Honor, at this time, the

21  government would offer Mr. Reyna as an expert in money

22  laundering.

23          THE COURT:  All right.

24          MR. WELK:  Your Honor, the government objects to

25  the designation as an expert for the reasons stated in the

```
 1    arguments of our filings.
 2                   THE COURT:  All right, very well.  All right.  So
 3    the Court -- the Court does look at federal rules although
 4    it's -- there is -- the issue, is it -- does it apply -- does
 5    apply to some obviously I mean we do -- doesn't apply
 6    completely like you would in -- before a jury but it clearly,
 7    the Court does find that based on this witness's knowledge,
 8    experience, training and education, he may testify as an
 9    expert in the field of money laundering, anti-money
10    laundering; is that right?
11                   MS. MILLER:  That's right.
12                   THE COURT:  Anti -- yes, you've be qualified as
13    that.  You may proceed.
14                   MS. MILLER:  Thank you, Your Honor, may I
15    proceed?
16                   THE COURT:  You may.
17    BY MS. MILLER: (CONTINUING)
18       Q.   Could you please tell the Court whether it's part of
19    your expertise, you have to determine whether a person who is
20    a target of an investigation is using what is termed
21    sophisticated means in conducting money laundering?
22       A.   Yes.
23       Q.   And could you tell the Court what that terminology
24    means to you?
25                   MR. WELK:  I object, Your Honor, it's
```

```
 1    sophisticated means is not an element of money laundering and
 2    he hasn't been qualified.  That's a sentencing guidelines
 3    issue.
 4                THE COURT:  So, you want to -- okay.
 5                MS. MILLER:  Again, Your Honor, this is what I'm
 6    talking about.
 7                THE COURT:  Okay.  Wait, wait, wait.  Hold on a
 8    second, the objection is, is he using the sophisticated means
 9    in terms of a definition as delineated in the sentencing
10    guidelines?
11                MS. MILLER:  So, Your Honor, this witness has
12    testified in multiple sentencing hearings before but
13    sophisticated means is also a term that is used by money
14    laundering experts to determine whether a particular target is
15    using sophisticated means in conducting money laundering.  So,
16    it's obviously very relevant to the sentencing issues here.
17                THE COURT:  Okay.  As long as that there is a
18    connection --
19                MS. MILLER:  Yes, absolutely.
20                THE COURT:  We'll listen to his testimony.
21                MS. MILLER:  Yes.
22                THE COURT:  The Court will allow him to -- well,
23    you're laying the foundation now, so --
24                MS. MILLER:  Yes, thank you, Your Honor.
25                THE COURT:  The Court will overrule the objection
```

```
 1   at this time, but yes.  Whether or not it connects to the
 2   sentencing guidelines definition, we'll see if it comes
 3   through when she makes her argument later.
 4                MR. WELK:  Well, I would -- I would just point
 5   out that -- that the fact that people who are designated
 6   as -- study money laundering learn how to talk about
 7   sophisticated means doesn't mean that sophisticated means is
 8   something separate from a sentencing guidelines.  It is not an
 9   element of money laundering.  There is no sophisticated means
10   requirement in money laundering -- that's all --
11                THE COURT:  Well, that's true, it's not -- it's
12   not an element, I would agree with that, and that's true she
13   is not --
14                MS. MILLER:  I'm not saying it is.
15                THE COURT:  That it be -- I'm assuming
16   she's -- well, there is an issue of whether or not it should
17   be an enhancement.
18                MS. MILLER:  Correct.
19                THE COURT:  For the sentencing.  So, for that
20   purpose, the Court will allow the -- at least the witness to
21   testify regarding sophisticated means.
22                MS. MILLER:  Thank you.
23                MR. WELK:  I just want to be clear, Your Honor,
24   so the witness is going to be allowed to testify whether
25   sophisticated means were applied in this case within the
```

```
1    meaning of the sentencing guidelines?
2              THE COURT:  Well, I'm sure she's going to argue
3    that then -- that it is, it has to be applicable.
4              MR. WELK:  Sure.
5              THE COURT:  Right?  In terms of to have any
6    relevance, so yes, that's why I asked her is it somehow later
7    going to be grouped together at argument.
8              MR. WELK:  I would -- I would just suggest, Your
9    Honor, that there is a difference between the government
10   prosecutor arguing that -- that something satisfies --
11             THE COURT:  Right.
12             MR. WELK:  -- sophisticated means and then money
13   laundering expert explaining how sophisticated means are part
14   of money laundering when it's not an element.
15             THE COURT:  Well, so the Court agrees with you
16   it's not a part of the elements of the proof that prosecutor
17   has had to prove during the trial.  This is for purposes of
18   sentencing.  She's indicating that she wants to put on
19   evidence that it is an enhancement that the Court will -- that
20   the Court should consider, so whether I consider that or
21   whether I believe it, all or part or nothing of what he says.
22             MS. MILLER:  Up to you.
23             THE COURT:  It's up to the Court.
24             MS. MILLER:  Right.
25             THE COURT:  Later on the argument.  But the Court
```

1  notes your objection and over -- and I definitely sustain -- I

2  mean it's true, I would agree with you, Mr. Welk, it's not an

3  element of the crime.  Go ahead, you may proceed.

4  BY MS. MILLER: (CONTINUING)

5       Q.   Could you please tell the Court, what it means when

6  you determine whether there is or has not been sophisticated

7  means used in a money laundering scheme?

8       A.   Sophisticated means can involve complex methods that

9  criminals and/or money launders use to distance illegally-

10  sourced money.  And the methods they can use can include but

11  not be limited to the use of multiple bank accounts, the use

12  of multiple businesses.  It can also include the use of

13  multiple jurisdictions, domestically or internationally.  The

14  use of complicated or unexplainable transactions.

15      Q.   Okay.  I'd like to show you what has been previously

16  marked for purposes of this sentencing as Exhibit 93 at trial,

17  Your Honor, this was admitted as Exhibit G-0829.  May I

18  approach the witness?

19                THE COURT:  I'm sorry, can you repeat that?  G-0.

20                MS. MILLER:  829.

21                THE COURT:  Okay, and then can I get Anna or

22  Gina, can you give me that.  What is the sentencing exhibit

23  number?

24                MS. MILLER:  93.

25                THE COURT:  All right.  That has not been

```
 1    presented yet as -- right?  You guys -- that wasn't presented
 2    earlier?
 3                    MS. MILLER:  It may have been presented during
 4    the testimony of Mr. DeVogel or Ms. Pena.
 5                    THE CLERK:  Yes.
 6                    THE COURT:  It was.  Okay.  Let me double-check
 7    if I have it here.  93?  I understand it was.
 8                    MS. MILLER:  And, Your Honor, do you have that
 9    exhibit?
10                    THE COURT:  No, I think -- but that's fine.
11    You're going to put it on, Mr. Leon Guerrero, you're going to
12    put it up on the screen?
13                    MS. MILLER:  We're going to try.  We're prepared
14    to do the good old fashioned hard copy exhibits, Your Honor.
15    In case the -- it doesn't work.
16                    THE COURT:  Oh, it's not working.  Do we need --
17                    MS. MILLER:  It was working, you know, not
18    consistently on Friday, so I didn't want to delay the Court.
19                    THE COURT:  No, no, sometimes we just have to
20    reconnect it and my -- either my clerk or my -- IT guys will,
21    Government Exhibit 93, how many pages is that?
22                    MS. MILLER:  It's only one.
23                    THE COURT:  Okay, I'm looking at -- I'm trying to
24    see it.  I don't see Government Exhibit 93.  I'm sorry this is
25    for the sentencing.
```

```
 1              MS. MILLER:  May I approach, Your Honor, and give
 2   you my copy.
 3              THE COURT:  Oh yeah.  Yeah, I don't think I ever
 4   got that one.  93.  I have got the chart.  Okay, yeah.
 5              (Government handed copy to the Court.)
 6              THE COURT:  Oh, yeah no, no.  Hold on, I found
 7   it.  You're right.  You can have it back.  I'm sorry.  I
 8   missed that.  Do you see it there?
 9              THE WITNESS:  Yes, Your Honor.
10              THE COURT:  And Mr. Welk, were you able to
11   retrieve yours?
12              MR. WELK:  Yes, Your Honor, I have it.
13              THE COURT:  Okay.  Very good.
14   BY MS. MILLER: (CONTINUING)
15      Q.   So, Mr. Reyna, could you please tell the Court what
16   we're looking at here?
17      A.   These are businesses that were established and owned
18   by John Walker.
19      Q.   Okay.  And could you tell the Court --
20              MR. WELK:  Objection, foundation.
21              MS. MILLER:  Excuse me?  I'm sorry.
22              MR. WELK:  Objection, foundation.
23              THE COURT:  All right.  Sustained.  Sustained.
24   Why don't you just lay the foundation.
25              MS. MILLER:  Sure, by the way, Your Honor, just
```

1    for the record, this exhibit was admitted into evidence at

2    trial, number one.  Number two, this particular exhibit was

3    produced to the government by the defendant.

4                    THE COURT:  Okay, I do recall that.

5                    MS. MILLER:  Okay.

6                    THE COURT:  I do recall you saying that

7    previously, go ahead.

8                    MS. MILLER:  Yes.  Can you go back to that

9    exhibit, Stephen.

10                   MR. LEON GUERRERO:  Yes.

11   BY MS. MILLER: (CONTINUING)

12       Q.   And Mr. Reyna, if you look at the bottom of

13   Exhibit A-29, do you see the case number for this case?

14       A.   Yes, I do.

15       Q.   And you see the electronic Court filing number for

16   this case?

17       A.   Yes.

18       Q.   And this was something that was produced by the

19   defendant?

20       A.   Yes.

21       Q.   Okay.  So, what do we see here?

22       A.   Again, these are corporations that fall under

23   Mr. John Walker.

24       Q.   Okay.  And do we see John Walker's name under the

25   names of these corporations?

```
 1        A.    Yes.

 2        Q.    And his ownership of the shares in these

 3   corporations?

 4        A.    Yes.

 5        Q.    Okay.

 6               MR. LEON GUERRERO:  Marie?

 7               MS. MILLER:  Yes.

 8               MR. LEON GUERRERO:  Sorry, can we just use the

 9   ELMO?

10               MS. MILLER:  Yeah, we could just use the ELMO.

11   Your Honor, we're --

12               THE COURT:  All right.  Is it -- is it our

13   connection?

14               MR. LEON GUERRERO:  It is, Your Honor.

15               THE COURT:  It is?  Ours?  Okay, we'll just have

16   our -- should we have our IT guys come and help, Gina?  In the

17   meantime, we could use the ELMO but sometimes I think just

18   having use this before, there might be a connection on the top

19   part.

20               Is Vergel here, Gina.

21               (Pause.)

22               THE COURT:  No, I know.  He thinks it's our

23   connection.

24               MR. LEON GUERRERO:  We can address that at the

25   next break, Your Honor.
```

```
 1                    (Discussion with clerk.)

 2              THE COURT:  But anyway, okay, we'll just go

 3    through the ELMO.

 4              Okay, go ahead, proceed.

 5              MS. MILLER:  Okay, Your Honor.

 6    BY MS. MILLER: (CONTINUING)

 7       Q.   Approximately how many different corporations were

 8    used by Mr. Walker?

 9       A.   At least 48.

10              MS. MILLER:  Okay.  I'd like to also show you a

11    document that we've already discussed and was entered into

12    evidence as, Your Honor, the sentencing exhibit document was

13    33.

14              THE COURT:  Okay.

15              MS. MILLER:  The trial exhibit document was

16    G-0305.

17              THE COURT:  Okay, was that already previously --

18              MS. MILLER:  It was.

19              THE COURT:  Oh, yes, okay the business plan?

20              MS. MILLER:  The business plan, yes, Your Honor.

21              THE COURT:  I got that.  Mr. Welk, let me know if

22    you find your exhibit.

23              MR. WELK:  I have it, Your Honor.

24              THE COURT:  All right.  Very well.

25              MR. WELK:  Thank you.
```

1              THE COURT:  Oh and just for the record, your

2    Co-Counsel, Ms. Ault, I believe is on the Zoom call.  Is that

3    correct, Ms. Ault?

4              MS. AULT:  Yes, I confirm that with your clerk

5    this morning, Your Honor.

6              THE COURT:  Very well.  Put that on the record.

7    Go ahead.  Exhibit 33.

8              MS. MILLER:  Thank you, Your Honor.

9    BY MS. MILLER: (CONTINUING)

10       Q.   So, Mr. Reyna, did you also look at the business

11   plan?

12       A.   Yes, I did.

13       Q.   And this was also entered into evidence in the trial;

14   correct?

15       A.   Yes.

16       Q.   And if you look at the bottom of page 8 and on top of

17   page 9 of the business plan, do you see where I am?

18       A.   Yes.

19       Q.   This was a document retrieved from Mr. Walker's

20   computers at his offices at Hansen Helicopters during the

21   investigation?

22       A.   Yes, that's correct.

23       Q.   Okay.  And what does this document indicating about

24   Mr. Walker's position in Hansen Helicopters?

25       A.   It lists John Walker, President, CEO, he has been the

1   owner of Hansen Helicopters since 1998 and it's President and

2   Chief Operating Officer since 1999.

3      Q.   And how many people does this document indicate

4   during that period of time he managed?

5      A.   During this period he managed a staff of 85 employees

6   both on site and in the field.

7      Q.   Okay, and if you go down to the second paragraph,

8   what does it indicate about Mr. Walker's certifications with

9   the FAA?

10      A.   John holds an FAA commercial mechanic air frame and

11   power plant and inspection authorization proof license and FAA

12   commercial license for helicopters, airplane and glider, he

13   holds type ratings for single and multiple engine certified

14   flight instrument and sea instrument.

15      Q.   Thank you.  Now, if you look back at Exhibit 93 for

16   the sentencing, which is G-0829, there is a list of --

17            THE COURT:  Okay, hold on.

18            MS. MILLER:  829, which was the first document we

19   looked at, Your Honor.

20            THE COURT:  Okay.

21   BY MR. MILLER: (CONTINUING)

22      Q.   On the bottom of that document, there is a list of 30

23   Vanuatu International Companies.  Do you see that, sir?

24      A.   Yes, I do.

25      Q.   As an expert in money laundering, are you familiar

1  with the Vanuatu jurisdiction?

2      A.    I am.

3      Q.    And could you please tell the Court, how you're

4  familiar with the Vanuatu jurisdiction?

5      A.    Yes, in preparation for my testimony, I conducted

6  research on Vanuatu, specifically I looked at the Financial

7  Action Task Force also known as FATF and this is an

8  intergovernmental body and what they're responsible for is to

9  monitor the money laundering policies, procedures and controls

10  for countries throughout the world.  And during the timeframe

11  of 2015, they were reviewing these money laundering controls

12  for Vanuatu and in 2016, they put them on the gray list, which

13  meant that they were under review for having inadequate money

14  laundering controls.

15              THE COURT:  I'm sorry, what was the name of the

16  organization?

17              THE WITNESS:  The Financial Action Task Force.

18  Also known as FATF.  FATF.

19              THE COURT:  And that's -- is that formed in

20  Vanuatu?

21              THE WITNESS:  No, it's an intergovernmental body

22  that consists of country members throughout the world.

23              THE COURT:  I see.

24              THE WITNESS:  Yes, and also during my research,

25  they were taken off that list in 2018, but during further

```
 1   research, I could see that the European union currently has
 2   Vanuatu on their black list.  So, they thought of finding them
 3   to have inadequate money laundering controls at this time.
 4                   THE COURT:  Okay.
 5                   MS. MILLER:  Thank you, Your Honor.
 6   BY MS. MILLER: (CONTINUING)
 7       Q.   Did you review the charters of the Vanuatu companies
 8   that were created by Mr. Walker?
 9       A.   I did.
10       Q.   And could you tell the Court in reviewing those
11   charters, what stood out to you as a money laundering expert?
12       A.   That if someone created a business in Vanuatu, they
13   were not allowed to conduct any business there.
14       Q.   So, to be clear, Mr. Walker's Vanuatu companies were
15   not permitted to actually conduct business in Vanuatu?
16       A.   Yes, that's correct.
17                   THE COURT:  And for the record, Your Honor, that
18   evidence came in through the defense during trial, and that
19   was Exhibit D-136.
20                   MR. WELK:  I'm sorry, what evidence came in?
21                   MS. MILLER:  The evidence of the Vanuatu
22   charters.
23                   MR. WELK:  Okay, where is it now?
24                   MS. MILLER:  It was admitted at trial, as Exhibit
25   D-136.  And it is marked as an exhibit for sentencing, as
```

1    Exhibit 230.

2        Q.   What does that fact mean to you, Mr. Reyna --

3             MR. WELK:  Could I have a moment to look for that

4    exhibit?

5             THE COURT:  Okay, yes.  Well, yes, you may.  Hold

6    on.  Was that brought in the other day or is that something

7    you're looking at right now?

8             MS. MILLER:  I'm sorry, Your Honor?

9             THE COURT:  Was that brought in on Friday?

10            MS. MILLER:  No, that wasn't brought in on Friday

11   but we can -- we can pull that, Your Honor.

12            THE COURT:  Okay, let me just have my staff bring

13   it to me.

14            MS. MILLER:  Yes.  And for the purposes --

15            THE COURT:  Hold on, let Mr. Welk try to find it.

16            MS. MILLER:  It's Exhibit 230.

17            MR. LEON GUERRERO:  I could pull it up, Your

18   Honor.

19            THE COURT:  Okay.  So, it's D-136 is the trial

20   exhibit?

21            MS. MILLER:  Yes, Your Honor, D-136.

22            THE COURT:  Okay, sentencing exhibit.

23                 (Discussion with clerk.)

24            THE COURT:  Sentencing Exhibit 230.

25            MR. WELK:  I have it, Your Honor.  Thank you.

```
 1                    (Discussion with clerk.)

 2             THE COURT:  Go ahead, go ahead.  Did you find it

 3    there, Mr. Welk?

 4             MR. WELK:  I do, yes, thank you, Your Honor.  I

 5    have it.

 6             THE COURT:  Yeah, well, make sure you're able to

 7    look at the exhibits as the witness is being asked to refer to

 8    them.

 9             MS. MILLER:  And Mr. Leon Guerrero said he could

10    pull it up on the screen, Your Honor.

11             THE COURT:  You're able to do that now?  Okay,

12    thank you, Anna.  Okay.

13             MR. WELK:  Just for purposes of cross-examination

14    though, Your Honor, I'd like to be able to find them, so then

15    I could ask him about it on cross-examination.

16             THE COURT:  Of course, yeah.  The point is even

17    just during direct I want to see them as well.

18             MR. WELK:  Okay.  Thank you.

19             THE COURT:  So, I -- yeah I understand that.

20    Okay.  So, we're looking at Exhibit 230.

21             MS. MILLER:  Yes, Your Honor.  Which was admitted

22    at trial by defense as D136.  And this is one of numerous

23    Constitutions for the creation of these companies, all of them

24    were identical.

25             MR. WELK:  Objection, Your Honor.  The
```

1    prosecution --

2              MS. MILLER:  This is evidence that came in during

3    trial.

4              THE COURT:  Hold on.  Hold on.  Let's hear his

5    objection.  What's the objection?

6              MR. WELK:  The prosecutor just testified that all

7    of them are identical.  There is no foundation for that.

8    That's -- that's -- that's a statement of fact that prosecutor

9    is not allowed to make.

10             THE COURT:  All right.  Um, well, I mean it's

11   true, you are testifying.

12             MS. MILLER:  Your Honor, we're at sentencing.  I

13   have to be able to rely on evidence that came in that you

14   heard protracted argument on and it came into evidence.  If I

15   have to resubmit every piece of evidence that came in through

16   trial, we're going to be here for eight months again.  So,

17   that should be unnecessary.  And as Counsel for sentencing,

18   Mr. Welk is responsible for being familiar with the evidence

19   that was admitted at trial.  This is a sentencing, this is a

20   critical proceeding in this case.  And this cannot continue to

21   delay this sentencing to say, well, wait a minute, that's a

22   fact that hasn't been established.  Yes, it has.  Absolutely,

23   it has.

24             THE COURT:  All right.  Hold on.  Go ahead.

25             MR. WELK:  Your Honor, we're in the phase right

```
 1   now of this hearing of examination of witnesses.  If the
 2   prosecution wants to make argument during the argument phase
 3   of this hearing and refer to evidence that was admitted during
 4   trial, that's one thing.  But to -- but to in the midst of her
 5   direct examination of a witness to merely state facts,
 6   that -- she's testifying, it's inappropriate in any phase.
 7                   THE COURT:  Well, I think it probably be -- I
 8   think it will be more appropriate -- you're not
 9   right -- you're not wrong saying that she's testifying but she
10   could just say Court, Your Honor, can you just take judicial
11   notice, the jury trial that all the other charters as it
12   relates to the other 47 companies were identical.
13                   MS. MILLER:  Yeah, that's fine.
14                   THE COURT:  The Court will allow that.
15                   MS. MILLER:  Thank you, Your Honor.
16                   THE COURT:  So, Mr. Welk, the Court will accept
17   that, go ahead, proceed.
18                   MR. WELK:  Thank you.
19   BY MS. MILLER: (CONTINUING)
20       Q.   Mr. Reyna, if you look at the first page of this
21   particular charter, this is for which of the alter ego
22   companies?
23       A.   Wilma's Flight Services.
24       Q.   Okay.  And if you go to the second page and Mr. Leon
25   Guerrero --
```

1          MR. LEON GUERRERO:  Yeah.

2          MS. MILLER:  -- pull it up.

3    BY MS. MILLER: (CONTINUING)

4    Q.   Okay, if you go to the second page, the restrictions

5    and -- yes, right there, section five, the restrictions on

6    operations, could you tell the Court, what you're referring to

7    when you said the companies could not conduct business?

8    A.   Under restrictions, Number 52A, it states, "carry on

9    business in Vanuatu."

10   Q.   Okay.  Thank you, sir.  As a money laundering expert,

11   what does it mean to you if a company is created in a country

12   like Vanuatu but then the constitution for the company does

13   not allow the company to actually conduct business in Vanuatu?

14   A.   That the sole purpose of these companies are to be

15   used as shell companies or alter egos.

16   Q.   How many persons were involved in Walker's fraud

17   based on the exhibits that you reviewed, for example, the ones

18   we already saw this morning G-305, and G-829?

19   A.   At least seven co-conspirators, a 120 employees, and

20   numerous alter egos and additional co-conspirators and

21   nominees.

22   Q.   Okay.  I would like to show you what has been

23   previously marked and introduced at trial for the purposes of

24   sentencing.  It's Exhibit 91.  At trial it was admitted as

25   Exhibit G-0761.

```
 1              THE COURT:  Okay.  Again, we are going to pull
 2   that.  Hold on, I'll pull 91.  We'll wait for -- I think
 3   Mr. Welk is trying to get his as well.
 4              MR. WELK:  It's showing up on the screen, I'll be
 5   able to see it there, Your Honor.
 6              THE COURT:  All right, yeah.  All right.  He's
 7   ready too.  Are you sure you don't want to get it there,
 8   Mr. Welk.  If you want to get it, we'll take a minute to allow
 9   you to get.  You need to get a copy of it.  It looks like it's
10   a declaration.
11              MR. WELK:  I got it.
12              THE COURT:  Okay.  Go ahead.
13              MS. MILLER:  May I proceed, Your Honor?
14              THE COURT:  You may.  You may.
15              MS. MILLER:  Thank you.
16   BY MS. MILLER: (CONTINUING)
17       Q.    Mr. Reyna, what is this document?
18       A.    This is the declaration of Kenneth Crowe in support
19   of motion to modify conditions of release.
20       Q.    Okay.  And who is Mr. Crowe based on your review of
21   the evidence?
22       A.    He's a former business partner and employee of
23   Mr. John Walker.
24       Q.    Okay.  Can you look at Paragraph 4 on page 2 of this
25   declaration.
```

1      A.   Yes.

2      Q.   And please let the Court know how many individuals

3   are identified as of July 5th, 2018, as being employed by

4   Hansen Helicopters?

5      A.   Approximately 121 persons.

6      Q.   And where is their location of employment shown on

7   Paragraph 4?

8      A.   Guam, CNMI, Majuro, Philippines, Missouri and on

9   ships.

10     Q.   Okay.  And then could you please turn to

11  Paragraph 14.  And can you read Paragraph 14 for the Court

12  please?

13     A.   "Each member of the management team has a

14  responsibility to keep Walker, the company's principal owner,

15  informed of Hansen's operations.  Walker resides in Missouri

16  and the time difference between Missouri and Guam does

17  not -- or does create some communication problems."

18     Q.   Okay.  And I'd like to now show you what has been

19  marked for sentencing as Exhibit 40 but what was entered into

20  trial as Exhibit G-0366.

21          THE COURT:  Okay, hold on.  Okay.

22               (Discussion with clerk.)

23          THE COURT:  You have that there, Mr. Welk?

24          MR. WELK:  I have it, Your Honor, thank you.

25          THE COURT:  All right.  You may proceed.

```
 1              MS. MILLER:  Yes, Your Honor.

 2    BY MS. MILLER: (CONTINUING)

 3        Q.    Do you have Exhibit 366 in front of you, sir?

 4        A.    I do.

 5        Q.    Okay.  And can you tell the Court what that exhibit

 6    is?

 7        A.    The first page includes an e-mail from Rufus Crowe to

 8    Tom Feruzzo.

 9        Q.    Okay.  And what is the subject?

10        A.    The subject is MNS Capital files and there is

11    multiple attachments as well that's noted here on the first

12    page.

13        Q.    Okay.  And the attachment consists of what generally?

14        A.    The structure of John Walker's companies and other

15    financial documents related to his businesses.

16        Q.    Okay.  If you go to page 2 of Exhibit 366, could you

17    tell the Court what we see here?

18        A.    Yes.  These are companies that are owned and

19    controlled by Mr. John Walker.

20        Q.    So, it's a slightly different organizational chart

21    than what we saw in G-0829?

22        A.    Yes.

23        Q.    Okay.  And this was being provided to MNS Capital

24    Group; is that right?

25        A.    Yes.
```

1      Q.    Okay.  If you go to page 3, what do we see on page 3?

2      A.    These are a list of registration, make and model

3 numbers of helicopters that are owned and controlled by

4 Mr. John Walker.

5      Q.    Okay.  And Pages 3 through page 33, what are we

6 seeing there?

7      A.    Here we see the screen prints of FAA registry records

8 for specific helicopters which list their tail numbers and

9 other specific information about these helicopters.

10      Q.    Okay.  And then if you go to page 34, what do we see

11 on Pages 34 and 35?

12      A.    So, on page 34, we see a New Zealand certificate of

13 registration for tail number ZK-HIA.  And we see that's Hughes

14 Tool Company with number 369HS.  And again, it lists the

15 aircraft's serial number and it further states that the name

16 of person lawfully entitled to the possession of the aircraft

17 for a period of 28 days or longer is John Walker.

18      Q.    Okay.  And then if you turn to page 36, what do we

19 see on page 36?

20      A.    We see a certificate of registration from the

21 Department of Transportation and Communications Air

22 Transportation Office out of Manila and the type of

23 registration is a renewal for general aviation and it lists a

24 Philippine registration number of RP-C588 and it's a Hughes

25 Helicopter and it provides the number 500-369 HS.  And the

1  name of the owner is Jan's Helicopter, with an address in

2  Tandang Sora, Quezon City.

3      Q.   And is Jan's Helicopters one of the companies that

4  was identified as a shell company of John Walker?

5      A.   Yes.

6      Q.   Can you turn to page 37, please?

7           THE COURT:  Okay, why don't you, for the court

8  reporter, just spell out this Tandang, sorry, I think it's

9  Tandang City, right?  Is that what he said?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.  Could you spell that for the

12 Court reporter?

13          THE WITNESS:  Yes.  Tandang is spelled

14 T-A-N-D-A-N-G, Sora is spelled S-O-R-A, Quezon is spelled

15 Q-U-E-Z-O-N and then city, C-I-T-Y.

16 BY MS. MILLER: (CONTINUING)

17     Q.   Can you turn to page 37 and can you tell the Court

18 what we see on page 37?

19     A.   Yes.  This is a copy of a spreadsheet that lists

20 Hansen Helicopters with a total of 46 helicopters and the

21 contracts show a date of August 18th, 2016 and the current

22 rate of helicopter rental is a total of 480,000 per year and

23 under that, it lists the different companies that are -- have

24 lease agreements with the Walker company and next to that,

25 under the specific column -- so Column C lists those companies

1    that have the lease agreements with Hansen Helicopters, or the

2    John Walker companies.  Then under Column D, is the

3    registration number of the helicopters and then, I'm sorry,

4    Column E will list the vessel names and then Column F lists

5    the monthly rent and Column G lists the contract expired and

6    then Column H lists the terms of these agreements.

7         Q.   Now even though all of these helicopters contracts

8    are identified under the heading Hansen Helicopters Inc., you

9    had an opportunity to look at the actual helicopter contracts?

10        A.   Yes.

11        Q.   Was Hansen Helicopters, Inc., the lessor name, used

12   in all of those contracts?

13        A.   No.

14        Q.   What was the name of the lessor in those contracts?

15        A.   Wilma's.

16        Q.   And was it also various other alter ego companies?

17        A.   Yes, it was.

18        Q.   Could you please look at page 38 and if it's too

19   small looking at it, with your glasses, you can look on the

20   screen in front of you.  And what do we see identified

21   in -- on page 38?

22        A.   Yes, it lists the directors of the John Walker

23   businesses and under Column B, it lists the different names of

24   these businesses and under Columns C, D and E, it lists the

25   directors which include John Walker, Kenneth Crowe, and Regent

1 Limited and in Columns F, G and H, it lists the shareholders

2 to include Bean Bag, Caledonian Insurance, law partners,

3 nomination shareholder, and under Columns I, J and K, it lists

4 the documents held on file to include specific amounts of

5 share certificates and whether or not there is a signed copy

6 of a file for both Columns J and K.

7     Q.    Okay.  And those companies that are listed on that

8 Page, are those are the companies under whose names the

9 helicopters were leased?

10     A.    Yes.

11     Q.    Okay.  If you turn now to page 30 -- sorry page 43,

12 what do we see here on page 43?

13     A.    Wilma's Flight Service accounts receivable aging as

14 of June 30th, 2016.

15     Q.    So, regardless of which company leased the

16 helicopters, which company was actually receiving the income

17 from the leases?

18     A.    Wilma's Flight Services.

19     Q.    Okay.  Now, can you please turn to page 53.  And what

20 are we seeing on page 53?

21     A.    A Caledonian Agency Incorporated balance sheet as of

22 December 31st, 2013.

23     Q.    And was Caledonian Agency another one of Walker's

24 alter ego companies?

25     A.    Yes, it was.

          1        Q.   Okay.  Can you please now turn to page 71.  And what

          2   do we see starting on page 71?  If you could go to the top of

          3   that Page, Mr. Leon Guerrero.

          4        A.   A Caledonian Insurance Company balance sheet as of

          5   December 31st, 2015.

          6        Q.   And was Caledonian Insurance Company another alter

          7   ego of John Walker?

          8        A.   Yes.

          9        Q.   Can you turn to page 79.  And what do we see on the

         10   top of page 79?

         11        A.   A Caledonian Insurance Company profit and loss

         12   spreadsheet for January through December 2013.

         13        Q.   Okay.  And now can you turn to page 87.  And what do

         14   we see here?

         15        A.   Wilma -- Wilma's Flight Service Inc. Balance sheets

         16   as of December 31st, 2013.

         17        Q.   Now, could you tell the Court on the balance sheet,

         18   what do we usually see on a balance sheet of a company?

         19             MR. WELK:  Objection, vague and ambiguous.

         20             MS. MILLER:  What's on a balance sheet of a

         21   company is vague and ambiguous?

         22             MR. WELK:  What does that have do with what's on

         23   this balance sheet?

         24             MS. MILLER:  Well, if I'm able to continue the

         25   questioning, Your Honor, you will see what the relevance of

```
 1   this is.
 2              THE COURT:  Overruled, go ahead.  I'm sorry, what
 3   Page is this, 83?
 4              MS. MILLER:  Yes, Your Honor, no, now we're on
 5   page 87.
 6              THE COURT:  Okay, this is 87.  Let me pull up 87.
 7              MR. WELK:  Further objection is made on
 8   foundation, he's an expert in money laundering, not balance
 9   sheets.
10              THE COURT:  Overruled.  He had.
11   BY MS. MILLER: (CONTINUING)
12      Q.   What's contained on the balance sheet, sir?
13      A.   So, in a balance sheet, the assets, liabilities, and
14   owners equity are listed on this document.
15      Q.   And could you tell the Court, are the helicopters
16   that were used in Walker's fraud listed on Wilma's balance
17   sheet as an asset?
18      A.   Yes.
19      Q.   And what is the depreciated value of those
20   helicopters as listed on Wilma's Flight Service balance sheet?
21      A.   Yes, under Column F, Row 36, under the aircraft
22   amount there, it shows over 10.5 million.
23      Q.   Okay.  And specifically we're looking at Row 36?
24      A.   Yes.
25              THE COURT:  I'm sorry, what exhibit is that
```

```
 1   again.
 2              THE WITNESS:  Yes, Your Honor.  It's under Column
 3   F, Row 36, where it lists aircraft.  It's an amount that's
 4   over 10.5 million.
 5              THE COURT:  And that's the -- did you say
 6   depreciated value, what did you say?  It represents what?  I'm
 7   sorry, what does that column represent?
 8              THE WITNESS:  It represents the valued amount of
 9   the aircraft.
10              THE COURT:  Oh, okay.
11              THE WITNESS:  As of December 31st, 2013.
12              THE COURT:  Okay, what's -- okay.  It's the value
13   of the aircraft?  The fixed assets, that's what it says there?
14              THE WITNESS:  Yes.
15              THE COURT:  All right.  Thank you.
16   BY MS. MILLER: (CONTINUING)
17       Q.   Are there other assets identified on that sheet?
18       A.   Yes, there are.
19       Q.   Okay.  And if you go up, Mr. Leon Guerrero.  Thank
20   you.  Could you tell the Court what other sets are identified
21   on that sheet?
22       A.   Yes, just starting from the top, for example, under
23   Column F, Row 7 and going down, we see multiple checking and
24   savings accounts and as we continue going down this spread
25   sheet, for example, under Column E, Row 20, you see accounts
```

1  receivable and further down, we see additional amount that's

2  are due to Wilma's Flight Service as well.

3      Q.   Okay.  Are there buildings and equipment's and real

4  estate identified as well?

5      A.   Yes, under Column E and underneath the Row 35, that

6  says fixed assets, it lists just as you mentioned, buildings,

7  furniture, and fixtures and vehicles.

8      Q.   Okay.  And there is depreciation shown as an

9  accountant and as an expert in money laundering, could you

10 explain to the Court what the depreciation expense represents?

11             THE COURT:  I'm sorry, is that up -- is that up

12 at GA -- I'm sorry, what -- what -- what line is it at?

13             MS. MILLER:  The depreciation expense, Your

14 Honor?

15             THE COURT:  Yeah, I'm just --

16             MS. MILLER:  It covers, it follows every

17 single -- Mr. Leon Guerrero, can you go down.

18             THE COURT:  He keeps going up and down, I'll try

19 to find where you're talking about.

20             MS. MILLER:  I'm saying down and I mean up, keep

21 going up, up, up, up, up, up.  Up, right there.  Right there.

22 So, if you see for example, Your Honor, there is the line that

23 says aircraft.

24             THE COURT:  That's right, he talked about that.

25             MS. MILLER:  Then it has accumulated depreciation

```
 1    under that.

 2              THE COURT:  Oh, I see, the depreciation is after

 3    each of the --

 4              MS. MILLER:  Correct, after each of the fixed

 5    assets, there is depreciation.

 6              THE COURT:  Okay.

 7              MS. MILLER:  And so, could you explain to the

 8    Court what the depreciation expense represents?

 9              THE WITNESS:  Yes.  So, when assets are purchased

10    for a business, they are purchased at cost, for example.  And

11    so, instead of the business taking that expense within that

12    year, the asset is capitalized.  So, they're given a period of

13    time to take that expense each month and it accumulates over a

14    year over years, so they basically get to take that total cost

15    and expense it throughout, you know, a series of

16    monthly -- you know, expenses and throughout the years,

17    spreads it out basically.

18              THE COURT:  Okay.

19              MR. WELK:  I'm sorry, Your Honor, I'm going to

20    object to this line of questioning.

21              THE COURT:  Okay.  Okay.  Yes, your objection?

22              MR. WELK:  This witness has been qualified as an

23    expert in money laundering.  That's what he's here to testify

24    about.  What he's testifying about right now is how accounting

25    is done for businesses.  How tax is presumably are -- ways
```

taxes can be calculated for businesses.  This doesn't have

anything to do with any kind of money laundering.  There is

no -- there is been no -- this balance sheet doesn't -- there

has been no allegation that it includes anything illegal or

that it represents specified unlawful activity and explain how

depreciation works in a profit and loss statement has nothing

to do with money laundering.  If the government wanted to have

an expert testify about accounting, then they should have

designated, they should have called an expert witness and

designated him or her as an expert in accounting.  But the

fact that this expert happens to know how to do accounting,

that's interesting but it doesn't have anything to do with why

he was designated as an expert which is about money

laundering.

         THE COURT:  All right.  And your response?

         MS. MILLER:  My response is, Your Honor, as a

money laundering expert, he absolutely part of his job is to

review financial statements of companies, the whole point of

this exercise is to show the numerous companies that were used

by Walker, how regardless of which company under which the

lease was entered into, all of the money came into one

company, which was Wilma's Flight Service.  It also shows the

assets that Walker had accumulated and used during the fraud.

One of the considerations that this Court has to make in

sentencing is the consideration of what the appropriate

application of economic loss is.  The defendant has entered

into an agreement with the government to forfeit not only a

money judgment but also all of the aircraft that were involved

in the fraud.  This is directly relevant to the value of those

aircraft for the purposes of this Court making that

determination and it's also relevant to the issue of

sophisticated means.  We've seen now numerous companies used

and numerous jurisdictions, we've seen how the defendant hides

income and assets on various different balance sheets and

income statements for the various companies.

So, it's very relevant to the issue of

sophisticated means, it's relevant to the issue of economic

loss and those issues are controverted.  If Counsel withdraws

his objection to the sophisticated means enhancement, then we

don't have to continue doing this exercise.  However, as long

as he maintains an objection, it's important for this Court to

see just how convoluted Mr. Walker made his scheme to avoid

detection.

THE COURT:  All right.  Fine, go ahead, Mr. Welk.

MR. WELK:  How allegedly convoluted the business

was -- this expert -- this person is not qualified, he hasn't

been qualified to testify as about convoluted business.  He's

here to testify about money laundering.  The government can

tie everything into whatever it happens to say, so because

five of the counts of the 110 were money laundering, which by

```
 1    the way had nothing to do with any of these businesses, it had
 2    to do with very specific transactions that went from one
 3    company to another and then to another.  But it didn't involve
 4    Wilma's services.  Not directly.
 5                    MS. MILLER:  What?  Of course it did.
 6                    THE COURT:  No, no, let him speak.
 7                    MR. WELK:  And that's not alleged in the -- my
 8    point is, Your Honor, this is -- I understand that the
 9    government wants to expand its arguments, its ability to
10    argument everything else, but designating this agent as a
11    money laundering expert.  And by the way, in the paperwork
12    that explained why this -- this witness was an expert witness,
13    it was to discuss how money laundering works, the layering,
14    the placement, all of that, and to -- and to answer any
15    questions the Court might have about money laundering.
16                    Nothing he has testified to about so far has
17    anything to do with money laundering anymore than every crime
18    or any crime has something to do with money laundering if the
19    government is eventually going to allege it, but this
20    isn't -- this isn't what an expert witness is supposed do when
21    they're qualified for a specific topic which this -- which
22    this witness has been.
23                    THE COURT:  All right.  Court will overrule the
24    objection.  You may proceed.
25                    MS. MILLER:  Thank you, Your Honor.
```

BY MS. MILLER: (CONTINUING)

Q.   Could you please now turn to page 97.  And what do we see on page 97, sir?  If you get to the top, there you go.

A.   Hansen Helicopters profit and loss for the time period of January through December 2015.

Q.   And on the very top left-hand corner of this profit and loss statement, specifically Row 1, how are these companies being described?

A.   John D. Walker Group Companies.

Q.   Okay.  And what was the profit for 2015 as shown on this statement?

A.   May I ask which company are you --

Q.   Yes, so if could you go down, Stephen, I'm sorry, yes, can you go all the way down to the bottom, it's on the next page.  And if you go to the right.  Thank you.  So, we have both on the very bottom there, we have a net income, do you see that net income?

A.   I do.

Q.   Identified for the combined companies?

A.   Yes.

Q.   And what is that?

A.   It's over 4.9 million.

Q.   Okay.  And if we go up, the gross income for the combined companies, down, I keep saying up and I mean down, I'm sorry.  No, the other way.  Yes.  Thank you.

```
 1                    THE COURT:  I'm sorry, what Page, is this 97
 2      again?
 3                    MS. MILLER:  So, 97 and 98, Your Honor, are the
 4      profit and loss statements.
 5                    THE COURT:  Let me look --
 6                    MS. MILLER:  The combined for the businesses.
 7                    THE COURT:  So, where are we looking at, can you
 8      make that bigger?
 9                    MS. MILLER:  Yes, so Mr. Leon Guerrero, can you
10      go back down to page 98 to the very bottom right.  Yes.  And
11      can you focus in on the combined.
12                    THE COURT:  What you are you asking --
13                    MS. MILLER:  Net profit.  Down.  Right.  Far
14      right.
15                    THE COURT:  Oh, okay.  I keep looking --
16                    MS. MILLER:  Right there.
17                    THE COURT:  I was looking for combined there.
18      All right.
19                    MS. MILLER:  And do you see that, Your Honor?
20                    THE COURT:  I do now.
21                    MS. MILLER:  Almost 5 million dollars.
22                    THE COURT:  Okay.  That's the 4,000,922.
23                    MS. MILLER:  Yes, Your Honor.  And that was the
24      net profit for the combined companies.  And --
25                    MR. WELK:  Excuse me, the document says net
```

1    income not net profit.

2                    THE COURT:  Okay.  Let's go to what is --

3                    MS. MILLER:  The profit and loss statement.  Do

4    we need to explain that, Your Honor.

5                    THE COURT:  No, no, no, hold on, hold on.  Let's

6    just -- let's look at --

7                    MR. WELK:  You don't need to explain anything

8    because that's what it says.

9                    THE COURT:  Okay.  Let's go -- I'm trying to

10   find -- let's go back to the left, what does it say all the

11   way to the left.  Net income.

12                   MS. MILLER:  And loss.

13                   THE COURT:  All right.  Net income and then

14   parenthesis, loss.

15                   MS. MILLER:  Right.

16                   THE COURT:  Right.

17                   MS. MILLER:  And can you go up now or down.  Yes,

18   there you go.  Keep going.  Keep going.  Keep going.  Keep

19   going.  Keep going.  Keep going.  Keep going.  Okay, hold on.

20   And then keep going.  Okay.  There we go.

21   BY MS. MILLER: (CONTINUING)

22       Q.   And then could you tell us what the service lease

23   rental income is for that year?

24       A.   Do you want me to state the one for Wilma's under

25   Column E, Row 9 or the combined number Q --

```
 1              MS. MILLER:  Combined.  And Mr. Leon Guerrero,
 2    can you go to the right, to the combined for all the
 3    companies; thank you, sir.  Right there.
 4              THE WITNESS:  Yes, it's over 23 million.
 5    BY MS. MILLER: (CONTINUING)
 6        Q.   $23,167,598.96?
 7        A.   Yes.
 8        Q.   Okay.  Thank you.
 9              MS. MILLER:  Did you see that, Your Honor?
10              THE COURT:  Yes, I did.
11              MS. MILLER:  Wonderful, thank you.
12    BY MS. MILLER: (CONTINUING)
13        Q.   So, sir, based on your review of the documents and
14    the evidence, how many different jurisdictions were involved
15    in Mr. Walker's fraud?
16        A.   It included the United States, Vanuatu, the
17    Philippines, and Canada.
18        Q.   Okay.  As an expert in money laundering, and an IRS
19    Criminal Investigations Special Agent, how would you
20    characterize Mr. Walker's scheme?
21        A.   A sophisticate -- sophisticated complex scheme.
22        Q.   Okay.  I'd like you to go back to Exhibit 93, which
23    was previously entered into evidence as G-0829.
24              THE COURT:  Okay.  Hold on let me pull 93.  Okay.
25    The chart?
```

```
 1                    MS. MILLER:  Yes, Your Honor.

 2                    THE COURT:  You got it, Mr. Welk?  93, okay

 3       Exhibit 93.  Go ahead.  You got it.  All right.

 4                    MR. WELK:  Thank you.

 5       BY MS. MILLER: (CONTINUING)

 6           Q.   In conducting your money laundering investigations,

 7       do you often have to determine who the organizer or leader is

 8       of the scheme?

 9           A.   Yes.

10           Q.   And what does that mean when you are conducting your

11       investigation and testifying when you -- when you talk about

12       organizer or leader?

13                    MR. WELK:  Objection, this is -- this is

14       sentencing guidelines, this is a sentencing guidelines issue

15       not a money laundering issue, it has nothing to do with money

16       laundering.  I'm sorry, Your Honor, I just -- maybe I'm

17       mistaken, was -- was this witness qualified as a sentencing

18       guidelines expert or as money laundering expert?

19                    THE COURT:  He was qualified as a money

20       laundering expert.

21                    MS. MILLER:  And, Your Honor, all of these

22       concepts apply in money laundering investigations and cases.

23       Mr. Welk seems to think that the sentencing guidelines are

24       somehow detached from the reality of the charges under which

25       Mr. Walker was convicted.  The reason why these enhancements
```

exist is because if these things are present in the particular

scheme, it is something that this Court must consider during a

sentencing.  So, I'm not sure why he's having so much

difficulty connecting these two things.  But they're relevant.

They go --

           THE COURT:  Just respond to the -- the objection

rather than -- editorial lines about the opinion.

           MR. WELK:  Let me see if I can clarify it.

           THE COURT:  Yeah.

           MR. WELK:  The agent's job is to investigate

criminal activity and make -- gather evidence in support of

suspected criminal activity and present that to the U.S.

Attorney's office.  The prosecutor's job is to upon obtaining

a conviction, argue to the Court whether or not certain

sentencing enhancements apply or departure to whatever else,

how the sentencing guidelines are applied.  It is up to the

Court to decide whether those things apply.  But the idea that

an agent who regardless of his experience in investigating

money laundering has that same training, experience and

knowledge about how to apply the sentencing guidelines, it's

outside of his scope of his employment.  It's outside the

scope of what he does.  He's not an expert in applying

sentencing guidelines.  So, in his -- nor is he an agent, an

expert in interpreting the sentencing guidelines or how they

apply to a specific case, especially a case in which he

```
 1   appears to have had no personal experience whatsoever.  So, I
 2   object to him being asked questions about how he interprets
 3   the sentencing guidelines.  He's not an expert in that area.
 4   That's something for the government to argue and for me to
 5   argue to you, Your Honor.  Not -- this testimony is
 6   superfluous.
 7              MS. MILLER:  I did not ask him to apply the
 8   sentencing guidelines.  I'm not asking him to apply the
 9   sentencing guidelines.  Your Honor, will apply the sentencing
10   guidelines.  However, as I stated earlier, the sentencing
11   guidelines consider things such as sophisticated means,
12   organizer leader, because if those things are present in the
13   case, in the investigation, then it's something this Court can
14   and should consider in enhancing the sentence.  We have a
15   probation report that recognized those things.  We have a
16   money laundering expert, I'm asking him about in his
17   investigations, does he determine who the organizer leader is
18   of these schemes.  That's absolutely within the bailiwick of
19   his expertise.
20              THE COURT:  The Court will overrule the
21   objection.  Go ahead.  Proceed.
22   BY MS. MILLER: (CONTINUING)
23      Q.   So, can you tell the Court when you're looking at a
24   determination of who is the organizer leader, what factors are
25   you looking at?
```

A.   I'm looking at factors to include who is directing individuals underneath that person, for example, are they giving them instructions on opening accounts, financial institutions, are they being asked to be signatory on these accounts, are they asked to conduct financial transactions, such as wire transfers, bank deposits, are they also being asked to be directors on a business document such as Articles of Incorporation, as well but overall, the organizer leader, they're the person that I would say is the shot caller, they are calling the shots and they are directing the individuals underneath them on what they need to do.

Q.   So, if we go back to Exhibit G-0829, the organizational chart that the defendant actually produced to the Court and to the government in this case, who is identified as the organizer leader on that specific exhibit?

A.   John Walker.

Q.   Who is the president of all of these companies that were used in this fraud?

A.   John Walker.

Q.   Who is the primary signatory used on every bank account used in the fraud?

A.   John Walker.

Q.   Who received profits from the fraud as opposed to regular pay?

A.   John Walker.

```
 1        Q.   Who agreed to forfeit all of the aircraft that were
 2   involved in this fraud?
 3              MR. WELK:  Objection.  Foundation.
 4              THE COURT:  I mean that's already been asked and
 5   answered too.  Isn't that part of the forfeiture?
 6              MR. WELK:  No.
 7              MS. MILLER:  No, Your Honor, it hasn't been asked
 8   and answered.  However --
 9              MR. WELK:  She -- she testified to that.
10              MS. MILLER:  --
11              THE COURT:  But that's already been presented,
12   has it not?
13              MR. WELK:  Yes.
14              THE COURT:  With regard to the civil forfeiture.
15              MS. MILLER:  Oh, no, no, no, this is the criminal
16   forfeiture.
17              THE COURT:  I'm sorry, criminal forfeiture.
18              MS. MILLER:  Yes, so there is a consent judgment
19   of forfeiture, Your Honor, that Mr. Walker entered into.
20              THE COURT:  Yeah.
21              MS. MILLER:  Yes.  And this witness has reviewed
22   it because one of the other things that --
23              THE COURT:  Maybe I shouldn't have said asked and
24   answered but the Court notes that it's already been -- I don't
25   know if it was through another witness but that's already been
```

```
 1    testified.

 2                    MS. MILLER:  Mr. Walker has.  Yes, Your Honor.

 3                    THE COURT:  That too, so sustained.

 4                    MS. MILLER:  Yes, Your Honor.

 5    BY MS. MILLER: (CONTINUING)

 6         Q.   Who is controlling the dissolution of the alter ego

 7    companies?

 8         A.   John Walker.

 9         Q.   I'd like to show you an exhibit which has been marked

10    as Exhibit 104 for sentencing, but at trial it was admitted as

11    G-1091.

12                    THE COURT:  Okay, hold on, Trial 1091?

13                    MS. MILLER:  Yes, Your Honor.

14                    THE COURT:  Okay.

15                    MS. MILLER:  And for sentencing, it's in the

16    sentencing notebook as Exhibit 104.

17                    THE COURT:  That hasn't been brought in yet,

18    right?  We're getting that --

19                    MS. MILLER:  No, not yet, yes.

20                    THE COURT:  All right.  Let Mr. Welk get his and

21    then I can get mine.

22                    MR. WELK:  I have it, Your Honor.

23                    THE COURT:  All right.  Okay.  Mr. Welk, has it.

24                    MS. MILLER:  Okay.  And do have you have it,

25    Mr. Reyna?
```

```
 1                    THE WITNESS:  Yes, I do.

 2                    MS. MILLER:  And, Your Honor?

 3                    THE COURT:  I do.

 4                    MS. MILLER:  Thank you, Your Honor.  May I

 5    proceed?

 6    BY MS. MILLER: (CONTINUING)

 7        Q.   Could you tell us what we are looking at here?

 8        A.   Yes.  It's a --

 9                    MS. MILLER:  Can you scroll up, Mr. Leon

10    Guerrero.

11                    THE COURT:  Okay, you said this was already

12    admitted -- oh yeah, this was admitted at trial?

13                    MS. MILLER:  It was admitted at trial, Yes, Your

14    Honor.

15                    THE COURT:  Okay.  1091.  Okay.

16    BY MS. MILLER: (CONTINUING)

17        Q.   So, what we are looking at here, Mr. Reyna?

18        A.   Yes, it's a letter stating Hansen Helicopters, Inc.,

19    and it's dated March 21st, 2008, and it's to, and it says

20    attention and from John Walker.

21        Q.   Okay.  And the topic?

22        A.   Yes, "It's time for a new company policy."

23        Q.   Could you read that, please?

24        A.   "If you can't fly or can't fix the helicopter for

25    some stupid bullshit reason, HH is not going to continue to
```

1    pay your salary.  Against my better judgment and contrary to

2    our competitor's policy, I will pay half salary.  This does

3    not include honest downtime, the result of unavoidable issues

4    or probably even avoidable issues.  This new policy is for

5    stupid lazy bullshit.  This has been an ongoing problem for

6    sometime.  It has just come to a boiling point because we had

7    a flight crew sit on the boat for 55 days and never fly once.

8    They also never once called the shop to inform us there was a

9    problem.  Twenty years and you think you heard it all."

10        Q.    Okay.  Thank you, sir.  Based on this and other

11   communications that you reviewed, including that declaration

12   of Mr. Crowe, which we talked about earlier, who is ultimately

13   in control of the employees in this company?

14        A.    John Walker.

15        Q.    On the balance sheet that we just reviewed in

16   Exhibit 366, who was identified as the controller and owner of

17   all of the companies?

18        A.    John Walker.

19        Q.    And who is identified as the CEO of all of the

20   companies in the business plan?

21        A.    John Walker.

22        Q.    Based on your review of this evidence, could you tell

23   the judge what your expert opinion is on who is the organizer,

24   leader of the scheme to defraud?

25        A.    That John Walker is the owner, controller, leader of

```
 1    all of these shell companies, also known as alter egos.
 2         Q.   Okay.  Following his indictment in May of 2018, what
 3    did Mr. Walker do with his bank accounts?
 4         A.   He --
 5              MR. WELK:  Objection, foundation.
 6              THE COURT:  Yeah, why don't you lay a foundation.
 7    Sustained.  Why don't you just -- the Court will sustain that.
 8    Go ahead.
 9    BY MS. MILLER: (CONTINUING)
10         Q.   Have you reviewed the bank records that are related
11    to this case?
12         A.   Yes, I have.
13         Q.   Okay.  And you are an IRS Criminal Investigation
14    Agent; correct?
15         A.   Yes, I am.
16         Q.   And you have a relationship with the other IRS agents
17    who were involved in the investigation in this case?
18         A.   Yes.
19         Q.   And you've reviewed numerous documents in
20    anticipation of your testimony; correct?
21         A.   Yes, I have.
22         Q.   And you're basing all of your testimony on the review
23    of those documents; is that correct?
24         A.   Yes.
25         Q.   All right.  Could you tell the Court, what did
```

1   Mr. Walker do with his bank accounts after he was indicted in
2   May of 2018?
3              MR. WELK:  Your Honor, I object again.  On
4   foundation grounds, it's interesting that the agent looked at
5   a lot of documents and talked to other agents, but the
6   question of what Mr. Walker did with his bank accounts has to
7   be more specific because the government is arguing that every
8   bank account of every company in which Mr. Walker had an
9   interest appears to -- they appear to be arguing that those
10  are his bank accounts and so, there needs be some clarity
11  about what -- what bank accounts the agent looked at and why
12  or if he considers every account of a Walker-related agency
13  company to be Mr. Walker's bank account.
14             THE COURT:  All right.  The Court will sustain,
15  why don't you narrow it.
16             MS. MILLER:  Your Honor, again, this is
17  sentencing, number one.
18             THE COURT:  I got it.  I got it, no objection.
19             MS. MILLER:  Which means federals don't apply.
20  Number two --
21             THE COURT:  I know --
22             MS. MILLER:  He's an expert, you know, even in
23  trial, we would have to produce all of the underlying evidence
24  to support his testimony at trial.
25             THE COURT:  Ms. Miller though.

1               MS. MILLER:  Yes.

2               THE COURT:  He's saying that maybe Mr. Walker

3    has -- it sounds like maybe Mr. Miller has a whole bunch of

4    other accounts that may not be relevant to this trial or this

5    sentencing.  So, is he just focused on the ones that are

6    relevant to --

7               MS. MILLER:  That's all I'm focusing on, Your

8    Honor, that's all I'm focusing on.

9               THE COURT:  Just narrow that then.

10              MS. MILLER:  Sure.

11              THE COURT:  Or clarify that.

12   BY MS. MILLER: (CONTINUING)

13      Q.   After May of 2018, specifically in July of 2018, did

14   Mr. Walker open up a new bank account for one of his alter

15   egos called Limey Air Services, Inc.?

16      A.   Yes.

17              MS. MILLER:  Your Honor, I'd like to show the

18   witness an exhibit that has been previously marked as

19   Exhibit 138, which was introduced at trial as Exhibit 2939.

20              THE COURT:  Okay.  Is that a new one?  Let me

21   pull that.  Hold on a second, let me try to get that,

22   Ms. Miller.

23              MS. MILLER:  Yes, Your Honor.

24              THE COURT:  We'll look at that.  138, Anna?

25                   (Discussion with clerk.)

```
 1              MR. WELK:  I have it, Your Honor.

 2              THE COURT:  Okay, very well.  Okay, go ahead, you

 3    may proceed.

 4              MS. MILLER:  Yes, Your Honor.

 5    BY MS. MILLER: (CONTINUING)

 6        Q.   So, if we look at the first page here; can you tell

 7    the Court what we're looking at?

 8        A.   Yes, this is a member application with Community

 9    First Guam Federal Credit Union.

10        Q.   Okay.  And who is identified on this document as the

11    treasurer of Limey Air Services, Inc.?

12        A.   Kenneth Rufus Crowe.

13        Q.   And who is Mr. Crowe?

14        A.   The treasurer of Limey Air Service.

15        Q.   And we also saw his name on Exhibit 829 as a director

16    and owner of some of the other corporations?

17        A.   Yes.

18        Q.   And who is identified as a director of Limey Air

19    besides Mr. Crowe?

20        A.   Marvin Ray Reed.

21        Q.   Okay.  And who else?

22        A.   Phillip Turner Kapp.

23        Q.   Okay.  And are those three people who were

24    co-defendants with Mr. Walker in the criminal case?

25        A.   Yes.
```

1    Q.   Are those people also ones referenced in Mr. Crowe's

2    affidavit as the management team that had to keep Mr. Walker

3    apprised of everything happening with the companies?

4    A.   Yes.

5    Q.   Could you now please turn to page 76 of Exhibit 2939

6    and what do we see on page 76?

7    A.   Yes, it's a corporate affidavit dated July 25th,

8    2018, for Limey Air Services, Inc.

9    Q.   And what does the address show for Limey Air

10   Services, Inc.?

11   A.   P.O. Box 9099, Tamuning Guam 96931.

12   Q.   Okay.  And could you read just the first paragraph of

13   the corporate affidavit?

14   A.   "I, John D. Walker, 99.9% owner of the company,

15   certify that two of the original officers of the company

16   verbally resigned sometime ago and are no longer affiliated

17   with the company, specifically Angela Walker, past Treasurer,

18   and David P. Ledger, past Vice President and Secretary.  The

19   current officers of the company are myself as President,

20   Phillip T. Kapp as Vice President, and Kenneth R. Crowe , as

21   Secretary Treasurer."

22   Q.   Okay, thank you.  And could you now go to page 72,

23   Mr. Leon Guerrero and Mr. Reyna, of these documents and what

24   do we see on page 72?

25   A.   The Hansen Helicopters, Inc. minutes of the

1    shareholders meeting of Hansen Helicopters, Inc. held at the

2    company's offices in Harmon Guam on January 26th, 2015.

3        Q.   Okay, and who is signing those minutes in Guam on

4    January 26st, 2016?  As a shareholder?  If you go to the

5    bottom?

6        A.   John D. Walker, Kenneth R. Crowe and Marvin R. Reed.

7        Q.   Okay.  And Mr. Leon Guerrero, if you can go to

8    page 73 of the document.  And what are we seeing here, sir?

9        A.   Limey Air Services, Inc., minutes of the shareholders

10   and board of directors meeting of Limey Air Services, Inc.

11   held at company's affiliates Hansen Helicopters, Inc.,

12   attorney's office in Hagatna, Guam on June 8th, 2018."

13       Q.   And what is present during that meeting in Guam?

14       A.   John D. Walker, Kenneth R. Crowe, Phillip T. Kapp,

15   and Marvin R. Reed.

16       Q.   And the next Page who is signing the minutes, it's

17   page 74?

18       A.   John D. Walker, Kenneth R. Crowe, Marvin R. Reed and

19   Phillip T. Kapp.

20       Q.   And page 75, Mr. Leon Guerrero, can you tell us what

21   we're seeing Mr. Reyna, on page 75?

22       A.   Limey Air Services, Inc., minutes of the shareholders

23   and board of directors meeting of Limey Air Service, Inc. held

24   at company's affiliates Hansen Helicopters, Inc. offices in

25   Harmon, Guam on June 25th, 2018.

1      Q.   Okay.  And who signs off on those minutes?

2      A.   John D. Walker and Kenneth R. Crowe.

3      Q.   Okay.  Thank you.  And now if you would please turn

4  to Pages 82 and 83 of these documents.  And could you tell the

5  Court, starting on page 82, what are we seeing here?

6      A.   Incoming wire transfer log, January through

7  December 2018.

8      Q.   And the beneficiary of the incoming wire transfers?

9      A.   Limey Air Service.

10      Q.   Which is the company that we saw Mr. Walker's

11  signature on page 76, saying he's 99.9 percent owner of?

12      A.   Yes.

13           MS. MILLER:  Go to the right please, Mr. Leon

14  Guerrero.

15  BY MS. MILLER: (CONTINUING)

16      Q.   Where are these wire transfers originating from?

17      A.   Pacific Spotters Corporation.

18      Q.   Okay.  And we see the amounts there, can you go to

19  the next page, Mr. Leon Guerrero?  Go all the way to the left

20  first, please.  And again, who is the beneficiary of these

21  wire transfers in 2019?

22      A.   Limey Air Service.

23      Q.   A company that Mr. Walker is a 99.9 percent owner of?

24      A.   Yes.

25      Q.   And where are these wire transfers coming from.

1  Mr. Leon Guerrero, if you could go to the right.  Thank you,
2  originator?
3      A.   Pacific Spotters Corporation.
4      Q.   Did you total the amount of wire transfers that went
5  from Pacific Spotters Corporation in 2018 and 2019 into Limey
6  Air's bank account?
7      A.   Yes.
8      Q.   And what is that total?
9      A.   Approximately $5 million.
10     Q.   Okay.
11          THE COURT:  Can you pull that -- I'm sorry, it
12 goes all the way down.
13          MS. MILLER:  It does, Your Honor, yes.
14          THE COURT:  Okay.  What Page is that?
15          MS. MILLER:  82 and 83.  Page 82, Your Honor, has
16 the 2018 wire transfers and page 83 has the 2019 wire
17 transfer.
18          THE COURT:  I'm sorry, what was the total amount
19 approximately?
20          THE WITNESS:  Approximately $5 million.
21          THE COURT:  5 million?
22          THE WITNESS:  Yes, Your Honor.
23          THE COURT:  All right.  Thank you.
24 BY MS. MILLER: (CONTINUING)
25     Q.   Were bank accounts of Mr. Walker's closed in 2018

```
1   after he was indicted?

2       A.   Yes.

3       Q.   Okay.  I'd like to show you what has been marked for

4   sentencing as Exhibit 228, which was admitted at trial as

5   Exhibit Defense 132.

6            THE COURT:  I'm sorry, this is for Exhibit 228

7   for sentencing?

8            MS. MILLER:  Yes, Your Honor, and D-132, was the

9   number of the exhibit at trial?

10           THE COURT:  All right.  Hold on, let me pull

11  that.  And give Mr. Welk a chance as well to pull 228.

12           MS. MILLER:  May I proceed, Your Honor?

13           THE COURT:  --

14           MS. MILLER:  Oh, okay, I'm sorry.

15           THE COURT:  He's also looking for it as well.

16           MS. MILLER:  Oh, Okay.  You have it?

17           MR. WELK:  I have it, Your Honor.

18           THE COURT:  Okay.  Very well.  You may proceed,

19  Ms. Miller.

20           MS. MILLER:  Thank you, Your Honor.

21  BY MS. MILLER: (CONTINUING)

22      Q.   Mr. Reyna, do you have -- do you see the document on

23  the screen and do you have it?

24      A.   I do.

25      Q.   Okay.  Can you tell the Court what we're looking at
```

1    here?

2        A.    It's a letter from Bank of Hawaii dated June 25th,

3    2018, in regards to Wilma's Flight Services, Inc. account

4    number ending in 2462.

5        Q.    Or 7462?

6        A.    I'm sorry, 7462.

7        Q.    Okay.  And what is this letter saying?

8            MS. MILLER:  Can you scroll up, Mr. Leon

9    Guerrero?  Thank you.

10   BY MS. MILLER: (CONTINUING)

11       A.    "Dear, sir, we have conducted a review of our

12   customer accounts and transaction history and have determined

13   that we will no longer be able to service your account.  This

14   letter will serve as notice of our intent to terminate the

15   account listed above collectively the account, on July 31st,

16   2018, pursuant to the business deposit account agreement

17   governing the account.  We believe this will provide you with

18   sufficient time to make other arrangements to meet your

19   financial needs.  In conjunction with this closure, any debit

20   cards attached to your account will be blocked from further

21   transactions five business days prior to the closure date

22   identified above.  You may voluntarily close your account

23   prior to July 3rd, 2018 by visiting one of our branches.  If

24   you do not do so by August 7th, 2018, a check in the amount of

25   any funds remaining in your account will be sent to your last

1  address of record."

2      Q.   As a money laundering expert, can you tell the Court

3  whether you have substantial experience dealing with banks and

4  information regarding accounts of persons who are targets of

5  money laundering investigations?

6      A.   Yes.

7      Q.   Are banks required to close accounts if they believe

8  that there's any illegal activity occurring with those

9  accounts?

10     A.   Yes.

11     Q.   Could you please explain to the Court why that is?

12     A.   Per the bank secrecy act, it requires financial

13  institutions to maintain anti-money laundering procedures

14  which include customer due diligence, know your customer

15  policies and procedures.  So, when a new customer is on

16  boarded with the bank, the financial institution wants to get

17  an idea of what kind of customer this is going to be, so they

18  want to know what type of business they're in, what should

19  they expect in deposits, such as wire transfers, deposits,

20  expenses, or debits and credits.  And during the monitoring of

21  the account, if the account activity does not match what

22  initially was told to the bank employees at the time, they

23  might find it suspicious.  And over a period of time if the

24  client can't justify the basis of the account activity, they

25  will find it suspicious and then possibly close the account.

1    Q.   Okay.  And did that happen with Mr. Walker's various

2    alter ego companies in this case?

3    A.   Yes, it did.

4    Q.   Did the government seek to get records about

5    Mr. Walker's accounts in the Philippines?

6    A.   Yes.

7    Q.   Can you tell --

8              MS. MILLER:  Do I need to break now?

9              THE COURT:  Oh, okay.  Yeah, sure, go ahead.

10   Finish your last question and then we'll take a recess.

11             MS. MILLER:  Okay, thank you, Your Honor.

12   BY MS. MILLER: (CONTINUING)

13   Q.   Could you tell the Court what the Mutual Legal

14   Assistance Treaty process is that the government uses to

15   obtain bank records from foreign countries?

16   A.   Yes.  The MLAT is a process that the investigators

17   and the prosecutors work on, it includes an affidavit

18   requesting specific records from a foreign country.  And

19   during this process of drafting up this affidavit and all the

20   particulars are noted on what's needed, it's then handled

21   through the office of international affairs at the Department

22   of Justice.  Once they receive it and everything is good to be

23   passed on to the foreign country, the foreign country will

24   then comply with the request and provide any requested records

25   or documents and then they will be certified so that way in

```
 1   turn the U.S. government can use it as evidence.

 2              THE COURT:  All right.  Very well.  Take a

 3   15-minute recess and come back.  Thank you, Counsels.

 4              MS. MILLER:  Yes, Your Honor.  Thank you.

 5              (Recess taken at 9:41 a.m.)

 6              (Back on the record at 10:11 a.m.)

 7              THE COURT:  Okay.  We're all settled on the

 8   computer.

 9              MS. MILLER:  Yes, Your Honor.  Well,

10   unfortunately, Your Honor, and we appreciate the -- the giving

11   us the time, it is still not working.  So --

12              THE COURT:  It's not our computer.

13              MS. MILLER:  No, it's not on your side, it's on

14   our side.  So, the U.S. Attorney's office is moving away from

15   trial director to some other software program for trial.  And

16   I don't know if that's what's causing the kinks but it keeps

17   crashing.  So, I apologize, we'll have do the good old-

18   fashioned --

19              THE COURT:  That's fine.

20              MS. MILLER:  -- hard copy exhibits.

21              THE COURT:  Yes, Mr. Welk, go ahead.

22              MR. WELK:  Just waiting for Mr. Walker.

23              THE COURT:  Oh, yes, okay.  We'll call him in.

24                   (Pause for defendant.)

25                   (Discussion with law clerk.)
```

```
 1              THE COURT:  Where is the defendant?  Is he right
 2   there?
 3                    (Defendant present.)
 4              THE COURT:  Okay.  We're back on the record.  All
 5   Counsels present, Mr. Walker is present.  Okay.  We'll
 6   proceed -- hold on, wait till you're seated.  All right, very
 7   well.  You may proceed.
 8              MS. MILLER:  Thank you, Your Honor.
 9              THE COURT:  Mr. Walker, you need your hearing
10   aid.  Test it, make sure it's okay.  Testing.  You can hear?
11              THE DEFENDANT:  (Nodded head.)
12              THE COURT:  All right.  Very well.  You may
13   proceed.
14              MS. MILLER:  Thank you, Your Honor.
15   BY MS. MILLER: (CONTINUING)
16      Q.   Mr. Reyna, when we left off last time, you were
17   talking about the Mutual Legal Assistance Treaty process or
18   the MLAT process.  Did the government do that in this case to
19   get the records from the Philippines?
20      A.   Yes, it did.
21      Q.   Okay.  I'd like you to look at what has been
22   previously marked for sentencing as Exhibit 265 and at trial
23   it was marked as G-2990.
24              THE COURT:  I'm sorry, so sentencing is what now?
25              MS. MILLER:  265.
```

```
 1                    THE COURT:  Okay.  Sentencing.  And the trial
 2      number is?
 3                    MS. MILLER:  G-2990.
 4                    THE COURT:  2990.  Okay.
 5                    MR. WELK:  Your Honor, 265 is a rebuttal exhibit.
 6                    THE COURT:  Okay.
 7                    MR. WELK:  Which the Court said the government
 8      could not use except in rebuttal.
 9                    MS. MILLER:  Actually that's not what the Court
10      said.
11                    THE COURT:  Well, I mean I know my order said
12      that.  I should have expounded on that.  I know my order said
13      that there would be rebuttal of any prosecution presentation,
14      but then at the sentencing hearing early on Friday, the Court
15      indicated that if it was rebutting any type of information
16      that was extracted during cross-examination, the Court would
17      consider that as rebuttal.  So, is that what this is?
18                    MS. MILLER:  That's what this is, Your Honor,
19      yes.
20                    THE COURT:  Okay.  All right.  So -- and this is
21      265.
22                    MS. MILLER:  Yes, Your Honor.
23                    THE COURT:  And what is the -- what is it that
24      you believe is rebutting in terms of cross-examination that
25      Mr. Welk conducted either today or on Friday?
```

1          MS. MILLER:  Your Honor, if you recall, Mr. Welk

2     in questioning both witnesses, Ms. Pena as well as

3     Mr. DeVogel, was challenging the testimony that Pacific

4     Spotters Corporation was an alter ego of John Walker and that

5     Pacific Spotters continued the illegal operations of the

6     leases, that was the issue that was being contested and that's

7     the issue that this testimony goes directly to.

8          THE COURT:  All right.  Yes, Mr. Welk?  You

9     wanted to respond to that?

10          MR. WELK:  I do.  Your Honor, because --

11          THE COURT:  Go ahead.

12          MR. WELK:  I'm confused by this line of analysis

13     that the government is using that it seems that testing a

14     witness or exploring a witness testimony has turned

15     into -- has been involved into the defense making a

16     presentation -- it's not a presentation of evidence, the

17     cross-examination is merely questioning of the witness on

18     direct examination.  The idea that that that question merely

19     asking the witness about something they've already testified

20     about, that allows the use of rebuttal evidence is completely

21     unfamiliar to me.

22          THE COURT:  Well, I'm sorry, what is the -- well,

23     let's first of all, what is the offer of proof here?

24     Specifically?

25          MS. MILLER:  The specific offer of proof, Your

 1    Honor, is that the United States, in Exhibit G-2990, at trial

 2    and 265 for the sentencing received from the Philippines, the

 3    information that was provided to the bank that Mr. Walker put

 4    opened when he went to the Philippines in 2018 for Pacific

 5    Spotters Corporation.  If you recall, the witnesses were

 6    cross-examined on to the leases and the fraud continuing and

 7    also specifically the challenges was Pacific Spotters

 8    Corporation was not an alter ego of John Walker.  Mr. Welk

 9    argued that to the Court.  And this shows, if you turn to

10    page 27 of Exhibit 2990, that after Mr. Walker was indicted,

11    he not only opened up Pacific Spotters Corporation and the

12    bank account for Pacific Spotters Corporation, but starting on

13    page 27 through the end of this exhibit, you see that all of

14    the leases for the helicopters were signed over to the name of

15    Pacific Spotters Corporation.

16             So that shows the continuation of the fraud even

17    post indictment, which is extraordinarily relevant obviously

18    to the sentencing, and it also contradicts Mr. Welk 's

19    argument to this Court both in his filings and with the

20    cross-examination of the witnesses that Pacific Spotters

21    Corporation was not just yet another alter ego of Mr. Walker,

22    allowing him to continue the fraud.

23             It also goes directly to this issue of

24    sophisticated means as we talked about before.  Now moving the

25    operations off of the U.S., off of Guam, into the Philippines

```
1   to try to avoid, you know, continued prosecution and
2   detection.
3               THE COURT:  All right.  Okay.
4               MR. WELK:  Your Honor, I did not argue that PSC
5   wasn't a --
6               THE COURT:  I'm sorry, hold on hold on.
7               (Discussion with the clerk.)
8               MR. WELK:  I didn't argue that PSC wasn't an
9   alter ego of Mr. Walker, I pointed out that the Court's order
10  regarding alter ego corporations did not identify PSC as an
11  alter ego of Mr. Walker.  It identified it as an alter ego of
12  Hansen and went to find that -- that Hansen was not an alter
13  ego of Mr. Walker.  Now, that's not -- there is nothing new
14  there, I was just referencing the Court's previous order.  And
15  the fact that the government -- look, the question of whether
16  something is rebuttal evidence or not, that's -- that's not a
17  difficult question.  But it does -- it requires -- you have to
18  be rebutting some sort of evidence, not just a question.  The
19  fact that the government thinks that I may attack one of their
20  theories in argument doesn't mean that they get to then bring
21  in rebuttal evidence because that didn't occur to them.
22  Or --
23              MS. MILLER:  I don't, I don't --
24              THE COURT:  I agree with you that in terms of
25  arguments, that's true, but in terms of any evidence that was
```

1  extrapolated during the cross-examination of the witnesses,

2  either on Friday or this witness today, the Court's allowing

3  the prosecution to go ahead and let this witness speak on that

4  particular point of rebuttal.

5          MR. WELK:  So, you mean even if the government

6  introduces a topic?

7          THE COURT:  No, no, she's saying she's only

8  rebutting what -- what may have already been cross-examined of

9  the prior witnesses on Friday and today.  That's what -- not

10  the arguments, but the evidence.

11          MR. WELK:  I know --

12          THE COURT:  Which is their testimony.

13          MR. WELK:  I know that's what she's saying, Your

14  Honor, and thank you for putting it that way, my questions on

15  cross-examination are not evidence.

16          THE COURT:  No.

17          MR. WELK:  They're questions and the fact --

18          THE COURT:  But the answers could be evidence.

19          MS. MILLER:  Right.

20          THE COURT:  Whether it's accepted or not by the

21  Court.

22          MR. WELK:  But they're answers from her witness

23  and what she's trying to prove now is, she's trying to get

24  another witness, who I have not cross-examined at all to try

25  and get in a document that the previous witness who I did

```
 1    cross-examine was found incompetent to authenticate.  That's
 2    just -- the problem I have with this, Your Honor, is that --
 3                 THE COURT:  Okay.
 4                 MR. WELK:  -- the Court set rules.
 5                 THE COURT:  Yeah.
 6                 MR. WELK:  -- for the parties to identify what
 7    they were going to use during this hearing, where the rules of
 8    evidence don't apply with full force and effect.
 9                 MS. MILLER:  And the Court --
10                 THE COURT:  Well, the rules of evidence don't
11    apply.
12                 MS. MILLER:  They don't.
13                 THE COURT:  It is.  But however, there is case
14    law that says from the Ninth Circuit and U.S. Supreme Court
15    that in terms of relevancy, there has to be some indicia of
16    reliability, so we all know that.
17                 MR. WELK:  Right.
18                 THE COURT:  So, that's why the Court is like
19    listening to what's relevance of it, and also in fairness
20    to -- to your client, like when you -- when you make an
21    objection on vague and ambiguous, the Court does believe
22    that's important because that issue of relevancy does come
23    into question.
24                 MR. WELK:  Sure.
25                 THE COURT:  Like you did with the accounts,
```

```
 1   Mr. Walker's accounts but anyway, all right, I understand what
 2   you're saying.  All right.  The Court will overrule the
 3   objection.  Go ahead.  You may proceed.
 4   BY MS. MILLER: (CONTINUING)
 5       Q.   So, if you could turn to page 27 of Exhibit 265,
 6   which was G-2990, can you please tell the Court what we're
 7   seeing starting on page 27 through the end.
 8       A.   "Helicopter lease service amendment."
 9       Q.   And who is being identified now as the lessor of
10   these helicopters?
11                   MR. WELK:  I'm sorry, can I have the Page number?
12                   THE COURT:  Yes, what was the Page number again?
13                   MS. MILLER:  27, Your Honor.
14                   THE COURT:  Okay.  Hold on.  Did you get that,
15   Mr. Welk?  Page 27.
16                   MR. WELK:  I have it, yes.
17                   THE COURT:  Okay, go ahead.
18                   THE WITNESS:  The lessor is Pacific Spotters
19   Corp.
20   BY MS. MILLER: (CONTINUING)
21       Q.   And for example, I'm not going go through all the
22   leases but just on this particular one, what is the
23   registration number of the helicopter that's being leased?
24       A.   N6188D.
25       Q.   So basically, after the indictment, the leases that
```

```
 1    were previously in the name of the different alter ego

 2    companies are now in the name of Pacific Spotters Corporation?

 3                  MR. WELK:  Objection, overstates the exhibit

 4    Which applies to one helicopter.

 5                  THE COURT:  I'm sorry, let me -- let me hear

 6    the -- I'm sorry, I have to re-listen to the question,

 7    Veronica, can you just repeat that question again and the

 8    objection too.

 9      (Whereupon the reporter read back the requested portion.)

10                  THE COURT:  All right.  Court will sustain that

11    objection.

12                  MS. MILLER:  So, Your Honor, for the record, from

13    page 27 through page 272, we have leases.  If this Court needs

14    me or would like me to go through every single one of those,

15    I'm happy to.  But Mr. Welk has this document, he's had an

16    opportunity to review the document and I think we can ask this

17    Court to take judicial notice of the fact that the leases,

18    it's not one lease, it is multiple leases that are contained

19    herein.

20                  THE COURT:  Right, but his objection was really

21    focused on the exhibit that was identified by the witness

22    Exhibit 27.

23                  MS. MILLER:  Okay.

24                  THE COURT:  So, the Court has sustained that but

25    with regards to -- since this exhibit has already been
```

```
 1   admitted in trial, you're asking the Court to take notice,

 2   judicial notice that page 27 to 272 include all the leases?

 3              MS. MILLER:  Yes, Your Honor.

 4              THE COURT:  That's what the --

 5              MS. MILLER:  That is correct.

 6              THE COURT:  And what, and what else and that the

 7   less or is?

 8              MS. MILLER:  Pacific Spotters Corporation in

 9   every single one of those.

10              THE COURT:  On all those leases.

11              MS. MILLER:  Correct, Your Honor.

12              THE COURT:  All right.

13              MR. WELK:  If I may --

14              THE COURT:  Okay.  So, the Court sustains your

15   objection on 27 but the Court will accept the -- grant the

16   request for notice, judicial notice of the leases from 27 to

17   272.

18              MS. MILLER:  Yes, Your Honor.

19              MR. WELK:  If the witness is not going to answer

20   the question then that was asked of him?  Because I know -- I

21   know the government feels like I should have looked closely at

22   all 2800 pages, well actually, that be about 3,000 pages if we

23   count these exhibits but the fact is she's asking this witness

24   to testify about this.

25              THE COURT:  So, I sustained your objection and so
```

yeah, he's not answering the question as it's posed to that

exhibit but in lieu of that, so I guess the question is

withdrawn; correct?

              MS. MILLER:  Yes.

              THE COURT:  All right.  And the Court will take

judicial notice of 27 to 272.

              MS. MILLER:  Thank you, Your Honor.

              THE COURT:  Next question.

BY MS. MILLER: (CONTINUING)

    Q.   The next question is, Mr. Reyna, did you also look at

another schedule of leases being operated by Pacific Spotters

Corporation?

    A.   Yes.

    Q.   Okay.  Before we get to that question, let me ask

you, as an expert in money laundering, could you tell the

Court what the reference to a specified unlawful activity is?

    A.   A specified unlawful activity also known as an SUA,

is a predicate offense.  So, for example, there are multiple

federal violations such as fraud, in this case wire fraud that

create illicit funds and that particular predicate offense is

also known as an SUA.

    Q.   Okay.  And in this particular case, Mr. Walker was

convicted of conspiracy to commit wire fraud, is conspiracy to

commit wire fraud or wire fraud an SUA for money laundering?

    A.   Yes, it is.

1    Q.   And the wire fraud under which Mr. Walker was

2  convicted was in relation to these leases; is that correct?

3    A.   Yes.

4    Q.   And after he was indicted in May of 2018 as we just

5  saw the leases continued but now under the name of Pacific

6  Spotters Corporation?

7    A.   That is correct.

8    Q.   Who is the owner of Pacific Spotters Corporation?

9    A.   John Walker.

10   Q.   Who is the president of Pacific Spotters Corporation?

11   A.   John Walker.

12   Q.   As an expert in money laundering, are you also asked

13 to testify as to the economic loss that was suffered by

14 victims of a fraud?

15   A.   Yes.

16   Q.   In rendering any opinions regarding economic loss

17 that's suffered by victims of a fraud, can you tell the Court

18 generally what evidence do you look at?

19   A.   In this particular case, I looked at bank records --

20         MR. WELK:  Objection, Your Honor, the question

21 was what does he look at generally, I would like to have an

22 answer to that.

23 BY MS. MILLER: (CONTINUING)

24   Q.   You could answer generally what you look at and then

25 I'll ask you what do you look at in this particular case?

```
 1              THE COURT:  Okay, so go ahead.

 2    BY MS. MILLER: (CONTINUING)

 3         A.    Financial records such as bank records, financial

 4    statements, tax returns.

 5         Q.    Do you look at things such as QuickBooks records?

 6         A.    Yes.

 7         Q.    And in a case like the Walker case, did you look at

 8    leases?

 9         A.    I did.

10         Q.    Do you look at things like investor materials?

11         A.    Yes.

12         Q.    Did you look at the prior testimony from trial of the

13    IRS agent who was the agent in this case?

14         A.    I did.

15         Q.    And did you also review the evidence of the forensic

16    accountant in this case?

17         A.    Yes.

18         Q.    Okay.  Did you formulate an opinion based on your

19    review of the bank records, Quickbooks records, testimony of

20    the IRS agent, testimony of the forensic accountant, and

21    investment materials as well as financial records and tax

22    records, what the total amount of the fraud was involved in

23    this case?

24              MR. WELK:  Objection.

25              THE WITNESS:  Yes --
```

```
 1                MR. WELK:  It calls for a legal conclusion.

 2                THE COURT:  Overruled, go ahead.

 3                THE WITNESS:  Yes, I did.

 4   BY MS. MILLER: (CONTINUING)

 5        Q.   And could you tell the Court what that amount was?

 6        A.   On an annual basis, the total loss was over

 7   $19 million and the total loss for the entire conspiracy was

 8   over $408 million.

 9                THE COURT:  I'm sorry, how much?

10                THE WITNESS:  $408 million for the total

11   conspiracy.

12   BY MS. MILLER: (CONTINUING)

13        Q.   Did you also read an order of this Court where the

14   Court indicated that the tuna boat companies did not get what

15   they bargained for?

16        A.   Yes.

17        Q.   And did you listen to the testimony of Mr. DeVogel?

18        A.   I did.

19        Q.   Can a person enter into a legal contract for a good

20   that is fraudulently obtained?

21        A.   No.

22        Q.   Can a person enter into a legal contract to provide

23   the services of a licensed professional if the person is not

24   licensed?

25                MR. WELK:  Objection, these are straight pure
```

```
 1   legal conclusions that he's being asked to called to testify

 2   on.  He's not qualified as a legal expert on contract law or

 3   similar areas of law.

 4              MS. MILLER:  Your Honor, I'm not asking him as a

 5   legal expert, I am asking him as an IRS criminal investigator

 6   and as a money laundering expert because one of the things

 7   that Mr. Reyna is asked to do often in sentencings is to

 8   determine issues, such as economic loss, which he is

 9   particularly poised to do.  And so this isn't a legal, this is

10   his analysis.  And of course, Your Honor, you will be the one

11   to apply the law.

12              MR. WELK:  No, he's specifically being asked

13   about the specific contract law and conclusions being drawn on

14   whether a contract is valid or not.  That's not within the

15   realm of his -- first of all, it's a legal conclusion that

16   he's not qualified or competent to testify to.  But he's also

17   not qualified an expert in that area.

18              THE COURT:  All right.  Overruled.  Go ahead.

19   BY MS. MILLER: (CONTINUING)

20      Q.   Can you enter into such an agreement legally?

21      A.   No.

22      Q.   When you're evaluating issues such as economic loss,

23   do you consider those issues whether, for example, if the

24   lease was entered into for $40,000 and the argument is well,

25   there was some sort of a benefit provided, do you look at
```

1   whether there was a legality to the lease or an illegality?

2       A.   Yes.

3       Q.   In this particular case, did you review documents

4   that showed the opening of Pacific Spotters Corporation by

5   Mr. Walker?

6       A.   I did.

7       Q.   I'd like you to look at what has been marked for

8   sentencing as Exhibit 141, which was introduced at trial, Your

9   Honor, as Exhibit G-3003.

10              THE COURT:  Okay.  Do you have that?  Let me pull

11  that Exhibit 141.

12              MS. MILLER:  Mr. Reyna, do you have that exhibit

13  in front of you.

14              THE COURT:  Do you have it, Mr. Welk?

15              MR. WELK:  I have it.

16              THE WITNESS:  I have it on the monitor.

17              THE COURT:  We have it on the monitor.  Okay.

18              MS. MILLER:  May I proceed, Your Honor?

19              THE COURT:  You may.  Yes, you may.

20  BY MS. MILLER: (CONTINUING)

21      Q.   So we're looking at what was previously entered into

22  evidence as Exhibit 3003 at trial.  Could you tell the Court

23  if you reviewed this exhibit?

24      A.   Yes, I have.

25      Q.   And what is this exhibit?

1     A.   It's a deed of absolute sale.

2     Q.   Okay, the whole exhibit, I'm asking generally and

3 then I'll go to specific pages.

4     A.   Yes, this in particular this page shows that one unit

5 Hughes helicopter is being sold and it is being sold from

6 Jan's Helicopter, Inc.

7     Q.   Okay.  And Jan's is, you already testified, one of

8 the alter ego companies Mr. Walker used?

9     A.   Yes.

10     Q.   Okay.  Can you go to the second opinion, Mr. Leon

11 Guerrero, and hold on before you go to the second opinion,

12 who's signing this document as the president of Jan's?

13     A.   John Walker.

14     Q.   Okay.  And this opinion --

15           THE COURT:  I'm sorry, what package is this?

16           MS. MILLER:  So, if you go back to the first

17 opinion, Your Honor, on the bottom, you'll see the signature

18 of John Walker as the president of Jan's.

19           THE COURT:  Okay, so this is package 1 at the

20 top.

21           MS. MILLER:  That was package 1, yes, Your Honor.

22           THE COURT:  Thank you.

23 BY MS. MILLER: (CONTINUING)

24     Q.   Then if we go down to package 2, we're just seeing

25 documentation relating to that particular helicopter; is that

1    correct?

2        A.    Yes.

3        Q.    Okay.  Can you go down to package 3, please.  And

4    that's the registration information for that particular

5    helicopter?

6        A.    Yes.

7        Q.    Package 4.  Again, registration information for that

8    helicopter?

9        A.    Yes.

10       Q.    Package 5, package 6, package 7, package 8.  Okay.

11   Package 9.  Here we go.  So, I want to stop on package 9 for a

12   moment.  The other documents that we saw were related to the

13   registration for that one particular helicopter.  On

14   package 9, we see a certificate of insurance for Jan's

15   Helicopters, can you tell the Court who is the insurance

16   company that is providing the certificate of insurance for

17   Jan's?

18       A.    Caledonian Insurance Company.

19       Q.    Okay.  And is that another one of Walker's alter

20   egos?

21       A.    Yes, it is.

22       Q.    Okay.  And could you move ahead to the next opinion,

23   Mr. Leon Guerrero.  Okay, so let's stop there for a moment.

24   You see 17 aircraft identified here?

25       A.    Yes.

```
1        Q.   Okay.

2             THE COURT:  Sorry, what exhibit number --

3             MS. MILLER:  This is package 9, I believe, is

4   that -- no, ten.

5             THE COURT:  Ten, all right.

6             MS. MILLER:  Package 10.

7             THE COURT:  Okay.  What was the last question,

8   this is what now, what does this represent.

9             MS. MILLER:  So, this is a listing of the

10  helicopters, Your Honor --

11            THE COURT:  Okay.

12            MS. MILLER:  -- that were owned by Jan's

13  Helicopters, one of the Walker's alter egos.

14  BY MS. MILLER: (CONTINUING)

15       Q.   And you see the agreed value of those helicopters

16  there, Mr. Reyna?

17       A.   Yes, I do.

18       Q.   Okay.  And can we go to package 11, please.  And

19  that's more registration information.  Let's go to package 12,

20  please.  More registration information.  And now, let's go to

21  package 13 and package 14.  So, if we stop on package 14, can

22  you tell the Court what we see here on package 14?

23       A.   Yes, this is a bill of sale for Jan's Helicopters

24  Service, Inc. is the seller.

25       Q.   Okay.  And what is being sold here?
```

```
 1      A.   Helicopters that are registered in the Philippines.

 2      Q.   Okay.  And that's a list of helicopters we saw on

 3  package 10; is that correct?

 4      A.   Yes, that's correct.

 5      Q.   And if you go scroll down, Mr. Leon Guerrero.  And

 6  hold on right there, that's perfect.  And what is the date

 7  that is inserted hereby the seller?

 8      A.   November 13th, 2018.

 9      Q.   So, this is approximately six months after Mr. Walker

10  was indicted?

11      A.   Yes.

12      Q.   And who is the buyer of these helicopters?

13      A.   Pacific Spotters Corporation.

14      Q.   Okay.  And if you scroll down, and what is the total

15  amount that Pacific Spotters Corporation is paying for these

16  helicopters?

17      A.   $340,000.

18      Q.   Okay.  And that substantially less than the agreed

19  value we saw on package 10 for all of these helicopters?

20      A.   Yes, it is.

21      Q.   All right.  And can we go down, Mr. Leon Guerrero --

22           THE COURT:  I'm sorry, pull that up.

23           MS. MILLER:  Stop right there.

24           THE COURT:  What opinion is that, sorry, that's

25  package 15.
```

 1                    MS. MILLER:  This is package 15, yes, Your Honor.

 2                    THE COURT:  Okay, so this is for all of the

 3    helicopters noted on package 14?

 4                    MS. MILLER:  Yes, Your Honor.

 5                    THE WITNESS:  Yes, Your Honor.

 6                    THE COURT:  All right.  Thank you.

 7    BY MS. MILLER: (CONTINUING)

 8        Q.   And if you read the -- there is a paragraph that

 9    starts with the seller hereby warrants to the buyer and then

10    there is -- there is a Roman numeral I, II and Roman numeral

11    III, can you read Roman numeral III, please?

12                    THE COURT:  I'm sorry, where are we looking at?

13    What paragraph?

14                    MS. MILLER:  We're on the third paragraph down

15    under the buyer.

16                    THE COURT:  Okay.  Okay, I got it.

17                    MS. MILLER:  And the seller Jan's is warranting

18    to the buyer Pacific Spotters Corporation certain warranties.

19                    THE COURT:  Okay.  All right paragraph 3, that's

20    what you're going to discuss?

21                    MS. MILLER:  Yes, Your Honor.

22    BY MS. MILLER: (CONTINUING)

23        Q.   And then Roman numeral III, if you could read that

24    please, Mr. Reyna?

25        A.   "The aircraft is sold in an as-is basis, without any

```
1   warranties whatsoever expressed or implied as to the
2   marketability, fitness for any purpose, durability, design or
3   suitability, especially that it was disclosed that the
4   majority of the aircraft are considered to be scrap,
5   nonfunctional, and/or have expired and lost certificates of
6   registration and airworthiness."
7               MS. MILLER:  Okay.  Can you go on to the next
8   page, please, Mr. Leon Guerrero.
9   BY MS. MILLER: (CONTINUING)
10      Q.   And first, let's go down a moment.  Who signed on
11  behalf of the buyer, Pacific Spotters?
12      A.   Phillip Turner Kapp.
13      Q.   And he was a named co-defendant in this case?
14      A.   Yes.
15              MS. MILLER:  Okay.  Can you scroll down again,
16  Mr. Leon Guerrero.  And we see a opinion of acknowledgements
17  here and can you scroll down, Mr. Leon Guerrero.  Thank you.
18  And scroll down some more, please.  And let's go -- and stop
19  right there at package 18.
20  BY MS. MILLER: (CONTINUING)
21      Q.   And what do we see on package 18?
22      A.   Board's resolution, bulk sales, which lists all the
23  helicopters that are being sold by Jan's Helicopter Services.
24              MS. MILLER:  Okay.  And can you scroll down,
25  Mr. Leon Guerrero.
```

```
1                THE COURT:  I'm sorry, is that the same listing
2    that was on package 11?
3                MS. MILLER:  It is, Your Honor.
4                THE COURT:  No, I'm asking the witness.
5                THE WITNESS:  Yes, it is.
6                THE COURT:  Okay.  Thank you.  All right.  Thank
7    you.
8    BY MS. MILLER:  (CONTINUING)
9        Q.   And who is signing this board resolution on November,
10   looks like maybe 2nd, 2018?
11       A.   John Darrell Walker.
12               MS. MILLER:  Okay.  And can you scroll down,
13   Mr. Leon Guerrero?
14               THE COURT:  What package is that?
15               MS. MILLER:  And hold on, that was package I
16   believe 8 -- 19, Your Honor.
17               THE COURT:  Okay.
18               MS. MILLER:  Thank you, and if we -- keep
19   scrolling down please.  And right there.  Package 20.
20   BY MS. MILLER:  (CONTINUING)
21       Q.   What do we see there, whose passport is copied there?
22       A.   John Walker.
23       Q.   And what is the date there?
24       A.   December 14th, 2018.
25               MS. MILLER:  Okay.  And that's it.  Thank you,
```

1    Mr. Leon Guerrero.

2    BY MS. MILLER: (CONTINUING)

3        Q.    In your experience as a money laundering expert, why

4    would someone charged with a crime open up a new company to do

5    exactly the same thing that their other companies were doing?

6        A.    In order to continue the ongoing criminal scheme, and

7    that way it's -- gives the criminal the ability to avoid the

8    detection of law enforcement.

9        Q.    So, in 2018, after Mr. Walker was indicted, did the

10   articles of incorporation for Pacific Spotters Corporation

11   change?

12       A.    Yes, I did.

13       Q.    And could you tell the Court how they changed?

14       A.    They were changed so that they modeled Hansen

15   Helicopters and so it listed that not only repairs can be done

16   but also that the business could lease helicopters.

17       Q.    Okay.  In addition to selling those 17 aircraft that

18   we saw in Exhibit 3003, did you review an exhibit that showed

19   that the remainder of Mr. Walker's helicopter fleet was sold

20   to Pacific Spotters Corporation?

21       A.    Yes.

22            MS. MILLER:  Your Honor, I would like to show the

23   witness and the Court Exhibit 7 for the sentencing.

24            THE COURT:  Okay, seven.

25            MS. MILLER:  Yes, Your Honor.

```
 1                    THE COURT:  Hold on a second.  Let me pull that
 2    up.
 3                    MR. WELK:  I have it.
 4                    THE COURT:  You got it.  I guess we're trying to
 5    find ours but go ahead.  My I think --
 6                    MS. MILLER:  So Mr. Leon Guerrero can pull it up
 7    on the screen as well, Your Honor.
 8                    THE COURT:  You may.  Can you repeat the exhibit
 9    number again?
10                    MS. MILLER:  Yes, Your Honor, it's Exhibit 7.
11                    THE COURT:  So, sentencing Exhibit 7.
12                    MS. MILLER:  Yes, Your Honor.
13                    THE COURT:  What was the trial exhibit?
14                    MS. MILLER:  There wasn't a trial exhibit for
15    this, this is a document that was received by Pacific Spotters
16    Corporation.
17                    THE COURT:  Okay, so this is a new exhibit then?
18                    MS. MILLER:  Yes.
19                    THE COURT:  Okay.  Exhibit 7.
20                    MR. WELK:  Um, Your Honor, could I ask for a
21    clarification because there was a ruling on -- with respect to
22    the proffer of Cherry Espion and the documents that were
23    received in connection with that proffer --
24                    THE COURT:  On Cherry Espion, uh-huh.
25                    MR. WELK:  I would inquire whether this is
```

```
 1   included within those documents because that was -- that was

 2   the proffer that we were notified of at the last minute.

 3                 MS. MILLER:  As I told Counsels previously and

 4   the Court, PSC produced all of these documents to us before

 5   the proffer of Cherry Espion.  These documents were produced

 6   to Mr. Welk before the proffer of Cherry Espion.  And these

 7   documents are not related to the proffer of Cherry Espion.

 8                 THE COURT:  Okay.  So, they're not related.  So,

 9   what are they related to?

10                 MS. MILLER:  They show, Your Honor, the --

11                 THE COURT:  Hold on.

12                 MR. WELK:  They weren't produced to me by the

13   government until late in the process.  I know Ms. Miller is

14   convinced that PSC's attorney gave me -- gave me these

15   documents because he told her he did, but I did not receive

16   them.

17                 MS. MILLER:  But I gave him the documents in a

18   timely manner, Your Honor, pursuant to this Court's order,

19   yes, he received them.

20                 MR. WELK:  Thank you, Your Honor.

21                 THE COURT:  All right.  So, you're not saying you

22   didn't receive it, is that right, Mr. Welk?

23                 MR. WELK:  No, I received it in connection with

24   this.

25                 THE COURT:  Right.
```

```
 1              MR. WELK:  It's fine, Your Honor.  I'll withdraw

 2    the objection.

 3              THE COURT:  Okay.  Very well, proceed.

 4              MS. MILLER:  Thank you, Your Honor.

 5              MR. LEON GUERRERO:  Gina.

 6              THE COURT:  Sorry, this is Exhibit 7.

 7              MS. MILLER:  Yes, Your Honor.

 8    BY MS. MILLER: (CONTINUING)

 9        Q.   So, in addition to the 17 aircraft that we see that

10    Jan's Helicopters sold to Pacific Spotters in 2018, were the

11    other helicopters that were used in the fraud sold to Pacific

12    Spotters?

13        A.   Yes, they were.

14        Q.   And if we look at Exhibit 7, if we could pull it up

15    on the screen and if we can't, we'll do the good old-hard

16    copy.  Okay.  There it goes.  So, Exhibit 7 is 567 pages, Your

17    Honor, I'm obviously not going go through all of those pages,

18    however, we will go through the first one and any others that

19    the Court would like, but basically let's look at this first

20    exhibit.  Eddie Air Inc., do you recognize the name of that

21    company?

22        A.   I do.

23        Q.   And what is that company?

24        A.   It's a company owned and controlled by John Walker.

25        Q.   This is one of the alter ego Vanuatu companies?
```

1          A.    Yes, it is.

2          Q.    And what is this company doing in this particular

3     document?

4          A.    It's selling a helicopter to Pacific Spotters

5     Corporation.

6                MS. MILLER:   Okay.  And can you scroll down

7     please, Mr. Leon Guerrero.

8     BY MS. MILLER: (CONTINUING)

9          Q.    And for this particular document, which two

10    helicopters are being sold to Pacific Spotters Corporation?

11         A.    It's 1 and 2, which are Hughes Helicopters.

12         Q.    Okay.  With U.S. registration numbers?

13         A.    Yes.

14               MS. MILLER:   Okay.  Can you keep scrolling down,

15    Mr. Leon Guerrero.

16    BY MS. MILLER: (CONTINUING)

17         Q.    And who is signing this on behalf of Eddie Air?

18         A.    Kenneth R. Crowe.

19         Q.    Okay.  And he was one of the defendants in the

20    criminal case; correct?

21         A.    Yes.

22         Q.    Okay.  And when you continue to look through the

23    567 pages of this document, do you see the various names of

24    various different alter egos that were used by John Walker in

25    this scheme?

```
 1        A.   Yes, I do.

 2        Q.   And do you see the listing of various helicopters

 3   that were used by John Walker in this scheme as well?

 4        A.   Yes.

 5        Q.   Okay.  Let's look at Exhibit 11, please.

 6             THE COURT:  Sorry, so for purposes of your

 7   testimony, are the helicopters, the 17 helicopters that were

 8   previously identified in the last exhibit.

 9             THE WITNESS:  These are additional helicopters,

10   Your Honor.

11             THE COURT:  These are additional.  Additional to

12   the 17?

13             THE WITNESS:  Yes, Your Honor.

14             THE COURT:  Okay.

15             THE WITNESS:  And they're also in the names of

16   other shell or alter ego companies.

17             THE COURT:  Okay.  I'm sorry, hold on one second.

18   What was the other exhibit please?

19             MS. MILLER:  Yes, Your Honor, the next exhibit is

20   Exhibit 11.

21             THE COURT:  All right.  This is -- now was this

22   also in trial or not?

23             MS. MILLER:  No, this is another Pacific Spotters

24   exhibit, Your Honor.

25             THE COURT:  Oh, okay, let me pull 11.  Do we
```

```
 1    have -- I think it's here, right?  This is it?  Okay.  All
 2    right.  Okay, I've got 11.
 3                    Do you have that, Mr. Welk?
 4                    MR. WELK:  I have it, Your Honor, yes.
 5                    THE COURT:  Very well.  Okay, go ahead.
 6                    MS. MILLER:  May I proceed, Your Honor?
 7                    THE COURT:  You may, you may.
 8    BY MS. MILLER: (CONTINUING)
 9        Q.    So, Mr. Reyna, we saw earlier in Exhibit G-2939, on
10    package 82, wire transfers going from Pacific Spotters to
11    Limey Air, a company in which John Walker was a 99.9% owner;
12    correct?
13        A.    Yes, that's correct.
14        Q.    And on package 83, we saw wire transfers going from
15    Pacific Spotters to Limey Air in 2019, wire transfers from
16    Pacific Spotters to Limey Air; correct?
17        A.    Yes, that's correct.
18        Q.    And we had a total of approximately $5 million going
19    from Limey Air to Pacific Spotters in 2018 and 2019; is that
20    correct?
21        A.    It is correct.
22        Q.    Okay.  Now what we're seeing here is a certification
23    by Pacific Spotters that $3,000,110 went to John Walker
24    between 2021 and 2024; is that correct?
25        A.    That is correct.
```

```
 1        Q.   Okay.  Could you also look at what has been

 2   previously marked as Exhibit 211, 211, we're going to go to

 3   that.

 4             THE COURT:  I'm sorry, this is now Exhibit 211?

 5             MS. MILLER:  Exhibit 211 to the sentencing, Your

 6   Honor.

 7             THE COURT:  Okay.  Sentencing Exhibit 211.  Okay,

 8   let's pull that.  Hold on.  Okay.  This is not a government

 9   trial exhibit, right?

10             MS. MILLER:  No, Your Honor, this is another

11   exhibit from Pacific Spotters Corporation.

12                   (Discussion with clerk.)

13             THE COURT:  Mr. Welk, you got it?  Did you get

14   it, Mr. Welk?

15             MR. WELK:  I have it, Your Honor.

16             THE COURT:  Go ahead.

17   BY MS. MILLER: (CONTINUING)

18        Q.   So, Mr. Reyna, have you reviewed this document?

19        A.   Yes, I have.

20        Q.   The first three entries to this document, if you move

21   over more to the right, Mr. Leon Guerrero, appear to be what?

22        A.   Remittances to John Darrell Walker for the account of

23   Jan's Helicopters Service, Inc. to apply as payment to the

24   $310,000 balance for the purchase of helicopters in November

25   of 2018.
```

1      Q.   So, this is related to the document we showed the

2   Court earlier, G-3003, which was the bill of sale for those 17

3   helicopters between Jan's Helicopters owned by John Walker to

4   Pacific Spotters owned by John Walker; correct?

5      A.   That is correct.

6      Q.   Okay.  And if we continue down, what is being

7   described in the remarks as why these funds are going between

8   Pacific Spotters to John Walker?

9      A.   These are advances to John Walker.

10     Q.   Okay.  And at the very bottom, we see two dividends?

11     A.   Yes, that's correct.

12     Q.   Okay.  And the total again equals the total of the

13  summary we saw on the prior document of $3,000,110; correct?

14     A.   Yes, that's correct.

15     Q.   Okay.  I'd like you to look at what has been marked

16  for the purposes of sentencing, as Exhibit 210.

17             THE COURT:  Okay, 210.  Is that it up here?  No,

18  this is not it --

19             MS. MILLER:  That's 211, Your Honor, in front of

20  you.

21             THE COURT:  Okay.

22             MS. MILLER:  So, we are going to 210.

23             THE COURT:  Okay.  Did you find it, Mr. Welk?

24             MR. WELK:  I have it, Your Honor.

25             THE COURT:  Okay.

1          MS. MILLER:  Okay, and if could you expand that,

2    Mr. Leon Guerrero.  Excellent.  Okay.

3    BY MS. MILLER: (CONTINUING)

4        Q.   And what are we seeing here?  And can you scroll up,

5    Mr. Leon Guerrero.  Perfect, to the total on the bottom.  What

6    are we seeing here, who is the receiving these payments from

7    Pacific Spotters?

8        A.   Yes, this is a summary of payments to Kenneth R.

9    Crowe for 2021 through 2024.

10       Q.   So, for the same period of time that Mr. Walker was

11   receiving payments; correct?

12       A.   That is correct.

13       Q.   And what is the total amount of money that was

14   remitted to Mr. Crowe during that period of time?

15       A.   A little over $93,000.

16       Q.   For a fraction of the funds that were received by

17   Mr. Walker; correct?

18       A.   Yes, that's correct.

19       Q.   Did you also analyze, sir, the transfers that were

20   made between Pacific Spotters Corporation and Limey Air from

21   2021 to 2023?

22       A.   Yes.

23       Q.   And what was the total amount of wire transfers

24   between Pacific Spotters and Limey Air between those two

25   dates?

```
 1       A.    (No response.)

 2       Q.    21 through 23?

 3       A.    $3 million.

 4       Q.    No, that's --

 5       A.    Oh, I'm sorry.

 6       Q.    That's the funds that went directly to John Walker.

 7             THE COURT:  Is he -- is he reviewing the same

 8   exhibit.

 9             MS. MILLER:  We have another exhibit, Your Honor,

10   that we're going to pull up that shows the additional

11   transfers.

12             THE WITNESS:  Yeah, that's over $9.5 million.

13             MS. MILLER:  Okay.  And if you give me one

14   second, Your Honor.

15             THE COURT:  Mm-hmm.

16             MS. MILLER:  It's Exhibit 15, Your Honor, to the

17   sentencing exhibits.

18             THE COURT:  Okay, all right.  Okay, again, this

19   is not a trial exhibit?

20             MS. MILLER:  This is not a trial exhibit.

21             THE COURT:  All right, so sentencing Exhibit 15?

22             MS. MILLER:  Yes, Your Honor.

23             THE COURT:  Okay.  We'll get that.  Let's see if

24   Mr. Welk will have it too.

25             (Pause.)
```

                    MS. MILLER:  No, that's not it.

                    THE COURT:  Is this it?

                    MS. MILLER:  No, it's not.

                    THE COURT:  Wrong exhibit?

                    MS. MILLER:  Wrong exhibit.

                    THE COURT:  Wrong exhibit.

                    MS. MILLER:  The PSC bates number, Mr. Leon
Guerrero, is PSC_001572.

                    MR. WELK:  It's not 15.

                    THE COURT:  No, she said it's not 15.  Gina, the
sentencing exhibit number.

                    MS. MILLER:  That's what we're looking for, Your
Honor, the PSC bates number is 001572.  So, we are looking for
the correlating sentencing exhibit number.

                    THE COURT:  Gina, thinks it's 213, do you want to
double-check that.

                    MS. MILLER:  Oh, 213?  Thank you, Gina.

                    THE COURT:  Is that right, Gina?  So, that's the
trial -- the trial exhibit or government's exhibit?
Sentencing?

                    MS. MILLER:  Sentencing.

                    THE COURT:  Number?

                    MS. MILLER:  Gina, is the --

                    THE CLERK:  Sentencing.

                    THE COURT:  Try -- try 213.

```
 1                    MS. MILLER:  213.

 2                    THE COURT:  213, that's right.

 3                    MR. LEON GUERRERO:  I'm pulling it up.

 4                    THE COURT:  Yeah, I got to pull it too.

 5                    MS. MILLER:  Thank you, Gina.

 6                    THE CLERK:  You're welcome.

 7                    MS. MILLER:  No, that's not it, but that's okay.

 8                    THE COURT:  That's not it?

 9                    MS. MILLER:  0015 -- yeah, no, this is a

10      different one, but yes, I want to use this one so let's keep

11      that up for a moment.

12                    THE COURT:  Okay.  Hold on hold on.  Let Mr. Welk

13      try to find it.

14                    MS. MILLER:  Yes, Your Honor.

15                    THE COURT:  If he wants to be able to.

16                    MR. WELK:  I'm sorry, what am I looking for?

17                    THE COURT:  She says it's exhibit -- government

18      Exhibit 213?

19                    MS. MILLER:  Yes.

20                    MR. WELK:  Got it.

21                    THE COURT:  Okay, very well.

22                    MS. MILLER:  Thank you, Your Honor.

23      BY MS. MILLER: (CONTINUING)

24         Q.   So --

25                    THE COURT:  213.
```

BY MS. MILLER: (CONTINUING)

Q.   So, when the Articles of Incorporation for Pacific Spotter changed so that Pacific Spotters was now going to be a helicopter leasing company, what did Mr. Walker do with a percentage of his ownership in Pacific Spotters?

A.   He divested himself because under Philippine law a U.S. citizen could not have more than a third of the ownership of the company.

Q.   Okay.  And when he divested a portion of his 90% ownership of the company, who did he divest that interest to?

A.   To four mechanics that worked for his companies, along with the wife of one of the mechanics.

Q.   Okay.  And this exhibit, 213, to the sentencing, is what?  What do we see in this exhibit?

A.   It's a loan document between John Walker and Cherry Espion.

Q.   Okay.  And if we continue looking at this exhibit, is it also a loan document between Mr. Walker and the other individuals who assumed some of his portion of ownership?

A.   Yes, that's correct.

Q.   And what was the interest on this loan?

A.   There is no interest listed on this loan document.

Q.   Okay, as a matter of fact, Paragraph 2 says the loan shall not bear any interest; is that correct?

A.   That is correct.

```
 1      Q.   And what are the terms of the loan?

 2      A.   The terms include the amount of 26 million pesos

 3   shall be payable in 120 equal monthly installments for a

 4   period of ten years starting July 1st, 2020 until July 1st,

 5   2030.

 6      Q.   And did you perform an analysis of what 26 million

 7   Philippine pesos is in U.S. dollars approximately?

 8      A.   Yes, I did.

 9      Q.   And what is that amount?

10      A.   It was roughly about $4,000.

11      Q.   A month?

12      A.   A month.

13      Q.   Okay.  And if we go to the next package, Mr. Leon

14   Guerrero.  Is that the only opinion there?  Okay, so did you

15   see other loan agreements between Mr. Walker and Oswald

16   Espion, and this Cherry Espion's husband?

17      A.   Yes, I did.

18      Q.   And between Mr. Walker and Jeffrey Sarimos?

19      A.   Yes.

20      Q.   Okay.  Did you see any evidence in the financial

21   records that we received from Pacific Spotters Corporation of

22   any of these individuals making that almost $4,000 a month

23   payment to Mr. Walker?

24      A.   No, I did not.

25           THE COURT:  I'm sorry , you saw no transactions
```

```
 1    of repayment?

 2                   THE WITNESS:  No, Your Honor.

 3                   THE COURT:  Or I guess payment, not repayment but

 4    payment.  Okay.

 5    BY MS. MILLER: (CONTINUING)

 6        Q.   Okay.  I would now like you to look at what has been

 7    previously marked for sentencing purposes as Exhibit 223.

 8                   THE COURT:  Okay, 223?  Is that a new one as

 9    well?

10                   MS. MILLER:  Yes, Your Honor, that's another

11    Pacific Spotters document.

12                   THE COURT:  Okay.  Hold on.  Let me pull that.

13    Mr. Welk, did you find it?

14                   MR. WELK:  I have it, Your Honor.

15                   THE COURT:  Okay, good.  Go ahead.

16                   MS. MILLER:  And, Your Honor, do you have it?

17                   THE COURT:  I do.

18                   MS. MILLER:  Okay.  And we also have it on the

19    screen.

20                   THE COURT:  All right.

21    BY MS. MILLER: (CONTINUING)

22        Q.   Mr. Reyna, what is the date of this memorandum of

23    understanding and agreement?

24        A.   March 22nd, 2021.

25        Q.   And could you read this to us, please?
```

A.   Yes.  "Memorandum of understanding and agreement.
This agreement documents a verbal arrangement that has existed
between Pacific Spotters Corporation, PSC, and Wilma's Flight
Services, Inc., Wilma's, since August 2018 whereby PSC agreed
to process the fleet payroll for all independent contractors,
pilots and mechanics, of Wilma's.  It is understood between
PSC and Wilma's that Wilma's does not currently have a bank
account which has to capacity to process its fleet's payroll,
and as a result, it is more efficient for PSC to process such
payroll since PSC is the one that collects all lease payments
for the fleet helicopters, and as such, if Wilma's were to
have its own bank account, then PSC would have to remit money
to Wilma's out of the lease payments it receives for Wilma's
to be able to process the fleet payroll."

Q.   As an expert in money laundering, what is your
interpretation of this document?

A.   That PSC is taking the place of Wilma's.

Q.   And to remind the Court, Wilma's Flight Service was
one of the John Walker companies under his control?

A.   That is correct.

Q.   And to remind the Court, we saw an Exhibit G-0366,
the balance sheet and income statement for Wilma's Flight
Service?

A.   Yes, that's correct.

Q.   And Wilma's was the alter ego that was identified as

```
 1    owning all of the helicopters that were used in the fraud?
 2        A.   Yes, that's correct.
 3        Q.   And in the consolidated financial statements we saw a
 4    gross profit from the leases of excess of $23 million?
 5             MR. WELK:  Objection, leading.
 6             THE COURT:  Overruled.
 7             THE WITNESS:  Yes, that's correct.
 8    BY MS. MILLER: (CONTINUING)
 9        Q.   Okay.  How much total funds went from Pacific
10    Spotters to Limey Air Services, the company in which John
11    Walker is a 99.9% owner from the creation of Wilma's -- from
12    the creation, I'm sorry, of Pacific Spotters through 2023, the
13    total amount?
14        A.   Approximately 20 million USD.
15        Q.   Okay.
16        A.   Just a little under.
17             MS. MILLER:  Okay.  Let's now look at Exhibit 224
18    please for the sentencing, which is another Pacific Spotters
19    document, Your Honor.
20             THE COURT:  Okay.  Hold on, 224 give us a second.
21    Did you get that, Mr. Welk?
22             MR. WELK:  I have it, Your Honor.
23             THE COURT:  All right.  Okay.  We're good.
24             MS. MILLER:  Do you see that document in front of
25    you, Mr. Reyna?
```

1          THE WITNESS:  Yes, I do.

2   BY MS. MILLER: (CONTINUING)

3       Q.   Okay.  Can you tell us what this document represents?

4       A.   Yes, it's a memorandum of understanding and

5   agreement.

6       Q.   Okay.  And could you read this to the Court, please?

7       A.   Yes.  "Pilots, mechanics, and other support personnel

8   for the aircraft onboard fishing vessels, collectively flight

9   support personnel, are under independent contractor agreements

10  with Wilma's Flight Services, Inc., Port Vila, Vanuatu, a

11  corporation providing flight support personnel to helicopters.

12  Pacific Spotters Corporation is a helicopter maintenance and

13  leasing corporation located in Clark Freeport Zone

14  Philippines, leasing helicopters to fishing vessels operating

15  in the Pacific ocean.  By virtue of this memorandum, Wilma's

16  Flight Service, Inc., Wilma's, and Pacific Spotters

17  Corporation, PSC, hereby document their verbal agreement that

18  has existed since July 1st, 2019, to wit, one, PSC shall

19  collect all lease payments from fishing vessels, lease

20  contracts shall be executed between the vessel companies and

21  PSC; two, in consideration of the above lease collections, PSC

22  shall be responsible for and shall timely pay costs of

23  contractor-related compensation due to such flight support

24  personnel; three, this agreement is without prejudice to other

25  fees that may occur between the two parties."

```
 1        Q.    And who is signing the agreement on behalf of Wilma's
 2   Flight Service and Pacific Spotters Corporation?
 3        A.    Kenneth R. Crowe.
 4        Q.    And Pacific Spotters?
 5        A.    Phillip T. Kapp.
 6        Q.    Again, two of the defendants -- co-defendants?
 7        A.    Yes.
 8        Q.    So, in reviewing --
 9              MR. WELK:  I object to Mr. Crowe being referred
10   to as a co-defendant.  He's not.
11        Q.    In reviewing the --
12              THE COURT:  Overruled, go ahead.
13   BY MS. MILLER: (CONTINUING)
14        Q.    -- transfers of funds between Pacific Spotters and
15   Limey Air, and as you testified almost $20 million, do those
16   funds represent funds of a specified unlawful activity?
17              MR. WELK:  Objection.
18              THE WITNESS:  Yes.
19              MR. WELK:  Calls for a legal conclusion.
20              THE COURT:  Overruled, go ahead.
21              THE WITNESS:  Yes, it does.
22   BY MS. MILLER: (CONTINUING)
23        Q.    And do those funds represent money laundering?
24        A.    Yes, they do.
25              MS. MILLER:  I have no further questions for the
```

```
 1   witness, Your Honor.

 2                  THE COURT:  Mr. Welk?

 3                  MR. WELK:  Just a moment, Your Honor.

 4

 5                        CROSS-EXAMINATION

 6

 7   BY MR. WELK:

 8       Q.    Good morning, Special Agent Reyna.

 9       A.    Good morning, sir.

10       Q.    Are you a CPA?

11       A.    I am not.

12       Q.    You testified earlier that you -- let me ask you, I

13   understood you to testify earlier that you had reviewed

14   whatever you have reviewed, you came to the conclusion that

15   the manner in which the Walker-related entities were

16   operated -- was a complex -- complex methods used to distance

17   criminal proceeds.  Do you recall that?

18       A.    I do.

19       Q.    And you identified as reasons for that, is that there

20   were multiple bank accounts, right?

21       A.    Yes.

22       Q.    Multiple companies, yes?

23       A.    Yes.

24       Q.    And multiple jurisdictions, right?

25       A.    Yes.
```

1      Q.   Before we get -- before we go any further, you've

2  made multiple references to these companies as alter ego

3  companies, what is your basis for that, the use of that term?

4      A.   (No response.)

5      Q.   Well, I'm sorry, I'm sorry, what is an alter ego

6  corporation?

7      A.   Alter ego is another term for a shell company.

8      Q.   Okay, what is -- what is an alter ego corporation

9  other than a synonym for shell company?

10      A.   It is a company that provides no legitimate service

11  or business.

12      Q.   Anything else?  Is there anything else that defines

13  an alter ego company?

14      A.   That's all I have.

15      Q.   Doesn't alter ego mean as a term of art that

16  it -- that there is no legal distinction to be drawn between

17  alter egos, whether they're companies or other companies or

18  individuals?

19      A.   I'm not sure what you're asking.

20      Q.   I'm asking you, if the term alter ego -- you

21  understand what the term alter ego means, right?

22      A.   Yes, I gave you my definition.

23      Q.   Okay.  But have you ever heard that the term alter

24  ego is a legal term of art that refers to corporations that

25  have no legal distinction between them and either the person

```
1    who owns them or the corporation who owns them?

2         A.   I haven't heard it specifically phrased the way you

3    just mentioned.

4         Q.   You ever heard the phrase piercing the corporate

5    veil?

6         A.   I've heard the term.

7         Q.   Do you know what that means?

8         A.   I mean there is a related -- there is a relationship

9    between the owner and the alter ego, if that's what you're

10   asking me.

11        Q.   I don't understand your answer.  Were you answering

12   what you think piercing the corporate veil means?

13        A.   I don't understand what your question.  So if you

14   could rephrase it in way or somehow better, then I can answer

15   it.

16        Q.   I asked you if you know what piercing a corporate

17   veil means?

18        A.   That there is a potential relationship between an

19   owner and corporation.  And what the link is, the pierce, I'm

20   not sure what you're trying to ask me.

21        Q.   Okay.  I don't want you to focus not so much on what

22   you think I'm trying to find out but -- so piercing the

23   corporate veil, you're familiar with that phrase?

24        A.   I've heard the term, I'm trying to give you my

25   interpretation of what I think it may mean.
```

1    Q.   Okay.  And what does it mean to pierce the corporate

2  veil in your understanding?

3    A.   Is that trying to connect the owner and the

4  corporation, what's the link between the two; that's how I

5  interpret it.

6    Q.   Just trying to connect them?

7    A.   That's what I just said.

8    Q.   So, you don't understand it to mean that there is

9  derivative liability of an individual because the corporate

10  veil is pierced and the individual is therefore liable under

11  circumstances that it -- he normally would not be?

12    A.   What's your question?

13    Q.   I just asked it.  I can have it re-read if you like?

14    A.   Re-read it.

15    Q.   Okay.

16         THE COURT:  Can you -- Veronica, could you repeat

17  the question for the witness.  The last question.

18    *(Whereupon the reporter read back the requested portion.)*

19         THE WITNESS:  If you could just rephrase the

20  question in plain simple English, I think I can maybe answer

21  what you're trying to ask me.

22  BY MR. WELK: (CONTINUING)

23    Q.   Okay.  I'll give it a try.  It may be a little

24  complicated because *piercing the corporate veil* is a legal

25  term of art.  And what I'm asking you is, you've answered that

1    you think it means there's a link between an individual and a

2    corporation, so do you think that if Mr. Jones owns Apex,

3    Inc., that that means that -- that means piercing the

4    corporate veil, just the fact that Mr. Jones owns Apex, Inc.?

5         A.   What's your question?  I'm not tracking what your

6    question is.

7                   MS. MILLER:  Your Honor, I'm going to object.  I

8    think the problem here is, Mr. Welk is using a specific legal

9    term of art that frankly applies in the civil context, of

10   piercing the corporate veil.  And he's asking this witness to

11   agree with his legal definition and the witness is not

12   understanding the question -- I'm not sure I understand

13   exactly what he's asking.  And I'm not sure it's relevant to

14   these proceedings, so I'm going to object on that basis.

15                  THE COURT:  Court will overrule the objection.

16   Go ahead.

17                  The objection is overruled.  Go ahead.

18                  MR. WELK:  Thank you.

19   BY MR. WELK: (CONTINUING)

20        Q.   Let's try this.  Let's try this, Agent Reyna.

21   Because you used the term alter ego, right?

22        A.   I did.

23        Q.   And you think you believe you have an understanding

24   of what that term means?

25        A.   Yes.

1    Q.   Do you think that the mere fact that John Walker is a

2  majority owner of a company means that the company is his

3  alter ego?

4    A.   Yes.

5    Q.   All right.  And that's the context in which you have

6  used the term alter ego in your testimony today; correct?

7    A.   That he is a owner of these corporations and also

8  that the corporations, as I used it during my testimony, that

9  it's also known as a shell company that's not forming any

10  legitimate business.

11    Q.   I see.  Okay.  So -- so, it also includes in your

12  mind alter ego also includes this idea of a shell company,

13  yes?

14    A.   Yes.

15    Q.   And shell company is defined as a company that

16  provides no services or business, yes?

17    A.   No legitimate business or service.

18    Q.   And what do you mean by "legitimate"?

19    A.   Something that's legal.

20    Q.   So -- and when you use the term alter ego about, let

21  me put this exhibit back up, number 93.

22              THE COURT:  Okay.  Gina, can you --

23              THE CLERK:  Yes.

24              THE COURT:  Let's try --

25  BY MR. WELK:  (CONTINUING)

1    Q.   Is it your belief, Special Agent Reyna, that all of

2    these entities listed on here are alter egos of John Walker?

3    A.   Yes.

4    Q.   But did you do an investigation into what all of

5    these companies did?

6    A.   As far as what?

7    Q.   Like for example, did you know that the -- did you

8    uncover in your investigation that the Vanuatu international

9    companies, that most if not all of them were the title holder

10   of at least one helicopter?

11   A.   I reviewed records, I did not conduct the

12   investigation.  I was not the case agent.  I was just brought

13   in to testify as a money laundering expert witness for this

14   hearing.

15   Q.   I see.  Okay.  So -- so going back to my question,

16   did you -- do you know that these international, these Vanuatu

17   corporations that most or all of them own, were the title

18   holder of a single helicopter?

19   A.   I do recall that they were -- that they were owners

20   of multiple helicopters.

21   Q.   Each of them?

22   A.   I don't recall if exactly all of 'em were under every

23   single one of these companies.

24   Q.   Do you recall that there were any of the companies

25   that didn't own any helicopters?

1     A.   I don't recall that.

2     Q.   Do you know Bean Bag Helicopters Services owned any

3   helicopters?

4     A.   If you have something to show me, then I can review

5   that.

6     Q.   I'm just asking whether you know?

7     A.   I don't recall.

8     Q.   Okay.

9     A.   If they did own one or multiple or if any at all?

10    Q.   I'm sorry, I -- I didn't hear that last part or any

11   at all?

12    A.   That's what I said.

13    Q.   Okay, so it's your -- it's your testimony today that

14   all of these companies were alter egos, right?

15    A.   Yes.

16    Q.   That there were 48 alter egos?

17    A.   At least.

18    Q.   And in making that determination, did you look at

19   each of those companies to see if they owned anything or if

20   they did any kind of business?

21    A.   I looked at multiple records and some of those

22   records show that some of these helicopters were registered in

23   some of these names.

24    Q.   Thank you.  Did you look at each of these companies

25   to see whether each of them owned helicopters or was involved

1  in some sort of business?

2      A.   Again, I can't tell you if I looked at every single

3  one of these and whether -- if they owned any helicopters,

4  whether it's one or more or any at all, but I did look at

5  records related to this chart.

6      Q.   So you said -- so, if I'm understanding you correctly

7  you looked at some records and based on that review, you found

8  that each of these companies either didn't own any

9  helicopters, owned one or owned more than one, right?

10     A.   I just told you that I looked at these records and I

11 don't recall if each one of these corporations owned one, more

12 or any of the helicopters.

13     Q.   I think that's -- okay, that's what I asked.

14              MS. MILLER:  Your Honor, I'm going to move to

15 strike Mr. Welk's comment.

16              THE COURT:  That's what I asked?  Okay, just go

17 ahead.

18              MR. WELK:  Just confirming that I got an answer

19 to my question.

20              THE COURT:  You're talking to yourself?

21              MR. WELK:  Exactly.  I'll withdraw the statement

22 I'm happy to withdraw it.  I don't want to upset the

23 government since --

24              THE COURT:  Let's move on.

25              MS. MILLER:  I'm going to move to strike these

```
1    unnecessary --

2              THE COURT:  Yeah, yeah, yeah.  Both of you.

3              MS. MILLER:  -- comments.

4              THE COURT:  All right.  Yeah.

5              MR. WELK:  Can I --

6              MS. MILLER:  The part about -- okay, the part

7    about.

8              THE COURT:  He was just reconfirming, the Court

9    will overrule that objection, but let's just be civil and

10   let's continue on, proceed.

11   BY MR. WELK: (CONTINUING)

12       Q.   Can I have the ELMO back up again?  So, going back to

13   your definition of alter ego, it was a company that provides

14   no legitimate service.  Did you inspect each one of these

15   companies or the records of each one of these to companies to

16   determine whether each of them was providing a legal service

17   or business?

18       A.   I reviewed multiple records, I don't recall if I

19   reviewed every single one.

20       Q.   Did you -- do you believe that you reviewed enough

21   records to come to the conclusion that none of these

22   businesses was operating, was providing legitimate service or

23   business?

24       A.   Based on what I have learned during the preparation

25   for my testimony and also the prior testimony on Friday, as I
```

understand it, the services that were being provided were

based on helicopters that had fraudulent parts, that were

being worked on by mechanics that weren't licensed.  So, based

on that and those facts, that I can see is not legitimate

business.

Q.   And how is it that you know that that's not a

legitimate business?

A.   I listened to the testimony, for example, of the FAA

employee, Mr. DeVogel.

Q.   And you understood his testimony to be that none of

these companies was operating as a legitimate business?

A.   I don't know about specifically that question, but as

far as the -- as I mentioned, the mechanics not being licensed

or the parts -- having counterfeit parts being used to be

installed on these aircraft.

Q.   Was it your understanding that Mr. DeVogel or anyone

else testified that the pilots weren't licensed?

A.   That's what I learned during the preparation for my

testimony.

Q.   Not licensed anywhere?

A.   I don't know about whether they were licensed in

other jurisdictions and I don't know whether or not they

were -- like all of them were licensed or maybe there was just

a few, I just know that some from based on what I've learned

during the preparation of my testimony that they were not

 1    licensed.

 2         Q.   How many pilots were there?

 3         A.   I don't recall but I remember there being at least a

 4    120 employees.

 5         Q.   Oh, how many of those employees were pilots?

 6         A.   Again, I don't -- I don't recall exactly how many

 7    were pilots.

 8         Q.   I see.  How many of them were mechanics?

 9         A.   Again, I don't have the exact break out between

10    pilots and mechanics and the different employees within John

11    Walker's businesses.

12         Q.   How many of the employees were office staff?

13         A.   Again, I don't -- I don't know.

14         Q.   Would they have to be licensed?

15         A.   Depending on what they were performing.

16         Q.   As office staff?

17         A.   As far as I know, no.

18         Q.   Okay.  So -- so there would be -- so -- the office

19    staff could have been providing legal services, right?

20         A.   I am unaware if any of the office staff provided any

21    type of legal services.

22         Q.   Are you aware of them providing illegal services?

23         A.   Um, if you give me a list of the office staff

24    and -- do you have them?

25         Q.   Look, I'm just trying to understand your use of this

term alter ego, which seems to be that because you heard that,
this isn't the question by the way, I just want to clarify
this is what I understand your answer to be, that you heard
other government witnesses talk about the fact that there was
illegality in the operation of these businesses and it sounds
like that led you to conclude that these were alter egos
because they weren't providing legal services, is that right?

A.   I learned that these were corporations that were
established by John Walker and that he was the majority owner
of them.

Q.   Okay.  What does -- what does that mean, does that
alone make him an alter ego?

A.   That the corporations that were established were done
under his guidance and that he's a majority owner of them,
that's -- that's what I know.

Q.   And you know that because people told you that?

A.   Again, it's based off of, you know, my review of
evidence which also included transcripts of other, you know,
witnesses that testified at the trial.

Q.   So -- so and these are government witnesses?

A.   Yes.

Q.   So you based on your review of government evidence
here, you've come to the conclusion that all of John Walker's
businesses were engaged in illegal conduct, yes?

A.   As far as I know that his business was involved with

1    providing leased helicopters that were maintained by

2    uncertificated mechanics and also included helicopters that

3    had counterfeit parts installed on them.

4        Q.   And that's because someone told you that or you read

5    testimony to that --

6             MS. MILLER:  Your Honor, I'm going to object, we

7    are now -- we've asked this question now about five times and

8    we're wasting court time because, Your Honor, the jury verdict

9    speaks volumes here.  And so, we're -- I'm not sure what we're

10   trying to get to.  The other issue here, Your Honor, is you

11   instructed the jury at trial, if the defendant used a

12   corporation to perpetrate a fraud or the defendants have

13   dominated or disregarded the corporation as a separate entity,

14   then the jury could find that the corporations were alter

15   egos.  That was already a finding that the jury found as to at

16   least 36 of these alter ego companies.  So we're -- we're

17   wasting time.  And we're asking the witness the same question

18   over and over and over again expecting I guess a different

19   answer?  But he's answered.

20            THE COURT:  All right.  The Court will overrule

21   the objection.  He's testing the credibility of the witness,

22   the Court will allow it.  Go ahead.

23            MR. WELK:  Thank you, Your Honor.

24   BY MR. WELK:  (CONTINUING)

25       Q.   What was the time period you studied in preparing for

1    your testimony?

2        A.    2014 to the present.

3        Q.    And you did -- you did some research yourself I think

4    you said right, in addition to reading other people's

5    testimony?

6        A.    I did.

7        Q.    And what did that involve?

8        A.    As I mentioned earlier, it involved the review by the

9    Financial Action Task Force on the money laundering controls

10   of the country of Vanuatu.

11       Q.    Is that -- is the IRS associated with the Financial

12   Action Task Force?

13       A.    No.

14       Q.    How did you review the records of the Financial

15   Action Task Force?

16       A.    I learned about the Financial Action Task Force when

17   I became a certified anti-money laundering specialist.  And as

18   I previously mentioned, they're responsible for ranking the

19   money laundering controls of multiple countries.  And so in

20   this case, I looked online and I read about their review of

21   the country of Vanuatu, along with the European unions ranking

22   as well.

23       Q.    That's open source material you looked at?

24       A.    Yes, it is.

25       Q.    And you looked at things the government showed you,

1  right?

2      A.   Yes, I did.

3      Q.   When you were looking at the -- sorry, the complex

4  methods used to distance criminal proceeds, did you look at

5  bank accounts for all of these, could I have the ELMO back,

6  please.  Did you look at bank accounts for all of these

7  companies?

8              THE COURT:  Are you focusing on the 30 Vanuatu

9  internationals or --

10             MR. WELK:  No, I --

11             THE COURT:  Or every company that's on this list?

12             MR. WELK:  Thank you, Your Honor.

13             THE COURT:  Is that what you're asking?

14  BY MR. WELK: (CONTINUING)

15     Q.   To clarify, I'm asking about all of the companies on

16  this list because I believe your testimony was that all of

17  them are alter egos of John Walker, is that right?

18     A.   Yes.

19     Q.   Okay.  So starting with Hansen Helicopters and Hansen

20  Helicopters Marshals, all the way down to the bottom of the

21  list, did you do any investigation of any kind to determine

22  whether each of these companies had bank accounts?

23     A.   No, I just reviewed any bank records that were

24  provided to me in preparation for my testimony.

25     Q.   Okay.  And the bank records that were provided to you

1  were for which of these companies?

2      A.   I'd have to see them again.  But I do recall, for

3  example, like last week there were wire transfers records and

4  signature cards that were shown at the hearing on Friday, I

5  looked at those.

6      Q.   You looked at those during the hearing or you --

7      A.   Both -- both during the hearing and then obviously in

8  preparation for my testimony, but I also looked at some other

9  records as well.  If it didn't include the actual records, it

10 included schedules or spreadsheets that summarized totals, for

11 example, amounts that were just shown to me earlier, wire

12 transfers from Pacific Spotters Corporation to Limey Air

13 Services.

14     Q.   Okay, and who provided you with these documents?

15     A.   The U.S. government.  And the prosecutor's that I'm

16 working with right now in preparation for my testimony.

17     Q.   You got everything from the prosecutors in the case,

18 right?

19     A.   Everything in preparation for my testimony I did.

20     Q.   Okay.  You didn't -- you didn't contact any banks or

21 contact any government databases or any sort of law

22 enforcement sources other than the prosecutor's in this case

23 to find out information about any of these entities, did you?

24     A.   I did not contact anybody, I received everything from

25 the prosecutors.

1    Q.   How many -- so how many bank accounts did Hansen

2    Helicopters have in 2014?

3    A.   I can tell you I don't know how many bank accounts

4    that any of these corporations have.  Again, I just reviewed

5    what was provided to me.

6    Q.   I see.  The reason I ask is because you said that one

7    of the complex methods used to discuss criminal proceeds is to

8    have multiple bank accounts?

9    A.   Correct.

10   Q.   But you don't know how many bank accounts any of

11   these companies had, right?

12   A.   No, just for example, just seeing the accounts in

13   different jurisdictions, for example, accounts in the

14   Philippines, in the name of Pacific Spotters Corporation that

15   are in turn transferring money to Limey Air Services.

16   Q.   Well, how many bank accounts -- how many PSC bank

17   accounts have you seen?

18   A.   Just again, you know, the spreadsheet that listed I

19   believe it was multiple accounts with different financial

20   institutions, and if needed if you want to show me that trial

21   exhibit or I'm sorry, the sentencing exhibit I'll be happy to

22   look at that.

23   Q.   Maybe I'll find it.  I don't know what you're talking

24   about but I'll -- maybe we'll come across it.  So, you don't

25   know how many accounts PSC has or ever had, right?

1    A.   I do not.

2    Q.   What about Wilma's, how many accounts did Wilma's

3  have?

4    A.   I don't know how many.

5    Q.   Okay.  All right.  So, what about multiple companies,

6  if multiple companies are used, well let me go back to bank

7  accounts for a second.  If multiple bank accounts are used to

8  distance criminal proceeds by someone, distance them from who?

9    A.   So, when criminal proceeds originate, oftentimes

10  criminals or money launderers will first figure how to place

11  it into the financial system, after that they'll conduct

12  multiple transactions to then transfer it from account to

13  account, which is also known as layering and during that

14  process, once those illegal funds are moved from the original

15  source to multiple accounts, it just makes it more difficult

16  for law enforcement to detect the origination of where those

17  accounts entered into a financial account with a bank.

18    Q.   And that last step is called *integration*, right?

19    A.   That's correct.

20    Q.   Right, so what you just described, that's concealment

21  money laundering, isn't it?

22    A.   Those are the three known processes of laundering

23  funds which is the placement, layering and then the

24  integration.

25    Q.   And that's true even if 19 -- 18 USC 1957 money

1    laundering, the spending statute, as it's known?

2        A.    Yes.

3        Q.    So you think in -- is it your package that in 1957

4    money laundering transaction, there is placement layering and

5    integration?

6        A.    Well, in that example, the layering can just happen

7    at the same time as the placement.  It can go where the funds

8    are wired or deposited directly into account of a alter ego or

9    shell company or a nominee, so you have the placement and also

10    the layer happening all at once.

11        Q.    So if someone is trying to -- to achieve placement

12    and layering and they move it from one bank account to the

13    other, would you expect that someone who's attempting to

14    distance themselves from criminal proceeds would move money

15    from one account that they are clearly associated with to

16    another account that they are clearly associated with?

17        A.    Can you re-ask that question?

18        Q.    Sure.  Like for example, would a money launder, let's

19    say his name is John Smith, no, let's do something better than

20    that because there is lots of John Smiths, Harold Wilkerson,

21    Harold Wilkerson has money in his bank account, he's put money

22    in his bank account, now if Harold Wilkerson earns criminal

23    proceeds and he puts that money into an account in his own

24    name, is that money laundering?

25        A.    It depends.

1        Q.    Under which circumstances would receipt and deposit

2   of money accounts to money laundering?

3        A.    What's your question?  If you could rephrase it.

4        Q.    I'll re-ask it.

5        A.    Sure.

6        Q.    Under what circumstances does a person receive money

7   and deposit it into an account in his own name, under what

8   circumstances is that a money laundering transaction?

9        A.    So it can happen if he's trying to, for example,

10  evade the reporting requirement.  So if the funds are

11  structured into the account and the funds included illicit

12  proceeds, that's also known as structured money laundering.

13       Q.    And does that sort of -- wait, so structuring is a

14  form of money laundering?

15       A.    So under the money laundering provision, there is a

16  prong that involves evading the reporting requirement.

17       Q.    Okay.  But the mere -- you're suggesting that the

18  mere deposit of -- that structured deposits into an account

19  constituted money laundering violation in addition to a

20  structuring violation?

21       A.    No.  If it involves illicit proceeds, money that's

22  derived from a specific unlawful activity.

23       Q.    Money derived from a specified unlawful activity?

24  The mere receipt and deposit as structuring, you're saying

25  that's a money laundering violation?

1     A.    It can be charged as money laundering.

2     Q.    And what statute would that be charged?

3     A.    If you provide me the violations of the 1956

4  provision, then I can show you.

5     Q.    So -- is it your package that if money is derived

6  from a specified unlawful activity as defined in

7  Section 1956(c)(7) or 18 U.S.C. 1961(a), that the mere deposit

8  of specified unlawful activity into an account in the

9  depositor's name is a violation of Section 1956?

10    A.    It depends.  See, there is more to it.  So if

11 somebody else is conducting the transaction for them, such as

12 a nominee, there is other -- there is other ways to look at

13 it.  If you're trying to describe concealment money

14 laundering, there is other factors to look at, such as

15 concealing the nature, source, location, ownership or control

16 of the proceeds.

17    Q.    Right.  Yeah, that's -- you're right, but that's not

18 what I asked you.  I asked you if a person receives money and

19 all he does is deposit that money into a bank account in his

20 name, even if he does it in a structured manner, I'm trying to

21 figure out if you think that's a money laundering violation

22 under 1956 or 1957?

23    A.    Yes, if you bring out the money laundering

24 violations, I can show you.

25    Q.    I don't have to bring it out.  Because --

1          A.    Okay.

2          Q.    -- because if you're talking about SUA's, SUA's, are

3     not money laundering.  There's more to it than that, right?

4          A.    An SUA as I previously mentioned is a predicate

5     offense that generates illicit proceeds, the money laundering

6     involves conducting a financial transaction with proceeds of

7     the SUA.

8          Q.    Right.

9          A.    And those proceeds, that transaction as mentioned,

10    comes from the SUA and the transactions can involve promoting

11    the SUA, concealing the proceeds.

12         Q.    Right.

13         A.    The evasion of tax and also as I mentioned, the

14    trying to evade the reporting requirement.

15         Q.    Okay.  So -- but again, I'm really trying to focus

16    you on what my question is.  You've -- you've grafted intent

17    and other acts upon the deposit.  The mere deposit of money

18    into an account in the depositor's name.  Standing alone,

19    nothing else.  It's not a money laundering transaction, is it?

20         A.    It depends on the circumstances.

21         Q.    Those are the circumstances.  I've given you the

22    circumstances.  This is a hypothetical question that I'm

23    allowed to ask an expert witness to discovery your -- the

24    depth of your knowledge in this area.  So the hypothetical is,

25    a person deposits illegal proceeds into a bank account in his

1   own name, does that, only that, is that enough to establish

2   money laundering?

3        A.   It depends.

4        Q.   Okay.  All right.  Would you describe that as a

5   complex method being used to distance one's self from criminal

6   proceeds?

7        A.   The mere deposit?  Do you have another example?

8   Other than how it's being done?

9        Q.   I'm sorry, Agent Reyna, I'm not trying to -- I

10  really -- I'm asking you a very specific question.  And you

11  keep telling me that the answer would be different depending

12  on other things.  I would like to get your answer to the

13  question that I'm asking you as opposed to -- we can -- we can

14  sit here all day talk about how we change the facts and have

15  it be different but all I want to know is, is what I've asked

16  you and that is, doesn't mere receipt and deposit of even

17  specified unlawful activity proceeds, does that constitute

18  money laundering under the money laundering statutes in the

19  U.S. Code?

20            MS. MILLER:  Asked and answered this question

21  repeatedly.  The witness's answer has not changed.  The

22  witness has asked Counsel to provide him with a code.

23            THE COURT:  Okay.  The Court -- the Court will

24  sustain the objection.  He has answered it.  He keeps saying

25  it depends.

1          MR. WELK:  It depends, okay.

2          THE COURT:  So, that's his answer.

3          MR. WELK:  Okay, good.

4     BY MR. WELK: (CONTINUING)

5          Q.   What is it about having multiple companies that makes

6     something a complex method to distance someone from criminal

7     proceeds?

8          A.   The use of multiple companies makes it more

9     difficult.  For example, if law enforcement is trying to trace

10    illicit funds that are being transferred between these

11    different corporate accounts, especially if they're in foreign

12    jurisdictions.

13         Q.   Does it?  So if I deposit money in Bank of Hawaii and

14    then I transfer it to another account in my name at Bank of

15    America, does that inhibit law enforcement at all?

16         A.   Again, it depends.  So if the funds, like I just

17    mentioned, are being transferred to a foreign jurisdiction as

18    previously I testified to, if we have to go through the MLAT

19    process, we need to obtain those records from the foreign

20    jurisdiction, in order to learn the names of the owners of the

21    bank accounts.

22         Q.   But even if it went to a foreign jurisdiction, if it

23    came from a domestic account, you'd be able to obtain the

24    records from the domestic account, the bank, to figure out

25    where the money went, right?

A.   Through the process of serving a grand jury subpoena.

Q.   Right.  Is that something that you do as a part of criminal org- -- criminal investigation, right?

A.   That's correct.

Q.   You know how -- you served probably hundreds of subpoenas in your career, yeah?

A.   I served multiple subpoenas, yes.

Q.   So if it's a transfer from a domestic bank to another domestic bank, and the transfer goes from an account that is openly -- by openly, I mean according to publicly-filed documents, that bank is owned by Harold Jones, I'll just stick with one name, and just use that one, Harold Jones owns a company, publicly, and he has a bank account, in the name of that company and he sends money to another company that he owns in his name and the records for which are in his name, a public record, would you describe that as a complex method to distance himself from that money?

A.   I mean it adds a layer to the ultimate origination of where the funds are going.  So if it goes into one account, then it goes to the next, it's all about does it make business sense, what's the purpose?  And the more accounts that are used, it just makes it difficult and, for example, for law enforcement, to trace the money.  And oftentimes, criminals and money launderers use these layering processes of moving money from account to account in order to avoid our detection.

1    Q.   But in your experience, isn't it true that if they're

2    trying to disguise the nature, location, source, ownership or

3    control of the money, that they would move it into an account

4    that wasn't easily identifiable as belonging to them?

5    A.   Yes, that would be an option for them.

6    Q.   Well, in your experience though, what do people who

7    are trying to launder money, do they just tend to, in your

8    experience, in the cases that you've worked, do you find that

9    these criminals transfer money from one account that -- to

10   which their name is attached to another account to which their

11   name is attached?

12   A.   Yes, I have seen that.

13   Q.   Is that -- is that effective money laundering in your

14   view?

15   A.   Well, in the examples or in the example I'm trying to

16   give, in my own case experience, I have seen it where it's

17   done from one account to the other but they could be in

18   business names, so even just using a business name adds

19   another layer to the overall, you know, movement of funds and

20   opening up these different accounts as well.

21   Q.   Right.  So in that example I gave you, Harold Jones

22   owns a business that he is publicly attached to, and that

23   business has a bank account and then transfers the money to

24   another business with which he is also publicly attached, do

25   you consider -- do you consider that to be an effective form

1    of layering in your experience?

2        A.    It's used all the time.

3        Q.    Again?

4        A.    And as far as its effectiveness --

5        Q.    I'm sorry, excuse me.  I'm sorry.  In your

6    experience, do you consider that to be an effective act of

7    money laundering?  It's a yes or no question.

8        A.    Yes.

9        Q.    Yes?  Okay, I'm sorry, that surprised me.  Because

10   that's --

11            MS. MILLER:  Objection, again, Your Honor, I'm

12   going to move to strike the gratuitous comments made by

13   Counsel.

14            THE COURT:  Yeah, that's true, I'll strike that.

15   It surprises you.

16            MR. WELK:  My apologies, Your Honor.

17            THE COURT:  Let's not comment on the evidence.

18   Let's go, proceed.

19   BY MR. WELK: (CONTINUING)

20       Q.    Because that's -- in that situation I just gave you,

21   that's a really easy way to connect that money and the

22   transaction to Harold Jones, right?

23       A.    I wouldn't define that as easy, because as a criminal

24   investigator, we have to go through the process to determine,

25   one, what is the name of this corporation?  Who is the owner?

1    We have to go through those processes to find out, for

2    example, from account A to B and then we have to get a grand

3    jury subpoena, serve it to, you know, maybe 1 or 2 financial

4    institutions, so all of that adds steps, all of that is a

5    process.  And the more steps that criminals or money launders

6    take, it makes it more difficult for law enforcement to detect

7    what the scheme may be.  So oftentimes, the criminals or money

8    launderers are adding more steps to what they're doing to

9    again layer illicit funds, so that way they can distance where

10   those funds originate from to and then where they ultimately

11   end up so they can avoid detection from law enforcement,

12   whether the accounts or businesses somehow come back to them

13   or not.

14       Q.   Okay.  If you add facts, you're right, you make it a

15   far more compelling case to my hypo, but I'm going to ask you

16   again to stick to the facts that I set up for you.  Do you

17   know what a corporate subsidiary is?

18       A.   Yes.

19       Q.   What is a corporate subsidiary?

20       A.   So if there is a parent corporation underneath it, it

21   might have some subsidiary businesses that fall under it.

22       Q.   And are you familiar with the practice of companies

23   that have a subsidiary that is actually a separate

24   corporation?

25       A.   I believe so.  Do you have an example?

          Q.   I don't know that I have an example that you would
have heard of.  The idea that a corporation can be a
100 percent owner of another corporation.  You understand
that, right?

          A.   Yes.

          Q.   And you operate primarily in Texas, is that right?

          A.   I do.

          Q.   Does Texas have electronically-available corporate
records?

          A.   It does.

          Q.   So if you look up a name of a corporation in Texas,
can you find the articles of incorporation and other corporate
documents?

          A.   Yes.

          Q.   And that's open source material, right?

          A.   It is, but depending on the secretary state of Texas,
they may -- you might need an account and pay for those
records, so -- it's not fully open source, you might have to
pay for those records.

          Q.   Even the government has to pay for it?

          A.   It depends on whether there is an account and whether
they agree to provide it to us at charge or not.

          Q.   It depends.  All right.  The situation I just
described to you, where a corporation owns another
corporation, is that to you, in your experience, training,

1    knowledge, is that a signal that that parent corporation is

2    involved in some sort of criminal activity?

3        A.   Not necessarily.

4        Q.   What if a company owns a bunch of restaurants and

5    they put each of those restaurants in the name of a subsidiary

6    corporation, for business purposes, does that mean -- is that

7    a sign that they're going to be involved in money laundering?

8        A.   Again, not necessarily.

9        Q.   Multiple jurisdictions, you said that's another sign

10   that -- of a complex method to distance money from an owner?

11       A.   Yes, it can be.

12       Q.   If -- let's say that Harold starts a business and

13   he's selling clothes in Los Angeles, a store, and he buys

14   clothes from a company in Mexico and he buys clothes from a

15   company in Canada, you know that those countries have

16   different forms of currency than the U.S. dollar, right?

17       A.   Yes.

18       Q.   If Harold was to incorporate a company in each of

19   Mexico and Canada to make it easier for him to do business

20   with them in their own currency, pesos and Canadian dollars,

21   do you consider that to be an effort to somehow distance

22   himself from those -- from those moneys?

23       A.   Again, no, not necessarily, it just depends on the

24   facts.

25       Q.   So -- so it's certainly allowed, it's certainly

credible that companies that a company or an individual

could -- could create multiple companies for business

purposes, right?

    A.   Yes.

    Q.   They're completely not associated with any illegal

activity, yes?

    A.   Correct.

    Q.   And they could even do that in Vanuatu, right?

    A.   Again, just based of what I learned during

preparation of my testimony and in reading what I read earlier

that business can be conducted there in the country of

Vanuatu, that to me was a suspicious.

    Q.   Do you know why business cannot be -- that business

can't operate in Vanuatu?

    A.   No, I don't.

    Q.   Did you investigate that at all?

    A.   No, I did not.

    Q.   Is it possible that that's just the law of Vanuatu?

    A.   Yes, it is possible that's the law.

    Q.   So that's -- that's legal in Vanuatu, yes?

    A.   I don't know the specific laws related to established

incorporations there.  As I mentioned earlier, I reviewed the

rankings that the fact of Financial Action Task Force and the

European Union assessed on the country in Vanuatu's money

laundering controls.

1        Q.    Have you ever become aware in your job as a Special

2   Agent of the IRS that the state of South Dakota has financial

3   laws that some have argued are inconsistent with the know

4   your -- know your customer and anti-money laundering programs

5   required by many other states in the United States?

6        A.    I haven't heard that specifically about South Dakota

7   but I've heard it referenced related to other states.

8        Q.    Does that suggest to you that companies that are

9   incorporated in those other states are like maybe involved in

10  money laundering because they incorporated there?

11       A.    It could be.

12       Q.    But do you conclude that all of the companies that

13  are incorporated in those states are involved in some sort of

14  criminal activity?

15       A.    No.

16       Q.    And you don't think that about Vanuatu, do you?

17       A.    Um, no.

18       Q.    What about the Cayman Islands?

19       A.    Where?

20       Q.    The Cayman Islands?

21       A.    No.

22       Q.    It's another commonly known as a -- as a money

23  laundering haven, right?

24       A.    Yes, I'm aware of that.

25       Q.    Okay.  Do you know how many accounts John Walker had?

1      A.   No, no, I'm not.

2      Q.   Do you have any -- did anyone ever show you any

3 accounts that John Walker ever had?

4      A.   I've mentioned earlier the evidence I reviewed.  I

5 looked at a few schedules, spreadsheets, detailing, financial

6 transactions that include wire transfers, I also looked at a

7 few of the signature documents and other related records to

8 the different account.

9      Q.   Did you look at any records of the bank account that

10 was in the name of John D. Walker?

11      A.   Are you asking if the account was titled just in his

12 name?

13      Q.   Yes.

14      A.   No, I didn't, I don't recall reviewing any account

15 just in his name.

16      Q.   Okay.  So when you say -- in your testimony when you

17 referred to accounts belonging to John Walker, what do you

18 mean?

19      A.   If he was listed as a signator of the account, and

20 that signature authority of the account even if the account

21 was titled in a business name.

22      Q.   Do you consider Pacific -- Pacific Spotters account

23 to be a Walker account?

24      A.   If you -- do you have a signature card for me to

25 review?

1      Q.   It has to be a signature card?  Can it just be that

2  his name is on the account?

3      A.   I mean if you have anything for me to review, I can

4  answer your question.

5      Q.   Please put the ELMO on the screen.  This is

6  Exhibit 138 that you were asked about.  And you testified that

7  you felt that Walker accounts, you identified an account as a

8  Walker account, if it had his name on it or he was a

9  signatory, right?

10     A.   Yes.

11     Q.   So here's an account, signature opinion for Community

12 First Guam Federal Credit Union, you see that at the top?

13     A.   I do.

14     Q.   And can you tell me who the authorized individuals to

15 sign are on that account?

16     A.   Yes.  Kenneth Crowe, Phillip Kapp and Marvin Reed.

17     Q.   So you wouldn't consider this to be a John Walker

18 account then?

19     A.   During the review of some of these documents maybe it

20 was another package in here that I saw in preparation.  I

21 believe John Walker is listed on there.

22     Q.   For the bank account?

23     A.   I believe it's -- it might be this one, yes.

24     Q.   Or is it just that he's the owner of -- owner of the

25 company?

1      A.   I just need to see the additional pages that are

2   included in this exhibit.

3      Q.   I don't have any other pages from this exhibit

4   so -- maybe the prosecutor can answer about that.

5            MS. MILLER:  For the record, Counsel does have

6   all of the pages for that exhibit?  I just want the record to

7   be clear to.

8            MR. WELK:  So, the record is clear, I have this

9   many pages with me.  I may have it somewhere but I don't have

10  it with me.

11           THE COURT:  You don't have it.  Like with regard

12  to what was shown today at sentencing?  Is that what you're

13  saying?

14           MR. WELK:  No, I don't have it in my hand right

15  now because I did not -- I am not -- I do not intend to ask

16  Special Agent Reyna about every single piece of paper that we

17  went over during his testimony.

18           THE COURT:  Okay.  I got it.  All right.  It's 12

19  noon, Counsels.  So why don't we take a lunch recess.  Just to

20  get a feel for, Mr. Welk, how much more time do you need with

21  this witness?

22           MR. WELK:  I am not -- I promise you I'm not

23  trying to be flip, but it depends.

24           THE COURT:  No, no, no.  Okay.

25           MR. WELK:  I mean I'm having a hard time getting

1    answers in my view, I'm frustrated by getting a lot of answers

2    that it depends.  So, I'm not sure.  I'm hoping hopefully in

3    an hour I could be done.

4           THE COURT:  You might have an hour?  Okay, that's

5    fine.  And then this is your last witness?

6           MS. MILLER:  Yes, Your Honor.  Depending on what

7    the defendant puts on, we do have rebuttal witnesses.

8           THE COURT:  Okay.  All right.  We'll see you in

9    an hour.  Okay.  Thank you.  Thank you everyone.

10           (Recess taken at 12:01 p.m.)

11           (Back on the record at 12:57 p.m.)

12           THE COURT:  Okay, ready to go?  I see Mr. Walker

13    is here.  Okay.  Did you have your lunch, Mr. Walker?

14           THE DEFENDANT:  I did, thank you.

15           THE COURT:  Okay.  Very well.  We are back on

16    record.  We're back on the record, all Counsels present and if

17    it's not working or if you need a new one, let us know on your

18    hearing assistance.

19           Okay.  Go ahead, Mr. -- Welk's -- Mr. Welk, go

20    ahead.

21           MR. WELK:  Thank you, Your Honor.

22           THE COURT:  Sorry about that.  Just had a

23    brain --

24           MR. WELK:  Funny story about that involving

25    another U.S.A. that I used to know, it has nothing to do with

1   this.

2   BY MR. WELK: (CONTINUING)

3       Q.    All right.  Mr. -- or I'm sorry, Agent Reyna, I'm

4   going to move on to Exhibit 91, which I'll put up.  This is a

5   declaration of Kenneth Crowe.  Do you recall seeing this

6   document and testifying about it?

7       A.    Yes, I do.

8       Q.    What -- based on this document, I'll refer to you

9   Paragraph 2, what was Mr. Crowe's title at Hansen Helicopters?

10      A.    Operations Manager and Chief Pilot.

11      Q.    Putting up package 2 of that same document, this

12  indicates correct that Hansen as of 2018 and its related

13  companies, do you have an understanding of what that means,

14  *related companies*?

15      A.    Yes.

16      Q.    What is your understanding?

17      A.    Any associated companies to Hansen Helicopters.

18      Q.    Would that be the companies that you have referred to

19  as the alter ego companies?

20      A.    Yes.

21      Q.    Are there any other companies other than those that

22  you think are included in this category?

23      A.    No.

24      Q.    And what is the basis for your understanding that

25  related companies means the, as you refer to them, the alter

*Criminal Case No. 18-00010, USA v. Walker*

1   ego companies?

2       A.   That based on the evidence I reviewed in preparation

3   for this testimony, that John Walker was the owner -- the

4   majority owner of these corporations.

5       Q.   Let me ask you something about that, do you -- is it

6   your understanding that PSC is one of these related companies?

7       A.   Yes.

8       Q.   That it's an alter ego of John Walker?

9       A.   Yes.

10      Q.   And do you contend that John Walker is a

11  major -- what did you -- I mean, do you consider him to be a

12  majority shareholder of that company?

13      A.   I reviewed records related to the percentage of

14  ownership of the other individuals involved with the

15  corporation.  I know that it later changed and he divested

16  part of his ownership and that way, individuals that had

17  Philippine citizenship are now owners as well.

18      Q.   Okay.  But in your -- do you have an opinion on

19  whether John Walker is the majority shareholder of PSC?

20      A.   I have to look at the amended articles of

21  incorporation to see where the ownership interest and

22  percentage is at, at this point.

23      Q.   Let me -- if -- let's assume for the sake of this

24  question that Mr. Walker is the owner of approximately 33% of

25  PSC and that the ownership is otherwise divided amongst

several individuals, none of whom own individually as much as 33%, under that scenario, would you characterize Mr. Walker as a majority shareholder of the company?

A.   Yes.

Q.   Okay, so when you say -- when you use the term *majority shareholder*, you don't mean 50% or more, you mean whoever holds the most stock, right?

A.   Based on the example given, that is correct.

Q.   Okay.  Paragraph 5, can you -- you see where it says that John D. Walker is a resident of Missouri?

A.   Yes, I see that.

Q.   Do you have any reason to believe that statement is inaccurate?

A.   I have no reason to believe that it's not accurate.

Q.   And on paragraph number 6, is Mr. Walker identified as a member of the management team of Hansen?

A.   I don't see his name mentioned in Paragraph 6.

Q.   Paragraph number 9, can you read the -- well, actually can you read that whole paragraph please, Paragraph 9?

A.   "Crowe is responsible for the safe daily operation of approximately 40 helicopters and has continuous responsibility for pilot training.  Crowe must communicate with Kapp, Reed and Zuroske regarding the needs of pilots and their maintenance."

          Q.   And I'm going to put up the next page, if you could
continue?

          A.   "Assistants who are working aboard fishing vessels
throughout the western pacific, Crowe regularly receives
information from those who fly and maintain the helicopters at
sea and he must forward that information to others in the
company who are responsible for maintenance and logistics."

          Q.   Based on that paragraph what were -- what were John
Walker's responsibilities with respect to daily operation of
the company?

          A.   I didn't see it mentioned, it just referred to Crowe.

          Q.   Can you read Paragraph 10, please?

          A.   "As director of maintenance, Kapp coordinates with
the ship-based mechanics to troubleshoot mechanical issues
that arise until the issue is either resolved or the
helicopter is grounded while waiting the delivery of parts or
the helicopter is landed in Guam or another port for
maintenance.  Kapp must coordinate maintenance issues with
Crowe and work with him on relocating helicopters from one
ship to another when necessary.  If Crowe is not made aware of
maintenance issues, a pilot's safety could be jeopardized."

          Q.   And could you please read Paragraph 11?

          A.   "As Vice President for logistics, Reed is responsible
for acquiring parts and supplies needed in Guam and
dispatching those parts and supplies to the ships or ports

where they are needed by Hansen Helicopters.  Reed, Crowe and

Kapp need to be in continuos communication with each other

about the safety of the pilots and mechanics, the scheduling

and timing of maintenance, the work that will have to be done

and the parts and materials that are needed for each

helicopter regardless of where it may be located."

Q.   Thank you.  This will be the next page, page 4, again

this is Exhibit 91 that I'm referring to.

THE COURT:  I'm sorry, Exhibit 91, right?  Is

that what you said?

MR. WELK:  91, the sentencing and I'm

using -- I'll be using only sentencing exhibit numbers, Your

Honor.

THE COURT:  Okay.  Okay.

BY MR. WELK: (CONTINUING)

Q.   Can you read the last sentence of that top paragraph

on this opinion, the fourth page?

A.   "Getting the helicopters to the right ship at the

right time requires close coordination amongst Crowe, Kapp and

Reed."

Q.   Now, I'll ask you to read the first -- the first

sentence of Paragraph 14.

A.   "Each member of the management team has a

responsibility to keep Walker, the company's principal owner,

informed of Hansen's operations."

1      Q.   Can you describe for the Court what documents you

2   reviewed in preparation for your testimony that showed the

3   management team notifying Walker of things that were going on

4   with the company?

5      A.   Yes, there were some e-mails that I reviewed.

6      Q.   And what was -- what was the subject matter of those

7   e-mails?

8      A.   I would need to review them in order for me to

9   answer.

10     Q.   Do you have them available to you?

11     A.   I don't have them in front of me but I believe the

12  prosecutors that I'm working with, have, have some of these

13  e-mails.

14     Q.   These were documents that they gave you?

15     A.   For review, yes, that's correct.

16     Q.   Were these -- were these documents where these

17  individuals on the management team were actually notifying

18  Mr. Walker of activities?

19     A.   Yes.

20     Q.   What sort of activities were involved?

21     A.   If I recall right, one of the e-mails may have

22  involved an accident and a death of individuals on helicopter.

23     Q.   So that was someone notifying Mr. Walker of an

24  accident and a death?

25     A.   I believe so.  Again I would have to review that

1    specific exhibit to make sure.

2        Q.   Do you recall whether Mr. Walker responded to that

3    communication?

4        A.   Again, I'd have to review that exhibit to answer the

5    question.

6        Q.   You don't recall that there being any communication

7    like that though, right?

8        A.   I would need to review that exhibit.

9        Q.   Okay.  I'd ask you to do that then.

10       A.   If you have the exhibit available, I'd review it.

11       Q.   I have no idea what you're talking about, sir.  I

12   didn't give you the exhibit to look at in the first place.

13       A.   Okay.  I don't have it in front of me so I can't tell

14   you at this point.

15       Q.   And you don't know if it's available to you either?

16       A.   I don't know at this point in time.

17       Q.   Okay.  Do you have any recollection of any documents

18   that you were given to look at that involved Mr. Walker giving

19   directions to any of those individuals on the management team

20   identified in Mr. Crowe's declaration?

21       A.   Again, I believe so, I would just need to review -- I

22   believe it was an e-mail with some communication from

23   Mr. Walker to some of the employees that worked for him.

24       Q.   And what was the subject matter?

25       A.   Again, I'd have to review the e-mail and then I could

1   answer your question.

2        Q.   What was the time period when that e-mail was sent?

3        A.   I don't -- I don't recall the exact date.

4        Q.   Do you recall an approximate date?

5        A.   I -- I don't recall even the approximate date.

6        Q.   Was it between 2014 and 2024?

7        A.   It's possible.

8        Q.   It's possible it was outside that range as well?

9        A.   It could be.

10       Q.   You don't know?

11       A.   At this time, I don't recall the exact timeframe.

12       Q.   I just -- when you say at this time you don't recall,

13  do you think you may recall later or?

14       A.   I need to refresh my memory by reviewing the exhibit.

15       Q.   Okay.  I'm happy to have you do that if you can find

16  it or if you know where it is, is that possible?

17       A.   I don't have it in front of me at this time.  I would

18  need to be provided the exhibit.

19       Q.   Okay.  Is it -- is it at your seat or --

20       A.   No, it's not.

21       Q.   I'm referring next to Exhibit No. 40.  Do you recall

22  this document?

23       A.   I do.

24       Q.   So this is a -- you testified it's a New Zealand

25  certificate of registration, right?

1    A.    Yes.

2    Q.    And what's the date on this?

3    A.    August 5th, 1998.

4    Q.    What was your -- this was something that you were

5    given to review by the government?

6    A.    Yes.

7    Q.    And did anyone explain to you what the purpose of

8    showing you this document was?

9    A.    It showed that his businesses and helicopters were

10   registered in different jurisdictions throughout the world.

11   Q.    Okay.  This shows that as of this date of issue, that

12   one helicopter was registered as of 5 August, 1998, right?

13   A.    Yes.

14   Q.    Well, outside your period of review, yes?

15   A.    Based on my understanding of the timeframe of the

16   conspiracy, that's correct.

17   Q.    Didn't the conspiracy start in 2020, I'm sorry, 2000,

18   sorry not 2020, didn't it start in 2000?

19   A.    I believe that's correct, yes.

20   Q.    So this is from August 5 of 1998, right?

21   A.    Yes, that is correct but I'm not sure this helicopter

22   came back into the conspiracy once -- once it began.

23   Q.    Well, what do you know about this helicopter other

24   than that it's listed on this document?

25   A.    That's it, other than what you just mentioned.

1    Q.   Okay, can you read the -- can you read the line right
2  above "John Darrell Walker" on this exhibit?
3    A.   "Name of person lawfully entitled to possession of
4  the aircraft for a period of 28 days or longer."
5    Q.   Do you have any idea how long Mr. Walker was entitled
6  to possession of this aircraft?
7    A.   I don't other than the information that I just read
8  on this exhibit.
9    Q.   So it could have been as brief as 28 days?
10   A.   That is correct.
11   Q.   You don't know?
12   A.   I don't know.
13           THE COURT:  I'm sorry, Mr. Welk, my clerk is
14  asking what page is this for Exhibit 40?
15           MR. WELK:  Oh, I'm sorry, it's page 34.
16           THE COURT:  Page 34.  Okay.  Thank you.
17           THE CLERK:  Thank you.
18           MR. WELK:  My apologies for that.
19  BY MR. WELK: (CONTINUING)
20   Q.   I'm putting up another one.  This is page 35 of
21  Exhibit 40.  What's the date on this one?
22   A.   February 16th, 1999.
23   Q.   And do you ascribe any significance to this document?
24   A.   Again, it shows a helicopter owned by John Walker
25  that was registered in New Zealand.

1      Q.   And do you recall -- do you have any knowledge about

2   this particular helicopter having been involved in this case

3   in any other way?

4      A.   Not specifically.

5      Q.   Except that -- except that Mr. Walker was entitled to

6   possession of it for 28 days in 1999?

7      A.   Yes, for a period of 28 days or longer.

8      Q.   Next -- next document I want to show you also from

9   Exhibit 40, this will be page 37 of Exhibit 40, you were asked

10  about this.  Do you recall this document?

11     A.   I can't see it too clearly.  If there is a way to

12  magnify it?  Might be better.  Yeah, I can see it now.

13     Q.   Is that better?  Great.  Okay.

14     A.   Yes, I do recall this one.

15     Q.   And this shows monthly rent on helicopters, right?

16     A.   That is correct.

17     Q.   And what period does this apply to?

18     A.   The contract date under Column D, Row 3, shows

19  August 18th of 2016 and then on Column H going all the way

20  down under the column "Heading of Terms" it shows the

21  timeframes of either 3 years, 1 year, or even 2 years.

22     Q.   Where did this -- do you know where this document

23  came from?

24     A.   I don't recall but I know it was shown to me earlier.

25     Q.   Okay.  And I -- that was -- that's my fault that I

         was vague there.  I assumed that it came to you from the

         government?

              A.   It did.

              Q.   The prosecutor.  But do you know -- do you have any

         idea where this document came from where they -- where they

         obtained it, where the prosecution obtained it?

              A.   I need to refresh my memory from the additional

         documents that accompanied this particular spreadsheet.

              Q.   And do you have any of those documents with you here

         in the courtroom today?

              A.   They're here, I just don't have them in front of me.

              Q.   Okay.  Could you recover them if -- if I asked you to

         do so?

              A.   I could if I needed to.

              Q.   Well, would it help you refresh your recollection if

         you -- you're saying if you saw the document in hard copy, it

         would refresh your recollection as to where it was obtained

         from?

              A.   If I saw the additional documents, in particular this

         shows G-0366-37, if I saw the preceding documents in front of

         this one, it may help, yes.

              Q.   Did you review the -- the contracts that are

         referenced on this spreadsheet?

              A.   I saw several contracts.

              Q.   How many do you think you saw?

1      A.   I can't say exactly how many.

2      Q.   Is it more than half of them?

3      A.   I don't know in total how many there were so I can't

4  say if I reviewed half or not.

5      Q.   Was it more than two?

6      A.   I believe so, yes.

7      Q.   Was it more than ten?

8      A.   I believe so, yes.

9      Q.   More than 20?

10      A.   I don't recall.

11      Q.   Can you explain to the Court, let's look at line

12  number -- I'm looking at second column the one that has the

13  heading number over it.  And then you got beyond that the

14  company name.  Number one is Fong Kuo 18 something.  There is

15  a monthly rent indicated there of $37,500.  What did that

16  include?

17      A.   What do you mean by what did it include?

18      Q.   What was the -- what was the boat paying for, what

19  did it receive in return for that money?

20      A.   As I understand, it included the use of that

21  particular registration number, that helicopter.  And the

22  pilot that piloted that particular aircraft.

23      Q.   What about a mechanic?

24      A.   I believe so, yes.

25      Q.   How much of the $37,500 per month was attributable to

*Criminal Case No. 18-00010, USA v. Walker*

1    the pilot?

2         A.    That I don't know.

3         Q.    How many of it was attributable to the mechanic?

4         A.    I don't know.

5         Q.    How many of the contracts that you reviewed contained

6    a specific representation that the helicopter would be

7    FAA-certified?

8         A.    I don't remember seeing that language in the lease

9    contracts.

10        Q.    The answers you've given so far as to that contract,

11   is that the same for all of these contracts that are

12   referenced here?

13        A.    Yes.

14        Q.    And again that was Exhibit 40, page 37.  Next

15   document is Exhibit 40, page 38, this one is even smaller.  I

16   may be able to -- I may be able to zoom in.

17                  THE COURT:  Yeah, I think you can.

18                  MR. WELK:  There you go.

19                  THE COURT:  You could do it even more so.

20                  MR. WELK:  This is -- this is old school.  This

21   takes you back to the old days.

22                  THE COURT:  The ELMO.

23                  MR. WELK:  The ELMO.

24   BY MR. WELK:  (CONTINUING)

25        Q.    Okay.  What are we looking at here?

1    A.    I would say a copy of a spreadsheet that lists the
2  directors, shareholders and documents held on file for the
3  companies listed under Column B.
4    Q.    And it appears that Kenneth Crowe and John Walker are
5  directors in all the same companies, yes?
6    A.    Yes, that's what it looks like.
7    Q.    Do you consider Kenneth Crowe to be -- do you
8  consider any of these companies to be an alter ego of Kenneth
9  Crowe?
10   A.    No.
11   Q.    And why is that?
12   A.    Just based on what I've looked at, John Walker is the
13 majority shareholder of these corporations.
14   Q.    So to you the alter ego characterization is based
15 entirely on ownership?
16   A.    Yes.
17   Q.    So the fact that Kenneth Crowe as we saw in his
18 declaration had all of those very specific responsibilities
19 for day-to-day operations, that doesn't change your opinion
20 about whether these companies were alter egos of John Walker?
21   A.    No.
22   Q.    Next is Exhibit 40, page 43.  And this is titled
23 "Wilma's Flight Service A/R Aging Summary."  Can you tell me
24 what the significance of this document is, or what this is
25 about?

1      A.    Yeah, it shows the accounts receivable, aging summary

2    as of June 30th, 2016.

3      Q.    And does this have any particular significance to you

4    in terms of your determination as to whether this scheme as

5    you've called it, is some sort of criminal operation?

6      A.    What are you exactly asking me?

7      Q.    Well, you're -- you were designated as an expert to

8    talk about money laundering and you've testified today at some

9    length about how you think that this scheme that Mr. Walker

10   was operating was a criminal scheme.  I'm just wondering if

11   this has any significance to your opinion about that -- about

12   this -- about there being a scheme that Mr. Walker was

13   running?

14     A.    Well, based on the evidence I reviewed for my

15   testimony, after Wilma's Flight Service was no longer used in

16   the scheme, the Pacific Spotters Corporation took over all

17   receipts of revenue from the leases, since Pacific Spotters

18   Corporation became the lessor in these contracts with

19   different tuna boat companies.

20     Q.    Okay, did that happen in 2016?

21     A.    As I understand it in 2016, law enforcement conducted

22   search and seizure warrant of Walker's businesses and in 2018,

23   Pacific Spotters Corporation began to then become the lessor

24   with the tuna boat companies instead of it being Wilma's

25   Flight Service.

1      Q.   Let me go back for a second to Exhibit 40, page 37.

2  This is the listing of the -- we looked at this just a second

3  ago.  The listing of the contracts with the various boats.

4  You remember this?

5      A.   Yes.

6      Q.   Now you indicated that an alter ego was a company

7  that wasn't providing any legitimate services or product,

8  right?

9      A.   That's correct.

10     Q.   Okay.  And so, but there is all these contracts here

11 where these are tuna boat companies, right?  Tuna boats?

12     A.   That's what I understand.

13     Q.   Okay.  And they were paying between $37,500 and

14 $40,000 a month to rent these helicopters with mechanics and

15 pilots, right?

16     A.   Yes.

17     Q.   And this is in 2016, yeah?

18     A.   Yes.

19     Q.   Is it your -- is it your opinion that that this

20 was -- this was illegitimate business?

21     A.   Yes.

22     Q.   And what is your basis for that comment?

23     A.   Again, based on evidence that I reviewed and also

24 that I listened to last Friday from Mr. DeVogel of the FAA,

25 that Walker and his businesses employed uncertificated pilots

1    and mechanics and also used counterfeit parts on their

2    helicopters.

3        Q.   Did they use the -- did they use -- is it your

4    understanding that they used counterfeit parts on all of their

5    helicopters?

6        A.   I'm not sure of that.

7        Q.   Okay.  Do you have any idea what percentage of their

8    helicopters had counterfeit parts?

9        A.   I do not.

10       Q.   Do you know that there were counterfeit parts being

11   used on any helicopters in August of 2016?

12       A.   Not for that specific -- specific timeframe.

13       Q.   During what timeframe are you -- do you know that

14   Hansen Helicopters or its subsidiaries was using counterfeit

15   parts in their helicopters?

16       A.   I don't have that evidence or I do not review

17   evidence specific to the timeframe of that violation.

18       Q.   Do you recall seeing any -- no, never mind, okay.  I

19   understand.  Thank you.  This is Exhibit 40, page 71, which

20   the heading on the document is "Caledonian Insurance Company

21   Balance Sheet."  Do you see that?

22       A.   I do.

23       Q.   What was -- what was the business of Caledonian

24   Insurance Company?

25       A.   From what I learned during the review of evidence in

preparation for my testimony, this particular business was to
be used as a insurance company for John Walker's businesses.

Q.   Do you have any reason to believe that it was not
used as an insurance company by John Walker's businesses?

A.   I don't have any information on its specific use.

Q.   Do you know what the country of incorporation was for
Caledonian Insurance Company Limited?

A.   I believe it was Vanuatu.

Q.   And do you have any reason to believe that it did not
in fact operate as an insurance company in Vanuatu?

A.   Again, I don't have any information if it was used as
an insurance company or not.

Q.   But you don't have any information that it was not
used as an insurance company, right?

A.   That's correct.

Q.   You just don't know?

A.   I just don't know.

Q.   Understood.  Are you familiar with self insurance?

A.   Yes.

Q.   And this company according to this balance sheet as
of December 31, 2015, had nine half million dollars in assets,
right?

A.   Based on what I see under Rows E and G, I'm sorry,
Columns E and G, Row 18, yes, that's correct.

Q.   Do you have any reason to believe that they weren't

1  in fact capitalized in that amount?

2      A.   I don't have any information to say that that those

3  amounts weren't available in the accounts of that business.

4      Q.   Okay.  Exhibit 40, page 79.  This is from January

5  through December 2013, do you have any reason to believe that

6  these numbers were not entirely accurate?

7      A.   I don't have any information about that.

8      Q.   One way or other?

9      A.   That's correct.

10      Q.   So do you have an opinion upon whether this business

11  was doing legitimate business?

12      A.   I don't have enough evidence or I did not receive

13  enough evidence to review any of the facts related

14  specifically to that business and its operations.

15      Q.   With respect to all of the Vanuatu companies, which

16  of those companies did you review records that you feel

17  comfortable making a -- giving an opinion about whether it was

18  a legitimate business or not?

19      A.   Hansen Helicopters.

20      Q.   And what did you review for Hansen Helicopters?

21      A.   Again, I'd have to review anything that was presented

22  to me earlier today and then I can answer that.

23      Q.   I'm sorry, so did you -- did you reach your opinion

24  today?  About whether these -- the Hansen Helicopters was a

25  legitimate business?

1    A.    No.

2    Q.    Okay.  So when you got here today, did you have an

3  opinion formed in your mind already about whether Hansen

4  Helicopters was a legitimate business?

5    A.    Based on the evidence I reviewed, yes.

6    Q.    And you reviewed what the prosecutors gave you?

7    A.    That's correct.

8    Q.    And what was your conclusion?

9    A.    That the businesses established by John Walker were

10  alter ego or shell companies.

11    Q.    Okay.  But --

12    A.    And --

13    Q.    I'm sorry, I didn't mean to interrupt?

14    A.    And involved in providing services to these tuna boat

15  companies with air helicopters that were maintained and

16  piloted by uncertificated pilots and mechanics and also the

17  helicopters which contained counterfeit parts.

18    Q.    I'm sorry, I thought you testified just a few minutes

19  ago that you had no idea whether any of these helicopters had

20  counterfeit parts in them, does it -- did I get that wrong?

21    A.    I've listened as I've mentioned to testimony of

22  Mr. DeVogel last Friday talking about that.

23    Q.    And do you recall Mr. DeVogel testifying about -- are

24  you talking about his testimony of the helicopters that were

25  seized at the Guam warehouse here?  Recently?

A.   I'd have to -- I'd have to look at the transcript on the specifics of that testimony.

Q.   Do you recall Mr. DeVogel testifying about finding counterfeit parts in any helicopter owned by Hansen Helicopters?

A.   Again, I'd have to look at the transcript from last Friday.

Q.   You don't recall that now though, right?

A.   I don't recall any specifics if it was Hansen Helicopter or another alter ego or shell company.

Q.   So -- you didn't look at any records relating to any of the, what you call alter ego or shell companies, right?

A.   Can you rephrase the question?

Q.   I thought you testified just a few minutes ago that you did not look at any business records of any of the alleged alter ego companies and I thought you said you had not looked at any of those records?

A.   No, I've looked at some records.

Q.   What did you look at?

A.   Articles of incorporations, some bank records, lease contracts, QuickBooks files, spreadsheets and summaries of financial transactions, testimony of other witnesses that testified at trial.

Q.   Okay.  And in any of those documents, any of those records that you reviewed, did you find evidence that specific

1    helicopters associated with a specific company had counterfeit

2    parts in them?

3        A.    Again, I don't -- I didn't have that evidence

4    presented to me, I just listened to the testimony that was

5    presented last Friday, by Mr. DeVogel.

6        Q.    Okay.  Do you have any idea who owned the helicopters

7    that were seized from the Guam warehouse within the last year?

8    By the United States government?

9        A.    From what I understand, they were owned by

10   Mr. Walker.

11       Q.    Individually?

12       A.    I don't know if they were owned directly in his name

13   or one of his alter ego or shell companies.

14       Q.    Okay.  Do you have a government card that's assigned

15   to you?

16       A.    I do.

17       Q.    Okay.  And that's your card that you -- it's for your

18   use, right?

19       A.    Yes, I have a government-owned vehicle assigned to

20   me.

21       Q.    But you don't own that car, do you?

22       A.    I do not.

23       Q.    Okay.  And you understand that there is a difference

24   a car that you own and a car that's owned by the government

25   that you have use of, right?

1      A.   Yes.

2      Q.   So when you say those helicopters in the warehouse

3    that you think they belonged to John Walker, do you mean they

4    belonged -- they were titled in his name?

5      A.   I don't believe any of them were titled in his name.

6      Q.   I see.  So your statement that they were owned by

7    John Walker is -- is a follow on to your understanding or your

8    believe that every company that was owned by John Walker is in

9    fact owned by -- it might as well be the property of John

10   Walker, right?

11     A.   Yes.

12     Q.   And is it your opinion that all of these lists of

13   helicopters that we've looked at in 2013, 2014, 2016, that all

14   of those helicopters belonged to John Walker?

15     A.   They were, from what I understand, they were under

16   the names of businesses that he was a majority owner of.

17     Q.   And so, did they belong to him then?

18     A.   Yes.

19     Q.   So if a helicopter would have crashed into somebody's

20   house and put the house on fire and caused damage, nobody was

21   hurt or died, could the -- could the owner of the house just

22   sue John Walker instead of the company that actually owned

23   the -- the helicopter?

24     A.   I mean it's at the discretion of that individual who

25   they want to sue, but individuals that establish corporations

1    try to set them up in order to limit their liability, that way

2    if somebody is sued, that typically would be the corporation

3    that would be sued.

4        Q.   Okay.  Well, don't you think that in this instance,

5    if one of these tuna boats wanted to sue over the lease, that

6    they would sue the company that they entered into the lease

7    with and not Mr. Walker?

8        A.   Again, it would be up to them if they wanted to try

9    to sue both Mr. Walker and the tuna boat company, but again,

10   that's why someone would establish a corporation to handle any

11   type of liability for an injury, for example, or a death.

12       Q.   So I'm trying to figure out, maybe -- maybe I do

13   understand this but you -- you testified that Mr. Walker's

14   ownership of these companies is the determining factor for

15   you, please correct me if I'm wrong, but this is what I

16   understand your testimony to be, that because Mr. Walker was

17   the owner of 99.9% of these companies that that's why he's an

18   alter ego of the company and therefore, it's just his, right ?

19       A.   Yes.

20       Q.   So how does that square with the idea, the concept

21   that you just described where people start corporations so

22   that they can shift liability away from themselves

23   individually?

24       A.   Well, there was limited shareholders in these

25   corporations and he was the 99.9% owner of these corporations.

1      Q.    So you think the shift of liability is based on the

2    percentage of ownership and that -- well, first of all, let me

3    say that, do you think that the -- the liability protection

4    that one gains from creating an incorporation, that that

5    depends on the level of their -- the degree of their ownership

6    of the company?

7      A.    No.

8      Q.    Okay, then why does it matter that he's the 99.9%

9    owner?

10      A.    It matters in the sense that in that instance or

11    these instances that he is the owner, controller, leader of

12    all of these companies and he's directing his employees that

13    we've discussed to conduct specific duties for his businesses.

14      Q.    Right, but okay, so give me an example of something

15    that he directed as the leader of the company that you're

16    aware of?

17      A.    Yeah, again, if -- if there is an exhibit, for

18    example, like an e-mail communication between him and one of

19    his employees, then I can discuss that.  It would help me

20    refresh my memory on the specific instance.

21      Q.    We will absolutely get to that.  But is that the only

22    one that you're aware of where he was directing something to

23    his employees?

24      A.    At this time, yes.

25      Q.    Well, what if -- what if Mr. Crowe -- you're aware

1    that Mr. Crowe had some level of ownership in at least some of

2    these companies, right?

3        A.   I'd have to look again at the percentage ownership of

4    all the corporations and all the list of shareholders to -- to

5    say that he in fact was said owner at all in any of 'em.

6        Q.   What if he was a 1% owner?  Would he have

7    any -- would he have complete protection or would he

8    be -- could he be considered an alter ego as well?

9        A.   Again, I believe that ultimately Mr. Walker is the

10   owner controller, leader of all these companies and he

11   provided a small percent ownership in these companies so they

12   can have the ability to make decisions on behalf of the

13   corporation, that's why I believe he gave them at least one

14   percent ownership or less or maybe slightly more.

15       Q.   So to the extent that Mr. Crowe or Mr. Kapp had an

16   ownership interest regardless of the size of it, if they had

17   an ownership interest, you think that the reason Mr. Walker

18   did that was to so that those guys, Crowe and Kapp, could make

19   decisions and act on behalf of the corporation?

20       A.   Yes, and possibly receive some type of profit sharing

21   or dividends that the corporations earned throughout the

22   duration of their operations.

23       Q.   So going back to -- I'm going go back to the

24   declaration of Kenneth Crowe, where he identifies himself as

25   responsible for the safe daily operation of approximately 40

1  helicopters and has continuous responsibility for pilot

2  training.  Wouldn't that make him largely responsible for the

3  conduct of the companies as well?

4      A.  If you want to show me the exhibit again, I can read

5  it.

6      Q.  Sure.  Yeah.  I'm back to Exhibit 91.  This is

7  page 2.  And I'm referring to Paragraph 9.  Do you see that?

8      A.  I do.

9      Q.  Do you think that -- that his position as he

10  describes it there and what his responsibilities are, does

11  that make him -- why doesn't that make him a leader?

12      A.  Based on what I'm reading, he has responsibility with

13  the businesses ultimately owned and operated by Mr. John

14  Walker.

15      Q.  Right, but -- but you acknowledge that he has what

16  appear to be here, I don't mean to put words in your mouth,

17  but is it fair to say that he had significant

18  responsibilities, he was responsible for the safe daily

19  operation of approximately 40 helicopters and has continuos

20  responsibility for pilot training.  Doesn't that make him

21  sound like a leader?

22      A.  It sounds like he has significant responsibility

23  within the corporation or corporations.

24      Q.  Okay.  And then going to the next page, this is

25  page 3 of Exhibit 91, I'll refer to you Paragraph 10, which

```
1    describes Mr. Kapp as the director of maintenance who
2    coordinates with ship-based mechanics to troubleshoot
3    mechanical issues that arise until the issue is either
4    resolved or the helicopter is grounded while waiting the
5    delivery of parts or the helicopter is landed in Guam.  It
6    goes on to say that Kapp is required to coordinate maintenance
7    with Crowe and work with him on relocating helicopters from
8    one ship to another.  Doesn't that -- isn't that fairly
9    characterized as Mr. Kapp also having leadership
10   responsibilities for the companies?
11        A.   Yes, he has a significant amount of responsibility
12   for that company or corporations.
13        Q.   I'm going to put up exhibit -- oh, I'm sorry, I have
14   one last thing on this last exhibit.  This is Exhibit 40, I'm
15   going to put up page 97 of Exhibit 40.  I'm going to refer to
16   you that very top line there, line number one.  Okay.  Do you
17   see that?
18        A.   I do.
19        Q.   What does that say?
20        A.   John D. Walker Group Companies.
21        Q.   Okay.  It doesn't say just John D. Walker's
22   companies, right?
23        A.   No, it does not.
24        Q.   Thank you.  All right.  Next I'm going to go to
25   Exhibit 104.  I think this may be -- I'll ask you, is this the
```

```
 1    e-mail or the document that you were referring to earlier

 2    about Mr. Walker giving direction?

 3        A.   No, not specifically this one.

 4        Q.   Oh, I see.  Do you think that this -- this document

 5    demonstrates that -- do you think it demonstrates anything?

 6        A.   Yes.

 7        Q.   And what is that?

 8        A.   I mean just in summary, it appears that, you know,

 9    within the first sentence, he's talking about not continuing

10    to pay salaries.

11        Q.   For people who don't do their jobs, right?

12        A.   Yes.

13        Q.   What's the date on this?

14        A.   March 21st, 2008.

15        Q.   Well, outside your period of investigation, right?

16        A.   As I understand, it's prior to the timeframe of the

17    start of the conspiracy.

18        Q.   That's right, 2000.  All right.  Do you recall

19    testifying that that Mr. Walker received profits and not

20    regular pay?

21        A.   Can you repeat the question?

22        Q.   Yeah.  Do you recall either -- either saying or

23    agreeing with maybe with Ms. Miller that Mr. Walker received

24    profits and not regular pay?

25        A.   I recall profits, I don't -- I don't remember
```

1   anything specific to a salary.

2       Q.   Okay, you recall saying that or something very much

3   like that?

4       A.   About the profits.

5       Q.   Yeah, so he was -- he was paid out of profits of his

6   company?

7       A.   That's what I understand.

8       Q.   As opposed to being paid like a regular wage?

9           MS. MILLER:  Objection.  Your Honor, he's already

10  answered that question.  He's already said that he did testify

11  that Mr. Walker received profits.  He didn't say anything

12  about whether he also received a salary.

13          THE COURT:  Okay.  That's fine.  Overruled.  Go

14  ahead.

15  BY MR. WELK: (CONTINUING)

16      Q.   Okay.  Do you have the question in mind?

17      A.   Repeat your question, please?

18      Q.   Okay.  Again, I apologize if I misunderstood you,

19  Special Agent.  I asked you if you recalled saying something

20  that he received profits, not regular pay, I thought you said

21  yes, that you had indicated that in your testimony.

22      A.   I don't recall testifying specifically about

23  salaries.

24      Q.   Okay.  So did he receive salary?

25      A.   Again, I don't know.  I know we reviewed a

1    spreadsheet that showed that there was some wire transfers

2    that indicated they were advances or dividends.

3        Q.   Okay, do you understand dividends to be different

4    than profits?

5        A.   What's your specific question?

6        Q.   Do you -- aren't dividends distributions of company

7    profits to shareholders, is that --

8        A.   Yes.

9        Q.   Okay.  So when you say he received profits wouldn't

10   that include dividends?

11       A.   Yes.

12       Q.   And -- but you don't know whether he received a

13   salary in addition to that, right?

14       A.   I'm unaware if he did or not.

15       Q.   Okay.  You also -- you were asked who's controlling

16   the dissolution of the Walker-related companies.  How do you

17   know about the dissolution of the Walker-related companies?

18       A.   I reviewed a document filed with the Court that he

19   was ordered to do the -- or to pursue the dissolution of the

20   companies.

21       Q.   And when you were asked about who was doing that, you

22   said John Walker, right?

23       A.   That's how I understand it and that's what I recall.

24       Q.   Okay, you understand -- do you know that John Walker

25   has been in jail in Guam since September of 2022?

1    A.    Yes.

2    Q.    And that that order was entered quite a while after

3  he had gone into jail?

4    A.    Yes.

5    Q.    So what is the basis for your statement that John

6  Walker is the person who is controlling the dissolution of

7  those companies?

8    A.    I don't have the specifics of somebody acted on his

9  behalf or he gave them power of attorney or somebody such as

10  and attorney as yourself facilitated that for him.

11   Q.    Okay.  So you don't know if he's controlling it or

12  not?

13   A.    The dissolution or --

14   Q.    Yeah?

15   A.    Or what specifically?

16   Q.    The dissolution?

17   A.    I don't know the exact details of how

18  he's -- Mr. Walker is dissolving those companies.

19   Q.    Do you know the general details?

20   A.    Other than what I read, no.

21   Q.    So all you know is that you read an order that said

22  that those companies are to be dissolved, right?

23   A.    That is correct.

24   Q.    And you don't -- you have no idea whether he has

25  anything to do with it or not?

1    A.    Specifically, I don't.  Again, I don't know if he did
2  it or somebody on his behalf did it.
3    Q.    Okay, but if somebody on his -- on his behalf did it,
4  then he didn't do it, right?
5    A.    Again, if somebody did it on his behalf then he may
6  have asked them to do it for him because he was ordered by the
7  Court.
8    Q.    He may have but you don't know that, right?
9    A.    Again, I don't -- I don't have the details.
10   Q.    I'm sorry, this is important because this thing about
11 something being done on his behalf, do you consider something
12 being done on his behalf the same as Mr. Walker doing it
13 himself?
14   A.    If he directed somebody to, yes.
15   Q.    Do you have any reason to believe that Mr. Walker
16 directed someone to dissolve his companies?
17   A.    I don't have any of that information.
18   Q.    Do you have any reason to believe that John Walker
19 directed someone to enter into any specific lease over a
20 helicopter during the entire period of the conspiracy?
21   A.    I don't have any of those details.
22   Q.    Do you have any reason to believe that John Walker
23 directed an individual working for him to do anything that's
24 described in the Second Superseding Indictment?
25   A.    Again, there were some e-mails that I reviewed, I

1  would need to refresh my memory and read them and then I could

2  answer that question.

3      Q.  Do you remember John Walker directing some evidence

4  showing that John Walker directed someone to sink a

5  helicopter?

6      A.  I don't have any information regarding that.

7      Q.  Do you have any information that John Walker directed

8  someone to wear a specific kind of life vest that went off

9  unexpectedly and caused that person not to be able to get out

10 of a helicopter?

11          MS. MILLER:  Objection, Your Honor, assumes facts

12 not in evidence.

13          MR. WELK:  I believe there was evidence about

14 that presented at the trial.

15          MS. MILLER:  No, actually there was not evidence

16 presented about that at the trial.  There was an NTSB report

17 that was presented and in the NTSB report, it specifically

18 indicated that the owner of the aircraft's representative made

19 a statement to the NTSB regarding the life vest of the pilot.

20 That was it.

21          THE COURT:  All right.  So --

22          MR. WELK:  I'll rephrase the question.

23          THE COURT:  All right.

24 BY MR. WELK: (CONTINUING)

25      Q.  Do you have any reason to believe that the

```
 1    representative who made a representation to the NTSB regarding

 2    the helicopter accident that Ms. Miller just described was

 3    John Walker?

 4         A.   I don't have any of that information.

 5         Q.   Do you know if it was Rufus Crowe?

 6         A.   I do not know.

 7         Q.   Do you know if it was Mr. Kapp?

 8         A.   I do not know but as far as Mr. Kapp or Crowe or

 9    based on what you're asking me, if there is anything that you

10    could show me, I could -- I could better answer that question.

11         Q.   Well, I'm curious whether -- I'm curious whether you

12    have seen anything that showed you that?

13         A.   Again, as I mentioned there was some e-mails I

14    reviewed, I'd have to refresh my memory by reviewing them.

15         Q.   I see.  Did you review any leases, helicopters leases

16    that were signed by Mr. Walker?

17         A.   I reviewed some leases.

18         Q.   Do you recall whether any of them were signed by

19    Mr. Walker?

20         A.   Again, if you have any that you could show me, then I

21    could point out whether or not he signed them.

22         Q.   Okay.  Do you recall right now seeing any helicopter

23    leases that were signed by Mr. Walker?

24         A.   I don't recall.

25         Q.   So you can't testify about how many leases John
```

 1    Walker signed, helicopter leases?

 2        A.    No.

 3        Q.    You testified that Mr. Walker opened a Limey account

 4    at some point; do you recall that?

 5        A.    Yes.

 6        Q.    And what is your basis for that?

 7        A.    Evidence that I reviewed in preparation for my

 8    testimony.

 9        Q.    Can you be any more specific than that?

10        A.    I need to see that specific exhibit.

11        Q.    Have any idea what exhibit that was?

12        A.    I don't recall the exact exhibit number.

13        Q.    I'm going to show you a document that was shown to

14    you earlier.  This is from Exhibit 138.  It's page 72.  This

15    is minutes of a shareholders meeting of Hansen Helicopters.

16    Do you see that?

17        A.    I do.

18        Q.    2015.  January 26th, 2015?

19              THE COURT:  I'm sorry, page 72?  Is that what you

20    said?

21              MR. WELK:  72, yes.

22              THE COURT:  Thank you, okay, there you go.

23    BY MR. WELK: (CONTINUING)

24        Q.    Do you see where it says present?

25        A.    Yes.

1      Q.   Can you read what it says below John D. Walker's

2  name?

3      A.   "Shareholder 5,001 shares, 2.34% of total shares,

4  99.9% of shares excluding shares owned by the company."

5      Q.   So doesn't that say that he owned 2.34% of total

6  shares?

7      A.   Yes.

8      Q.   This is page 73 of Exhibit 138.  Do you recall this

9  document?

10     A.   Yes.

11     Q.   It appears to be minutes of a shareholders and board

12  of directors meeting, Limey Air Service, June 8th, 2018.  Is

13  there any significance to you that Mr. Kapp and Mr. Crowe were

14  officers of the -- of Limey, of the corporation?

15     A.   What's your specific question?

16     Q.   I wondered if it has any significance to you in terms

17  of you potentially believing that Mr. Walker was solely

18  responsible for Limey Air?

19     A.   (No response.)

20     Q.   Let me withdraw that question and start over again.

21  Do you contend that Mr. Walker is one and the same as Limey

22  Air?

23     A.   I believe he's an owner of the company.

24     Q.   Okay.  But as we talked about before, Mr. Crowe and

25  Mr. Kapp had substantial responsibilities with the companies,

1   right?

2       A.   Yes.

3       Q.   So, it's not just Mr. Walker, is it?

4       A.   No.

5       Q.   You talked about the fact that after the indictment

6   was issued, that there were a lot of bank accounts closed, do

7   you recall that?

8       A.   I recall reviewing the letter from the Bank of Hawaii

9   about accounts or at least one of the accounts that was due to

10  be closed.

11      Q.   Okay.  Do you know -- did you know that when

12  the -- when the indictment was issued, that the -- that Hansen

13  and the related companies were unbanked by the banks in Guam

14  because of the indictment?

15      A.   I didn't know that.

16      Q.   In your experience as an agent, your lengthy

17  experience as an agent, aren't you familiar with the fact that

18  often when an account holder in a bank is indicted, federally

19  indicted that banks where that entity or person holds accounts

20  will often close the accounts?

21      A.   Yes.

22      Q.   And in your experience, do they tell the depositor,

23  we're closing your account because you got indicted?

24      A.   Not specifically.

25      Q.   Are you aware of any case where a bank did do that?

1    Where a bank said to a depositor, we're closing your account

2    because you've been indicted?

3        A.    No.

4        Q.    So, I'm showing you -- this is Exhibit 138, page 75.

5    That highlighting is mine.  Can you read that paragraph that

6    includes the highlighted language?

7        A.    "The was a specific discussion held as to the need

8    for Limey Air Services, Inc. to open a general checking

9    account at Community First Bank in order to conduct general

10   banking for Guam operations.  It was unanimously agreed to

11   open this account at Community First Bank."

12       Q.    Thank you.  And this is -- these are minutes of a

13   shareholders and board of directors meeting for Limey Air,

14   right?

15       A.    Yes.

16       Q.    Now, is there anything about this where they do a

17   minutes of a shareholders and board of directors meeting where

18   they specifically discuss the need to open a bank account in

19   order to conduct general banking for Guam operations?  Does

20   any of this strike you as suspicious as an expert?

21       A.    That this is done after law enforcement conducted

22   search and seizure warrants of Mr. John Walker's businesses in

23   2016?

24       Q.    You think that's suspicious?

25       A.    Yes.

1     Q.   Do you know that all their bank accounts were closed?

2     A.   I did not know that all of them were closed.

3     Q.   I'll ask you to assume that upon being indicted, that

4 all of the bank accounts for -- in Guam for the Walker-related

5 companies were closed by the banks, where those accounts were

6 held, now if that were true, do you think there is something

7 suspicious about this?

8     A.   I find it suspicious if the businesses were allegedly

9 involved in providing leased helicopters with counterfeit

10 parts and were maintained by mechanics and pilots that were

11 uncertificated, yes.

12     Q.   So you find the mere accusation that they were

13 involved in criminal activity, that means that opening a bank

14 account in the name of the preexisting company at a Guam bank,

15 that that was suspicious?

16     A.   Yes.

17     Q.   Do you have -- do you have an opinion on how a

18 business would operate if it didn't have any bank accounts?

19     A.   As I -- as I previously -- previously mentioned that

20 if the business was operating in an illegal manner and they

21 are now in turn continuing to profit from that and taking the

22 proceeds of wire fraud which is the predicate offense and then

23 putting it into a bank, then they are committing money

24 laundering.

25     Q.   This brings us back full circle, Special Agent.  So

1    you think that Limey Air which has contracts with all these

2    tuna boats, to provide helicopters, pilots and mechanics, that

3    when they get paid, the mere deposit of that money into a bank

4    account in Limey Air Services, Inc. bank account, that that is

5    money laundering?

6              MS. MILLER:  Objection, Your Honor, Limey Air did

7    not have leases with all these companies.

8              MR. WELK:  That is -- I'm sorry, Your Honor, I

9    object to this testimony from the government.  I think he can

10   answer the question.

11             MS. MILLER:  No.  No, because that's a -- that's

12   a false premise.  He just asked this witness what's wrong with

13   Limey Air having leases depositing the money from the leases

14   into the Limey Air account.  Limey Air didn't have the leases,

15   it was Pacific Spotters leases that the money was being

16   deposited into this account.

17             THE COURT:  Okay.  So your objection is assuming

18   facts not in evidence?

19             MS. MILLER:  Absolutely.  That was -- what he

20   just said is not a fact in evidence.

21             MR. WELK:  My understanding.

22             THE COURT:  Okay.  Go ahead.

23             MR. WELK:  Setting aside the fact that this is

24   sentencing and therefore the federal rules of evidence do not

25   apply.

```
 1              THE COURT:  Unless it's relevant -- issue of
 2   relevancy.
 3              MR. WELK:  My understanding is that he -- in fact
 4   I'm about to get to the exhibits where Pacific Spotters --
 5              THE COURT:  What about -- what about the assuming
 6   facts not in evidence, the lease, that's what she's talking
 7   about, the lease.  The leases.
 8              MR. WELK:  Let me clarify this.
 9   BY MR. WELK: (CONTINUING)
10      Q.   Special Agent, is it -- is it your testimony that
11   Limey Air Services, did they have an account prior to this
12   account, that they -- that they opened?
13      A.   I don't know.
14      Q.   This is in 2018.  You don't know?
15      A.   I do not.
16      Q.   Do you know if Limey Air Service received any money
17   for leases prior to 2018?
18      A.   I'm unaware if they received anything prior to 2018.
19      Q.   But at some point, Limey Air Service began receiving
20   payments from PSC, right?
21      A.   Yes.
22      Q.   When was that?
23      A.   Approximately in beginning in 2018.
24      Q.   So that would have been during this period, June of
25   2018?
```

```
 1        A.   Yes.

 2        Q.   Now, I feel like I can ask my earlier question

 3   because that's now in evidence.

 4             MS. MILLER:  Objection, Your Honor.

 5             MR. WELK:  What's the objection?

 6             MS. MILLER:  The Question -- his earlier question

 7   was Limey Air --

 8             THE COURT:  Okay.  Hold on, it sounds like he

 9   withdrew his question cause he asked another --

10             MS. MILLER:  Okay.  Okay.  He just said -- now I

11   can ask my earlier question.  I mean, let's make sure this

12   record is clear.

13             THE COURT:  He withdrew his -- it sounds like he

14   withdrew his question because he asked another question about

15   the receipt, did Limey Air receive funds, that's what you were

16   --

17             MS. MILLER:  From PSC, not from Limey Air leases,

18   right.

19             THE COURT:  Well, he didn't -- he didn't talk

20   about the leases, he talked about the receipt of moneys,

21   right?

22             MR. WELK:  Yes.

23             THE COURT:  Okay.  Go ahead, next question.

24   BY MR. WELK: (CONTINUING)

25        Q.   Is it your understanding that Limey Air was receiving
```

1  payments into a Limey Air account in June of 2018?

2      A.   I'd have to see the specific spreadsheet that

3  detailed multiple wire transfers, specifically that they were

4  receiving those transfers from Pacific Spotters Corporation.

5      Q.   All right.  I'm going to put up, this is Exhibit 138,

6  page 82; incoming wire log, do you recall this document?

7      A.   Yes, but I believe there might have been another page

8  to this one.

9      Q.   You're right.  I can only show you one at a time?

10      A.   Okay.

11      Q.   I will get it for you next.  So -- during this time

12  period, didn't -- wasn't PSC leasing helicopters?

13      A.   Yes.

14      Q.   And they were paying rent on those helicopters,

15  right?

16      A.   The tuna boat companies were paying rent to PSC.

17      Q.   Okay.  Aren't these PSC paying Limey for the

18  helicopter leases?

19      A.   I don't know why PSC is sending these wires to Limey.

20      Q.   Do you find it suspicious that they're sending money

21  to Limey?

22      A.   Yes, and the fact that these are both John

23  Walker-controlled companies.

24      Q.   And why is that suspicious to you?

25      A.   Because as I testified earlier that this appears to

1   be layering of proceeds of wire fraud and as it goes from one

2   account to another account, it continues to obscure the

3   origination of where these funds came into the initial account

4   at PSC.

5       Q.   You understand that John Walker controls -- you're

6   under the impression that John Walker controlled PSC in 2018,

7   right?

8       A.   Yes.

9       Q.   And why is it you were under that impression?

10      A.   That he was listed on the Articles of Incorporation

11   as an owner.

12      Q.   Okay.  Articles of incorporation; that's a public

13   access document, right?

14      A.   Yes.

15      Q.   And then Limey Air Service, we just looked at

16   the -- we just looked at the shareholders and board of

17   directors meetings, he's the president of that company, right?

18      A.   Yes.

19      Q.   And a director of them?

20      A.   Yes.

21      Q.   What about -- so why is it -- why is it suspicious to

22   you -- strike that.  It's suspicious to you that a man who

23   openly owns a company, is sending transferring money to

24   another company that he openly owns?

25      A.   If he was indicted in May of 2018 for wire fraud and

money laundering violations, and if his bank accounts were

subsequently closed and then he is then in turn opening

additional bank accounts to continue the criminal scheme, yes,

I find it suspicious.

Q.   Ah, so you're saying that if a person is indicted for

a crime, that they're guilty of that crime until proven

innocent?

A.   No, I'm not saying that.

Q.   Okay, then why would it be suspicious that he

continued to operate the business after only having been

indicted?

A.   Again, the fact that he is continuing to operate this

business with aircraft that contained counterfeit parts,

pilots and mechanics that are uncertificated, changing the

alter ego that conducts the leases with the tuna boat

companies, then receiving payments in a company now

established in the Philippines, that's been dormant for two

years, those accounts in the Philippines are receiving the

proceeds of the wire fraud and then in turn sending it to

another John Walker-controlled company in the name of Limey

Air services, I do find that very suspicious.

Q.   Do you find that suspicious now because he was

convicted in 2022 or do you think it was suspicious at the

time that just because he'd been indicted and all of their

bank accounts were closed, that he transferred his business

```
1    into the one company that had a bank account?

2              MS. MILLER:  I'm sorry, just for clarification,

3    there is no evidence that all bank accounts were closed.  So

4    when Counsel originally asked him those questions he said, I

5    want you to assume that.  There is no evidence in the record

6    that all of the bank accounts were closed.

7              THE COURT:  Okay, so what's the objection then on

8    the --

9              MS. MILLER:  The objection is he asking another

10   hypothetical question or is he assuming facts not in evidence.

11             THE COURT:  You want to answer to that, can you

12   answer to that objection, Mr. Welk?

13             MR. WELK:  Your Honor, I'll -- you know, I'll

14   just ask for a ruling, then I'll go back to asking him my

15   questions.

16             THE COURT:  I'm not sure if -- I mean --

17             MR. WELK:  I don't understand the objection.

18             THE COURT:  You don't understand the objection.

19             MS. MILLER:  The objection is this, Your Honor,

20   Counsel asked --

21             THE COURT:  Okay.  Hold on a second.  The whole

22   issue of the closure of all John Walker's accounts, I think

23   it's true though, you had said okay, let's just assume that

24   all his accounts were closed.

25             MR. WELK:  I'll clean it up.
```

```
 1                THE COURT:  And another -- okay.  Clean it up.

 2                MR. WELK:  I'll retract the question.

 3                THE COURT:  All right.  Go ahead.

 4   BY MR. WELK: (CONTINUING)

 5        Q.   I thought we covered this earlier but maybe we did

 6   not, Special Agent, how many bank accounts did the, what you

 7   refer to as the alter ego companies, how many bank accounts

 8   did those companies have in Guam in 2018?  In April of 2018?

 9        A.   I don't know the exact number of accounts.

10        Q.   How many bank accounts did the Walker

11   related-entities have in Guam in July of 2018?

12        A.   I do not know.

13        Q.   Did you ever know?

14        A.   Not the exact number.

15        Q.   Do you know -- do you even have an approximate

16   number?

17        A.   No.

18        Q.   You weren't aware whether there was one account or a

19   hundred, is that right?

20        A.   If you have some exhibit for me to review, then I

21   could tell you.

22        Q.   Not the -- not the question.  The question is what

23   did you know and what were you shown, what were you told?

24   Were you told whether the Walker-related entities had any bank

25   accounts in Guam prior to the issuance of the indictment in
```

1    2018?

2         A.   Based on what I reviewed, yes, I believe there was

3    some accounts in Guam.

4         Q.   And who held those accounts?

5         A.   They were in Walker-owned businesses.

6         Q.   What were they?  What businesses?

7         A.   I don't recall the exact names of them.

8         Q.   Any of 'em?

9         A.   I recall names of the businesses, I just don't recall

10   which ones had accounts and specifically where they were at

11   other than, for example, exhibit that was shown earlier about

12   the Bank of Hawaii in June of 2018 sending of the letter to

13   John Walker about the account that would be closed.

14        Q.   Well, what -- what company was that account held in?

15        A.   If you have the exhibit to show me, then I could tell

16   you.

17        Q.   You don't remember, is that right?

18        A.   Again, if you showed me the exhibit, I could tell

19   you.

20        Q.   I'm just trying to clarify that you don't remember,

21   is that right?

22        A.   I don't remember exactly the name of the company.

23        Q.   Do you remember there being any other company other

24   than that one that you had any awareness of?

25        A.   Not specifically.

```
 1        Q.   Do you recall generally whether there were more

 2   accounts?

 3        A.   I don't know.

 4        Q.   So you don't know -- going back to the ELMO, please.

 5   You don't know what these payments were for, right?

 6             THE COURT:  Can you give me the exhibit number on

 7   this again?

 8             MR. WELK:  Sorry, it's 138, page 82.

 9             THE COURT:  Okay.  Thank you.

10             THE WITNESS:  No, not specifically.

11   BY MR. WELK: (CONTINUING)

12        Q.   Do you know generally what they are?

13        A.   They're transfers from Pacific Spotters Corporation

14   bank accounts in the Philippines to Limey Air Service.

15        Q.   Do you have any reason to believe that they

16   are -- that they are something other than helicopter lease

17   payments from tuna boats?

18        A.   No.

19        Q.   Let me get you this, let me get you this other

20   opinion.  This is just more of the same, right?

21             THE COURT:  Okay.  What's your -- this is what?

22             MR. WELK:  Sorry, this is page 83.

23             THE COURT:  Same exhibit?

24             MR. WELK:  Of Exhibit 138.

25             THE COURT:  Thank you.
```

BY MR. WELK: (CONTINUING)

    Q.   Again the highlighting is mine.  What is this?

    A.   It shows incoming wire transfer log January through December 2019, it shows the originator name Pacific Spotters Corporation, out of the Philippines and the originating banks include the United Coconut Planters Bank, BDO Unibank, Banco De Oro Unibank and these transfers are being sent to Limey Air Services.

    Q.   Do you have a page about what these payments are for?

    A.   As I understand, the Pacific Spotters Corporation was receiving revenue from the tuna boat leases and then I see here that in turn these funds from the PSC account or accounts are being then transferred to Limey Air Service but I do not know exactly why, other that that these are John Walker-controlled companies.

    Q.   Okay, do you consider -- when you look at bank records, do you -- do you believe as an agent that it should be clear to you by looking at bank records why some -- one company is sending money to another company?

    A.   What's your exact question?

    Q.   I'd like to have it read back, that was my exact question.

          THE COURT:  Okay.  Go ahead, Veronica, read it. Read it back.

    *(Whereupon the reporter read back the requested portion.)*

 1          THE WITNESS:  Can you rephrase your question?

 2    BY MR. WELK: (CONTINUING)

 3      Q.   Sure.  You indicated looking at this that when you

 4    look at this chart, this isn't a bank record, right?

 5      A.   No, it's not.

 6      Q.   This is a summary chart?

 7      A.   Yes.

 8      Q.   Did you look at the underlying bank records?

 9      A.   Not for these transfers.

10      Q.   Okay.  Did -- did you ask to look at them?

11      A.   No.

12      Q.   So you said you don't understand why these payments

13    are being made, right?

14      A.   I don't know if these are payments.

15      Q.   You don't know that they're payments.  So the

16    title -- what do you think they are, what might they be if

17    they're not payments?

18      A.   They're wire transfers from PSC or also known as

19    Pacific Spotters Corporation to Limey Air Service.

20      Q.   I thought you just said that -- that this was PSC

21    having received payments for helicopter leases and then

22    forwarding them on to Limey?

23      A.   As I understand based on the evidence I reviewed,

24    that Pacific Spotters Corporation basically took over being

25    the -- the lessor of these leases with the tuna boat companies

1    in place of Wilma's, right.  And then so, now that they took

2    over, they're receiving the lease payments and then in turn

3    for reasons that I don't know why the moneys are being wired

4    to Limey Air Service, what I've been telling you is that these

5    are John Walker-controlled companies, the money is moving from

6    one John Walker-controlled company to another one.

7        Q.    Okay.  Do you consider these to be money laundering

8    transactions?

9        A.    If the predicate offense is the continuation of lease

10   contracts that involve helicopters that contain counterfeit

11   parts, uncertificated pilots and mechanics, yes.

12       Q.    And what is your -- what is your evidence that any of

13   those things are true with respect to these payments?

14       A.    Based on evidence that I reviewed and the review of

15   testimony of witnesses that testified at the trial.

16       Q.    So did you review evidence and testimony

17   where -- where the evidence was that during 2019, every single

18   helicopter that was leased by PSC had counterfeit parts in it?

19       A.    Again, I don't know which -- which helicopters had

20   those counterfeit parts.

21       Q.    You don't know if any of them had counterfeit parts,

22   do you?

23       A.    Me specifically, I do not know.

24       Q.    Okay.  And you don't know if even one of those

25   helicopters was being flown by an uncertificated pilot, do

1    you?

2        A.   I don't know for these wire transfers how it traced

3    back to the tuna boat contracts in which mechanics worked on

4    which specific, you know aircraft.

5        Q.   Did you read all the contracts that PSC entered into

6    in 2018?

7                MS. MILLER:  Objection, Your Honor, asked and

8    answered several times actually.

9                THE COURT:  Yeah, I think he has -- he said he

10   doesn't recall.

11               MR. WELK:  He doesn't recall.

12   BY MR. WELK: (CONTINUING)

13       Q.   You didn't read these leases, right?

14       A.   I reviewed some leases.

15       Q.   How many of them -- how many of those leases did you

16   conclude involved helicopters that had counterfeit parts in

17   them?

18               MS. MILLER:  Asked and answered, Your Honor,

19   several times.  We're just repeating ourselves, I'm not sure

20   why.

21               THE COURT:  Yes, he's already -- he's already

22   been asked.

23               MR. WELK:  He stated it depends?

24               THE COURT:  He just didn't recall.

25               MS. MILLER:  Objection, Your Honor.

1          THE COURT:  He already indicated he doesn't

2     recall.  And if you want to give him the exhibits, he can

3     refresh his recollection as I understand.

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  That's what he said.

6          MR. WELK:  Well, that's --

7          THE COURT:  Okay.  Go ahead.

8          MR. WELK:  Let me do that.

9          THE COURT:  Okay.  Okay.

10         MR. WELK:  I think I'm done with Exhibit 138,

11    Your Honor.

12         THE COURT:  Okay.  Very well.

13    BY MR. WELK: (CONTINUING)

14         Q.   All this money that we just talked about that came

15    from the PSC account into the Limey Air Services account, you

16    have that in mind?

17         A.   Yes.

18         Q.   What investigation did you do to see where that money

19    went after it went into the Limey Air Services account?

20         A.   I didn't review anything related to that.

21         Q.   To your knowledge, did anyone investigate where the

22    money went after it went into the Limey Air Services account?

23         A.   I do not know.

24         Q.   You do not know?

25         A.   That's correct.

1        Q.   But you're not aware of anybody having to do that,

2    right?

3        A.   I'm -- I'm unaware if anybody.

4        Q.   This was nine and half million dollars during 2018

5    and 2019, right?

6        A.   What was the timeframe again, that you just

7    mentioned?

8        Q.   2018 and 2019.

9              MS. MILLER:  Objection, Your Honor, again,

10   these -- the facts he's stating are incorrect.

11             THE COURT:  I'm sorry, is that 138?  Exhibit 138?

12             MR. WELK:  Here I'll have him do the math, Your

13   Honor.

14             THE COURT:  No, I'm sorry was that the

15   timeframe --

16             MS. MILLER:  He testified and --

17             MR. WELK:  Please, please, I beg of you, please.

18             THE COURT:  Hold on.  Mr. -- I'm asking Mr. Welk,

19   referring to Exhibit 238, the last --

20             MR. WELK:  I'm going to go back to --

21             THE COURT:  I'm sorry, 138.

22             MR. WELK:  I'm going to go back to 138, pages 82

23   and 83 and I'm going to have -- I'm going to ask the agent to

24   add up what these money transfers were in 2018 and 2019.

25   BY MR. WELK: (CONTINUING)

```
 1         Q.   So we'll start with Exhibit 138, page 82.

 2              MS. MILLER:  Your Honor, is he asking the witness

 3    to do this addition in his head?

 4              MR. WELK:  I am not concerned with how he does

 5    it.  I'm just asking him --

 6              THE COURT:  If he needs a calculator, I'm sure

 7    he'll ask.  Some people can do it off the top of their head.

 8              MS. MILLER:  I'm sure he could do it by rounding.

 9    Sure yeah.

10              THE COURT:  Okay, go ahead.  Proceed.  We'll have

11    Mr. Welk.

12    BY MR. WELK: (CONTINUING)

13         Q.   Can you give me a ballpark figure of what

14    these -- what these numbers here, what these wires add up to?

15         A.   About 1.2 million.

16         Q.   $1.2 million, okay.  That's for 2018, right?

17         A.   Yes, can you hold it up there just for another minute

18    so I can just look at it one more time.

19         Q.   Of course.  Go ahead take your time.  Whoa

20    that's -- there we go.

21              THE COURT:  That's a lot better.  Okay.

22              THE WITNESS:  Roughly like I mentioned,

23    $1.2 million.

24    BY MR. WELK: (CONTINUING)

25         Q.   Okay.  I would apologize to you that this is not my
```

```
 1   exhibit so here's the second opinion, this is page 83, from

 2   138.  Can you please do the same thing with this?

 3               MS. MILLER:  Your Honor, I'm going to object

 4   again.  This is -- this has been asked and answered.  If you

 5   recall when I questioned this witness about the total amount

 6   of the wire transfers in 2018, in 2019 he testified

 7   approximately $5 million total for those two years.  He said

 8   that already.  He's done it already.  Do we really need to now

 9   waste the time for him to do this addition again in his brain?

10               THE COURT:  You know what I actually thought that

11   the last question was -- we never got to this, did anyone do

12   an investigation where the money went to after it got to Air

13   Limey Services and I think the issue was the dates, I thought

14   you were just going to focus on the dates.

15               MS. MILLER:  No, now he's back --

16               THE COURT:  No, no, no, I know but previously,

17   right, Mr. Welk, I thought you were asking him that.  And

18   that -- so that's why I said are we talking about the last

19   exhibit, it indicates the dates.  But now you're getting into

20   a different issue on the numbers.  I mean he has already

21   testified to a rough estimate of the numbers.

22               MR. WELK:  Well, this is sentencing.

23               THE COURT:  No, I know.  I know.

24               MR. WELK:  But the fact that the prosecutor may

25   have asked him a question, that doesn't mean it's asked and
```

1  answered for -- because I'm trying to lay a foundation

2  for -- for these numbers, I mean if --

3              THE COURT:  Yeah.  Yeah, all I'm saying is, I

4  thought your last question was going to focus on what happened

5  after the -- was there any investigation of where the moneys

6  went to after it got to Air Limey Services[sic].

7              MR. WELK:  Yeah.

8              THE COURT:  And I thought the only -- really the

9  issue was the dates.

10              MR. WELK:  It is.

11              THE COURT:  So yeah, so the issue was only the

12  dates and I thought you were just going to go back, that's

13  what I want to clarify, was it 2018 and 2019.

14              MR. WELK:  That's going to be my next question.

15              THE COURT:  Go ahead, I thought that was your

16  last question.

17  BY MR. WELK: (CONTINUING)

18      Q.   So it sounds like Ms. Miller said it was $5 million,

19  does that sound right?

20      A.   Yes, that's correct.

21      Q.   So around $5 million that came from PSC to Limey in

22  2018 and 2019, that was six and seven years ago, right?

23      A.   Yes.

24      Q.   And -- and are you aware whether anyone, with the

25  U.S. government, did any investigation whatsoever as to where

```
 1   that $5 million went after it landed in Limey Air Services
 2   account?
 3               MS. MILLER:  Objection, Your Honor.  Asked and
 4   answered twice on cross now.
 5               THE COURT:  No, I don't think he ever answered
 6   that question.
 7               MS. MILLER:  He has, he has.  I guarantee you he
 8   has.
 9               THE COURT:  After -- well, okay, overruled, go
10   ahead.  Let me just make sure.  Yeah, maybe it was the years I
11   think you're right it may have been year but go ahead.
12               THE WITNESS:  I'm unaware.
13               THE COURT:  All right.  Okay.
14   BY MR. WELK: (CONTINUING)
15       Q.   Do you know whether Limey Air Services is a defendant
16   in this case?
17       A.   I'm unaware and I do not believe they are.
18       Q.   You understand that this sentencing hearing has to do
19   with John Walker and Hansen Helicopters, right?
20       A.   Yes.
21       Q.   What evidence are you aware of that any of the money
22   transferred from PSC to Limey, whether in these last two pages
23   that we looked at or there after ever wound up with John
24   Walker or Hansen Helicopters?
25       A.   I'm unaware where those moneys went.
```

```
1        Q.   Exhibit 228.  Wilma's Flight Services.  Are you aware

2   of any -- any evidence that Mr. Walker had something to do

3   with these transfers from PSC to Limey Air Services?

4        A.   I'm -- I am unaware of him directly to be involved in

5   those transfers.

6        Q.   Are you aware of him being involved in any financial

7   transfers at all ever?

8        A.   I have to review a few of the e-mails that are

9   exhibits to answer that question.

10        Q.   Do you know what an SAR is?

11        A.   I do.

12        Q.   What is that?

13        A.   An SAR is the acronym for a suspicious activity

14   report.

15        Q.   And what is a suspicious activity report?

16        A.   So FINCEN, is a bureau of the treasury --

17        Q.   And it's -- I apologize, just to be clear, that's

18   abbreviation for the Financial Crimes Enforcement Network?

19        A.   Yes.

20        Q.   That is -- it's a component of the United States

21   treasury; correct?

22        A.   Yes, that's correct.  They're responsible for

23   enforcing the Bank Secrecy Act and the BSA is also known

24   mandates that financial institutions maintain adequate money

25   laundering controls for their financial institutions, which
```

1    include reporting requirements, for example, if cash

2    transactions at a financial institution exceed over $10,000, a

3    currency transaction report may be or needs to be filed.

4    Also, if activity that takes place in a financial account is

5    suspicious, then financial institutions are required to file

6    what is known as a SAR.

7        Q.    And what information is included in the SAR?

8        A.    It would include information related to the customer

9    name, identifying information, such as a social security

10   number, tax ID number, address, any additional account

11   information as far as, you know, phone numbers, e-mail

12   addresses, and then the type of activity that has been deemed

13   suspicious would be reported to FINCEN on that report.

14       Q.    As a Special Agent with the IRS criminal

15   investigation, do you have access to SARs?

16       A.    I do.  These types of reports are maintained in a

17   database administered by a FINCEN and as a criminal

18   investigator, I have access to that database.

19       Q.    In connection with this case, did you ever do

20   any -- did you ever do any inquiries as to whether any SARs

21   were filed with respect to Mr. Walker?

22       A.    I did not.

23       Q.    Do you know if anybody ever did any searches whether

24   SARs were filed with respect to Mr. Walker?

25       A.    I am unaware if anybody did that.

         Q.   Exhibit 228, you looked at this earlier, this is the

Bank of Hawaii letter, I think you referred to it earlier

during cross-examination.  And can you just -- so I'm going

to -- I'm going to characterize this, I don't want to -- I

don't want to get in trouble.  This is letter that you were

shown earlier that indicates that the Wilma's Flight Services

account was going to be closed by Bank of Hawaii, right?

         A.   Yes.

         Q.   What's the date on that?

         A.   June 25th, 2018.

         Q.   And was that before or after the indictment in this

case?

         A.   I believe the indictment was in May of 2018, so it

would have been after.

         Q.   So that would be about a month afterwards, yes?

         A.   Approximately.

         Q.   And you indicated when you talked about this with

Ms. Miller that -- that as part of their anti-money laundering

protocols, banks will review accounts and then sometimes

they'll decide to close those accounts, right?

         A.   Yes.

         Q.   And sometimes they'll do that because they find

something irregular in the account or maybe a company said it

was going do business in a certain area and found out it was

doing business in some other area, right?

          1          A.    That could be a potential reason.

          2          Q.    Okay.  Do you know what the reason was that they

          3     closed this account?

          4          A.    I don't have that information.

          5          Q.    Did you ever talk to anybody at Bank of Hawaii and

          6     asked them why they -- why they closed this account?

          7          A.    I did not.

          8          Q.    Didn't find any SARs related to this account?

          9          A.    I never checked the FINCEN database for any SARs

         10     related to this account.

         11               MR. WELK:  Your Honor, I'm going to -- I need to

         12     have him take a look at Exhibit 265.

         13               THE COURT:  Okay.  Is that a new exhibit?

         14               MR. WELK:  I believe that's the 540 opinion

         15     exhibit that the government brought up.  So, I think he's

         16     going to need a hard copy of that.

         17               THE COURT:  Do you have have that, 265?  You got

         18     it.

         19               Do you have it there?

         20               THE WITNESS:  Yes, Your Honor.

         21               THE COURT:  Okay.

         22     BY MR. WELK: (CONTINUING)

         23          Q.    Do you have the document in front of you?

         24          A.    Yes, I do.

         25          Q.    Do you know what this exhibit consists of?

1      A.   Yes.

2      Q.   What is it?

3      A.   This is the response from the government of the

4 Philippines related to an MLAT request.

5      Q.   Can I ask you to turn to page 28, please.  And then I

6 believe the rest of this exhibit, the rest of this exhibit it

7 appears to be helicopter leases.  Do you agree?

8      A.   Yes.

9      Q.   Is there any way that you can tell me how many of

10 these leases you looked at in preparation for your testimony?

11      A.   I looked at several of them.

12      Q.   Can you tell me which ones?

13      A.   It would have been the first few.

14      Q.   Who are the parties to -- let's look at the first

15 one.  Who are the parties to -- on page 28, who are the

16 signatories on that?

17      A.   The lessor is Pacific Spotters Corp. and the lessee

18 is Oriental Marine Naru Limited.

19      Q.   This is Exhibit 265, page 28, who signed this -- who

20 signed this on behalf of Pacific Spotters?

21      A.   Kenneth R. Crowe.

22      Q.   Do you recall seeing any leases from Pacific Spotters

23 Corporation were signed by someone other than Kenneth R. Crowe

24 for Pacific Spotters?

25      A.   Based on my -- my review right now, just a quick

1   review just thumbing through these -- these contracts, he's

2   listed as the representative for PSC on signing these -- these

3   contracts, oh, there is it looks like Phillip Kapp as well,

4   towards the end.

5       Q.   Did you come across any signed by John Walker?

6       A.   No, I don't see his name listed and -- as the lessor

7   signing on behalf of the lessor on these contracts.

8       Q.   Thank you.  Do you know what the specific fraud was

9   that was alleged in the Second Superseding Indictment?

10      A.   Wire fraud.

11      Q.   Do you know what the nature of the wire fraud was?

12      A.   It included from my understanding was that there was

13  some electronic communications with some of the parties

14  involved and also, which include e-mails and then also the

15  wire transfers of funds from accounts in this case.

16      Q.   Are you aware that there was a crime alleged with

17  respect to the fraud alleged with respect to the leases that

18  were signed described in the Second Superseding Indictment?

19      A.   I'm unaware of anything specifically related to the

20  actual like lease contract other than the lease involves

21  aircraft that are maintained by pilots and mechanics that are

22  uncertificated.

23      Q.   Let me be clear, I don't believe any of these

24  contracts were actually referenced in the indictment because

25  the ones in the indictment aren't with Pacific Spotters Corp.

1  But with respect to the wire fraud conspiracy, which related

2  to the contracts, do you know what the objects of the

3  conspiracy were alleged to have been?

4      A.   If you have a copy of the Second Superseding

5  Indictment, I could -- I could read that for you if you need

6  me to.  I reviewed the indictment but again, to refresh my

7  memory if you present me a copy, I can -- I can read it with

8  you.

9      Q.   I'm sorry, you have reviewed the indictment?

10     A.   I've taken a look at it.

11     Q.   Would it surprise you to know that the wire fraud

12 conspiracy only alleged misrepresentations as to the

13 airworthiness of the helicopters?

14          MS. MILLER:  Objection, Your Honor, that

15 misstates the facts in the indictment.  The indictment speaks

16 for itself.

17          MR. WELK:  Well, many things --

18          THE COURT:  Okay, overruled, go ahead, overruled.

19          MR. WELK:  Okay.

20          MS. MILLER:  Your Honor, I'm going to object

21 because that is -- that is not what was indicted.

22          THE COURT:  The Court has the -- I've got the

23 indictment in front of me, I know what it says, I'm going to

24 allow --

25 BY MR. WELK: (CONTINUING)

219

```
1        Q.    Are you aware that there were three objects of the
2    conspiracy described in the wire fraud conspiracy count,
3    Count 99?
4        A.    I'm not aware of that specifically.
5        Q.    Would it surprise you to hear that the only of those
6    three objects, that involved the leases, was whether the
7    helicopters were airworthy?
8        A.    What was your question again?
9        Q.    Would it surprise you to learn -- let me take a step
10   back.  You've said a number of times during this
11   cross-examination, you've talked about helicopters having
12   counterfeit parts, mechanics who are uncertificated and pilots
13   who are uncertificated, is it your -- is it your understanding
14   that the wire fraud conspiracy in this case involved all three
15   of those factors?
16       A.    I'm unaware of that.
17       Q.    You were asked by Ms. Miller about how you determined
18   victim economic loss.  You remember that?
19       A.    Yes.
20       Q.    How do you determine who's a victim when you're doing
21   a criminal investigation?
22       A.    The victim can be someone who was defrauded of some
23   type of -- some type of financial means or an amount of
24   moneys.
25       Q.    Do you believe that in order to be defrauded, a
```

*Criminal Case No. 18-00010, USA v. Walker*

Case 1:18-cr-00010    Document 2332    Filed 07/29/25    Page 219 of 338

1    victim is required to suffer some pecuniary or economic loss?

2        A.    That's my experience, that based on your question,

3    yes.

4        Q.    So okay, so just to clarify, if someone -- if Person

5    A makes a material misrepresentation to person, B, person B

6    relies upon that, and they've suffered some kind of loss but

7    it's not an economic loss, do you think there's been a fraud?

8        A.    Yes.

9        Q.    Okay, so there is such a thing as a fraud without

10   economic loss, right?

11       A.    I mean if it's a material -- could be like a material

12   misstatement or omission, it depends.

13       Q.    But I'm talking about the loss.  A person can be

14   defrauded in some way but their loss can be noneconomic,

15   right?

16       A.    I believe it's possible.

17       Q.    Okay.  And in that situation, how would you determine

18   economic loss?

19       A.    Well, it could be the potential loss, maybe there was

20   an attempt of defrauding a victim and the predicate offense,

21   the fraud did not -- was not completed so, there could have

22   been a potential loss in that instance or if another example

23   if there was some type of predicate offense that related to

24   fraud and the amounts weren't of significant value but it was

25   a material -- something material to the overall scheme, then

yeah, I mean it's still be some type of fraud.

Q.   Right, but if the victim suffered no economic loss
and that was my question, and I'll -- and so I'll ask you
again, if the victim suffered no economic loss, let's say
whatever the situation was, the -- it didn't cause the victim
any money but the victim had his feelings hurt and he was sad,
because he had his feelings hurt but he didn't suffer any
economic loss, he didn't lose any money, could still be a
fraud, right?

A.   Yes.

Q.   And in determining the loss for that victim, it would
be zero, wouldn't it?

A.   Depends.  Again, if there is a total amount involved,
yes.  We can -- we can come up with a number.

Q.   Okay.  You can come up with a number even if the
victim didn't suffer an economic loss?

A.   It depends on what was potentially agreed upon.  If
the victim didn't receive what they believed they were going
to obtain through a contract, there's still a loss but we
can't calculate it.

Q.   And if you can't calculate it, then there is no loss,
right?

A.   There is still -- I think a loss we can attribute to
the total amount of the fraud.  If we can calculate the fraud,
then I think we can.

1    Q.   So you're saying that if you can calculate a fraud,

2    then even a victim who suffered no economic loss, that the

3    victim -- you can figure out a number for loss when they

4    suffered no economic loss?  That's the question.  The question

5    isn't, you know, maybe they could have suffered a loss or

6    something different would have happened, the question is

7    here's what happened, did the victim suffer a loss, and are

8    you suggesting that where the victim suffers no economic loss,

9    that you could calculate an economic loss for the victim?

10   A.   Not specifically for the victim just -- just in

11   total, like just the total fraud is, you know, this is based

12   on the total amount that was related to the predicate offense.

13   Q.   And what -- for what purpose would you determine the

14   amount of a fraud if not to determine loss to victims?

15   A.   Just to determine the total amount that, for example,

16   somebody who is a criminal or defendant is responsible for.

17   Q.   How and in what way would they be responsible for?

18   A.   Well, I mean based on the scope of the timeframe of

19   the violations that are being alleged like the timeframe of

20   the conspiracy, the amount that they potentially -- or that

21   amounts that they defrauded individuals, victims, also where

22   did the crimes take place, I mean all of that is taken into

23   account.

24   Q.   Taken into account in determining what?

25   A.   What the -- what the individual is charged for.

```
1        Q.   Okay, I'm really focusing on what you were asked
2    about by Ms. Miller and that is economic loss.  You said you
3    look at financial records to determine economic loss, right?
4        A.   Yes.
5        Q.   You look at tax records?
6        A.   Yes.
7        Q.   And what if you look at those and you find that the
8    victim didn't lose any money, there is no loss, right?
9        A.   It's hard to calculate based off -- I mean are we
10   relating this question to Mr. John Walker or is this a
11   hypothetical question?
12       Q.   For now, it's a hypothetical -- what I'm trying to
13   figure out Special Agent is how you can determine victim loss,
14   where the victim did not suffer an economic loss?  Do you
15   think that -- do you think that the victim can recover like
16   damages, like civil damages, some sort of like pain and
17   suffering or hurt feelings?
18       A.   I mean if an individual victim wants to seek some
19   type of legal, you know, action, that's up to them.
20       Q.   So they can sue the fraudster, right?
21       A.   Sure.
22       Q.   I'm not talking about that.  I'm talking about a
23   federal criminal prosecution, where there is a fraud but it
24   results in no economic loss to the victim, who may have been
25   victimized in some way, but it doesn't cost them anything,
```

they didn't lose any money, nothing happened to them that made
them spend money that they otherwise would not have spent and
I'm trying to figure out if you think under that scenario
without having any additional facts that there is a way to
determine economic loss for a victim who is not suffered an
economic loss?

     A.   I don't think we come up with the total amount of
economic loss, specifically in this case because the lease
contracts did not include legally, you know, based certified
mechanics and pilots, so it's hard to come up with a true
value.

     Q.   Not one of them?

     A.   I don't know which of the mechanics, I don't know
individuals that were responsible for which of the contracts
but just in general.

     Q.   So if you -- if you don't know which helicopters, if
any, had counterfeit parts in them, and you don't know which
pilots, if any, were uncertificated and you don't know which
mechanics, if any, were uncertificated, then how can you
determine the loss?

     A.   I don't think we can.

          THE COURT:  So why don't we, Counsels, let me
take a 15-minute recess at this time.

          MR. WELK:  Okay.

          THE COURT:  Come back.  Thank you.

```
 1                  (Recess taken at 2:54 p.m.)

 2                  (Back on the record at 3:12 p.m.)

 3                  THE COURT:  Okay.  We are back on the record.

 4     All Counsels present, Mr. Walker is present.  You can proceed,

 5     go ahead.

 6                  MR. WELK:  Sorry about that, Your Honor, you kind

 7     of snuck back in on me.

 8                  THE COURT:  No, it's okay, we're just waiting for

 9     Mr. Walker to come out.

10                  MR. WELK:  All right.

11     BY MR. WELK: (CONTINUING)

12          Q.   Okay.  Look at Exhibit 141.  Do you recall this

13     document, sir?

14          A.   Yes.

15          Q.   And this indicates that Jan's Helicopters sold a

16     helicopter to someone.  Is it your view that this is John

17     Walker selling this helicopter?

18          A.   Yes, John Walker is listed on the bottom of the

19     signature.

20          Q.   But it -- but it belongs to Jan's Helicopter, right?

21          A.   Yes.

22          Q.   Let me show you page 10 of Exhibit 141.  Do you

23     recall what the -- what the significance of this is?

24          A.    It's a list of registered helicopters in the

25     Philippines that were valued at $130,000 each that were in
```

```
 1   total sold for a little over 300,000 USD.
 2        Q.   Do you know who -- who this value was agreed between?
 3        A.   If you show me the additional documents, I could tell
 4   you.
 5        Q.   So you -- you don't know off hand?
 6        A.   No, but again, if you show me the additional
 7   documents for that exhibit, I could explain it.
 8        Q.   This is Exhibit 141, page 15.  Can you tell me what
 9   this is?
10        A.   It shows that on November 13th, 2018, that there is a
11   looks like an agreement or deed of sale between Pacific
12   Spotters Corporation and Jan's Helicopter Service and the
13   total consideration is for 340,000 USD.
14        Q.   Who signs this -- can you tell who signed this
15   agreement on behalf of Jan's Helicopter?
16        A.   John Paul Huey, V, Lero.
17        Q.   And who signed it on behalf of Pacific Spotters
18   Corporation?
19        A.   Phillip -- I'm sorry, Phillip Turner Kapp.
20        Q.   And do you see any indication anywhere on this
21   document that John Walker was involved in any way in the
22   transaction?
23        A.   I don't see his name on there other than these are
24   companies that he is an owner of.
25        Q.   But you don't see his name on there at all, do you?
```

```
 1        A.   I do not.

 2        Q.   Do you know if John Walker ever went to the

 3   Philippines?

 4        A.   I don't know.

 5        Q.   As an IRS CI agent, do you have the ability to

 6   contact Department of Homeland Security or Immigration and

 7   Customs Enforcement and inquire about international travel by

 8   U.S. citizens?

 9        A.   Yes.

10        Q.   Never did that with respect to Mr. Walker?

11        A.   I did not do that for this --

12        Q.   How difficult is that to make that kind of inquiry?

13        A.   It's a request made to someone who works for one of

14   the Department of Homeland Security agencies and just waiting

15   for response back on the particular request.

16        Q.   You don't need a court order or anything, right?

17        A.   If -- if it's needed, if the travel records are

18   needed for evidence, yes, but if it's just to obtain

19   information to determine if someone traveled internationally,

20   then those employees of DHS can provide that to an agent as

21   myself.

22        Q.   Exhibit 7.  You recognize this document?

23        A.   I do.

24        Q.   And this is -- according to this, Mr. Crowe is the

25   director, is authorized to sell aircraft to Pacific Spotters,
```

```
1   right?
2        A.   Yes.
3        Q.   It's his signature at the bottom?
4        A.   Yes, it is.
5        Q.   Any reason to believe that this document doesn't give
6   him the authority indicated on it?
7        A.   No.
8        Q.   Are you aware of the idea of that -- that an alter
9   ego, one way to determine whether a company is an alter ego of
10  an individual is the failure to comply with corporate
11  formalities?
12       A.   I'm not familiar with what you're trying to ask me.
13  Is there a way you can rephrase your question?
14       Q.   Do you know what corporate formalities are?
15       A.   Can you explain that to me?
16       Q.   No, I just wondered if you knew what it was.
17  Exhibit 11, you recall seeing this document?
18       A.   I do.
19       Q.   Now this indicates advances to Mr. Walker, right?
20       A.   Yes.
21       Q.   By PSC?
22       A.   That is correct.
23       Q.   And what's the time period?
24       A.   2021 to 2024.
25       Q.   Where did this document come from and let me -- let
```

1    me retract that.  I'm not interested in where you got it from.

2    I presume you got it from the prosecutors.  Do you know where

3    they got it from?

4        A.   I do not.

5        Q.   Do you have any idea what these payments are for?

6        A.   They were payments such as what's listed here as

7    advances or dividends for his ownership in PSC.

8        Q.   How do you know that?

9        A.   Well, it says here that the following remittances

10   relate to Mr. John Darrell Walker from 2021 to 2024.

11       Q.   Do you know what the advances were for?

12       A.   From what I learned during the preparation for my

13   testimony, that Mr. John Walker had divested his ownership

14   interest in PSC, so that four mechanics and the mechanic's

15   wife could then be added to the ownership of Pacific Spotters

16   Corporation.  And that in particular, he was allegedly going

17   to loan funds to these individuals so that they could buy his

18   ownership shares from him.

19       Q.   And when you say allegedly, does that mean that you

20   doubt that that's true?

21       A.   Well, based on those loan documents with these

22   mechanics and the mechanic's wife and the other one in

23   particular the one I reviewed earlier today, where there is a

24   loan document that shows there is no interest rate, I find

25   that suspicious that in fact it really is a loan.

1    Q.   So, if -- if I give money to someone and they promise

2    to pay me back but I don't charge them interest, that's not a

3    loan?

4    A.   There is different circumstances and in this case,

5    this is involving large amounts of money.

6    Q.   Well, how much do you consider a large amount of

7    money?

8    A.   If you want, we can just reference this exhibit right

9    here, I mean these are advances and dividends that total up to

10   3.1 million USD.

11   Q.   Right, but do you think this is a loan where somebody

12   called it a loan?

13   A.   Again, I've mentioned to you about the details of

14   what I learned that he had divested himself of his ownership

15   interest.

16   Q.   What does that have to do with this document, these

17   numbers?  Do you know?

18   A.   That, for example, this individual Cherry Anne Espion

19   became a owner of PSC.

20   Q.   Okay?

21   A.   And that there was also loan documents between

22   Mr. Walker and Cherry Espion.

23   Q.   Let me -- let me ask you something, is it -- are

24   you -- are you implying that there was something -- that the

25   transaction by which Mr. Walker divested a large portion of

```
1    his ownership interest in PSC to these individuals, Ms. Espion

2    and her husband and a few others, that there was something

3    inappropriate about that or something not true about that?

4         A.   Based on what I learned in preparation for my

5    testimony, a U.S. citizen can't have more than a third

6    percentage of ownership in a Philippine corporation.

7         Q.   Okay.

8         A.   So the mechanics and the mechanic's wife that have

9    Philippine citizenship were able to then or were brought in to

10   become owners of the company.  So that way, he still has some

11   ownership share and he still has some control over the company

12   as well.

13        Q.   Are you implying though that they -- that that wasn't

14   real, that that was some kind of a sham transfer?

15        A.   Again, based on the loan document I reviewed, when

16   there is zero interest, that's suspicious.

17        Q.   Why is it suspicious, is your suspension that it's a

18   sham transaction, is that what you're suggesting?

19        A.   In other investigations that I worked, criminals and

20   money launderers have used loan documents to facilitate money

21   laundering with little to no interest rates.  So in fact it is

22   not a true loan.

23        Q.   Well, what about -- what about parents who make a

24   down payment on a house for their children but don't charge

25   them interest on -- and they're going to pay it back, do you
```

```
 1    think that's -- that's a sham?
 2                MS. MILLER:  Objection.  Objection, Your Honor,
 3    relevance, we're far afield now.
 4                THE COURT:  Overruled.
 5    BY MR. WELK: (CONTINUING)
 6        Q.  Or is your -- is your belief that no interest loans
 7    are a sham, does that only have to do with commercial
 8    transactions?
 9        A.  Based on the totality of the evidence I reviewed,
10    including the timing of the indictment, the change in the
11    articles of incorporation, of PSC to reflect the same business
12    model as Hansen Helicopters, Mr. John Walker divested himself
13    in this -- part of his ownership interest in PSC to bring in
14    Philippine citizens as owners and then to also continue with
15    conducting some type of loan agreement without a interest
16    rate, it is suspicious to me.
17        Q.  Is it suspicious to you if a person goes to a car
18    dealership and they buy a car but they don't have to
19    pay -- they get zero percent interest on the loan?
20        A.  No.
21        Q.  Why -- why not?
22        A.  Because that's a promotion that auto manufacturers,
23    you know, offer to customers.
24        Q.  Do you know that Mr. Walker's been a mechanic, a
25    certified mechanic for decades?
```

1      A.   I don't know about his specific certifications or

2  their standings.

3      Q.   Do you know anything about his past?

4      A.   I know what I reviewed during the preparation of my

5  testimony.

6      Q.   And you didn't review anything that indicated to you

7  that he's been a mechanic for something like 30 years?

8      A.   I'm unaware of his length of time as a mechanic.

9      Q.   Are you aware that he was -- that he's been a pilot

10  for around that same period of time?

11      A.   Again, I'm unaware of how long.

12      Q.   Do you know -- do you know how he became the owner of

13  Hansen Helicopters?

14      A.   I do not.

15      Q.   Would it change your opinion about the legitimacy of

16  the transfer to Mrs. Espion and Mr. Espion and the others, the

17  mechanics and the mechanic's wife, would it change your

18  opinion to know that Mr. Walker got a break when he was young

19  and -- and acquired part of a company probably for less than

20  it was worth because the person who owned the company wanted

21  to help him get a leg up?

22              MS. MILLER:  Objection, Your Honor, assuming

23  facts not in evidence.

24              MR. WELK:  It's a hypothetical question.

25              MS. MILLER:  Oh, it's hypothetical?  Sorry, I

```
 1   didn't hear that part.  Okay.
 2              THE COURT:  Overruled, go ahead.
 3   BY MR. WELK: (CONTINUING)
 4       Q.    Would that change your opinion?
 5       A.    Can you repeat your question?
 6       Q.    Yeah.  Would it change your opinion about the
 7   legitimacy of Mr. Walker transferring interests to the
 8   Espion's and the other people who acquired interest in the
 9   Philippine company, that to know that Mr. Walker, when he was
10   a young man, was given a break on buying into Hansen
11   Helicopters by the owner of that company who saw promise in
12   him and wanted to help him get a leg up?
13       A.    No.
14       Q.    So do you think that if that happened with
15   Mr. Walker, that that was a sham transaction as well?
16       A.    I don't know if that happened or not.  I don't know
17   if you even know if that truly happened or not either.
18       Q.    I'd be happy to tell you but that's not my job here
19   today to tell you things like that.  I'm asking you a
20   hypothetical which I'm allowed to do because you're an expert
21   witness and I'm trying to discovery why you think that a
22   papered transaction that you've seen the documents for, why
23   you think that's not a legitimate transaction?  Do you think
24   that John Walker today is still the effective 100% owner of
25   PSC?
```

A.   I don't know his exact percentage but based on the totality of everything I reviewed, again, based on the timing of search and seizure warrants conducted at his businesses in 2016, the migration of his alter ego companies to then using PSC in 2018, and then him divesting himself of ownership interest in that business and then bringing in a Philippine citizen and then conducting some type of a loan agreement with zero interest I find it very suspicious.

Q.   When you say bringing in Philippine -- this is a company in the Philippines, you understand that, right?  PSC. You understand that PSC is in the Philippines?

A.   Yes.

Q.   So you -- what do you think that Mr. Walker started this company with a bunch of white people and then he brought in Philippine people so he could do a sham transaction about giving them an interest in his company?

A.   You can rephrase your question.

Q.   I'm asking you if that's what you think?

A.   I've already told you, I've explained -- I find it suspicious based on the totality of all the things I've mentioned.

Q.   Let me tell you what else you said.  You said he brought in these Philippine people and gave them an interest in his company.  What do you mean by that, that he brought in these Philippine people?

1    A.    Those are individuals that are listed on the articles

2  of incorporation, the amended articles of incorporation.

3    Q.    Right.  What do you mean by he brought them in?

4    A.    What are you trying to imply or what are you trying

5  to ask me?  You can ask me a specific question.

6    Q.    Special Agent Reyna, I'm not trying to imply

7  anything.  I'm asking you, what you meant when you said the

8  words he brought in Philippine people, what do you mean by

9  that?

10    A.    I've already told you that he needed to divest

11  himself of his ownership shares, he couldn't -- because he

12  could not maintain over a third -- over a third ownership

13  interest in the business.  So by having Philippine individuals

14  of Philippine nationality brought in to the business to become

15  owners, he still maintains some ownership control of the

16  business.

17    Q.    Do you understand them to be mechanics for the

18  business?

19    A.    From what I've learned during preparation for my

20  testimony, that four of them were mechanics and one was a

21  mechanic's wife.

22    Q.    Were they mechanics for Pacific Spotters?

23    A.    From what I understand, they were mechanics for John

24  Walker-owned companies.

25    Q.    Can I get the ELMO back, please?  Now, can you please

```
1   explain to me why you think they're paying -- why are they
2   paying $3.1 million to John Walker in support of a sham
3   agreement?
4       A.   I explained to you that what I saw in those loan
5   documents were suspicious.
6       Q.   We'll get to that.  I'm talking about this document?
7               THE COURT:  Can you give me -- this is exhibit
8   what, 11?
9               MR. WELK:  This is Exhibit 11.
10              THE COURT:  Or Exhibit 11, okay.  Thank you.
11  BY MR. WELK: (CONTINUING)
12      Q.   You've -- you've indicated that you think this was a
13  sham -- and you've told me why you think it's a sham?
14      A.   I never said the word sham.  You've repeated yourself
15  by saying the word sham.
16      Q.   I see.  You think this is a legitimate agreement, the
17  loan?
18      A.   I've already explained to you what I believe about
19  the loan based on the totality of all the evidence I reviewed.
20      Q.   Okay.  Why in your page, why would they pay John
21  Walker $3.1 million if they didn't -- if they weren't actually
22  paying the loan?
23              MS. MILLER:  Objection, Your Honor , that
24  misstates the facts in evidence.  These weren't payments,
25  these were advances and they were dividends.
```

```
 1                THE COURT:  Okay.  Yeah, I mean they are
 2    advances.  Okay.  That's right overruled, go ahead.
 3    BY MR. WELK: (CONTINUING)
 4        Q.   Can you answer the question?
 5        A.   It appears to me that there were payments, whether
 6    they were advances or dividends, being made to Mr. Walker
 7    based on his ownership interest in the business.
 8        Q.   But -- but the -- but don't the documents say that
 9    they are -- they are payments to him for the transfer of his
10    shares to those people, that they were paying him for those?
11                MS. MILLER:  Objection, Your Honor, again,
12    misstates facts in evidence.  The documents do not say what
13    Mr. Welk just said.
14                THE COURT:  Hold on.  Let me -- I'm sorry, I was
15    just reviewing this.  Can I just get the last question?  Hold
16    on.
17                What was the last question, Veronica?
18      (Wherefupon the reporter read back the requested portion.)
19                THE COURT:  I'm not sure if I understand the
20    question.  Okay.  Sorry, can you rephrase the question?
21                MR. WELK:  I can.
22                THE COURT:  Yeah, go ahead.
23    BY MR. WELK: (CONTINUING)
24        Q.   Maybe we need to come back to this one.  This is
25    Exhibit 211.
```

```
 1                    THE COURT:  Okay.  Can you make that a little

 2     thicker, please.  Even more so.  That's hard to read this.

 3                    Can you read it okay?

 4                    THE WITNESS:  I can see it.  It's -- it's better

 5     in focus, yes, that's better.

 6                    THE COURT:  Better for me too.  Go ahead.  211.

 7     BY MR. WELK: (CONTINUING)

 8        Q.   Do you know what these payments are for?

 9        A.   If we go to the column heading "Remarks," there is

10     listed some details about each of the transactions.

11        Q.   Okay.  Let's start with the top one, 29 January 21.

12     It says, "Remittance to John Darrell Walker in for the account

13     of Jan's Helicopter Service, Inc."  Do you see that?

14        A.   I do.

15        Q.   So that's a payment to Jan's, right?

16        A.   Based on what it says here.

17        Q.   You don't think it's -- you don't think that's what

18     it is?

19        A.   I don't know this is just -- that's just what it

20     says, I don't know if that's really the true reason of why the

21     payment occurred.

22        Q.   Do you have any -- any reason to believe it might be

23     something else?

24        A.   Again, based on the evidence I reviewed for my -- in

25     my preparation for my testimony, as I understand, John Walker
```

1   is a owner of Pacific Spotters Corporation and also Jan's

2   Helicopter Services, so these are two businesses that he owns.

3       Q.   And why does that make you doubt that the payment is

4   to Jan's Helicopter Service?

5       A.   I don't know if the transaction actually occurred.  I

6   just know that these are two companies listed here that he is

7   listed as an owner of.

8       Q.   Wait, when you say you don't know if the transaction

9   occurred, does that mean that you don't know if he -- if he

10  was actually -- if somebody was paid $10,000?

11      A.   I mean based on this, yes, that's what it says that

12  there is a $10,000 payment, there's a reference number, it

13  shows a paying banking institution, and a payee account

14  number, yes.

15      Q.   Okay.  Let me ask you about the line, if you go down

16  to the fourth box, 30 April 21.  And now, it says there was

17  $10,000 advanced to John Darrell Walker.  Do you think that's

18  true?

19      A.   If the transaction happened, whether or not it was

20  truly for an advance, I don't know.

21      Q.   But you don't even know -- you're saying you don't

22  even believe necessarily that the transaction happened, right?

23      A.   Well, let me -- let me clarify.  Based on this, if I

24  could reference the actual source documents, and I could

25  actually look to see if that's what happened, then yes.  But

these are two John Walker corporations, why would one John

Walker corporation advance $10,000 to another John Walker

corporation?  That to me is suspicious.

Q.   Right, but the line we looked at 30 April 21,

that -- that's a transfer to John Walker, so you believe -- do

you believe that one?

A.   For all of these like I said, if -- if I could

reference, you know, the source documents for these, I could

see them and I could tell you that it happened, I know this is

a summary of these transactions but the basis for the saying

in the remarks, I find them suspicious.

Q.   Can I get a yes or no answer to my question.  The 30

April 21, transaction listed on this paper here, says it's a

$10,000 payment as an advance to John Walker, do you believe

that that transaction occurred?

A.   I already explained to you if I saw the supporting

documents that support this, then I could tell you that but

again, I find it suspicious on what the remarks state in here

because these are John Walker companies.

Q.   Except that John Walker is not a John Walker company,

is he?  Is he?

A.   What's your question?

Q.   Okay.  30 April 21, you see it, see the line?

A.   I do.

Q.   Let's follow it across.  John D. Walker is the payee.

```
 1   Follow it along, amount of remittance in dollars, 10,000.
 2   Remarks, advances to John Darrell Walker, do you think John
 3   Darrell Walker is a company?
 4        A.   Him specifically is the person sitting right behind
 5   you.
 6        Q.   That's right.
 7        A.   That's him right there.
 8        Q.   Does he look like a company to you, is he a company
 9   or is he a person?
10        A.   He's a person.
11        Q.   Okay.  So 30 April 21, that's not a payment from a
12   John Walker company to a John Walker company, is it?
13        A.   This is Pacific Spotters Corporation here at the top,
14   it's a summary of payments to John Darrell Walker, says that
15   at the top, at the top left corner of this exhibit.
16        Q.   So let me -- let me see if I got this right.  You
17   don't -- okay, I still haven't gotten an answer to this.  Your
18   Honor, I beg of you, please, if he could just -- this is a
19   yes-or-no question and it's a simple one and he won't answer
20   it.  I want to know Special Agent, if you think , if you are
21   suspicious -- everything okay?  Yeah?
22        A.   Excuse me?
23             THE COURT:  I think --
24             MR. WELK:  I'm sorry --
25             THE COURT:  Hold on.  Hold on.
```

                    THE WITNESS:  Can you rephrase your question?

                    THE COURT:  I think he testified that he's

suspicious.  He has testified to that.

                    MS. MILLER:  Testified to it a hundred times.

                    MR. WELK:  He's answered the question that I

haven't asked a hundred times but he won't answer the one --

                    MS. MILLER:  Because he can't.

                    THE COURT:  Hold on.  Okay.  What's

your -- what's your next question?

                    MR. WELK:  Do you want me to just move along, and

he doesn't have to answer this question, that's fine.

                    THE COURT:  I think he just said he has -- he

suspects that that may not be true.  That's what he says.

Right, does he not say?

                    MR. WELK:  But he -- no, I respectfully disagree.

BY MR. WELK: (CONTINUING)

    Q.   Do you think every transaction on this opinion is

suspicious, that whether or not it really happened or not

based on what you know?

    A.   Not that they happened, it's based on what it states

under the "remarks" section.

    Q.   Does what -- are you saying that what it says under

"remarks" section is how you determine whether you think the

transaction really happened?

    A.   Based on the totality of all the evidence I reviewed,

1   it's suspicious to me.

2       Q.   What's suspicious to you about the 30 April 21

3   transaction -- no, strike that.  What's suspicious about the

4   29 April 22 transaction?

5               THE COURT:  I'm sorry, which one is that, is that

6   the next one underneath?

7               MR. WELK:  No, it's a few -- it's a few down.

8   These aren't numbered.

9               THE COURT:  Okay, can you make that a little

10  large.  Can you make that larger?  I'm looking for 29.  29

11  what?

12              MR. WELK:  29 April 22.  You know what I could

13  point to it here.

14              THE COURT:  29, April 2020 -- okay, I can't see.

15  29.

16              MR. WELK:  Right there.

17              THE COURT:  Okay.  There.

18  BY MR. WELK: (CONTINUING)

19      Q.   See that?

20      A.   Yes.

21      Q.   Are you suspicious of that transaction?

22      A.   I'm suspicious of all these transactions based on the

23  column heading "remarks."

24      Q.   Okay.  And you could have -- I think you indicated

25  that you could have sort of clarified your suspicions by

1  looking at the source documents, right?

2       A.   I would just reference like, for example, the

3  reference number in the paying bank and the account number,

4  that's all.  I don't -- I don't have any reason to believe

5  that the transactions didn't happen.  Again, I am just

6  suspicious of what's listed under the "remarks" section.

7       Q.   For every transaction?

8       A.   For all of these, yes.

9       Q.   So you think the advances to John Darrell Walker, you

10 suspect they could have been something else?

11      A.   Could have been for another reason but what I find

12 suspicious is that this involves, you know, Pacific Spotters

13 Corporation and everything else I've already talked about,

14 involving him divesting his ownership, shares, and everything

15 related to that.

16      Q.   To the Filipino people, right?

17      A.   As I mentioned, as I learned, they were four

18 mechanics and a mechanic's wife Philippine nationality.

19      Q.   Okay.  What did you find when you looked at the

20 source material for these transactions?

21           MS. MILLER:  Objection, Your Honor, asked and

22 answered.  He already said he didn't look at source material.

23           THE COURT:  Yes.

24           MS. MILLER:  Right?

25           THE COURT:  I think he -- I think he already

1    testified that he has not looked at those.

2              MR. WELK:  Okay.

3    BY MR. WELK: (CONTINUING)

4        Q.   This is 210.

5              THE COURT:  Okay.  What page is this, is it just

6    one page, 210?

7              MR. WELK:  As far as I know, Your Honor, 210,

8    it's just 210.

9              THE COURT:  Is it a summary sheet of 210?

10             MS. MILLER:  Yes, Your Honor, it's just one page.

11             THE COURT:  All right.  Exhibit 210.

12   BY MR. WELK: (CONTINUING)

13       Q.   What are these, Special Agent?

14       A.   Based on what it says on the top left corner of the

15   exhibit, these are summary of payments to Kenneth R. Crowe

16   from Pacific Spotters Corporation.

17       Q.   Are you suspicious of these?

18       A.   What makes it suspicious to me is if you allow me to

19   see the bottom of the page, that at the bottom, the total

20   amount listed that he received was a little over 93,000, and

21   that John Walker received over 3 million in the previous

22   exhibit, so that tells me that he has a larger ownership

23   interest than Mr. Crowe.

24       Q.   How -- how does it -- why do you think it means he

25   has -- that Mr. Walker has a larger ownership interest than

```
 1    Mr. Crowe?
 2         A.   Because he received more funds based on these charts.
 3         Q.   What about the salaries?  Are you suspicious about
 4    the salary payments?
 5         A.   I don't have any reason to be suspicious of the
 6    salaries.
 7         Q.   I'm sorry, I don't understand what you think is
 8    suspicious about this list now.
 9         A.   That Mr. Walker, even though he divested his
10    ownership or a portion of his ownership interest, it appears
11    he still receiving a large amount of money from the
12    corporation.
13         Q.   Right, but didn't you -- didn't you testify earlier
14    that -- that you understood that he had to divest a certain
15    percentage of his interest because there was a -- there was a
16    limit to how much a non-Filipino citizen could hold in a
17    Philippine corporation?
18              MS. MILLER:  Your Honor, again, asked and
19    answered multiple, multiple times.
20              MR. WELK:  Well, I'm not sure why -- I guess
21    maybe you can help me, Special Agent.
22              THE COURT:  It's true.  I mean he has been asked
23    and answered.
24              MR. WELK:  Okay, but -- okay.
25              MS. MILLER:  But what?
```

```
 1              MR. WELK:  I'm sorry, Ms. Miller.

 2              THE COURT:  Okay.  Wait.  Hold on.  Next

 3   question.  Go ahead.

 4              MS. MILLER:  Let's move on.

 5              THE COURT:  The objection will be sustained.

 6   Mr. Welk, go ahead, next question.

 7              MS. MILLER:  Move on to something than something

 8   different.

 9              THE COURT:  Counsel, no, no, Counsel,

10   just -- wait, wait, wait, Counsel.  Address the Court, not

11   each other.

12              MS. MILLER:  Yes, Your Honor.

13              THE COURT:  All right.  Let's go.

14              MS. MILLER:  We have heard the same question.

15              THE COURT:  The Court has sustained the

16   objection, go ahead, next question.

17              MS. MILLER:  Thank you.

18   BY MR. WELK: (CONTINUING)

19       Q.   In light of the fact that you understand that

20   Mr. Walker had to divest a certain percentage and that he

21   didn't send all of it, didn't have to divest all of it, I

22   don't understand why it makes you suspicious that Mr. Crowe

23   had a lower amount of ownership than Mr. Walker did?

24       A.   I just find it suspicious that even though on paper

25   he may have divested a portion of his ownership interest, he
```

1    still is receiving a significant amount of more of funds from

2    PSC than Mr. Crowe.

3        Q.   But -- are you suspicious because you think that

4    Mr. Walker's requirement to divest means that his ownership

5    has to be equal to that of Mr. Crowe?

6        A.   No.

7        Q.   Okay.  All right.  Exhibit 213.  You testified about

8    this loan document, do you recall?

9        A.   Yes.

10       Q.   And you -- I believe you testified that you had seen

11   similar loan documents between the other Filipino people that

12   he brought in, as you put it, that Mr. Walker brought in, yes?

13       A.   Yes.

14       Q.   Other than the zero percent interest, is there

15   anything else that you find suspicious about this loan

16   agreement?  I can show you the rest of the opinion as needed.

17       A.   Item number 2 is what stands out to me.

18       Q.   Okay.  Nothing else?

19       A.   Can you scroll down or so I can see the bottom a

20   little more.

21       Q.   Yup.

22            THE COURT:  Did you have another question?

23   BY MR. WELK: (CONTINUING)

24       Q.   I'm sorry, I thought you were going to tell me when

25   you were done reading it.  Do you find anything else

1    suspicious about this agreement?

2         A.    No.

3         Q.    Okay.  How many aviation cases have you worked on in

4    your career?

5         A.    I worked on several investigations where illicit

6    funds were used to purchase aircraft and I was involved in

7    being the seizing agent of those aircraft.

8         Q.    Were those aircraft leased for any commercial

9    purpose?

10        A.    Yes, they were.

11        Q.    What were they leased for?

12        A.    They were leased to customers in a foreign country

13   and the aircraft were owned by a company that in fact provided

14   lease -- leasing services.

15        Q.    Have you done any other cases, have you ever been

16   involved in cases other than this one involving the Philippine

17   islands?

18        A.    Can you ask that question again?

19        Q.    Have you ever been involved in any cases involving

20   the Philippine islands?

21        A.    No.

22        Q.    Have you ever heard the term *scrap* in the Philippine

23   islands aviation industry refers to unregistered aircraft?

24        A.    I was reading something about that.

25        Q.    Is that different than what scrap means in the United

     1    States in your understanding?

     2         A.    Yes.

     3         Q.    Could you please explain the difference to me?

     4         A.    As I understand that scrap in the Philippines

     5    means --

     6                MS. MILLER:  I'm going to object, Your Honor,

     7    there is no foundation for his understanding and as a matter

     8    of fact, I know that any understanding he has comes from the

     9    statement of Ms. Cherry Espion which Counsel has argued so

    10    vehemently that the government should not be able to use in

    11    this sentencing.

    12                So if Counsel wants this witness to talk about

    13    one portion of Ms. Espion's statements, then the government

    14    will ask the Court to allow us to move in the entire

    15    statement.

    16                THE COURT:  I'm sorry, your objection is that the

    17    Counsel has not laid the foundation?

    18                MS. MILLER:  Correct.  Because the only

    19    information this witness has about this question, and Mr. Welk

    20    knows this, comes from the proffer of Cherry Espion which he

    21    has objected to any portion of that proffer coming in for the

    22    purposes of sentencing.

    23                THE COURT:  All right.  Mr. Welk?

    24                MR. WELK:  I challenge --

    25                THE COURT:  She's objecting to the failure to lay

*Criminal Case No. 18-00010, USA v. Walker*

1    a foundation with this witness.

2              MR. WELK:  I asked him if he understood the

3    meaning of the term in the Philippines and he said he did,

4    that's a foundation.

5              THE COURT:  All right.  Overruled.  Go ahead.

6    Overruled.

7              MR. WELK:  Thank you.

8              MS. MILLER:  Objection, Your Honor.

9              THE COURT:  He said he knows --

10             MS. MILLER:  No, how does he know?  That's the

11   appropriate foundation.  Not do you know.  How do you know and

12   as I said, Your Honor, the only knowledge he has is from

13   Cherry Espion's proffer, so if he --

14             THE COURT:  That hasn't been established yet.

15   The Court will overrule the objection at this time.  Go ahead.

16             MR. WELK:  Thank you.

17   BY MR. WELK:  (CONTINUING)

18        Q.   Could you please tell me your understanding of the

19   meaning of the word scrap in the United States?

20        A.   During the preparation for my testimony for this

21   hearing I did read a report that was based on an interview

22   with Cherry Espion and during the review of that report, she

23   then referenced that scrap in the Philippines refers to

24   unregistered aircraft.

25        Q.   Okay.  During your direct examination, you were asked

 1    by Ms. Miller why would a person who's been indicted open a

 2    company in another country.  Do you recall that?

 3        A.   Yes.

 4        Q.   And your answer was to hide from law enforcement,

 5    right?

 6        A.   I explained that in order to continue the ongoing

 7    scheme, that the criminal or the money launderer, if they

 8    sought to avoid the detection of law enforcement, that they

 9    can open up a corporation -- a foreign corporation and it

10    would be more difficult for law enforcement to detect any type

11    of activity.

12        Q.   Can you think of any other reason why a person might

13    move their company out of the United States into another

14    country?

15        A.   Is this a hypothetical question?  Or is this related

16    to Mr. John Walker?

17        Q.   It's just a question.  Can you think of any other

18    reason why a person would move a company from the United

19    States to another country?

20             MS. MILLER:  Your Honor, objection.  It is either

21    a hypothetical or it is based on the facts of this case.  And

22    the witness is asking for clarification.  What is the

23    question?

24             THE COURT:  Sounds like a general question.

25             MS. MILLER:  All right.

```
 1              THE COURT:  Overruled.  Go ahead.
 2              MR. WELK:  That's what he's intending --
 3              THE COURT:  Sounds like a general question.
 4              THE WITNESS:  Yes, Your Honor.  If the individual
 5    opened up a company for a country, could be because they're
 6    going to conduct business there.
 7    BY MR. WELK: (CONTINUING)
 8        Q.   Okay.  Exhibit 223.  Do you recall seeing this
 9    agreement earlier?
10        A.   Yes, I do.
11        Q.   And who is this agreement between, what parties?
12        A.   Pacific Spotters Corporation and Wilma's Flight
13    Services.
14        Q.   And who is the signatory for each?
15        A.   Under Pacific Spotters Corporation, it lists Phillip
16    T. Kapp and under Wilma's Flight Services, Inc. it lists
17    Kenneth R. Crowe.
18        Q.   Do you see any -- do you see John Walker's name on
19    this document anywhere?
20        A.   I do not.
21        Q.   Exhibit 224, who are the parties to this agreement?
22        A.   Wilma's Flight Services and Pacific Spotters
23    Corporation.
24        Q.   And who signs for each company?
25        A.   Kenneth R. Crowe and Phillip T. Kapp.
```

1      Q.   Are you suspicious of this agreement?

2      A.   I find it suspicious that Wilma's was used prior to

3  the indictment of John Walker and then after the indictment,

4  the new alter ego shell company business that's being used to

5  facilitate the wire fraud and money laundering is Pacific

6  Spotters Corporation.

7      Q.   What money laundering is being facilitated here?

8      A.   If there were proceeds derived from any wire fraud

9  activity, that would be the money laundering violations.

10     Q.   And what evidence are you aware of they were involved

11 in money laundering activities in connection with this

12 agreement?

13     A.   That I'm just aware that based on the evidence I

14 reviewed for preparation for my testimony that the scheme

15 continued post the indictment of John Walker and that Pacific

16 Spotters Corporation was the business that was used to be the

17 lessor or the lease agreements with the tuna boat companies.

18     Q.   And -- okay, so you -- you said you know that.

19 What -- what is the fraud scheme that you know was continuing

20 during this time period?

21     A.   That the leases between Pacific Spotters Corporation

22 and the tuna boat companies involved aircraft that involved

23 pilots and mechanics that were uncertificated and that

24 aircraft involved counterfeit parts.

25     Q.   How many of the helicopters involved in the leases

1    during this time period had counterfeit parts?

2                    MS. MILLER:  Objection, Your Honor, asked and

3    answered multiple times.

4                    THE COURT:  True.

5                    MR. WELK:  Actually --

6                    THE COURT:  Sustained.

7    BY MR. WELK: (CONTINUING)

8        Q.   The question I asked you earlier, agent, was how many

9    of the tuna boat leases in the early stages, not with PSC, but

10   with the Guam or Vanuatu companies; am I correct, if -- if the

11   question was in fact asked and answered, then can I please

12   confirm that your answer to the Pacific Spotter Helicopters is

13   the same as the answer you gave earlier when I did not ask

14   specifically about Pacific Spotters, specifically that you

15   don't know if any of those helicopters had counterfeit parts,

16   you don't know if any of the pilots were uncertificated and

17   you don't know if any of the mechanics were uncertificated?

18       A.   I don't know the number of those individual

19   components.

20       Q.   Okay.  And that's true for the entire scope of

21   the -- of the conspiracy, right?

22       A.   Yes, other than what I've seen in the superseding

23   indictment that there was individual violations related to

24   unapproved or uncertified parts, aircraft parts and mechanics

25   and also just reviewing you know, listening to the testimony

```
1    of Mr. DeVogel last week.

2              MR. WELK:  I have nothing further.

3              THE COURT:  Okay.  Ms. Miller.

4              MS. MILLER:  No redirect, Your Honor.

5              THE COURT:  Okay.  Please step down, sir.  Thank

6    you.

7              MS. MILLER:  Government has no more presentation

8    of witnesses, Your Honor, we're ready to go to argument unless

9    defense has evidence.

10             THE COURT:  Defense, do you have any --

11             MR. WELK:  Can I have a moment, Your Honor?

12             THE COURT:  Yes, you may.

13             MR. WELK:  Your Honor.

14             THE COURT:  Yes?

15             MR. WELK:  The defense rests.

16             THE COURT:  Okay, the defense says no evidence

17   that they want to proceed forward with.  Okay.  Let's hear the

18   arguments.

19             MS. MILLER:  Your Honor, how would you like to

20   handle each of these?  Would you like to go through each

21   contested issue?  The government does its argument, then the

22   defense, then the government rebuts?  How would you like do

23   this?

24             THE COURT:  I think it makes it easier if we look

25   at this specific objections, right?
```

1              MS. MILLER:  Yes.

2              THE COURT:  He's talked about that.

3              MS. MILLER:  Yes.

4              THE COURT:  So if we start with the objection,

5     that will make it easier for everybody.  Yeah.  So we've

6     already resolved -- yeah, let's go to the first one on

7     aggravated role.  So, I'll hear from Ms. Miller and then from

8     the defense, Mr. Welk, on the first issue of aggravating role.

9     Pursuant to 3B1.1(a) as it relates to Count 10 and 99 of the

10    superseding indictment or the verdict form too.  So

11    aggravating role.  Okay.  Yes, prosecution, go ahead, you may

12    proceed.  You're asking for an additional plus four

13    enhancement; is that correct?

14             MS. MILLER:  Yes, Your Honor.  As organizer and

15    leader.

16             THE COURT:  Okay.  Go ahead.

17             MS. MILLER:  And so, Your Honor, as we heard

18    through the testimony of Mr. Reyna, John Walker was the 99.9%

19    owner of all of the companies that were used in the fraud.

20             In addition to being the 99.9% owner of all of

21    the companies that were used in the fraud, John Walker was

22    also the person who, when the companies were going to be sold

23    and he was sharing information with others, he identified

24    himself as the sole owner, CEO and controller of the

25    companies.  I would refer the Court specifically to Trial

Exhibits G-305, this is the business plan that John Walker had
created and had shared when he was interested in selling the
company.  And he indicated in that business plan that he was
in fact the CEO and Director of all of the companies.  And
then I would also refer the Court to G-0366 which was a
communication that was made to a company called MNS Capital.
When Mr. Walker again was considering selling the company to a
third party, he identified himself as being the controller and
owner of all of the companies that were listed in that
document.

        And, Your Honor, if you recall at trial, we
introduced Exhibit G-0302 in which Mr. Walker was described as
"being the sole person for whom all of the companies and
everything that was being operated in terms of the leases of
the helicopters, it was all John, that was the language in
0302, John and Hansen Helicopters are one and the same.  They
represent the same thing, it's all John."

        So, that's what we have, Your Honor, and what we
know is that when John Walker wanted money to come out of any
of the companies, all he had to do was send an e-mail and say
send me money.  We saw at trial Exhibit G-0001, in which John
Walker was directing the company to send him $400,000.  We saw
at trial another transfer of $4.8 million to John Walker for
supposedly for the purchase of helicopters even though there
was never any evidence that he ever purchased any helicopters

with those funds. John Walker was convicted of money laundering and the testimony of the IRS agent who was actually the agent in charge of the case, who testified, Your Honor, that he examined 15,000 pages of bank records, said that John Walker would move the money from company to company to company where it would then end up in the possession of Walker Agricola and then it would end up in John Walker's pocket.

And what you saw was shown today with the Court was Exhibit G-00024, from the trial, which actually was the signature card for Walker Agricola showing that John Walker was the only person on that signature card who could take the funds from Walker Agricola. And Special Agent Viranousith Khamvongsa testified that even though one company was used to lease the helicopter, a second company was used to receive the funds from the leased helicopter, then a third company was used to transfer those funds to and then the funds would transfer through several more companies before they would end up in John Walker's pocket.

And the jury believed his testimony and the testimony of Teshara Jones who was the forensic accountant who testified as well as the evidence that was introduced to the jury that showed that, ultimately, Mr. Walker was the one who received all of the funds. As Mr. Reyna testified to be an organizer and a leader, you don't have to do all of the nefarious acts yourself.

```
 1                MR. WELK:  Objection, Your Honor, that is an
 2      absolute attempt to use a money laundering expert's witness
 3      testimony to apply the sentencing guidelines, he was not
 4      qualified as an expert in the sentencing guidelines.
 5                THE COURT:  All right.  Very well.  Overruled.
 6      Go ahead.
 7                MS. MILLER:  So you can use other people and as a
 8      matter of fact people who are king pins do use other people
 9      all the time.  We saw Mr. Walker use Mr. Crowe, we saw him use
10      Mr. Kapp, we saw him direct them do things, yet, Your Honor,
11      the most compelling piece of evidence is how much money did
12      they get from committing these acts versus Mr. Walker?  At
13      trial, Your Honor, we introduced evidence both Mr. Kapp and
14      Mr. Crowe received W-2 income from their work and all these
15      companies, they did not receive profits from any of the
16      companies.
17                At trial, you heard the testimony of Mr. Reed,
18      who is another part of the management team, who said that
19      nobody received profits from any of these companies except for
20      John Walker.  And that makes sense when you look at exhibit
21      that Mr. Walker himself through his Counsel introduced to the
22      Court, Exhibit G-0829, which identifies all of the companies
23      and it shows that John Walker is the 99.9% owner of all of the
24      companies with one share going to Mr. Crowe or one share going
25      to Mr. Kapp or one share going to Mr. Reed, for "legalities
```

1   sake," which is what you saw, Your Honor, introduced into

2   evidence as Exhibit 0302.

3            Today, we saw that during the exact same period

4   of time between 2021 and 2023, when Pacific Spotters took over

5   the operations, after Mr. Walker was indicted, Mr. Walker

6   pulled over $3 million from Pacific Spotters or as Mr. Crowe

7   received $90,000.  That's 3% of the total.  And that was

8   consistent across the board for every single one of these

9   companies.

10           How else do we know that Mr. Walker is the

11  organizer leader?  You saw summary charts that were entered

12  into evidence in the case.

13           THE COURT:  Wasn't that -- if there's, you know,

14  100% of the company, if Mr. Walker had -- can only get the

15  maximum or the cap of one-third, so that's 33 and a third?

16           MS. MILLER:  So you're talking now about Pacific

17  Spotters, Your Honor?

18           THE COURT:  Pacific Spotters.

19           MS. MILLER:  Yes.

20           THE COURT:  So how is the breakdown --  I wasn't

21  clear how the breakdown, so you're saying Mr. Crowe received

22  3%?  Or he owned a 3% interest of Pacific Spotters?

23           MS. MILLER:  Yes, Your Honor, so if you look at

24  Exhibit G-3003, that was entered into evidence during the

25  criminal case, and you also look at Exhibit G-2990, which

```
1     would -- was entered into evidence in the criminal case and
2     you put those two things together they give you the whole
3     story of Pacific Spotters.  So --
4                 THE COURT:  Okay.  So --
5                 MR. WELK:  Excuse me, Your Honor, are any of
6     these -- I'm curious whether any of these documents were
7     actually presented in this hearing and if they are, if we
8     could please get the sentencing exhibit number?
9                 MS. MILLER:  Both of them were.
10                THE COURT:  Yeah, okay.  She said they were.
11    What is the -- what is the sentencing --
12                MR. WELK:  So far, I haven't heard a single
13    number of the sentencing exhibit number I only heard --
14                MS. MILLER:  Sentencing, Your Honor, I'm
15    certainly not limited to what was introduced in this hearing.
16    However, those two particular exhibits were introduced in this
17    hearing.
18                MR. WELK:  Can I --
19                THE COURT:  He just want the sentencing --
20                MS. MILLER:  Yeah, Mr. Leon Guerrero what
21    was -- and by the way he has an exhibit list which correlates
22    the exhibit number that was used for this hearing with the
23    exhibits that were used at trial.
24                THE COURT:  All right.  So just tell me what the
25    exhibit number is?
```

```
 1                    MR. LEON GUERRERO:  Could I get --

 2                    THE COURT:  I'm sorry, Mr. Leon Guerrero, could

 3      you bring the mic down, I couldn't hear you.

 4                    MR. LEON GUERRERO:  I'm asking Ms. Marie.

 5                    THE COURT:  Oh, okay.

 6                    MS. MILLER:  3003.

 7                    MR. LEON GUERRERO:  And the second one?

 8                    MS. MILLER:  2990.

 9                    (Pause.)

10                    THE COURT:  Okay.  So while he's -- while he's

11      looking for that, you're saying that that will just breakdown

12      the percentage of --

13                    MS. MILLER:  Yes.

14                    THE COURT:  Ownership interest?

15                    MS. MILLER:  So when Pacific Spotters was opened,

16      Your Honor, in 2016 right after the government performed its

17      search and seizures on the Walker properties, Mr. Walker

18      opened Pacific Spotters identifying himself as a 90% owner of

19      the company, that's in Exhibit 3003, and identifying Mr. Crowe

20      as having a percentage ownership in the country -- in the

21      company as well as Mr. Kapp.  Let me just pull up that exhibit

22      again to give you those exact numbers back in 2016.

23                    THE COURT:  You're still -- you're still trying

24      to figure out the -- find the sentencing --

25                    MR. LEON GUERRERO:  I have 3003 is sentencing
```

1    Exhibit 141.

2                    THE COURT:  Okay.

3                    MS. MILLER:  And I believe 2990 is 265, Your

4    Honor; is that correct?

5                    THE COURT:  Is that right -- oh yeah, my clerks

6    indicated they believe you're right.

7                    MS. MILLER:  Yeah.

8                    THE COURT:  But Mr. Leon Guerrero, you want to

9    double-check that?

10                   MR. LEON GUERRERO:  Yes, Your Honor.

11                   THE COURT:  265 is the sentencing exhibit number.

12                   MR. LEON GUERRERO:  It is, it is, Your Honor.

13                   THE COURT:  Okay.  That's fine.  All right.  Go

14   ahead.

15                   MS. MILLER:  So when Pacific Spotters was first

16   opened, Mr. Walker had a 90% ownership interest in Pacific

17   Spotters, Your Honor.  And then he gave an ownership interest

18   also to Mr. Crowe and Mr. Kapp.  When --

19                   THE COURT:  And what is that, what's that

20   ownership interest?

21                   MS. MILLER:  That ownership interest for those

22   two, let me look at Philippines produce and exchange.  Here we

23   go.  So if you look at 3003-25, for the record, the ownership

24   interests when the company first opened, it was -- here we go,

25   sorry, Your Honor, it is on page -- I'm going to have to get

that page for you, Your Honor.

THE COURT:  Okay.  It's fine.  Yeah, everybody keeps talking about the percentage point.

MS. MILLER:  Yes, yes, it started in 2016 as 90%. It went down to 32% in 2018 because the company's article of incorporation were changed in 2018 after the indictment.

THE COURT:  Right.

MS. MILLER:  To reflect that the company was now going to lease helicopters.  And when Pacific Spotters opened up a bank account in the Philippines, it was necessary to produce the leases and the other information that proved that the company was in fact going to be operating a helicopter leasing company but also --

THE COURT:  I guess the question is, is he the major shareholder?

MS. MILLER:  He is.  So his -- 32% --

THE COURT:  What's the percentage to --

MS. MILLER:  His 32% is higher than the percentage that any other alleged owner has in the company.

THE COURT:  So that will be Mr. Crowe, Mr. Kapp.

MS. MILLER:  Correct.

THE COURT:  Ms. Espion and the other mechanics?

MS. MILLER:  Correct.  So we have Mr. Padua.

THE COURT:  Okay.

MS. MILLER:  Antonio Padua, who was a Hansen

1    Helicopters mechanic, who is identified as owning 15% of the
2    company as of 2018.  We have Mr. Crowe who is identified as
3    owning 4% of the company in 2018, Mr. Kapp who's identified as
4    owning 2% of the company in 2018, Mr. Plew who is another
5    mechanic, who is identified as owning 2% of the company in
6    2018, Mr. Jeffrey Sarimos who is another mechanic, who is
7    identified as owning 15% interest in the company as of 2018;
8    Oswald Espion, who is Cherry Espion's husband and who was
9    mechanic for Hansen Helicopters for ten years, owns a 15%
10   interest according to the paperwork as of 2018 and Cherry
11   Espion, his wife, 15% interest in the company as of 2018 and
12   for the record, Your Honor, those percentages are shown in
13   Exhibit G-3003 on pages 30 and 31.

14            THE COURT:  Okay, thank you.

15            MS. MILLER:  You're welcome.  But what we see in
16   the financial records that we received through the MLAT and
17   that we received directly from Pacific Spotters in relation to
18   the discovery in the civil case is that regardless of what the
19   representations were about the ownership of the shares of
20   stock in Pacific Spotter Corporation, it was John Walker who
21   was still receiving all of the funds from Pacific Spotters
22   Corporation with the exception of payments of salaries, for
23   example, like what you saw for Mr. Crowe during that same
24   period of time.

25            THE COURT:  I'm sorry, so John Walker you're

```
 1   saying received not only the profits but -- and
 2   allegedly -- some people are using allegedly, at least the
 3   last witness was, the advanced loan amounts?
 4               MS. MILLER:  Correct.
 5               THE COURT:  To the other mechanics from the
 6   Philippines.
 7               MS. MILLER:  Correct, Your Honor.
 8               THE COURT:  Okay.
 9               MS. MILLER:  What we see is that from 2021,
10   through 2023 in the documents that Pacific Spotters produced
11   to us, Mr. Walker personally received over $3.1 million from
12   Pacific Spotters.  What we also see, Your Honor, in
13   Exhibit G-2939 --
14               THE COURT:  And the superseding indictment was
15   second -- or the first -- or yeah, Second Superseding
16   Indictment, that's what it says here, right?
17               MS. MILLER:  Yes.
18               THE COURT:  It was January 8th, 2021.
19               MS. MILLER:  Yes, January of 2021, that's
20   correct, Your Honor.
21               THE COURT:  Okay.
22               MS. MILLER:  So prior to that time, you saw in
23   Exhibit G-2972 which were the -- not 2972, 2939 which were the
24   Limey Air bank records.
25               MR. LEON GUERRERO:  That's sentencing
```

1    Exhibit 138.

2              THE COURT:  Okay, thank you.  Mr. Leon Guerrero.

3    Thank you.  Okay.

4              MS. MILLER:  What we saw on page 72 of the Limey

5    Air bank records was a letter signed by Mr. Walker --

6              MR. WELK:  Objection, Your Honor, that

7    mischaracterizes the document, it's a summary of the alleged

8    records.  It's not the records.

9              THE COURT:  It's a summary chart?

10             MS. MILLER:  It's not a summary chart.

11             THE COURT:  Exhibit 138.

12             MS. MILLER:  It's not a summary, no.

13             THE COURT:  It's not a summary chart?

14             MS. MILLER:  No.

15             THE COURT:  I'm sorry, let me just look at that.

16             MS. MILLER:  It's an 83-page document, Your

17   Honor.  It's not a summary chart.

18             THE COURT:  Yeah, do you see that, Mr. Welk?  You

19   want to look at Exhibit 138?  Do you see that?

20             MR. WELK:  Hold on.

21             THE COURT:  Okay.  Yeah, it's not -- it doesn't

22   look like a summary chart.

23             MS. MILLER:  It's not a summary chart.

24             THE COURT:  It's like -- it looks like banking

25   records.

MS. MILLER: It is.
THE COURT: Okay. Let him make sure he sees that.
MR. WELK: Your Honor, may I inquire about the source of these records? Are these received from an MLAT?
THE COURT: Um, Exhibit 138, I don't remember, was that from MLAT?
MS. MILLER: 2939 was not received pursuant to a MLAT because it is Limey Air bank records for a bank account that was locally -- these were received pursuant to a grand jury subpoena or an IG subpoena.
MR. WELK: Thank you.
THE COURT: Okay. You see that, did you get a -- get to look at that the 2939?
MR. WELK: Yes.
THE COURT: Okay. Very well, proceed.
MS. MILLER: Yes, Your Honor, if you look at page, for the record 72 of Exhibit 2939, you will see that John Walker produced a letter from himself to the bank when the Limey Air bank account was opened, this is page 72. And in that letter, I'm sorry, it's 76, I said 72 but it's 76.
THE COURT: Okay.
MS. MILLER: In that letter, Mr. Walker is telling the bank that Limey Air Services, Inc., with an address of Tamuning, Guam, is a company that is owned by him,

99.9% owned by him, and he is telling the bank the reason why
there is an update to the signature card which you saw on
pages 1 and 2 of this document is because the former officers,
Angela Walker and David Ledger, are no longer officers and now
they're being replaced in 2018 by Mr. Kapp and Mr. Crowe.

THE COURT:  Okay.

MS. MILLER:  And you see it's signed by John
Walker.

THE COURT:  I see.

MS. MILLER:  The important thing about this
document and these documents is that after the first
indictment, funds start flowing instead of going to Wilma's
Flight Service which we saw before the indictment, now the
funds from the leases are going to Limey Air Services.  And we
also see as the last two pages of this exhibit, that when
Pacific Spotters was opened and created and the leases were
changed over into the name of Pacific Spotters, that Pacific
Spotters started transferring funds to Limey Air through wire
transfers.  We saw wire transfers in 2018 and 2019, that
exceeded $5 million.  During trial, in 2020, we saw evidence
that the lease income exceeded $21 million.  And then we heard
testimony today that between 2021 and 2023, an additional
$9 million was transferred to Limey Air, from Pacific Spotters
Corporation which was just passing through the lease income,
with Mr. Walker being the 99.9% owner of Limey Air

1    corporation.

2              In addition to the exhibits that were presented

3    at the sentencing, Your Honor, there were additional exhibits

4    that were entered into evidence at trial, which further show

5    that John Walker was the owner and controller, the leader and

6    the organizer of this company.

7              We saw an exhibit that was entered into evidence

8    G-0551 during trial that was --

9              THE COURT:  What --

10             MS. MILLER:  G-0551, which was a letter to

11   Mr. Walker from Randy Rogers who is an indicted co-defendant

12   who's deceased who was actually repairing the aircraft that

13   Mr. Walker purchased and Mr. Walker and Mr. Rogers agreed that

14   Mr. Walker would actually buy Mr. Rogers' facility that was

15   repairing the aircraft so that he could control the repair and

16   maintenance of the aircraft.

17             We also see from trial Exhibit G-0739, G-0739,

18   which is an e-mail from Rufus Crowe to John Walker, where

19   Crowe is letting Mr. Walker know that Mr. Cislo who was bribed

20   to issue airworthiness certificates, would like the yellow

21   airplane in exchange for his issuance of these airworthiness

22   certificates.  We also see in Exhibit G-0158, that's 0158, a

23   reference to the fact that John, Mr. Walker, will buy it for

24   you, again communications regarding bribe to Mr. Cislo showing

25   that it is John Walker, not anyone else, who had the authority

and the control over whether to pay these bribes and how to
pay these bribes.

We saw an e-mail which was identified at trial
and entered into evidence as G-0842 to Mr. Walker from his
co-conspirators saying are there any other helicopters you
would like to own?  We saw evidence entered into -- during
this sentencing proceedings including the declaration filed by
Mr. Crowe where even though he described work done by others
on behalf of the company, he specifically said that everyone
had to keep Mr. Walker informed of everything that was
happening.

So what we see over and over again, Your Honor,
is Mr. Walker being contacted for raises for individuals who
worked for the company, they couldn't be approved without
Mr. Walker saying okay, payments to people who worked for the
company and how much they were paid, Mr. Walker controlled all
of the payments, we saw in Exhibit G-0024 introduced during
trial, Mr. Walker transferring $2.5 million from a alter ego
to himself and he did that over and over again when he wanted
to the pull cash out of the companies.  There wasn't anyone
else who worked for any of these companies who had the
authority to do that or whoever actually did do that.

We saw Exhibit G-0031 introduced at trial, that
showed Walker using Walker Agricola and, Your Honor, to remind
the Court, Walker Agricola again was the company in Missouri

that Mr. Walker transferred the funds to so that he could then pull them out to himself, making purchases in Guam using that company and wire transferring himself $5 million immediately after the seizures that occurred in 2016.

We saw, Your Honor, entered into evidence G-1245 at trial, the summary chart for the bill of sale of helicopters showing Mr. Walker signing off on the bill of sale for the helicopters that were used in the fraud. We saw summary chart G-1252 which was the registration summary chart and you also heard the testimony of Ms. Pena on Friday that regardless of which one of the alter ego companies that were registering the helicopters, it was John Walker signing for those companies and you heard that out of over 400 times that he signed registering those helicopters, 117 times were the electronic signatures and the rest of the time it was handwritten signatures by Mr. Walker. And during trial, Your Honor, we produced and showed you the actual registration applications which show they were filled out by hand and we saw Mr. Walker's signature under every one of them.

So, we saw on Friday, Your Honor, that Mr. Walker, when he renewed his FAA certificate as a mechanic with the FAA, that every other year that he was required to fill out those certifications from 1997 through 2021, Mr. Walker indicated to the FAA that he was performing personally mechanical work on the helicopters in Guam. As

recently as 2021, Your Honor, you saw Ms. Pena testify about
that. And Mr. Walker in that inspection authorization form
which was filed with the FAA under the penalty of perjury, he
specifically stated that during his normal work week when he
was performing these mechanical functions on these
helicopters, he could be located at the Guam address of Hansen
Helicopters. So either he lied to the FAA again when he said
that, or as Mr. Welk suggested, perhaps he what was lying back
and forth to and from Guam from Missouri to actually do these
mechanical functions on these helicopters. Or maybe it's a
combination of both. It doesn't matter. The point is, it
always goes back to Mr. Walker being the person who is in
control and is the leader and is the organizer of all of the
actions related to this case.

And the last thing I'm going to discuss, Your
Honor, before I turn it over to Mr. Welk is the stipulations
that were entered into for forfeiture. Immediately after the
trial in this case when Mr. Walker was found guilty of 99
felonies, his trial Counsel stipulated that the government met
its burden for forfeiture, for the items that had already been
seized and that stipulation was accepted by this Court and it
could be found in the court records at ECF 1813. Just a few
months ago, Mr. Walker's current Counsel entered into a
stipulation with the government again regarding forfeiture.
And in that stipulation, Your Honor, which was accepted by the

1    Court and could be found at ECF 2237, Mr. Walker's Counsel

2    stipulated and agreed that $58 million of the funds received

3    by Mr. Walker were associated with the wire fraud in this

4    case.  He also stipulated and agreed that almost $12 million

5    was involved in the money laundering in this case, he

6    stipulated and agreed that all of the helicopters that were

7    used in this case were in fact fraudulent and subject to

8    forfeiture to the United States.  Every single one of them.

9              And then he also stipulated and agreed that the

10   rest of the personal property in the attachment to ECF 2237,

11   were subject to forfeiture.  And this was an agreement signed

12   by Mr. Welk on behalf of Mr. Walker, not anybody else in the

13   case, not Crowe, not Kapp, not any other corporate entity but

14   Mr. Walker.  It is absolutely clear that he is the organizer

15   and the leader, the owner and controller and it is an

16   appropriate enhancement to identify him as such for sentencing

17   purposes.  Thank you, Your Honor.

18             THE COURT:  Okay.  Mr. Welk?

19             MR. WELK:  Thank you, Your Honor.  I'm going to

20   start at the end with the last thing that Ms. Miller

21   mentioned.

22             THE COURT:  Okay.

23             MR. WELK:  Having to do with this order of

24   forfeiture.  She said that the consent order of forfeiture was

25   not entered in by Mr. Crowe or Mr. Kapp, it was entered into

by Mr. Walker.  Well, there is a very simple reason for that,
is Mr. Crowe and Mr. Kapp aren't defendants in this case
anymore and this was a forfeiture order directed towards
Mr. Walker in connection with his -- with his conviction.
There are some other interesting things about this consent
order of forfeiture.  There was no admission in this consent
order of forfeiture.  It is an agreement to the entry of a
consent order of forfeiture and that's all it is.  Document
provides that the parties agree that based on the jury's
verdict, the forfeiture order can be entered.  There is no
admission here that -- that Mr. Walker earned this amount of
money in proceeds.  There is no admissions at all in here.
This was a effort -- you know one of the problems with -- with
large, the government is -- you know you could never
win -- there is constant accusations of wasting time, wasting
the government's time and the Court's time and here we
negotiated an agreement regarding this consent order of
forfeiture, which it's obvious from the wording of it
including, particular in the last paragraph, or the second to
last paragraph, "that in the event that any of the guilty
verdicts upon which this order is based are reversed, vacated
or remanded or a new trial is ordered, this order shall be
vacated and void as to any else as to counts of conviction and
any property order ceased or forfeited pursuant to this order
shall be returned promptly to the defendant."

```
 1                  That's not an admission that the money
 2    was -- that the property was paid.  I'll point out something
 3    else, Ms. Miller talked a lot about Walker Agricola and how
 4    that was a part of this massive scheme that the government
 5    alleges Mr. Walker was involved in.  There is a lot
 6    of -- there is a lot of redaction in the Exhibit C of this
 7    agreement.  And if one were to go to look at Exhibit C, well,
 8    actually, when you go back and you look at what appears in
 9    Exhibit C, all the things that are non-redacted in Exhibit C,
10    those are all assets of Walker Agricola.  Those are all assets
11    associated with --
12                  MS. MILLER:  Objection, Your Honor, Counsel is
13    testify to facts that are not in evidence.  There is zero
14    evidence that those assets that are exempted from this
15    forfeiture are in fact owned by Walker Agricola.  The
16    government has always contended and still contends that Walker
17    Agricola is an alter ego of John Walker.  So for the purposes
18    of entering into this stipulation, the government agreed to
19    all of the terms herein and did agree to allow certain
20    property be exempted based on the representation by Mr. Welk
21    that that was family property of Mr. Walker that had been
22    inherited by him.  The government never made any concession
23    about Walker Agricola.  So there should not be a misstatement
24    on this record before what really occurred here.
25                  MR. WELK:  May I be heard, Your honor?
```

```
 1                    THE COURT:  Yes, go ahead.

 2                    MR. WELK:  Go to page 33 of 36 of this exhibit,

 3       you will see the property that is exempted from forfeiture

 4       and --

 5                    THE COURT:  I'm sorry, I got to pull the exhibit

 6       then.

 7                    MR. WELK:  I'm sorry?

 8                    THE COURT:  Which exhibit number is it?

 9                    MR. WELK:  It's not an exhibit.  It's a

10       file -- it's a filed document, it's 2237.

11                    THE COURT:  Okay, let me pull 2237.

12                    MR. WELK:  ECF 2237.

13                    THE COURT:  Okay.  Hold on.  Go ahead and I'll

14       try to get it.

15                    MR. WELK:  Well, there is a column here that says

16       name of first -- first owner, name of owner.

17                    THE COURT:  Okay.  Hold on, I got it -- I found

18       it.  2237, I got it right here.  I'm sorry, go ahead, what

19       page?

20                    MR. WELK:  33.

21                    THE COURT:  Okay.  Okay I see it, okay, go ahead.

22                    MR. WELK:  Number 194, Walker Agricola.

23                    THE COURT:  Mm-hmm.

24                    MR. WELK:  This chart, by the way, was prepared

25       by the government.  It was filed in support of their motion
```

for forfeiture back in September a couple years ago.  197,

Walker Agricola; 198, Walker Agricola; 199, Walker Agricola;

200, Walker Agricola; 201, Walker Agricola; 203, Walker

Agricola; 204, Walker Agricola; 205, Walker Agricola; 206,

Walker Agricola.  Anyway, I would suggest that the government

can't have it both ways.  The documents says what it says.  No

where in this document does it say that Mr. Walker admits to

the -- that those are proceeds, the admission -- there is no

admission there, it's an agreement that the jury's verdict

could support the entry of a forfeiture order.  Government

can't argue with that and then come back and say, but where it

says it belongs to Walker Agricola, it doesn't really belong

to Walker Agricola.

          Some of the other comments by Ms. Miller, there

is no evidence that Mr. Walker controlled the payments that

the government cited no exhibits in support of that statement.

There is no evidence that Walker, that John Walker approved

raises, again there were no citations to evidence with respect

to that statement.

          According to the -- Ms. Miller stated that

Exhibit G-158[sic] was admitted at trial, but it does not

appear -- it's not on the list of exhibits admitted to trial

on the list that I have.  So G-158, to the extent that

Ms. Miller relies upon G-158, it was not admitted at trial.

          With respect to -- there seems to be a lot of

```
1    back and forth about where Mr. Walker lived and I'm going
2    address that in a few minutes, but you know --
3              THE COURT:  Does it really I mean -- of
4    course -- in your paperwork, says that Mr. Walker was living
5    in Missouri.
6              MR. WELK:  Yeah.
7              THE COURT:  But -- is it also plausible or
8    reasonable to assume that he was going back and forth Guam and
9    Missouri during the times in question?
10             MR. WELK:  Well, is it -- is it plausible?
11   It's -- I suppose it's equally plausible that he didn't.
12   There is no evidence that he was going back and forth, but
13   what I am going to get to in this section of my argument is
14   that there is substantial evidence that he was living in
15   Missouri for that entire period between 2011 and 2022.
16             THE COURT:  What about the argument that
17   Ms. Miller makes that he made representations that he would be
18   in charge of the maintenance of the helicopters at the base
19   headquarters, if you will, of Hansen Helicopters here on Guam?
20             MR. WELK:  Well --
21             THE COURT:  He himself?
22             MR. WELK:  If -- if he made those
23   representations, in the worst case scenario is that -- if
24   he -- if he wasn't there, then he made a misrepresentation to
25   the FAA about where he was conducting maintenance on
```

```
 1   helicopters.

 2                 THE COURT:  Go ahead.

 3                 MR. WELK:  Which is seems like an inconsequential

 4   untruth if it was an untruth.

 5                 THE COURT:  Well, I mean it was --

 6                 MS. MILLER:  It was consequential to file an

 7   official --

 8                 THE COURT:  Yeah, Ms. -- okay, I mean he does

 9   indicate that, I think in the -- I can't remember which -- I

10   remember seeing that, I saw those blocks where he indicated

11   his business was located, his maintenance of his helicopter

12   business was located here on Guam.  Anyway, go ahead.

13                 MR. WELK:  You know.

14                 THE COURT:  Okay.  So you're saying there

15   is -- you're saying there is no evidence really that they've

16   demonstrated that Mr. Walker was coming back and forth from

17   Missouri to Guam.

18                 MR. WELK:  I'm saying that there is evidence that

19   Mr. Walker was living in Missouri that I'm going to get to in

20   this section of my argument.

21                 THE COURT:  Okay, go ahead.

22                 MR. WELK:  But you know, there was a -- it's an

23   area of the law in 19 -- I think it was in the 1990s or early

24   two thousands where the Supreme Court was asked to weigh in on

25   this issue of whether currency reporting violations and border
```

crosses was significant, whether it was excessive.  These are
the cases that the excessive fines, application to forfeiture
began and the Court made a --

        MS. MILLER:  Your Honor, could I stop Counsel for
a moment?  If he's going to cite a case, I would like the
citation for the case.  With all due respect, talking about
case law generally --

        THE COURT:  It's fair, do you have the case
citation?

        MR. WELK:  I do not.

        THE COURT:  That would help me too.

        MR. WELK:  The Court -- the Court, over a series
of cases, I don't have the cases at my fingertips right now
because the way the law went was there was a determination
that mere -- so that when people left -- were going to leave
the country or were coming into the country and they lied
about how much money they were carrying, that that was merely
depriving the government of information, that was nothing more
to it than that, it was a mere reporting violation.  So the
idea that -- in other words, the courts generally don't
consider things like that where the only penalty, the only
loss to the government is the lack of information.

        MS. MILLER:  Your Honor, I'm going to have to
object and move to strike.  If Counsel is asking this Court to
not consider --

         1              THE COURT:  The Court -- the Court will sustain
         2    the objection.
         3              MS. MILLER:  Thank you.
         4              MR. WELK:  I have a --
         5              THE COURT:  Insofar as there is just no -- no
         6    specific case that's been cited.  So, just continue on.  Go
         7    ahead.
         8              MR. WELK:  Well, now I'm wondering if I should
         9    look up the citation.  Maybe I'll -- maybe I'll supplement it
        10    later and come back to this.
        11              THE COURT:  Okay.
        12              MR. WELK:  The business plan that -- that
        13    Ms. Miller referred to, is from 2013.  Which -- and the -- her
        14    implication seems to be and this runs -- this is common in the
        15    government's argument, that if a document says something that
        16    the government thinks is incriminating towards Mr. Walker,
        17    then it appears that they think it applied forever.  So she
        18    looks at a business plan for 2013, there is no background of
        19    what that was used for or what it was intended for by
        20    Mr. Walker and she said -- he says in there look, I'm in
        21    charge of the company and I do all these things.  Maybe he did
        22    in 2013, maybe he didn't.  That's just what he said in a -- in
        23    a business plan.
        24              THE COURT:  Okay.
        25              MR. WELK:  So there is no -- there is no

 1    evidence -- the thing -- she's got a piece -- she's got a
 2    writing that says it's all John, but what does that mean?
 3    What -- what evidence is there that it's all John, besides
 4    somebody wrote it on a piece of paper, it's all John.  What
 5    does that mean?  If it's all John, then why is it that
 6    throughout the evidence in this case, it's Crowe's name that
 7    shows up on documents that he signed.  It's Crowe that sends
 8    e-mails to John, to which John apparently never replied.  It's
 9    Crowe saying here's something we're going to do, again, to
10    which he does not reply.  It's Kapp saying he's going to do
11    something or it's Kapp signing papers.  That -- just because
12    John Walker owned the company doesn't make him a leader or a
13    manager within the meaning of the sentencing guidelines.
14            3B1.1, it doesn't say if the defendant was an
15    organizer or leader of a company that involved five or more
16    participants, it says if the defendant was an organizer or the
17    leader of a criminal activity that involved five or more.  So
18    the things that he did that aren't crimes does not prove that
19    he's subject to a role enhancement for purposes of the -- of
20    the sentencing guidelines.  At Paragraph 193 of the PSR,
21    probation officer calls for a four-level increase on the
22    ground that Mr. Walker was an organizer or leader.  That
23    involved four or more participants or was otherwise -- the PSR
24    falls into the same trap as the government jumps into
25    constantly, concluding that because -- because he owned the

```
 1    companies, 99.9% according to Ms. Miller, even though that's
 2    not accurate as to PSC, that that's the end of the game.
 3    Because he owned the company, because he almost owned all of
 4    the company, that he's a -- he's a leader within the meaning
 5    of the sentencing guidelines.  But at the same time, there is
 6    the false assumption that just because there were employees of
 7    the companies, that those people are participants, although
 8    Ms. Miller did say during her argument that she referred to
 9    Mr. Crowe and Mr. Kapp, how much did they get for committing
10    these acts?  She was talking about money, how much did they
11    get paid?  But committing these acts, that's exactly what they
12    did.  Because for the most part, what the evidence shows is
13    that these acts, the illegal acts, the acts of which
14    Mr. Walker was convicted, were committed by Crowe and Kapp.
15            Now, the theory that was applied was that there
16    is alter ego criminal liability and because they were working
17    for companies that were owned by Mr. Walker, that he -- that
18    he was responsible for that.  But the fact is he did not
19    commit these acts, Mr. Crowe -- there is ample evidence that
20    Mr. Crowe and Mr. Kapp did.  So --
21            THE COURT:  But the -- I'm just looking at the
22    3B1.1 aggravating role commentary of the 2018 sentencing
23    guidelines, it does say that there can of course be more than
24    one person who qualifies as an organizer of a criminal
25    association or conspiracy and you were -- I saw that you were
```

 1    trying to bring that out with regard to Mr. Crowe's and

 2    Mr. Kapp's role, if you will.  That was indicated in one -- I

 3    can't remember which exhibit but the Court saw that.  Are you

 4    saying though that -- are you saying that Mr. Walker had no

 5    degree of participation in the commission of the offense?

 6              MR. WELK:  I'm saying that there is no evidence

 7    that he -- that his level of participation rose to the level

 8    of an organizer or leader of the activity.

 9              THE COURT:  How about the claim -- how about the

10    claim right to a larger share of the -- of the fruits of the

11    crime?  They're saying that the profits were fruits of the

12    crime.  What about that?

13              MR. WELK:  Well, as the owner of the company, the

14    sharing was determined -- particularly when it comes to PSC,

15    the reason that the -- by the way, the four Filipinos that

16    were brought in to take over, the four of them, they held 60%

17    of the total shares in PSC, 15% each.  Mr. Walker held 32%.

18    So together, they held a majority of the stock.  But the other

19    thing --

20              THE COURT:  But individually though,

21    individually --

22              MR. WELK:  Right.

23              THE COURT:  -- individually, it sounds like

24    Mr. Walker had the highest percentage of share, is that true?

25              MR. WELK:  Absolutely true, yes.  Yes.

                    THE COURT:  Right.  So I see what you're saying
in terms of collectively, but if you're just looking at
individual shares, okay, we all agree with the numbers.
                    MR. WELK:  But the reason Mr. Walker received an
outsized share of the dividends is because the agreement that
Special Agent Reyna was so suspicious of for some reason
because it didn't have interest on it.  They were -- those
four, the Philippine citizens who acquired the shares through
that arrangement, they were -- they've been applying their
dividends --
                    MS. MILLER:  Objection, Your Honor, objection.
                    THE COURT:  I'm sorry?
                    MS. MILLER:  There is zero evidence that supports
what Mr. Welk is saying right now.  Zero evidence.  All we saw
was advances to Walker --
                    THE COURT:  Hold on, hold on.  I don't
even -- let him finish what he said, I don't know what
he -- let me hear what he was saying first.
                    MS. MILLER:  Sure.
                    THE COURT:  He was starting to say something but
go ahead, Mr. Welk.
                    MR. WELK:  I'm going to find the evidence, Your
Honor, because I think there is references in the documents
that the government referred to that explains where that money
came from.  I believe in the --

```
 1                  THE COURT:  You're talking about the advancements
 2      or --
 3                  MR. WELK:  No, no, no.  There's no advancements,
 4      it's -- give me just a moment, please.
 5                  THE COURT:  Mm-hmm.
 6                  (Pause.)
 7                  THE COURT:  Go ahead.  You were going to say?
 8                  MR. WELK:  One possible explanation for how why
 9      Mr. Walker was receiving the lion's share of the dividends is
10      that the Philippine shareholders were applying their dividends
11      to pay the debt that they owed.
12                  MS. MILLER:  I'm going to object, Your Honor,
13      one --
14                  THE COURT:  Hold on.  Okay, your objection is
15      what now?
16                  MS. MILLER:  My objection is lack of any reality
17      here.  He's saying one possible explanation.  What does that
18      have to do with Your Honor accepting evidence with some
19      indicia of reliability?  He can't say maybe the advances meant
20      this or meant this or meant that.  There is no indicia of
21      reliability associated with Counsel's saying, you know, one
22      possible explanation is that goes beyond the pail in terms of
23      relevant evidence.
24                  THE COURT:  She's right about that, Mr. Welk.
25                  MR. WELK:  I'll move on, Your Honor.
```

```
1                    THE COURT:  All right.
2                    MR. WELK:  Let's talk about the declaration of
3      Rufus Crowe.
4                    THE COURT:  Okay.
5                    MR. WELK:  Which Ms. Miller spends a lot
6      of -- has spent a lot of time with both her witnesses and in
7      her argument pointing out that in this four-page
8      declaration --
9                    THE COURT:  Why don't we come back to that
10     declaration.  We'll take a recess at this time.  Okay.
11                   MR. WELK:  Okay.
12                   THE COURT:  Let me take a 15-minute recess.  I
13     got -- yeah.  Thank you, Counsels.
14                   MS. MILLER:  Thank you, Your Honor.
15                   THE COURT:  15 minutes, then we'll come right
16     back.
17                   (Recess taken at 4:59 p.m.)
18                   (Back on the record at 5:12 p.m.)
19                   THE COURT:  Okay.  Go ahead.  We're back on the
20     record, go ahead, you may -- Mr. Walker is now present.  You
21     may proceed.
22                   MR. WELK:  Thank you, Your Honor.
23                   THE COURT:  All Counsels present.
24                   MR. WELK:  I was about to discuss the declaration
25     of Mr. Crowe and the government spends a lot of time and they
```

mention it in the argument, this one sentence in Mr. Crowe's
declaration, and this is Exhibit 91.  And the sentence is
"each member of the management team had a responsibility to
keep Walker, the company's principal owner, informed of
Hansen's operation" and there is a lot of emphasis placed on
that sentence.  But then in the midst of this argument about
who is really running things and who is making decisions and
who is taking actions and who is doing all these things, the
government just ignores the paragraphs where Mr. Crowe says,
he's responsible for the daily operation of 40 helicopters,
continuous responsibility for pilot training.  This is on
page 2.

        THE COURT:  Yeah.

        MR. WELK:  He must communicate with these three.
Even -- even the agent today admitted that these are
substantial responsibilities that he had.  Same thing with
respect to Kapp.  Kapp is the director of maintenance for the
company.  He has to coordinate with all these mechanics, he's
doing all these logistics, he's troubleshooting mechanical
issues, mechanical issues having to do with parts; things like
that.  Those are mechanical issues.  Kapp had
coordinate -- Kapp had coordinate those with Crowe.
Relocating helicopters from one ship to another, then you've
got Reed.  Reed was responsible for what?  Acquiring parts and
supplies needed in Guam and dispatching those parts and

supplies to the ships or ports where they're needed.  These
are critical actions, these are critical actions that go
directly to the charges in the indictment, but Walker is not
responsible for any of those things.  And there's no evidence
separate from this that Walker did these things.  This is
evidence that he did those things.  And if we're going to
believe that it matters, that Crowe had to keep Walker aware
of what was going on, we can't just ignore the rest of this
document.  This is an important declaration that shouldn't be
ignored.

In terms of this name thing, Ms. Miller referred
to Mr. Walker as king pin in her -- in her argument.  There is
a case about that, the Ninth Circuit has held, the case is
*U.S. versus Harris*, 999 F.3d, 1233, and at 1235 to 36, and
that's -- I'm sorry, that's Ninth Circuit, 2021.  1235 to
1236, the Ninth Circuit held that a nominal position in an
organization is not enough to satisfy the requirement of
someone being a leader or a manager.  There has to be
substantive evidence that they were -- as long as we're going
to use lingo, a shot caller, and that evidence just isn't
there with respect to Mr. Walker.  Not enough to justify
this -- this enhancement.

Mr. Walker wasn't charged with being the owner of
numerous companies.  That's not a crime.  He wasn't charged
with failing to follow corporate formalities, which the

witness who was called as the business and money laundering
expert wasn't even familiar with that term.  Also not a crime.
It's not enough to show that the underlying crimes involve
money, activities or property or even that the -- the
defendant had some control over those things.  And that -- and
that -- doesn't matter.  The government, as it does so often,
just constantly retreats to Mr. Walker's position as CEO and
owner of the company to hold him responsible for the conduct
for everyone who worked for the company, this time because
he's a leader for purposes of guidelines 3B1.1.

But here is the thing, the evidence showed that
Crowe, Kapp and Reed oversaw the parts, pilots, mechanics.
Pilot Marinho testified that he dealt only with Crowe, Kapp or
Reed.  That's ECF 2052 at 38.  Pilot Braga testified he dealt
only with Crowe, Reed or Kapp.  ECF 2042 at 37 and 39
through 40.  Pilot Bustos only dealt with Crowe and Reed.
ECF 2025 at 46 and 47 and ECF 2029 at 204 and 05 and 330.

There was evidence that pilots had little or no
interaction with Mr. Walker, ECF 2052 at 124, where Marinho
never met -- he said he never met or spoke to John.  The
evidence showed that Crowe and Reed also signed and managed
the tuna boat leases, which are in many ways are at the heart
of this.  Walker didn't even control wire transfers.  They
were handled by someone else which is why there is references
to him asking someone and telling someone to send an e-mail.

They were ordered by Crowe, also based on the evidence at
trial.

So if you disregard the nominal position, as you
must under Harris, there is no evidence that John Walker
himself organizing or leading anyone, there is no e-mails,
showing him giving directions for illegal actions, there is no
phone calls of him directing illegal actions or organizing any
type of criminal activity, there is no directives from him
with respect to those things.  There is no one saying I have
to check with John first before I can give you an answer to
that or I have to clear that with John.  The government has to
prove leadership with respect to a particular crime, not just
the overall scheme.  There is no evidence that he led or
organized with respect to the parts fraud, employing the
pilots, employing mechanics, the wire fraud or the money
laundering.  Crowe, Kapp and Reed were the leaders and
organizers for these criminal activity and that's bolstered by
this Crowe declaration.

Reed testimony -- Reed was kind of all over the
place but he testified that Walker owned the companies, and
that accidents were reported to Walker or Crowe.  The first
was -- he testified to, that Walker owned the companies
March 16th, pages 253 to 254, that testimony.  And that
accidents were reported to Walker or Crowe, May 9th testimony
at 100.  But he also testified that he didn't know if anyone

1    kept Walker advised and that Crowe was making all the

2    decisions.  That's from May 9th testimony, 254 to 55.

3              He testified that Walker was not involved in the

4    day-to-day running of the company, March 16thtestimony at 192.

5    He said that Walker retired in 2011 and Crowe took over.

6    That's May 9th testimony at page 37.  Walker moved back to

7    Missouri, this is also -- this is also Reed testifying, Walker

8    moved back to Missouri and turned over day-to-day operations

9    to Crowe after which Crowe managed all aspects of operation.

10   That's May 9th, 38, 39.  Reed said he did not know what

11   Walker's activities were between 2000 and 210, he had no

12   knowledge of how Walker treated pilots and mechanics and Reed

13   only ever saw him with shop employees in Guam.  That's

14   May 9th, at 208.  Reed was not aware of Walker being in

15   control of Hansen after Walker left in 2011.  That's May 9th,

16   250 and 251.  He did not see Walker at Hansen after 2011

17   except for a few times when he visited, that's May 9 th, 252

18   to 53.

19             Cislo testimony; Cislo said that he was told that

20   Walker had operational control of Hansen.  That's at page 73

21   of his testimony but that he had no communications with Hansen

22   about the bribe aircraft.  His communication were with Crowe

23   and Kapp, he admitted he didn't know who was running Hansen

24   but that he was talking to Crowe and Kapp.  That's Cislo

25   testimony at 416 and 417.  This is as good a time as any to

talk about what Mr. Walker was doing after 2011 when the

government claims that he was masterminding a huge criminal

organization in the southwest corner of the Pacific Ocean.

And where that can be found, Your Honor, in the support

letters that were submitted to the Court from Mr. Walker's

friend and neighbors in Neosho, Missouri located 7,346 miles

away from Guam.

MS. MILLER:  I'm going to object, Your Honor, to

any reference to those letters.  There's been zero foundation

laid for the introduction of any of those letters, doesn't

even come close to any indicia of reliability.  Those letters

are not authenticated.  Those letters -- we have no idea if

the people who purportedly drafted those letters actually did

draft those letters, they're unmitigated hearsay.  And

speaking of late filings that Mr. Welk just submitted days

after the Court entered the deadline, so there is no indicia

of reliability whatsoever.  There are people in the courtroom

today, some of who may or may not have written those letters,

if they want to get on the witness stand and corroborate

anything that they said, fine.  But otherwise, Your Honor, the

government would object and move to strike any of those

letters as unmitigated, unreliable hearsay with no foundation

whatsoever.

THE COURT:  Okay.  I'm just pulling up those

letters.  I do recall -- you're saying they're not relevant?

```
 1              MS. MILLER:  Absolutely they're not relevant.
 2    How could they be relevant if they're not authentic?  How can
 3    they be authenticated if all -- you have no way of knowing who
 4    wrote those letters.  None.
 5              MR. WELK:  Earlier today, Your Honor, I believe
 6    at the beginning of this hearing, Ms. Miller stood up here and
 7    made a little presentation about how the rules of evidence
 8    don't apply in a sentencing hearing and that how even major
 9    elements of the U.S. Constitution don't apply in the
10    sentencing hearing.
11              THE COURT:  I mean it does say that in case law
12    but except -- well, to the extent that it's relevant, that's
13    true.  But anyway --
14              MS. MILLER:  Indicia of reliability is the
15    standard.
16              THE COURT:  That's right.
17              MS. MILLER:  Indicia of reliability.
18              THE COURT:  I said that earlier today.  Okay.  Go
19    ahead.
20              MR. WELK:  I don't think there is -- should I
21    just go forward?
22              THE COURT:  Yeah, you know, so these letters, I
23    mean I normally allow all letters in, and I don't really get
24    any objections as to indicia of reliability objections.  Go
25    ahead.  The Court will -- the Court will overrule that
```

```
 1    objection and allow these letters to be brought -- to be

 2    submitted, go ahead.

 3                MS. MILLER:  To the extent that the Court is

 4    going to rely on any content of those letters, Your Honor, the

 5    government would like an opportunity to counter that, because

 6    for example, some of those letters are by employees of Hansen

 7    Helicopters, who we have investigative reports showing that

 8    they admitted to criminal acts.  One of those letters is by

 9    Mr. Walker's girlfriend.  Who is in the courtroom who can be

10    called to testify and so the government would ask that that be

11    permitted.  So if the Court is going to actually consider

12    them, it's one thing to say sure, you filed them, no problem.

13    It's another thing to say that any of the content of those

14    letters is going to weigh in your decision, Your Honor, in

15    determining whether or not Mr. Walker is an organizer/leader

16    because that raises a different spectre of responsibility for

17    the government to challenge that.

18                THE COURT:  All right.

19                MR. WELK:  I'm prepared to proceed, Your Honor.

20    I think that -- that -- look, there is no question that -- one

21    of the major features of the last two days, the only two days

22    of this hearing has been the government's insistence that

23    Mr. Walker never lived in Missouri, that he didn't move to

24    Missouri that, he stayed in Guam arguably.  I'm not sure what

25    their argument is.  But the question is, they said well, you
```

 1   know, they've raised this question, they've opened the door to

 2   the question what was Mr. Walker doing during this period

 3   after 2011 when it's -- when it is alleged that he moved back

 4   to Missouri.

 5              THE COURT:  Okay.  Let me just say.  The Court

 6   will allow the letters to come in.  If the prosecution wishes

 7   to call any witnesses to rebut any of these letters, they may

 8   do so.

 9              MS. MILLER:  Thank you, Your Honor.

10              THE COURT:  Any of the statements, it's up to the

11   prosecution.

12              MS. MILLER:  Thank you, Your Honor.

13              THE COURT:  All right.  But I will allow these

14   in.  Go ahead.  You may proceed.

15              MR. WELK:  Okay, before we -- before we go on,

16   are they going to be able to call witnesses of people

17   who's -- who are referred to in my presentation who wrote

18   letters?  Or do they just get to call whoever may be in the

19   room that wrote a letter?

20              THE COURT:  I'm not sure who they -- I don't know

21   who she's going to call.

22              MS. MILLER:  Well, for example, like I said, your

23   Honor, Rose Hansen is here, she -- she wrote one of these

24   letters.  So I would absolutely want to call her.  And there

25   may be other individuals who wrote the letters who are in the

```
 1   courtroom who I would absolutely wish to call, yes.

 2                    THE COURT:  Okay.

 3                    MR. WELK:  Okay.  I guess what I'm trying

 4   to -- what I'm trying to --

 5                    THE COURT:  Go ahead.

 6                    MR. WELK:  This is the nightmare, right.  This is

 7   the nightmare.  That somebody who makes the mistake of writing

 8   a letter of support for a defendant that the government is

 9   trying to send to prison for life, is going to be -- is going

10   to be called up and punished for having supported him by being

11   grilled and interrogated by the prosecutor.  Now, my question

12   is, is she going to get to call -- is she going to take roll

13   in the back of the room and get to call whoever, even if I

14   don't refer to their letter, just because we submitted a

15   letter?

16                    THE COURT:  I just got the impression

17   that -- this is what I understand just on the brief moments

18   that we had, that to the extent that she believes that the

19   representation regarding Mr. Walker's continued stay in

20   Missouri is noted within this -- these particular letters of

21   support, she wanted to at least test that -- test that

22   voracity of that.  That's what I understand she's indicating

23   that she wishes to do.

24                    MS. MILLER:  That is correct, Your Honor.

25                    MR. WELK:  Okay.
```

```
 1                    THE COURT:  I mean she has the right to call 'em.

 2                    MR. WELK:  She does?

 3                    THE COURT:  Well, I mean if she wants to call

 4       them, she can subpoena them.

 5                    MR. WELK:  She --

 6                    MS. MILLER:  He's proffering the testimony of

 7       these people through these letters.

 8                    THE COURT:  She can subpoena them.  Go ahead, go

 9       ahead, proceed.

10                    MR. WELK:  (Laughing.)  You'll learn in the

11       course of these letters, Your Honor --

12                    THE COURT:  I've read them.

13                    MR. WELK:  Huh?

14                    THE COURT:  I read them.  Go ahead.

15                    MR. WELK:  That John's a member of a church in

16       Neosho where the pastor, his wife and dozens of parishioners

17       signed a petition asking that he be allowed to continue to be

18       an asset to the community to which he donated five acres of

19       land on which to build a new church and school.  Those are

20       Exhibits 316 and 34.  You'll read about how John brings his

21       ailing mother to watch him and his farming crew clear ground

22       or bale hay.  Mr. Walker isn't a gentleman farmer, Your Honor.

23       He worked his farm caring for the cattle and baling hay.

24       You'll read how he made sure he talked to his mother every

25       day, no matter where he was or what he was doing.  It's
```

```
1    Exhibit's 4 and 16.  You will read about how he took care of
2    people who are not part of his family but worked for him or
3    were neighbors of him or just lived in his community with no
4    expectation of compensation.  Exhibit 4, John surprised one of
5    his employees by --
6                    THE COURT:  Do you mean page 4?
7                    MR. WELK:  Exhibit, the fourth letter.
8                    THE COURT:  Okay.  Like -- I'm sorry, but this is
9    ECF 2296, right?
10                   MR. WELK:  I think that's right, yeah.  And there
11   should be --
12                   THE COURT:  When you say Exhibit 4, do you mean
13   2296, page 4?
14                   MR. WELK:  No.  There were attachments.  It's
15   the -- they were -- they should have --
16                   THE COURT:  I've got the attachments.
17                   MR. WELK:  Attached as exhibits.
18                   THE COURT:  Let me make sure I got all of these.
19   But, go ahead.  Go ahead.  You may proceed.
20                   MR. WELK:  He surprised one of his employees by
21   flying them down to South Carolina so he could see his son
22   graduate.  And he -- in Exhibit 6, you will see that the sixth
23   letter, he helped raise his nephew after the death of his
24   brother When his nephew was ten years old.  He invited him to
25   come work for the farm in 2013, he turned his life around, the
```

```
 1    nephew.  John made it possible for Chance to get his degree.
 2    It's Exhibit 6.  There was also random acts of kindness
 3    expressed in these letters.
 4                THE COURT:  I'm sorry, so you don't really
 5    mean -- you mean 2296, page 6, right?  I just want to make
 6    sure I've got the right thing because I see Chance's letter
 7    here.  I want to make sure I'm not missing anything.  Right?
 8    Am I right?
 9                MR. WELK:  Yeah.
10                THE COURT:  Okay, yeah.
11                MR. WELK:  Yeah, that's how it's --
12                THE COURT:  When you say Exhibit 6, I'm like
13    thinking okay, no, you must be --
14                MR. WELK:  Yeah, that's what -- okay, yeah, so
15    dash 6 would be the -- I'll use that instead of -- instead of
16    exhibit.
17                THE COURT:  Okay.  I just want to make sure I'm
18    not missing the exhibits.  Go ahead.
19                MR. WELK:  Random acts of kindness that are
20    expressed in these letters in -7 --
21                MS. MILLER:  Your Honor, Your Honor.
22                MR. WELK:  -- teaching a friend's son.
23                MS. MILLER:  With all due to respect to Mr. Welk,
24    this has nothing to do with organizer or leader of the
25    criminal organization.  He could have a hundred letters
```

1    talking about how nice John is to his family and the people

2    that he pays, but we're talking specifically about a specific

3    enhancement and you know, Your Honor, because you actually

4    cited to the sentencing guideline, you could be an organizer

5    or leader from anywhere.  You don't have to live in Guam to be

6    an organizer or leader of an --

7              THE COURT:  Okay, I'm sorry, you're just saying

8    it's not relevant to the aggravating --

9              MS. MILLER:  It's not relevant.  Talking about

10   this is not relevant to this issue.

11             THE COURT:  Mr. Welk?

12             MR. WELK:  Said the prosecutor who has made an

13   issue for the last two days of testimony about where

14   Mr. Walker was and what he was doing after 2011.  The

15   government has made a point repeatedly, not just today, but

16   throughout this case that Mr. Walker has been running this

17   organization, running PSC, running all the companies for this

18   entire --

19             THE COURT:  So to the extent that you're saying

20   that all of these letters show where he was during this period

21   of time and -- okay, so the Court will allow that for that

22   purpose.

23             MS. MILLER:  For that limited purpose, right?

24             THE COURT:  Yeah, I agree.  Go ahead.

25             MS. MILLER:  And by the way, Your Honor, just for

```
 1   the record --

 2                 THE COURT:  That he's working from Missouri and

 3   he's doing all of these wonderful things with his pastor, his

 4   church, his nephew and so forth.  Okay.  Go ahead.

 5                 MS. MILLER:  And for the record, the only reason

 6   why the government spent any time showing the Court all of

 7   Walker's representations about his presence in Guam is because

 8   of the fact that they raised this issue, that he retired and

 9   moved to Missouri and had nothing to do with the companies any

10   more.

11                 THE COURT:  Okay.  Got it.  Go ahead.

12                 MR. WELK:  She said with utter incredulity.

13                 THE COURT:  Okay.  Go ahead.  Proceed on.

14   Proceed.

15                 MR. WELK:  Thank you, Your Honor.

16                 MS. MILLER:  Move to strike, Your Honor.

17                 THE COURT:  Stricken, yeah.  Utter incredulity,

18   you don't have to comment on the prosecutor's statement.

19   Let's go.

20                 MR. WELK:  Understood.

21                 Teaching a friend's teenage son to drive a farm

22   vehicle, that's -7, helping fellow farmers get their crops in

23   either by working their fields or lending equipment, that's

24   -13, -26, -27, -31, -32.  Stories of John cleaning

25   animal -- other people's animal pens, feeding other people's
```

```
 1    cattle, helping out in poultry operations when, I kid you not,
 2    an elderly neighbor was kicked by a cow.  It doesn't get any
 3    more country than that.  But that man wrote a letter and in it
 4    is sincere, it helped him keep his farm going.  Covering
 5    medical bills -8, -32, -35.  He paid for hotel rooms for
 6    people with no place to stay -9.  He taught children
 7    interested --
 8                 MS. MILLER:  Objection, Your Honor.  Paying for a
 9    hotel room?  What does that have to do with organizer or
10    leader?  We're so far afield here of this particular issue.
11                 THE COURT:  I think he's just saying he's quite
12    busy in Missouri doing a lot of --
13                 MS. MILLER:  Oh, okay.  So he was in Missouri
14    when he was paying for this stuff for other people?  Because
15    that's not in the letter, but I wonder if Counsels now adding
16    to the letter.
17                 THE COURT:  Overruled.
18                 MS. MILLER:  I just want to make the record
19    clear.
20                 THE COURT:  Overruled.  Go ahead.  Continue on.
21                 MR. WELK:  Thank you, Your Honor.  He taught
22    children interested in aviation about flying and what they
23    needed to know and do to be able to accomplish that, -10.  He
24    helped out with local school lunch programs, -12, -34.  He
25    took time to talk to kids and teach them, -17.  He gave a
```

competitor in an off-road race his only spare tire so the
competitor could continue, that's - 19.  Donating the use of
equipment after a devastating tornado in Missouri, -21, -23,
-39.

Giving a calf to a young boy who wanted to show a
calf in the county fair, -24.  Giving people a place to live
when they were having trouble, -29.  Working with kids of 4-H
clubs and Future Farmers of America Clubs, -33 and -35.

There are letters from the professional care
givers who helped John care for his mother, who saw him sit
for hours by her bed.  This went on for six years when she was
ailing, six years when he helped care for his mother in
Missouri.  Saw him offer the use of that wheelchair van for
youth by members of the community who needed it for
transportation, -10, -9, -40.

There is a quote from -11, that van made it
possible for an elderly neighbor to pass at home instead of in
a medical facility, an act that brought peace to the family.
There are letters from people who have known John Walker since
he was a child, -15.  But most of them are from people who got
to know him and interacted with him between 2012, when he
moved back to Missouri from Guam and 2022, when these letters
were written.

But those letters are important for two reasons:
First they go directly to the first of the seven factors to be

```
 1    considered under 3553.  The history and characteristics of the

 2    defendant --

 3                    MS. MILLER:  Your Honor --

 4                    THE COURT:  Why don't -- we're not on -- hold on,

 5    we're just on the aggravating role issue.

 6                    MR. WELK:  I'll come back.  Second reason is

 7    probably more important anyway, because unless the dozens of

 8    people who wrote these letters are being dishonest, they tell

 9    you what John Walker was doing when he left Guam in 2011 and

10    returned to Missouri.  They tell you why he came home, how

11    much he helped people, he was not operating a company more

12    than seven thousand miles away, he was not negotiating or

13    managing leases, and pilots and mechanics working half the

14    world away.  He was clearing brush, baling hay, helping his

15    neighbors take care of his chickens, he was caring for his

16    family and neighbors, grieving and healing from personal

17    tragedies.  That's why you don't see him giving orders or

18    being involved in day-to-day operations.  Crowe and Kapp were

19    running that business and the government's insistence that

20    they weren't is a false narrative.

21                    THE COURT:  Okay, thank you.

22                    MR. WELK:  Thank you, Your Honor.

23                    THE COURT:  All right.  Let's go to the next.

24                    MS. MILLER:  Your Honor, I do have rebuttal to

25    what was just presented.
```

```
 1                    THE COURT:  Okay, go ahead, what's your rebuttal
 2      on this?
 3                    MS. MILLER:  Yes, Your Honor.
 4                    THE COURT:  On the aggravating role.
 5                    MS. MILLER:  Absolutely.
 6                    First of all, the case that was cited by Mr. Welk
 7      at 999 F.3d 1233 was a situation where the defendant had a
 8      nominal role in the scheme.  Nominal.  How can you describe
 9      Mr. Walker's role in this scheme as nominal?  Mr. Welk is
10      talking about Mr. Walker moved back to Missouri in 2012.
11      Well, the conspiracy started in 1992, according to the Second
12      Superseding Indictment.  The conspiracy then continued for
13      over 20 years.  And everything that Mr. Walker put in place
14      between the time that he purchased Hansen Helicopters from
15      Vern Hansen until the time that he allegedly moved back to
16      Missouri continued after he moved back to Missouri.  But he
17      put it all in place, Your Honor.  And we know that because of
18      the actual evidence, not because of unsolicited,
19      unsubstantiated letters from people who said, well, he was
20      living in Missouri.  The government never contended that he
21      didn't live in Missouri, Your Honor.  What the government
22      contended was that it didn't matter.
23                    Your Honor, if you look at the sentencing
24      guidelines, a defendant is accountable for the defendant --
25                    THE COURT:  I'm sorry, okay where?
```

 1                    MS. MILLER:  I'm sorry?

 2                    THE COURT:  Where are you looking at?

 3                    MS. MILLER:  3C1.1 application note 9.

 4                    THE COURT:  Okay.  Hold on, hold on, 3C1.1.

 5                    MS. MILLER:  Application note 9.

 6                    THE COURT:  Okay.

 7                    MS. MILLER:  The defendant --

 8                    THE COURT:  I'm sorry, it's the wrong one.  129.

 9      You're looking at 2018?  I'm looking at the --

10                    MR. WELK:  There is no application note 9 for

11      2018.

12                    THE COURT:  Yeah, I don't see that.  I'm looking

13      at 2018.

14                    MS. MILLER:  Could you go to 1B1.3, Your Honor.

15                    THE COURT:  Okay, one -- 2018.

16                    MS. MILLER:  1B1.3.

17                    THE COURT:  1B1.3.

18                    MS. MILLER:  Yes, Your Honor.

19                    THE COURT:  Okay, 13, 1B -- 1B1.3.

20                    MS. MILLER:  Three.

21                    THE COURT:  Oh, three, okay, let me pull this.

22      Okay, and what application note?

23                    MS. MILLER:  Actually, it says under 1B1.3, in

24      applying the sentencing adjustments, the Court shall determine

25      the basis of the following, do you see that section there,

*Criminal Case No. 18-00010, USA v. Walker*

 1    Your Honor.

 2              THE COURT:  1B1.3.  Let me go to the actual

 3    guideline, right?

 4              MS. MILLER:  Yes, Your Honor.

 5              THE COURT:  1B1.3(a)?

 6              MS. MILLER:  1(a).

 7              THE COURT:  Okay.  I got there.  What am

 8    I -- what am I looking at?  1B1.3(a).

 9              MS. MILLER:  Where it says "all acts and

10    omissions committed, aided, abetted," do you see that, Your

11    Honor?

12              THE COURT:  I do.

13              MS. MILLER:  Okay.  "All acts and omissions

14    committed, aided, abetted, counseled, commanded, induced,

15    procured, or willfully caused by the defendant; and B, in the

16    case of a jointly undertaken criminal activity, in

17    parenthesis, a criminal plan, scheme, endeavor or enterprise

18    undertaken by the defendant in concert with others, whether or

19    not charged as a conspiracy," and in this case, we did have a

20    conspiracy charge, "all acts and omissions of others that

21    were, one, within the scope of the jointly undertaken criminal

22    activity; two, in furtherance of that criminal activity; and

23    three, reasonably foreseeable in connection with that criminal

24    activity that occurred during the commission of the offense of

25    conviction in preparation for that offense or in the course of

```
 1    attempting to avoid detection or responsibility for that

 2    offense, justifies the leader, organizer role enhancement."

 3                THE COURT:  This is like -- this is relevant

 4    conduct?

 5                MS. MILLER:  So the relevant conduct, Your Honor,

 6    as we talked about starting in 1992 and through 2023 based on

 7    the evidence that we had, John Walker was in fact directing

 8    and controlling.  Mr. Crowe didn't even start working for

 9    Hansen Helicopters until 2011.  So Walker, and if you read the

10    Exhibit G-1818, which was admitted at trial, which was the

11    statement by Mr. Reed, Mr. Crowe didn't start working for

12    Hansen Helicopters until 2011.  None of the illegal activity

13    took place at Hansen Helicopters until Mr. Walker joined

14    Hansen Helicopters in the 1990's.

15                So from the 1990's through the time that

16    Mr. Crowe joined Hansen Helicopters, Mr. Walker created the

17    Vanuatu companies.  They were all created prior to 2011.

18    Mr. Walker created the leases that were used.  If you look at

19    leases in G-2900, which were the leases for the company.

20                MR. WELK:  I'm sorry, Your Honor, I have to

21    object.  This has nothing to do with role.

22                MS. MILLER:  Of course it does.

23                THE COURT:  I'm sorry, it doesn't have to do with

24    what?

25                MR. WELK:  With role.  The role depends on the
```

```
 1    defendant's role in the underlying offense.  I mean this
 2    is --
 3                  THE COURT:  I know but she's now
 4    including -- trying to include the relevant conduct during
 5    this period --
 6                  MS. MILLER:  Correct.
 7                  THE COURT:  -- that's not necessarily within
 8    the -- within the indictment.
 9                  MS. MILLER:  Correct, so if Mr. Walker --
10                  THE COURT:  Hold on.
11                  MR. WELK:  I'm sorry.  I'm not done yet.  And
12    that's in response to -- is this -- is this in response to the
13    letters?  Or just --
14                  THE COURT:  Are you rebutting the letters?
15                  MS. MILLER:  No, not at all.
16                  MR. WELK:  This is rebuttal, right?
17                  MS. MILLER:  This is rebuttal and this
18    is -- Mr. Welk is trying to say that starting in 2012, when
19    Mr. Walker apparently moved to Missouri, that he came to Guam
20    infrequently, and therefore, he could not be the leader and
21    organizer of this criminal scheme.  What I cited to was --
22                  THE COURT:  But the rebuttal time is really from
23    2011 to 2023.
24                  MS. MILLER:  No, the relevant --
25                  THE COURT:  That's what he --
```

1          MS. MILLER:  And what I'm saying is that Walker

2     was convicted of a conspiracy to defraud the government and a

3     conspiracy to commit wire fraud that started in the 1990's.

4     That's what you're sentencing him on.  You're not sentencing

5     him on his actions between 2012 and 2021.

6          THE COURT:  Yeah, but I think his point was, are

7     you -- are you trying to bring in this evidence for only the

8     purposes of rebutting that timeframe from 2011 to 2023?

9          MS. MILLER:  Yes.

10          THE COURT:  Okay.

11          MS. MILLER:  Yes, absolutely.

12          MR. WELK:  But how can -- how can she rebut that

13     timeframe by talking about what happened in 1990's?

14          MS. MILLER:  Because he put it in action and then

15     he put people in control and the conspiracy and the frauds

16     continued.

17          THE COURT:  Okay, so that was another part of his

18     argument earlier?

19          MS. MILLER:  Correct.  Correct, that was another

20     part of his argument.

21          THE COURT:  Okay, I got it.

22          MR. WELK:  I object as improper rebuttal.

23          MS. MILLER:  So, is he --

24          THE COURT:  Overruled.  Go ahead.

25          MS. MILLER:  Okay.  Great.  So if we go to,

Mr. Leon Guerrero, I asked you to pull up a PowerPoint for me, please.

MR. WELK:  Your Honor, can I ask that any PowerPoint shown be made part of the record?

THE COURT:  Sure.

MS. MILLER:  I don't have any problem with that, Your Honor.  They're all marked as exhibits that were identified for trial.

THE COURT:  So really the PowerPoint is just really exhibits.  That's all.

MS. MILLER:  It is just a PowerPoint of exhibits.

THE COURT:  It's not argument.

MS. MILLER:  Correct.

THE COURT:  Actual exhibits.  All right.

MS. MILLER:  And it supplements what Ms. Pena presented in her evidence about Mr. Walker's personal involvement after 2011, since that seems to be the issue here.

THE COURT:  Okay.  Go ahead.  Well, that's part of the issue.

MS. MILLER:  It is part of the issue, it's not the whole issue obviously because of the length of the conspiracy.

THE COURT:  Well, that's part of his argument that he has.

MS. MILLER:  Correct.

```
1              THE COURT:  Both parts.  Go ahead.  I'm talking
2    about Mr. Welk's arguments.
3              MS. MILLER:  Right.  If you can -- there we go.
4              So, Your Honor, the first thing I want to bring
5    your attention to is Exhibit G-1977.  And Mr. Welk was talking
6    about the Limey Air account and he was talking about the
7    different co-conspirators who are identified in Exhibit 2939
8    on the signature card when the Limey Air account changed until
9    2018.  Exhibit 1977 shows Mr. Walker in 2019 in the Limey Air
10   bank account identifying persons who should have a credit card
11   dealing with the Limey Air bank account.  And when you see in
12   this document in the middle, it says John Darrell Walker,
13   about yourself, this was something that was actually produced
14   to us by the bank pursuant to a grand jury subpoena and this
15   was signed in 2019.  Next slide and this is just a close-up of
16   that information, Your Honor.
17             THE COURT:  Okay.
18             MS. MILLER:  Okay.
19             MR. WELK:  May I inquire if this was admitted at
20   trial?
21             MS. MILLER:  It was not but it doesn't have to
22   have been admitted at trial.  It was marked as a trial exhibit
23   and it's relevant to contradict Mr. Welk's contention that
24   once Mr. Walker moved to Missouri, he didn't have any
25   leadership role in the companies that are responsible for the
```

```
1    fraud.

2                MR. WELK:  Object as irrelevant.

3                THE COURT:  I'm sorry, you object as what?

4                MR. WELK:  Irrelevant, improper rebuttal.

5                THE COURT:  Overruled.  Go ahead.

6                MS. MILLER:  Okay, can you go to the next slide,

7    Mr. Leon Guerrero, please.  Here, Your Honor, we have

8    Exhibit G-3006.  This is an e-mail from Rufus Crowe to Les at

9    Hansen Helicopters based on an e-mail from John Walker, who by

10   the way, Your Honor, all the way through 2021 was still using

11   the e-mail address for the Guam e-mail.  From Walker to Rufus

12   Crowe regarding Hansen Helicopters sale.  "Rufus, I hired a

13   legal firm to help with the company's sale" and then he's

14   identifying who he -- who he hired to help with his sale.

15   They will be calling and e-mailing you unless give them

16   whatever they need.

17                So this is Mr. Walker directing Rufus Crowe to

18   give the potential buyer of Hansen's Helicopters whatever they

19   need.  That sounds like somebody who is a leader and organizer

20   in this criminal scheme.  Could we go to the next slide

21   please, Mr. Leon Guerrero.  Okay, and the next slide.  And now

22   we see, Your Honor, Exhibit --

23                MR. WELK:  Are there sentencing exhibit numbers

24   for any of these?

25                MS. MILLER:  No, they're not.
```

1          MR. WELK:  I see.

2          MS. MILLER:  These are strictly rebuttal to your

3     contention that Mr. Walker has nothing to do with these

4     companies after 2012.

5          MR. WELK:  Your Honor, I object to this avalanche

6     of admission of exhibits that have never been identified

7     before in connection with this hearing.

8          MS. MILLER:  Do we not want to sentence

9     Mr. Walker based on the facts that actually exist in this

10    case?  Is this -- I'm not really sure what the objection is

11    here.  It's relevant.  These are admissions by Mr. Walker.  So

12    the indicia of reliability is clearly met.  These are exhibits

13    that were marked for trial and we've already talked about

14    under 18 U.S.C. 3661, there is no limitation on what this

15    Court could consider in sentencing Mr. Walker.

16         So, Your Honor, I'm just bringing this

17    information which was available to Mr. Welk and to myself to

18    your attention because Mr. Welk stood up here said, Your

19    Honor, as an officer of the court, right, I mean he's talking

20    to you as an officer of the court, Mr. Walker left and had

21    nothing to do with the company.  I have hundreds of exhibits

22    that contradict that representation and all of those exhibits

23    were marked for the trial and all of those exhibits were given

24    to Mr. Welk.  So do we want to fraud upon this Court now in

25    the sentencing?  Or can we get to the heart of what was really

1   happening and show that John Walker continued to be the leader

2   organizer all the way through 2021.

3               THE COURT:  I gather though that what Mr. Welk is

4   saying is that these exhibits were not identified as

5   prosecution exhibits for your presentation at sentencing, but

6   really these exhibits are rebuttals to his argument, that's

7   really what -- rebuttal to his argument.

8               MS. MILLER:  Correct.

9               THE COURT:  Which is not really the evidence that

10  was presented.

11              MS. MILLER:  Correct.

12              THE COURT:  Okay.

13              MS. MILLER:  Correct.

14              THE COURT:  Is that what -- that's your

15  objection?

16              MR. WELK:  It's partially that, Your Honor, but

17  it's also that --

18              THE COURT:  Well, it's mainly that because you're

19  saying you didn't have notice then.

20              MR. WELK:  But what -- what compounds it is that

21  these are not -- these are -- what she's referring to are

22  exhibits that were not admitted at trial.  Maybe -- maybe they

23  were identified as exhibits but they weren't admitted at

24  trial.  So -- I mean that -- that's the objection.

25              MS. MILLER:  Some of these were admitted --

```
 1                    THE COURT:  I'm sorry.

 2                    MS. MILLER:  I'm sorry.

 3                    THE COURT:  Your exhibits -- Okay, so I'm sorry,

 4       your objection is the first one we just discussed and the

 5       second one that they were not admitted?

 6                    MR. WELK:  Yes.

 7                    THE COURT:  Okay.

 8                    MS. MILLER:  And again, Your Honor, some of them

 9       were admitted at trial, some of them weren't admitted at trial

10       for purposes of sentencing, Your Honor could consider either.

11       And so, I want to go through these and to the extent, Your

12       Honor, chooses to accept them, great, reject them, that's fine

13       too.  But what I do not want to see as a fraud upon this court

14       by having an uncontested representation by Counsel that

15       Mr. Walker stepped away and did not exercise authority as the

16       leader of this organization after 2012.

17                    THE COURT:  Okay.  Hold on one second.  Let me

18       just double-check.

19                    MS. MILLER:  Yes, Your Honor.

20                    (Pause.)

21                    THE COURT:  All right.  Court will overrule the

22       objection, go ahead.

23                    MS. MILLER:  Okay.  Could you get a little closer

24       view of Exhibit G-0694 please, Mr. Leon Guerrero.

25                    THE COURT:  Let me just cite to -- for purposes
```

1    of the Court's ruling, "18 U.S. Code 3661, no information

2    shall be placed on the information concerning the background

3    character and conduct of a person convicted of an offense

4    which the Court of the United States may receive and consider

5    for the purpose of imposing appropriate sentence."  Okay, go

6    ahead.

7              MS. MILLER:  Yes, Your Honor.  So in this

8    exhibit, Your Honor, you see an e-mail from Vanguard Aviation

9    to John Walker.  "And Dear John Walker, your payment receipt,

10   the wire for $56,362 is attached.  Thank you for your

11   business.  We appreciate it very much."  This is one example,

12   Your Honor, of numerous invoices that were sent to John Walker

13   personally for the important things, and this is in 2016.  And

14   the important things had to do with the repair and maintenance

15   of the helicopters, and most importantly to Mr. Walker,

16   spending money.

17             So here's from John Walker on April 8th of 2016

18   to Rufus Crowe.  "Payment receipt wire from Vanguard Aviation,

19   "Rufus, we're going to have to think about this a bit, I'm

20   spending, I'm, John Walker, is spending $60,000 a month to fix

21   these air frames."  He's not saying, we're spending.  He's

22   saying, I'm spending.

23             Next slide, Mr. Leon Guerrero.  2015, we see this

24   communication to John, from Rufus Crowe, and he's explaining

25   to John how they're jumping through all of these hoops and

```
 1    they are doing all of these things and they're keeping
 2    Mr. Walker informed of the day-to-day business.
 3                THE COURT:  I'm sorry, what is this exhibit
 4    number?
 5                MS. MILLER:  Yes, this is G-0549.
 6                THE COURT:  Okay, -1, is that right?
 7                MS. MILLER:  Yes, Your Honor, it's one page.
 8                THE COURT:  It's a letter, okay.  Go ahead.
 9                MS. MILLER:  Yes, Your Honor.  So we see Rufus
10    Crowe keeping John Walker informed of the day-to-day business
11    of the operations.  "We've been jumping through our asses and
12    just finished shipping ten machines, plus ten complete
13    inventories to Majuro last Friday.  This week I've been trying
14    to get the pilots trained up to meet with the aircraft on the
15    20th, I didn't have the time or energy to respond to e-mails."
16    You know, he goes on and on and on, but basically that's what
17    we're talking about, he's keeping John Walker informed of all
18    the details of --
19                THE COURT:  Who is this from again?
20                MS. MILLER:  This is from Rufus Crowe to John
21    Walker.  And this consistent with Mr. Crowe's affidavit in
22    2018, when Mr. Crowe says, "we all have to keep Mr. Walker
23    informed of what's going on."  Let's go to the next slide,
24    Mr. Leon Guerrero.
25                THE COURT:  Yes?
```

```
 1                    MR. WELK:  I want to -- I want to object one more
 2      time, Your Honor.
 3                    THE COURT:  Yes, go ahead.
 4                    MR. WELK:  This very nice looking, very
 5      well-produced PowerPoint, it seems highly unlikely to me that
 6      this was put together while I was up there doing my rebuttal
 7      and that means that the government had all these things
 8      stacked up and ready to go and yet didn't identify them as
 9      exhibits.  So I just want to -- and then I'll stop and she can
10      continue to go through however many hundreds of these she
11      wants to do, but that's my point.  There's no -- this
12      is -- this is -- this is a -- this is an ambush with this and
13      they could have identified all this stuff before.
14                    MS. MILLER:  An ambush using exhibits that
15      Counsel himself has had access to for over two years?  I
16      prepared this PowerPoint, Your Honor, during the break.  I
17      know all of these exhibits.  I have identified all the ways in
18      which Mr. Walker from 2012 through 2021 was personally
19      involved in the companies, as matter of fact, to remind, Your
20      Honor, because Mr. Welk wasn't there.  During trial, trial
21      Counsel tried to pull this same stunt, if you remember,
22      Mr. Walker retired and as we started bringing in evidence that
23      Mr. Walker did not retire, trial Counsel said we withdraw the
24      contention that he retired --
25                    MR. WELK:  Objection.
```

```
 1                MS. MILLER:  -- because they didn't want new
 2   evidence brought in.  And we are dealing --
 3                THE COURT:  Okay --
 4                MS. MILLER:  -- with the same thing here.
 5                MR. WELK:  Relevance of the history of what's
 6   happened before --
 7                THE COURT:  Right now, we don't -- let's move on.
 8   All right.
 9                MS. MILLER:  Okay, can you go to the next slide
10   please, Mr. Leon Guerrero.
11                THE COURT:  Court has already ruled the
12   objection, go ahead.
13                MS. MILLER:  Okay, and again --
14                THE COURT:  How many more exhibit do you have?
15                MS. MILLER:  So, Your Honor, these -- there is
16   just a few more that go back to 2012.  I'll go through them
17   quickly for, Your Honor, and then this will be made part of
18   the record, so I don't have to spend a lot of time on each of
19   them.
20                THE COURT:  Okay, how --
21                MS. MILLER:  And then we could -- would you like
22   to break now and continue tomorrow?
23                THE COURT:  No, I just want to figure out.  I got
24   to talk to my staff.
25                MS. MILLER:  Yes, Your Honor, of course.
```

```
 1                    THE COURT:  I thought we -- well anyway, I wanted
 2       to try to get all the arguments done tonight.
 3                    MS. MILLER:  I don't think that's --
 4                    THE COURT:  But I don't think that's going to
 5       happen.
 6                    MS. MILLER:  I don't think so.
 7                    THE COURT:  We're only on -- we're only on the
 8       first one.
 9                    MS. MILLER:  Yes.
10                    THE COURT:  And there's like a few more.
11                    MS. MILLER:  Many, yes.
12                    So I can go through this, there are how many more
13       slides, Mr. Leon Guerrero?
14                    MR. LEON GUERRERO:  Three more.
15                    MS. MILLER:  Three more slides after this.
16                    THE COURT:  If there is three more slides, let's
17       go.
18                    MS. MILLER:  Then we'll stop after this.  So
19       2015, Your Honor, here we see another filing by Mr. Walker
20       with the Federal Aviation Administration.
21                    THE COURT:  Exhibit number is?
22                    MS. MILLER:  And that is Exhibit No. G-3028,
23       Mr. Leon Guerrero.  Can we get a closer look at that please,
24       sir.
25                    So, Your Honor, this is a another one in 2015.
```

```
 1    As you heard the testimony of Ms. Pena, every other year, or I
 2    think it was Mr. DeVogel, every other year someone who has an
 3    inspection authorization as an mechanic with the FAA, which is
 4    the highest level of mechanic certification you can have, has
 5    to give this information to the FAA and has to tell the FAA,
 6    where you've been working for last two years, what have you
 7    been doing for the last two years and they certified that the
 8    information they're providing to the FAA is true and correct.
 9    Mr. Walker, from 1997 through 2021, said the same thing on
10    every single one of these applications.  He identified as the
11    place where he could be found during the work week, the Hansen
12    Helicopters facility in Guam, and he identified the
13    description of activity, the work that he was performing on
14    the aircraft that were located in Guam.
15              Mr. Leon Guerrero, could you go to the next
16    slide, please.  This is Exhibit G-0483, Your Honor.  This is a
17    communication from Mr. Kapp to Mr. Walker in December of 2015,
18    again, keeping Mr. Walker informed of information that he
19    obtained about purchasing more helicopters and helicopter
20    parts and providing that information to Mr. Walker to keep him
21    apprised of what's going on with the day-to-day operations of
22    the company, consistent with the affidavit filed by Mr. Crowe.
23              Next slide, Mr. Leon Guerrero.  Okay, that's a
24    closer look at that.
25              And then we have Exhibit G-0708.  It is an e-mail
```

from Mr. Walker to Rufus Crowe and then from Mr. Crowe back to

Mr. Walker.

So, Your Honor, this particular e-mail

communication was immediately after the crash that killed

Mr. Santos.  So while Mr. Walker was I guess doing nice things

in Missouri, one of his pilots was dying in an accident in one

of his helicopters, and Mr. Walker was made aware of the fact

that that accident had occurred, and here's Mr. Rufus Crowe

talking to Mr. Walker about doctoring the NTSB report

regarding that particular accident.

As a matter of fact, Your Honor, if you look at

Exhibit G-1242, which was entered into evidence during trial,

from 2013 through 2022, during trial, there were multiple

accidents, incidents and deaths that occurred that Mr. Walker

was made aware of while he was playing gentleman farmer in

Missouri.

MR. WELK:  Objection, Your Honor, objection that

is --

MS. MILLER:  On what basis?

MR. WELK:  Over with her mocking gentleman

farmer.

MS. MILLER:  He said he was a gentleman farmer.

MR. WELK:  I said he was not a gentleman farmer

and why.  That -- that is an improper comment, improper

commentary, that -- the mocking way she said gentleman farmer.

1   That's inappropriate.

2           MS. MILLER:  I wasn't mocking him.  I thought

3   Mr. Welk said that he was a gentlemen farmer.  If he didn't

4   say he was a gentleman farmer, then I withdraw it.

5           MR. WELK:  He's not a gentleman farmer because he

6   is a working farmer.  That's what I said.

7           MS. MILLER:  So while he was --

8           THE COURT:  I'm sorry, I don't know what the

9   difference between a gentleman farmer --

10          MR. WELK:  A gentleman --

11          THE COURT:  I know -- it sounds like -- to be

12  honest with you, it sounds, based on all of the letters, that

13  Mr. Walker is a gentleman, he's a farmer.

14          MR. WELK:  Right, but a gentleman --

15          THE COURT:  And he works, I mean I got that but I

16  don't know if there's like a mocking insinuation.

17          MR. WELK:  A gentleman farmer to a real farmer is

18  an insult because it is someone who owns a farm that doesn't

19  do anything to work it.

20          THE COURT:  Okay, so I guess thank you for

21  informing us.

22          MS. MILLER:  Yes, thank you.

23          THE COURT:  So she probably didn't know that

24  either?

25          MS. MILLER:  I didn't.  I'm not a farmer, Your

1    Honor.

2              THE COURT:  Okay.  All right.  So we'll -- okay,

3    well, anyway I took it as he's a gentleman, he's a farmer and

4    he works.  I got it.

5              MS. MILLER:  So if we look at this, Your Honor,

6    in 2015, we see Mr. Walker communicating with Mr. Crowe about

7    the death of Mr. Santos about this fatal accident and the NTSB

8    report.  Mr. Walker is receiving a copy of the information

9    that is Mr. Crowe is going to provide to the NTSB about this

10   accident.  That's how intimately involved he is.  And

11   Mr. Walker has to approve what is going to be told to the NTSB

12   about this accident.

13             Next slide, Mr. Leon Guerrero.

14             THE COURT:  I'm sorry, where does it say that

15   Mr. Walker has to --

16             MS. MILLER:  So if you look at it, Your Honor,

17   from the bottom up.

18             THE COURT:  Okay.

19             MS. MILLER:  We're seeing "good news, the NTSB

20   pretty much just copied and pasted my report.  I know I

21   shouldn't have been sweating it, but I do.  Everything else A

22   okay, Mike Lau is coming back for a year, want me to ask him

23   if he wants to make some extra money."  That's Rufus Crowe to

24   John Walker.  And then John Walker, "Rufus, it just came

25   through as a blank file, no problem, though I'm sure it reads

```
1    fine.  Thanks, John Walker."  Then Rufus Crowe to John Walker,

2    "Hey John, huh, that's odd.  Must be an Apple thing, here's

3    the link" and that's the link to the NTSB report.

4                THE COURT:  Okay.

5                MS. MILLER:  Next slide, Mr. Leon Guerrero.  And

6    that's jut a closer look at that.  And now, G-0842, this is in

7    2014, we're going backwards in time.  From Rufus Crowe to John

8    Walker, FAA bill of sale, "Hey John, I was getting ready to

9    send off the registration paperwork for N1156X, Mark Small

10   signed several blank bills of sale from Plymouth Copters,

11   Inc., if he has any other helicopters you'd like to own, you'd

12   like to own," this is Rufus Crowe saying to John Walker if

13   there is any other helicopters you would like to own, "send me

14   the numbers and serial numbers and I can make it happen.  I

15   was getting ready to fill out one of the bills of sale and

16   checked the FAA website, and unless he submitted paperwork

17   that the FAA hasn't processed yet, the helicopter is still

18   owned by J & P Apparel.  We're going to need a bill of sale

19   from J & P Apparel to Plymouth Copters, Inc. or to Bravo Air,

20   Inc.," Your Honor, Bravo Air, one of the alter ego companies,

21   Vanuatu, "I have attached the bill of sale.  Just need to add

22   the same of the officers signing it, their title and date,

23   date it in both places, oh, yeah, you've probably done this

24   before, haven't you?"  This is Crowe to Walker.

25                And what we see, Your Honor, on the bill of sale
```

summary chart, is these bills of sale being filed.  And if you

recall, Your Honor, during trial, we had the testimony of

Mr. Marson who testified that when John Walker signed the bill

of sale, indicating that Mr. Marson had sold him a helicopter

that was used in the fraud, that was a forgery.  And we see

here in this e-mail this was a common thing to happen but the

important part here is --

             MR. WELK:  Objection.  That mischaracterizes --

that mischaracterizes this document.  This doesn't say

anything about committing a forgery.

             MS. MILLER:  Of course it does.

             THE COURT:  I'm sorry?  It what?  What was your

objection, Mr. -- I'm sorry, I couldn't hear it.

             MR. WELK:  It mischaracterizes the document, Your

Honor.  She's --

             MS. MILLER:  You could read the e-mail yourself.

             THE COURT:  Let him finish.

             MR. WELK:  These e-mail speak for themselves

because they're in writing, that was one of the earlier

objections that the government made.  And -- and a few seems

to be a lot more than a few from this end.  I mean -- I'm

wondering when this is going to end, all these -- all these --

             MS. MILLER:  Again, Your Honor --

             THE COURT:  Hold on.

             MR. WELK:  -- disclosed exhibits.

```
 1              THE COURT:  Let him finish.  Okay, so the
 2   objection is that this document doesn't indicate that there
 3   was a forgery.  That's his objection.  What -- or does it?
 4              MS. MILLER:  Of course it does because what he's
 5   saying is we have several signed blank bills of sale, the FAA
 6   hasn't processed any information other than what we have, so
 7   I'm attaching a bill of sale.  Just need to add the same of
 8   the officer, which should be name of the officer signing it,
 9   their title and date it in both places.  Oh yeah, you've
10   probably done this before, haven't you?"
11              And what I'm reminding the Court of is the
12   testimony that you heard during trial of Mr. Marson who gave
13   us yet another example of Mr. Walker forging a bill of sale
14   indicating that Mr. Walker bought Mr. Marson's helicopter from
15   him when in fact he did not.
16              Next slide, Mr. Leon Guerrero --
17              THE COURT:  All right.  So the objection will be
18   overruled.  Go ahead.
19              MS. MILLER:  And that's just a close-up.  Next
20   slide.  And that is in 2014, the same year, Your Honor.  A
21   letter to Mr. Walker from Randy Rogers, Trafficopters, Inc.,
22   "Dear John, it is my understanding of our agreement as
23   follows:  You, John Walker, are purchasing all of
24   Trafficopters, all of their assets, helicopters, parts as well
25   as other things."  And so this shows, Your Honor, that when
```

Randy Rogers wanted to sell the business that he was
operating, fixing aircraft for John Walker and his companies,
he addressed this to Mr. Walker, saying this is a writing
based on my understanding of the oral agreement I have with
you.  Not Rufus Crowe, not Mr. Kapp, Mr. Walker.

Next slide.  Here again, Your Honor, in 2014,
John Walker to Joe Snaer, an employee of Hansen Helicopters,
"Joe, I was going to give you a raise when I was there last,
it just kind of slipped my mind.  Go ahead and make it $25."
And then Joe Snaer to John Walker, "Thank you very much."
There isn't one piece of exhibit, Your Honor, one piece of
evidence in this case that shows that Rufus Crowe or Turner
Kapp had the authority to give anyone a raise, had the
authority to purchase any helicopters, had the authority to
pay for the renovation of any helicopters.  When businesses
were purchased, it was John Walker who purchased them.  When
helicopters that were used in the scheme were purchased, it
was John Walker who purchased them.  And when those
helicopters were fraudulently leased, it was John Walker who
registered those fraudulently-leased helicopters with the FAA
from the beginning all the way through 2021, and you saw the
summary chart that was produced by Ms. Pena.  So I'm going to
stop here today with this presentation, Your Honor, but I am
reserving some time to address several other items that
Mr. Welk addressed in his arguments.

1          MR. WELK:  Wait.

2          THE COURT:  Oh, I'm sorry?

3          MR. WELK:  So the rebuttal is going to continue

4    tomorrow?  Is that -- is that right?

5          MS. MILLER:  I can keep going now if you'd like

6    to, Your Honor, but it's already 6:11 and I'm assuming that

7    Veronica and others here would like to break.  I want to be

8    considerate of their time.

9          THE COURT:  You still have further arguments on

10   this?

11         MS. MILLER:  I do, Your Honor.  Because Mr. Welk

12   made representations again that were not correct and I want to

13   make sure that the record is clear on that.  So we could keep

14   going now or --

15         THE COURT:  How much longer do you have on

16   your --

17         MS. MILLER:  I would say, Your Honor, no more

18   than about 15 minutes.

19         THE COURT:  Okay.  And we still have to go

20   through all the other enhancements, Counsels.

21         MR. WELK:  Your Honor, I -- honestly, I'd prefer

22   for, can we just finish this tonight?

23         MS. MILLER:  Sure, we can finish this tonight

24   if --

25         MR. WELK:  If it's only going to go for fifteen

```
 1   more minutes?  Because I'm -- you know this -- we're never
 2   going to get through this stuff if --
 3                THE COURT:  Well, this is only one.
 4                MR. WELK:  That's what I mean.
 5                THE COURT:  This is only one enhancement.
 6                MR. WELK:  I think she's -- I think she's already
 7   spent more than twice as much time on her rebuttal as I did on
 8   my response to the government's argument.  This is absurd.
 9                MS. MILLER:  I don't think it's absurd at all,
10   Your Honor.
11                THE COURT:  Counsels, look, look, look, let's
12   just finish this -- because there's a lot of enhancements that
13   the prosecution is requesting and --
14                MR. WELK:  Understood.
15                THE COURT:  So we have to plow through these.
16   You guys have already put on all the evidence and we just
17   really need to just get right to it.  I mean I've got -- Okay,
18   let's just figure this out because I do have to -- I want to
19   take into consideration my staff, too.
20                MS. MILLER:  Of course.
21                THE COURT:  They've been here since 8 o'clock
22   this morning.  We've got the administration of justice
23   obstruction still have to go through, the loss application,
24   the victim enhancement, the sophisticated means enhancement,
25   the plus two enhancements under 2C1.1(b)(1) plus two
```

```
1    enhancement.  Okay.  Oh, if there was involving more than one
2    bribe or extortion.  And yeah, the acceptance of
3    responsibility, yeah, those are the -- those are the ones we
4    have to go through.
5                    (Pause.)
6                    We still have -- we still have to sentence Hansen
7    Helicopters tomorrow.
8                    MS. MILLER:  I think, Your Honor, that Mr. Han
9    and Mr. Leon Guerrero have an agreement regarding that, so I
10   don't think we're going to hear any argument on that, is
11   that --
12                   MR. HAN:  Very short.
13                   MS. MILLER:  Okay.  Yeah, I think that's going to
14   be really, really short, as well as the forfeiture is going to
15   be really short.
16                   THE COURT:  All right.  Hold on one second.  Let
17   me talk -- let me talk to my staff.
18                   MS. MILLER:  Yes, Your Honor.
19                   THE COURT:  Let me talk to Veronica and Anna.
20                   (Discussion with the Court.)
21                   THE COURT:  Okay, I just spoke to my staff.  I
22   think we're going to go ahead and recess for the evening,
23   Counsels.  I -- you know, I don't mind plowing through it but
24   I want to take into consideration my -- my court reporter
25   who's here also and, you know, everybody, they want to do it
```

```
 1    but it's tough to be here as a court reporter as well, so I
 2    want to be careful about that.
 3               All right.  I think we, you know, just -- if we
 4    just -- I don't think it should be that difficult really to
 5    try to finish all of the objections by tomorrow morning.  We
 6    start at 8:15, if we get can get through all the objections,
 7    and, yeah, and then plus we also have to add the
 8    warrant -- downward departure from the guidelines, or
 9    departure from the guidelines and application of statutory
10    maximum and the 3553(a), those are also needed to be argued.
11    So I think we can -- let's try to finish all that by 12 noon
12    tomorrow.
13               MS. MILLER:  Yes, Your Honor.
14               THE COURT:  Okay?
15               MS. MILLER:  Yes.
16               THE COURT:  Just keep it --
17               MR. WELK:  Yes, I think we should try.
18               THE COURT:  Well, I want to -- I want to
19    definitely finish, I'm sure you do too.  We've -- the Court
20    has dedicated these three days, including tomorrow, so let's
21    do that.  I'll see you tomorrow morning, Counsels.
22               MS. MILLER:  Yes, Your Honor.  Thank you.
23               THE COURT:  8:15.  See you tomorrow morning at
24    8:15.
25               MS. MILLER:  Yes, Your Honor.  Thank you.
```

1          THE COURT:  Thank you very much.

2          Are you guys going to agree to the sentencing,

3   I'm sorry, Mr. Leon Guerrero?

4          MR. LEON GUERRERO:  No, I think according to

5   Attorney Han, arguments are going to be brief.

6          MR. HAN:  Very brief, Your Honor.

7          THE COURT:  Okay.  All right.  All right.  Very

8   well.  See you tomorrow.

9          (Proceedings concluded at 6:16 p.m.)

10   ----------------------------------------------

11          CERTIFICATE OF OFFICIAL REPORTER

12

13   CITY OF HAGATNA            )
                               )  ss.
14   TERRITORY OF GUAM          )

15

16          I, Veronica F. Flores, Official Court Reporter for

17   the District Court of Guam, do hereby certify the foregoing

18   pages, 1 to 338, to be a true and correct transcript of the

19   proceedings held in the above-entitled matter, to the best of

20   my ability.

21          Dated this 29th day of July 2025.

22

23                         /s/Veronica F. Flores
                          Veronica F. Flores
24

25

*Criminal Case No. 18-00010, USA v. Walker*